# TAB 1

| Certified by the American<br>Board of Psychiatry and Neurology | **KENNETH M. SELIG, M.D., J.D.**<br>Adult and Forensic Psychiatry<br>257 New London Turnpike<br>Glastonbury, CT 06033 | Member of the Connecticut<br>Bar Association |
|---|---|---|

Telephone: (860) 659-8998
Fax: (860) 659-4723

August 9, 2002



Attorney John J. Radshaw, III
Howd and Ludorf, Attorneys at Law
65 Wethersfield Ave.
Hartford, CT 06114-1190

    Re:   Cowan v. Breen, et al
           Your File No.: 45-02414

Dear Attorney Radshaw:

At your request, I conducted a record review regarding the above captioned case in which Victoria Cooper was allegedly fatally shot by Police Officer Michael Breen on July 13, 1999 at the age of 41.

The plaintiff retained a psychiatrist, Bruce Rounsaville, M.D., who rendered an opinion in a letter to the plaintiff's attorney, David Rosen, Esq., on February 12, 2002 which indicated that in his professional opinion "Ms. Cooper's cocaine use at the time of her death is unlikely to have had an effect on her life expectancy." You requested that I comment on this opinion and, specifically, as to whether it is scientifically supportable or essentially mere speculation.

I reviewed all of the records listed in and accompanying your letter of April 23, 2002. I also reviewed the deposition transcript of Dr. Rounsaville, which was taken on May 9, 2002, and the exhibits accompanying that deposition. I also had a telephone conversation on July 11, 2002 with Sherwood Lewis, Ph.D., the Director of Toxicology in the office of the Chief Medical Examiner.

Dr. Rounsaville assumes the following facts in arriving at his opinion. He assumes that Ms. Cooper was using cocaine once a week at the most for two to three years. She had lost her job at Amtrak because she tested positive for cocaine and continued to use cocaine despite losing her job. He testified that the fact that she continued to use drugs despite having lost the job because of drug use was the positive factor in his diagnosis that she was a mere abuser of cocaine and not dependent on cocaine, and he apparently made that diagnosis within reasonable medical probability, although he acknowledged that he could not rule out a diagnosis of dependence and that it was possible that she could have been dependent, but that there was insufficient evidence in the record to

Attorney John J. Radshaw, III                              Re:  Cowan v. Breen, et al     2

reach such a diagnosis. Furthermore, he indicated that the autopsy finding of .72 mg/L was consistent with a "moderate" amount of cocaine having been ingested in the 24 hours before death. He testified that whether she was snorting cocaine or smoking crack or using it intravenously does not affect the diagnosis, but the amount that she was using might affect the diagnosis. He did acknowledge that people do under-report their use of drugs. He also assumed that if the various people who have given depositions, including friends and relatives "knew so little about her cocaine use, then it must not have been, or, you know, must not have been, but probably wasn't that pervasive." Mr. Guerrette is the only individual who commented on the frequency that Ms. Cooper was using cocaine and he said once a week and Dr. Rounsaville took this as a fact, though he acknowledged it was possible that Mr. Guerrette under-reported this. However, he felt that Mr. Guerrette's testimony was reliable because Mr. Guerrette had no reason to be inaccurate or distort the truth. He further indicated that the amount found in her blood at autopsy could have come from as little as one-half a bag of cocaine. He acknowledged that it is unusual for an individual to begin using crack in their late thirties. He also indicated that because people report the amount and frequency of their use inaccurately, it is very difficult to do proper scientific studies on the outcome or the natural course of cocaine abuse or dependence. Furthermore, cocaine use is relatively infrequent in the general population and also there is a huge time-gap between use and death.

Dr. Rounsaville testified that in 10% to 20% of non-treatment-seeking cocaine users, use does not taper off, but it does in the rest. Therefore, he concluded that drug use is something that can have terrible consequences and ruin people's lives, but it's only the minority for which this is the case. He also acknowledged that "There are plenty of highly severe users that haven't sought treatment." He testified that Ms. Cooper's weight loss was not a relevant factor to him in making his diagnosis. He also acknowledged that the long-term course and consequences of cocaine use and abuse have been largely unstudied and that statistics documenting the impact on life expectancy are not available. He also indicates that she had no ongoing health problems. He also indicates that it was most likely that her use of cocaine would taper off without affecting her life span.

The literature which Dr. Rounsaville relies for his opinion does not address the issue at hand. One article from the American Journal of Public Health in January 1995 addresses only the natural history of drug use from adolescence to the mid-thirties in a general population sample. Ms. Cooper was in her mid- to late thirties when she began using cocaine and, therefore, this article cannot be relied upon to make predictions about her future use of cocaine had she lived or its effect on

her life span. However, the article does note that it is unusual for people to begin using illicit drugs after the age of 29. It also acknowledges that published research on the natural history of drug use in the general population is scanty. Similarly, the other articles relied upon by Dr. Rounsaville are inadequate either because of small sample populations, inadequate long-term outcome research, or reliability of amount and frequency of use. One article that he relied on from the Archives of General Psychiatry in February 1993 does indicate that fewer people with addictive disorders seek treatment than those with other mental illnesses. This article indicated that fewer than 25% of people with addictive disorders sought treatment. Therefore, Ms. Cooper's lack of seeking treatment is not informative as to the frequency or duration of her use.

There is substantial evidence to indicate that Ms. Cooper's use of cocaine was far greater in both quantity and frequency than Dr. Rounsaville concludes. In a telephone call with Dr. Lewis, he indicated that Ms. Cooper's blood level of .72 mg/L is one of the highest levels he has ever seen. He has been working with the office of the Chief Medical Examiner as the Director of Toxicology for many years. In fact, this level is so high, that he speculates that she may have swallowed some cocaine in order to avoid its being detected on her person. He was, however, unable to correlate the level of cocaine with the amount of use or her mental state as he indicated that it does depend on the route of administration, the time of intake, and, of course, the amount. However, Dr. Lewis clearly contradicts Dr. Rounsaville's conclusion that .72 mg/L is merely a "moderate" blood level. I defer to Dr. Lewis given that he is a toxicologist and specialist in this area.

Mr. Guerrette's entire history and deposition is of highly questionable reliability. It is inconsistent with the statement that he gave to the police. He has a history of numerous arrests and is highly antisocial. He had, in fact, been arrested just a week prior to this for speeding and driving without a license. He and Ms. Cooper had been seeing each other for approximately two years. In addition to her having tattoos, it is significant to me that her boyfriend was a known drug abuser who regularly flaunted the law in that he drove without a license on a regular basis, referred to police officers as "assholes" in his deposition, engaged police in a high speed pursuit, and suggests that the police constructed his statement to them without reading it back to him and then had him sign it. He does indicate that Ms. Cooper smoked crack with him on the night that this happened while she was still working and then went back to work after smoking a bag with him in his car.

Attorney John J. Radshaw, III                    Re: Cowan v. Breen, et al    4

Police reports indicate that on March 10, 1997, Ms. Cooper was given a summons by police for criminal trespassing, but appeared to be attempting to obtain crack from a dealer in New Haven, but was interrupted by the police first. On December 23, 1998, she reported her car missing which she had "loaned" to a "friend." She had waited 22 hours before calling the police and did not know the name or address of this "friend." She also could not fully explain how she knew him. (It is not uncommon for individuals seeking drugs to obtain drugs by loaning their car to dealers.)

In the high speed pursuit on July 6, 1999, Mr. Guerrette was clocked at 88 miles an hour and turned off his headlights and eventually struck a rock wall and then fled on foot just as he did on the night of this incident. Contrary to what he said in his deposition, he told the police that night that he fled because he was speeding and knew his license was suspended. He also wrestled with the police prior to being arrested once he was captured and he had to be handcuffed. He has at least five previous criminal convictions.

Although Ms. Cooper was ostensibly living with her sister, Toni Carloni, for the prior three to four months since losing her apartment, she had actually been staying there only about one day a week and had been spending a great deal of time with Mr. Guerrette. Her sister was quite concerned about Ms. Cooper's loss of weight, being sickly looking, and having scabs on her face. Ms. Carloni and her other sister, Joanne Cowan, had confronted Ms. Cooper about their suspicion that she was using drugs, but Ms. Cooper always avoided the subject. Ms. Cooper's ophthalmology records indicate a history of high blood pressure and diabetes which Dr. Rounsaville does not mention. It was also determined that the crack in Ms. Cooper's possession was of a very high quality, being 84% pure cocaine. Patricia Fiske, who worked with Ms. Cooper, indicated that Ms. Cooper had told her and other waitresses that she could get crack for them and had told Ms. Fiske several times how "high" she was when she arrived at work.

All of this information indicates that she was using crack much more frequently than once a week and continued to use it even though it was having a significant adverse impact on her physical health and was using it during work. (Although Dr. Rounsaville discounts Ms. Cooper's weight at death of 103 pounds because she was only 62" high and, therefore, not technically underweight, he ignores evidence that she had lost a significant amount of weight, which would be consistent with regular crack use.) Additionally, she had lost her apartment, had stopped playing softball, was not eating well, and was spending a lot of time with Mr. Guerrette. Prior to moving in with Ms. Carloni, Ms. Cooper was having

Attorney John J. Radshaw, III                               Re: Cowan v. Breen, et al    5

substantial money problems and was unable to pay her rent and so on and so she needed a place to live. (This would be consistent with her using substantial quantities of drugs, although, of course, not dispositive.) Mark Cowan, in his deposition, indicated that Ms. Cooper denied to him that she was using drugs. Again, denial is very common in a drug user. Toni Carloni was so concerned about Ms. Cooper's loss of weight and her not looking healthy that she looked like she was "wasting away to nothing." Ms. Cooper also was apparently filing for bankruptcy.

Bob Dekoyer, who was Ms. Cooper's softball coach and friend, testified that she told him that she lost the Amtrak job because she got hurt and missed too much time from work. This is, of course, another lie in an effort to hide her drug use.

Patty Cwalina, who has been friends with Ms. Cooper since they were teenagers, indicated that Ms. Cooper had another boyfriend, Andy, prior to Mr. Guerrette. Ms. Cwalina described Andy as a "total loser" who was unemployed and abusive and used cocaine. Ms. Cwalina said that Ms. Cooper "looked awful" during the time she was with Andy and that she constantly tried to get Ms. Cooper to break up with Andy, but Ms. Cooper did not have good self-esteem when it came to men.

In summary, any attempts to make a psychiatric diagnosis, within reasonable medical probability, based on this record can be nothing more than mere speculation because of contradictory data, unreliable data, and inadequate data. Furthermore, even if a diagnosis of either Cocaine Abuse or Cocaine Dependence could be made, it is not possible with our present scientific knowledge to render an opinion within reasonable medical probability as to what the future course of cocaine use would be and as to whether or not it would affect an individual's life span. Firstly, there are no studies and nothing in the literature that addresses this issue, never mind being dispositive of it, and, secondly, there are too many confounding factors. Ms. Cooper's beginning to use cocaine late in life, the fact that she continued to use cocaine despite numerous adverse consequences, including employment and physical health, the fact that she continued to use crack despite having high blood pressure (which would be likely substantially worsened by the use of crack), as well as diabetes (which constitutes an additional confounding factor), and that she was using crack in sufficient quantities to have lost her car, lost her apartment, lost her job, and to substantially impair her health indicates that her use was certainly not casual. Additionally, the extremely high blood level at the time of autopsy, the finding of nine bags of cocaine hidden in her sock, and her association with a highly

Attorney John J. Radshaw, III                    Re: Cowan v. Breen, et al    6

antisocial individual for the prior two years all indicates a life style that was extremely unstable, leading to a complete inability to predict what the future held for her. Of course, to put this whole issue in bold relief, the one conclusion that can be drawn from this case, within reasonable medical probability, is that had she not been using crack, it is very unlikely that she would have been involved with Mr. Guerrette and very unlikely that she would have been killed on July 13, 1999. It is likely that on this basis alone, her use of crack shortened her life.

I trust the foregoing is responsive to your inquiries. If there are other issues which you would like me to address or issues addressed here which you would like me to elaborate, please do not hesitate to contact me.

Respectfully submitted,

Kenneth M. Selig, M.D., J.D.

KMS:jb

TAB 2

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3    - - - - - - - - - - - - - - - - - - x

 4    MARGARET COWAN, As Administratrix    :

 5    of the Estate of Victoria Cooper,    :

 6             Plaintiff,                  : Civil Action No.

 7        vs.                              :   3:00CV00052

 8    MICHAEL BREEN,                       :    (DJS)

 9             Defendant.                  :

10    - - - - - - - - - - - - - - - - - - x

11    MARGARET COWAN, As Administratrix    :

12    of the Estate of Victoria Cooper,    :

13             Plaintiff,                  : Civil Action No.

14        vs.                              :   3:01CV0229

15    TOWN OF NORTH BRANFORD,              :    (DJS)

16             Defendant.                  :

17    - - - - - - - - - - - - - - - - - - x

18             Deposition of KENNETH SELIG, taken

19    pursuant to the Federal Rules of Civil Procedure at

20    the offices of Kenneth Selig, 257 New London

21    Turnpike, Glastonbury, Connecticut, before Elizabeth

22    A. Zawacki, LSR #00087, a Registered Merit Reporter

23    and Notary Public in and for the State of

24    Connecticut, on Tuesday, March 23, 2004, at 2:23

25    p.m.
```

Page 27

1  dispositive problem.
2  Q.  "Dispositive problem" meaning that because
3  there isn't epidemiological evidence about the
4  impact of cocaine use on life expectancy, it's not
5  possible to draw conclusions to a reasonable degree
6  of medical probability what the impact of cocaine
7  use on life expectancy is?
8  A.  That's tautologically and accurately put.
9       (Discussion off the record.)
10 Q.  Is it also your assessment of the record
11 that there's insufficient evidence concerning
12 Ms. Cooper's cocaine use to allow any conclusions
13 about the effect of that use on her future life?
14 A.  The answer is yes; both the history of her
15 use, the use within, you know, one to two months
16 prior to her death, and what her use would be in the
17 future had she survived.
18 Q.  These are all unknowns?
19 A.  These are all unknowns.
20 Q.  And so your opinion is that you and
21 anybody else cannot say to a reasonable degree of
22 medical probability what, if any, impact or lack of
23 impact cocaine use would have on Ms. Cooper had she
24 lived?
25 A.  That is correct.

Page 28

1    Q.    Another point that I just wanted to
2    understand your testimony about relates to a
3    telephone call that you had with a Dr. Lewis?
4    A.    Yes.
5    Q.    I see a handwritten mention of that on the
6    last page of your handwritten notes, and it's also
7    something you mentioned in your report, did you not?
8    A.    Yes.
9    Q.    Did Dr. Lewis tell you, and I'm looking at
10   your report now on page 3 -- withdrawn.
11         Did Dr. Lewis tell you that he was unable
12   to correlate the level of cocaine with the amount of
13   use or her mental state, as he indicated that it
14   does depend on the route of administration, the time
15   of intake, and of course the amount?
16   A.    Yes, that is what he told me.
17   Q.    Is it accurate to say that because he
18   could not correlate the level of cocaine with
19   Ms. Cooper's mental state, it means that he could
20   not say to a reasonable degree of medical
21   probability what effect her cocaine use had on her
22   behavior during the seconds or minutes before her
23   death?
24   A.    Yes.
25   Q.    Is it your opinion as well, based on your

1  training and expertise, and your evaluation of the
2  materials in this case, that it is not possible to
3  say to a reasonable degree of medical probability
4  what effect, if any, Ms. Cooper's cocaine use had on
5  her behavior in the seconds or minutes before her
6  death?
7       A.    Yes; and I'm assuming that by the word
8  "behavior" you're including, for example, her
9  judgment.
10      Q.    Correct.
11      A.    Yes, I agree, that is correct; and I don't
12 think anybody could within reasonable medical
13 probability.  I just don't think there's enough
14 information.
15      Q.    Now let me, to help myself understand your
16 assessment, let me ask you again to say whether
17 you've studied alcohol use and abuse?
18      A.    Well, what do you mean by "studied"?
19      Q.    Let me rephrase the question because I
20 understand it may not have been clear.
21            You've evaluated and treated persons for
22 alcohol abuse?
23      A.    Oh, yes, many.
24      Q.    And you're familiar with the literature
25 about the impact of alcohol intake on behavior?

1  the Mid-30s in a General Population Sample," and the
2  very first sentence in that article says that
3  published research on the natural history of drug
4  use in the general population is scanty. So given
5  that, no matter what this, no matter what this
6  article says, besides the fact that it wouldn't
7  apply to Ms. Cooper, it's only one article, and I
8  don't think that you can derive an opinion within
9  reasonable medical probability about something like
10 this from one article. So I'm not saying he's
11 wrong. I just don't think that there's enough
12 knowledge to know that he is right.
13     Q.    So what you're saying is that Ms. Cooper's
14 cocaine use might have affected her long term and it
15 might not have affected her long term, and there's
16 just no way for you to say one way or the other to a
17 reasonable degree of medical probability?
18     A.    Me or anybody. It's just not a question
19 that can be answered.
20     Q.    You don't think it's knowable whether she
21 would have stopped using cocaine a week or a month
22 or several months later or not; is that correct?
23          MR. RADSHAW: Object to the form of
24 the question.
25     A.    Correct, correct.

```
 1                    C E R T I F I C A T E
 2        I hereby certify that I am a Notary Public, in
 3   and for the State of Connecticut, duly commissioned
 4   and qualified to administer oaths.
 5        I further certify that the deponent named in
 6   the foregoing deposition was by me duly sworn and
 7   thereupon testified as appears in the foregoing
 8   deposition; that said deposition was taken by me
 9   stenographically in the presence of counsel and
10   transcribed by computer-aided transcription, and the
11   foregoing is a true and accurate transcript of the
12   testimony.
13        I further certify that I am neither of counsel
14   nor attorney to either of the parties to said suit,
15   nor of either counsel in said suit, nor am I
16   interested in the outcome of said cause.
17        WITNESS my hand and seal as Notary Public this
18   30 day of March            , 2004.
19
20                        _____
21                        Elizabeth A. Zawacki
22                             LSR #00287
23                             Notary Public
24   My commission expires:
25   February 28, 2005
```

# TAB 3

Page 1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
 3             FOR THE DISTRICT OF CONNECTICUT
 4
 5    ------------------------------x
 6    MARGARET COWAN, AS             :
      ADMINISTRATRIX OF THE          :
 7    ESTATE OF VICTORIA COOPER,     :
 8                 Plaintiff,        :
 9         -versus-                  :    300 CV 0052 (DJS)
10    MICHAEL BREEN,                 :
11                 Defendant.        :
12    ------------------------------x
13
14
15
16         Videotaped deposition of MICHAEL BREEN, taken
17    pursuant to the Federal Rules of Civil Procedure, at
18    the law offices of Rosen & Dolan, 400 Orange Street,
19    New Haven Connecticut, before Brenda K. Granfield, a
20    Registered Professional Reporter and a Notary Public
21    in and for the State of Connecticut, on Wednesday,
22    July 12, 2000 at 10:40 a.m.
23
24
25
```

**Page 190**

1 second shot in relationship to the vehicle. I was
2 in front of it.
3    Q. Were you in its path?
4    A. I was -- I would say I was in its path
5 moving to my right and trying to get out of the way
6 of the vehicle at that point.
7    Q. But at the very moment that you fired the
8 second shot, were you in its path?
9    A. Probably.
10   Q. And it was because you were in its path
11 that you fired the second shot?
12   A. No. That was done because of my training,
13 sir, as I indicated before.
14   Q. Okay. I'd like to move back now to your
15 report that you submitted on the 27th of July. In
16 connection with preparing the report, did you speak
17 with anybody?
18   A. In connection with preparing the report,
19 yes.
20   Q. And who did you speak with?
21   A. My attorney.
22   Q. Okay. On how many occasions?
23   A. Couple.
24   Q. For about how long?
25   A. I don't know. Maybe half hour. An hour.

**Page 191**

1    Q. Did you meet with your attorney for any
2 purpose other than discussing your report in between
3 the shooting and when you submitted the report?
4    A. Yes.
5    Q. What other purposes?
6       MR. GERARDE: I object and would
7 assert attorney-client privilege to a response to
8 that question.
9 BY MR. ROSEN:
10   Q. Your attorney's representation in between
11 the shooting and the 27th of July was exclusively in
12 connection with the shooting and its possible legal
13 implications; is that correct?
14   A. Yes.
15   Q. And the police officer's report that you
16 had to submit, you understood to be a very important
17 document in connection with any potential legal
18 liability that you had; is that correct?
19   A. Yes.
20   Q. And you discussed it with your attorney
21 before you submitted it, correct?
22      MR. GERARDE: Object. This is an
23 attorney-client privilege area that you're asking
24 him about, what he discussed with his lawyer.
25 BY MR. ROSEN:

**Page 192**

1    Q. Well, how many meetings did you have with
2 your -- how much time did you spend with your lawyer
3 in between the time of the shooting and when you
4 submitted your report?
5    A. I can't accurately say, but it was at
6 least probably a couple of times. Maybe a half
7 hour, an hour each time. I'm not certain on that.
8    Q. Did you show your attorney any drafts of
9 your report?
10   A. I don't know if I showed him any drafts,
11 but I discussed the case --
12      MR. GERARDE: Excuse me.
13      THE WITNESS: Okay.
14      MR. GERARDE: I'm going to stop you
15 and tell you don't answer what you discussed with
16 your lawyer. All right. If you didn't show him
17 drafts, then that's the answer to the question.
18      THE WITNESS: Okay.
19 BY MR. ROSEN:
20   Q. Did you have any conversation with any of
21 the State Police investigators after the morning of
22 July 13th before you submitted your report?
23   A. Like I indicated before, I believe the
24 State Police investigator I spoke to was Sergeant
25 Gafney, and that was briefly at the scene. Up until

**Page 193**

1 I submitted my report, no, I don't believe so.
2    Q. Do you know whether your attorney had any
3 communications with any State Police investigators
4 in between the shooting and when you submitted your
5 report?
6       MR. GERARDE: Once again, I think
7 that's an attorney-client question because the only
8 way he would know it is if he was told so by his
9 lawyer. If he knows from some source independent of
10 that, for instance from the State Police, then I
11 would not assert the privilege.
12   A. I don't know the answer to that question,
13 sir.
14   Q. Is it your testimony that the reason that
15 you thought that the vehicle was going to strike you
16 was because of the path of the vehicle, the fact
17 that it didn't stop, the information you've already
18 given me, correct?
19      MR. GERARDE: Objection to form.
20   A. Yes. The reason I believe the vehicle was
21 going to strike me because it was traveling directly
22 at me, and the operator had disregarded any type of
23 -- disregarded my commands for her to stop.
24   Q. You didn't base that judgment on any
25 particular information about who the operator was or

Page 194

1  the kind of person she was, did you, or did you?
2      A. No, sir. I didn't even know who she was
3  at that point.
4      Q. You didn't base your decision on any --
5  okay. You based your decision solely and
6  exclusively on what you saw the vehicle doing; is
7  that correct?
8          MR. GERARDE: Object to the form.
9      A. Right. Again, I based my decision on what
10 the operator was doing driving the vehicle directly
11 at me and disregarding my commands for her to stop,
12 yes, sir.
13     Q. And who she was or anything about her in
14 particular as compared to anybody else in the world
15 didn't play any part in your decision, correct?
16     A. No, sir.
17     Q. You gave an estimate of about 50 feet
18 between you and the vehicle at the time you fired
19 the first shot, Officer?
20     A. Yes, sir.
21     Q. Is that a reliable estimate?
22     A. I believe so.
23     Q. You're confident that it's a reasonably
24 accurate estimate?
25     A. It's an approximate distance.

Page 195

1      Q. But you think it's a good approximation
2  based on your observation, experience, training, and
3  so on?
4      A. Yes, sir.
5          MR. ROSEN: Thank you. I have no
6  further questions.
7          MR. GERARDE: I have about four
8  minutes of questions, but I need to organize those
9  exhibits. We can all stay present, but can we go
10 off the record for just a minute and then we'll get
11 going?
12         (Pause in the proceedings.)
13 CROSS-EXAMINATION
14 BY MR. GERARDE:
15     Q. Officer Breen, good afternoon. I'd like
16 to follow up in a few areas that were raised in
17 direct examination.
18         The first is I'd like to put Exhibit 1 in
19 front of you, which is your report, sir. And there
20 was testimony on direct examination that you did not
21 place an exact location of where you were relative
22 to the oncoming vehicle in the report, and you
23 indicated you did not put an exact location in, but
24 I would like to direct your attention to the very
25 bottom of page 8 if your report over on to page 9.

Page 196

1      Do you see sir on the very last line over
2  towards the right-hand side you begin a sentence
3  "With the car aiming directly at me and its
4  headlights shining on me, I felt the operator was
5  attempting to strike me with the car"?
6      A. Yes, sir.
7      Q. So that does indicate your position
8  vis-a-vis the car, at least at that point in the
9  sequence; is that correct, sir?
10     A. Yes.
11     Q. And if you go down on page 9, approximately
12 six or seven more lines, you indicated, "I fired a
13 second shot approximately one second later as I
14 quickly moved to my right to avoid being struck by
15 the car as it was still coming directly at me."
16         So there again you've also indicated your
17 position vis-a-vis the car at the time the second
18 shot was fired; is that correct, sir?
19     A. Yes.
20     Q. And if you go down approximately three
21 more lines, you indicate, "I would estimate that the
22 car was in 3 feet of me." And up above that "The
23 vehicle was still continuing eastbound on Foxon Road
24 past me on the roadway with the left side of the
25 car's body close to my own body."

Page 197

1      So there again you've indicated, to the
2  best of your ability, where you were vis-a-vis the
3  car during the sequence; is that correct, sir?
4      A. Yes.
5      Q. Now, I'd like to like to show you Exhibits
6  4 and 5 and ask you to look at those during the next
7  series of questions.
8          You indicated on direct examination that
9  the circled area with the initials MAB represented
10 an estimate by you as to where you were in the
11 roadway at the time the second shot was fired. Do
12 you remember that testimony, sir?
13     A. Yes.
14     Q. And I'd like to show you Exhibit 2, which
15 is the photograph of the Camaro with the ink
16 markings on it, and you indicated by putting a 2
17 within a circle as to the approximate area you were
18 in at the time you fired the second shot; is that
19 correct, sir?
20     A. Yes.
21     Q. Do you stand by the information you've
22 provided us in Exhibit 2 as being the location of
23 where you were to the best of your ability, the
24 approximate location, at the time you fired the
25 second shot?

Page 206

```
 1              CERTIFICATE
 2       I hereby certify that I am a Notary Public, in
 3   and for the State of Connecticut, duly commissioned
 4   and qualified to administer oaths.
 5       I further certify that the deponent named in
 6   the foregoing deposition, to wit: MICHAEL BREEN,
 7   came before me on the 12th day of July 2000 and was
 8   by me duly sworn and thereupon testified as appears
 9   in the foregoing deposition; that said deposition
10   was taken by me stenographically in the presence of
11   counsel and reduced to computer-aided typewriting
12   under my direction, and the foregoing is a true and
13   accurate transcript of the testimony.
14       I further certify that I am neither attorney
15   nor counsel for nor related to nor employed by any
16   of the parties to the action in which this
17   deposition is taken, and further that I am not a
18   relative or employee of any attorney or counsel
19   employed by the parties hereto, or financially
20   interested in this action.
21
         IN WITNESS THEREOF, I have hereunto set my hand
22   as Notary Public this 4th day of August 2000.
23
     Brenda K. Granfield, RPR-CP
24   LSR 00147
     Notary Public:
25   My Commission expires April 30, 2001
```