UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARGARET COWAN,<br>  as Administratrix of the<br>  Estate of Victoria Cooper,<br>      Plaintiff, | | |
| V. | : | CIVIL NO.: 3:00CV00052(RNC)<br>ALL CASES |
| MICHAEL BREEN,<br>      Defendant. | : | |
| MARGARET COWAN,<br>  as Administratrix of the<br>  Estate of Victoria Cooper,<br>      Plaintiff, | | |
| V. | : | CIVIL NO.: 301CV00229 (RNC) |
| TOWN OF NORTH BRANFORD<br>      Defendant. | : | JUNE 1, 2005 |

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE:**
**REPORT AND TESTIMONY OF MICHAEL DEARINGTON**

**INTRODUCTION**

     Defendants seek the admission of a state prosecutor's narrative report about the shooting that has nothing to add but delay and a thumb on the defendants' side of the scales. The thumb consists not of evidence, but of the prosecutor's opinion that the defendant officer was telling the truth in his written report and did not violate Connecticut's criminal code. The report is untrustworthy because it relies on information that has been shown during five years of discovery to be inaccurate, incomplete and unreliable and because it comes from a prosecutor who in twenty years overseeing police departments in New Haven County has *never* found that a

1

police officer used force unjustifiably.[1] The report is cumulative because it is based on nothing but police investigation that the jury will hear about anyhow; the prosecutor simply read the material that has been made available to both sides in this case and drew his own conclusions about the material. And the only non-cumulative part of the report is inadmissible because it is the prosecutor's legal opinions, whose admission would improperly invade the province of the Court.[2]

For essentially the same reasons, the testimony of the report's author, Michael Dearington, the State's Attorney for New Haven County, is inadmissible as expert testimony. Moreover, Mr. Dearington's testimony should be excluded for the additional reason that at his deposition he refused to explain the reasons for his conclusions, invoking the "deliberative process" privilege.[3]

## **FACTS**

After this shooting, the State Police took over the investigation and produced a large volume of investigative material, which the parties to this case have received and reviewed, and much of which is being offered into evidence. As the State's Attorney for New Haven County, Michael Dearington was charged with preparing a report concerning the shooting. *See* Conn. Gen. Stats. Section 51-277(a). Mr. Dearington's work consisted of reading the materials that were subsequently turned over to the parties in this case and reaching a conclusion about whether the officer had violated the criminal laws of the State of Connecticut. As Mr.

---

[1] One of those incidents, involving the shooting of Malik Jones, is the subject of a pending case in this court.
[2] A copy of the report is attached to this Memorandum as Tab 1.
[3] A copy of the deposition transcript is attached as Tab 2.

Dearington explained at his deposition, his role was limited to drawing conclusions from the reports submitted by others:

> Q. .... Other than the area of the legal requirements for police officers, do you consider yourself an expert in any other area of police practice or procedure?
> A. If the question deals with other than law that's applicable to police officers, the answer is there would be nothing beyond that.
> Q. Okay. Would it be fair to describe your role in preparing the report that you did arising out of the death of Victoria Cooper, as making a legal judgment as to whether the police officer did violate the criminal laws of the State of Connecticut?
> A. Yes.
> Q. Did you do any independent factual investigation?
> A. Me personally?
> Q. Yes.
> A. No.
>
> ......
>
> Q. Did you purport to reach any independent factual findings about what happened in this case?
> A. Independent of what?
> Q. Independent of the State Police and associated agencies' investigations?
> A. No.

Dearington Deposition, May 18, 2005, 13-15. Mr. Dearington explained that while in principle he could reject the factual conclusions presented to him by others, he "accepted all of them."

> Q. The fact gathering, and factual determinations involved in this case were made by others; is that correct?
> MR. GERARDE: Object to the form.
> A. Yes. But for the fact I am at liberty to accept or reject the conclusion, the factual conclusions presented to me.
> Q. Okay. Well, can you explain to me the basis on which you accepted or rejected factual conclusions that were presented to you?
> A. I accepted all of them.

*Id.* at 21-22. In doing so, he was following his standard operating procedure: he testified that in all ten to fifteen investigations of fatal police shootings he had conducted he had found the shooting justified. *Id.* at 41-42 In fact so far as he could recall he had never in twenty years as a

State's Attorney *ever* found a police use of force to be unjustified. *Id*.

Mr. Dearington's report consists of fourteen pages of summary of investigative materials and witness statements, followed by a six-page section headed "Conclusions." In this section, Mr. Dearington opines that "the law permits great latitude to police officers in making 'split second judgments' in potentially deadly situations, which in hindsight, upon laborious deliberation, may have not been the optimal response." Report at 20. Applying his "great latitude" standard, he concludes that Officer Breen's conduct was reasonable. Unaccountably, while Mr. Dearington spends pages of his report on Mr. Guerette's criminal record and the findings concerning narcotics, he does not say a word about whether the *second and fatal shot* was justified. He simply says that the officer was justified in opening fire.

After Mr. Dearington issued his report, the parties in this case received copies of the report and all the investigative material underlying it. Additionally, plaintiff's counsel purchased the Camaro from the owner (Stephen Guerette's brother), and it has been inspected by experts. Additionally, when the State Police closed their file, they turned over most of the physical evidence to counsel for the parties, and that evidence is available and has been reviewed as well.

The parties have done substantial discovery in this case. For starters, this discovery has included twenty liability depositions. Both sides have also retained expert engineers who have done both analysis of existing data and further forensic testing. For example, engineers for both sides did firearms testing to determine the probable angle of entry of the first bullet. Plaintiff's expert fired hundreds of rounds in connection with his testing and has generated a detailed report. And plaintiff has obtained additional evidence in the form of admissions under Rule 36. Obviously, none of this new evidence developed over the last five years is reflected in the Report.

Given the availability to the parties of all the information Mr. Dearington looked at and much, much more besides, what do Mr. Dearington and his report bring to the table? At his deposition, Mr. Dearington testified that he had nothing to add to the fact-finding process in this case:

> Q. Let me get right to something I'm curious about. Do you think you have anything to add to the fact-finding process that's going to happen in the civil trial in this case, other than being able to tell the court or jury what it is that you read in these various reports?
> MR. GERARDE: Object to form.
> Q. You can answer.
> A. No.

Dearington Depo. at 15. Instead, Mr. Dearington agreed with defense counsel's characterization that what he was doing was making a legal determination, based on his legal expertise:

> Q. And the process that you engaged in, in the aftermath of this shooting involved you having access to information provided to you by not only the State Police but also Henry Lee's office, and then applying that information to your knowledge of the law; is that correct?
> A. Yes.

*Id.* at 45. Defendants now propose to have this report presented to the jury, presumably pursuant to Fed. R. Evid. 803(8)(C), and to call Mr. Dearington as an expert witness.

## ARGUMENT

**I.   THE DEARINGTON REPORT SHOULD BE EXCLUDED BECAUSE IT IS UNTRUSTWORTHY, PREJUDICIAL, AND CUMULATIVE.**

Rule 803(8) (C) creates an exception to the hearsay rule for "factual findings resulting

5

from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). The principal reasons that the Report should not be admitted were well summarized by the Second Circuit when it held that agency findings of insufficient cause in employment discrimination cases may be excluded notwithstanding Rule 803(8)(C). *Paolitto v. Brown E.&C. Inc.*, 151 F.3d 60 (2nd Cir. 1998). In *Paolitto*, Judge Goettel had excluded a CHRO finding of insufficient evidence. Such a finding is very much like the Report, and here, as in *Paolitto,* "[i]n many respects, this finding -- which amounts to essentially a finding of no probable cause -- resembles a categorical legal conclusion...." *Id.* at 65.

      The Second Circuit had no trouble affirming Judge Goettel's ruling excluding the finding, even though some other circuits had held that all such findings were admissible. It began by pointing out that "the fact that evidence is within an exception to the hearsay rule does not by itself make it admissible per se." *Id.* at 64. It then identified the reasons that a trial judge might wish to exclude such a finding. Every one of the factors it pointed to applies squarely to this case. The Court first reasoned that

> employment-agency determinations "are not homogeneous products; they vary greatly in quality and factual detail." [Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304 (8th Cir. 1984)] at 1309. The party against whom such a determination is admitted must attempt to expose the weaknesses of the report, *see id*., an effort that may well confuse or mislead the jury and result in an undue waste of time. *See* Fed. R. Evid. 403. We believe that the district court is in the best position to consider the quality of the report, its potential impact on the jury, and the likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency. *See Denny v. Hutchinson Sales Corp*., 649 F.2d 816, 821-22 (10th Cir. 1981).

*Id.*

      Here, as in *Paolitto*, plaintiff would have to "attempt to expose the weaknesses of the

report" by pointing out all its many deficiencies, as well as the bias of the State's Attorney in favor of his client police departments, as evidenced by his failure to prosecute even egregious cases of police misconduct. That bias alone is sufficient to exclude the report as untrustworthy. *See* Federal Rules of Evidence Manual 1688-89 (Stephen A. Saltzburg et al. eds., 7th ed. 1998) (report may be untrustworthy "if the report appears to have been made subject to a suspect motivation. For example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias."); *cf. Pearce v. E.F. Hutton Group, Inc.*, 653 F. Supp. 810, 814 (D.D.C. 1987)("it is questionable whether any report by a committee or subcommittee of [the Congress] could be admitted under rule 803(8)(C) against a private party. There would appear to be too great a danger that political considerations might affect the findings of such a report.")

Furthermore, the "likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency" is extraordinarily high because a central deficiency of the Report as a reliable guide for the jury in this case is its failure to consider all the evidence that was developed after it was completed. What could be more unproductive than extended and repeated detours into questions of what was known then as opposed to what is known now? *See, New York v. Pullman, Inc.,* 662 F.2d 910, 915 (2nd Cir. 1981) ("admission of the report would have been likely to protract an already prolonged trial with an inquiry into collateral issues regarding the accuracy of the report and the methods used in its compilation").

Similarly, this case raises serious questions about both the quality of the report and its potential impact on the jury. To take the second point first, plaintiffs in police misconduct cases inevitably face a high hurdle arising from juries' reluctance to second-guess public officials

7

doing a dangerous job. Here defendants seek the additional benefit of having a *second* public official put his seal of approval on the officer's conduct. Since all the admissible facts in the report will be available to the jury anyway, the main impact of the report will inevitably be to make the jury feel that its work has already been done for it.

As for quality, the report suffers not only from the apparent institutional bias of the State's Attorney but also from a long list of deficiencies, some of which are set forth in the margin.[4]

These deficiencies are not surprising considering that Mr. Dearington did not have any sort of a hearing and did not gather any information himself, contenting himself with reading the investigation file in his office. Failure to hold a hearing in the course of preparing a report is one of the specific factors identified by the Advisory Committee on the Federal Rules as indicating lack of trustworthiness . *See* Advisory Committee Notes to Rule 803(8)(C) ("whether a hearing

---

[4] The report states that "the [State Police] reconstruction is in no way inconsistent in any significant way with the Officer's statements." Report at 15. This conclusion overlooks the following inconsistencies, among others: 1) The reconstruction says Breen fired his first shot from off to the side of the car; Breen says the car was heading directly at him; 2) If Breen's statement about the Camaro's speed is correct, the reconstruction establishes that he had only six seconds in the dark to a) recognize that the Camaro was moving and moving toward him so that he would want to flag it down, b) decide to shoot; c) draw his weapon; d) aim; and e) fire two shots one second apart. In this time period there is no way he also had time to wave his hands over his head and shout "stop police" loudly three times, as he claimed to have done; 3) Breen claimed that he was directly in front of the Camaro when he fired his first shot and then moved quickly to his right to fire the second shot as the Camaro went past him. The reconstruction establishes that the Camaro was way over on the right of the road at the time of the second shot, and the Dearington Report concludes that Breen was on or near the center line as the Camaro approached him. These facts make it impossible for Breen's story to be true.
        Other deficiencies include: 4) although Breen says that he yelled "stop police" loudly three times, none of the fourteen neighbors interviewed heard any such thing, although several of them heard conversations afterwards, as well as the gunshots; and 5) as noted in the text, the Report never directly addresses the reasonableness of the second, fatal shot but appears to assume that if the first shot was justified, then the second shot was justified also.

was held" is one of the "[f]actors which may be of assistance in passing upon the admissibility of evaluative reports"); *see also Beech Aircraft*, 488 U.S. at 168 n.11 (same).

Even the specific reasons that Judge Goettel relied on to exclude the CHRO determination, and that the Second Circuit approved, apply fully to this case. The *Paolitto* Court continued:

> Applying this standard, we see no abuse in the present case. Judge Goettel gave two reasons for excluding the CHRO determination: the evidence Paolitto introduced at trial undercut many of the CHRO's factual findings and Brown had a full opportunity to present to the jury all the evidence it had submitted to the CHRO. These were legitimate reasons to exclude the CHRO determination. *Hall v. Western Prod. Co.,* 988 F.2d 1050, 1058 (10th Cir. 1993) (district court did not abuse discretion in excluding state agency report where "all the evidentiary matter before the [state agency] could be presented to the jury" and, thus, sole purpose of admitting report "would be to suggest to the jury that it should reach the same conclusion" as agency) (internal quotations omitted); *Denny*, 649 F.2d at 822 (agency finding has low probative value where jury presented with "substantial admissible evidence on the matter").

*Paolitto*, 151 F.3d at 65.

As in *Paolitto*, the trial evidence will undercut the Dearington report's factual findings. For example, counsel showed Mr. Dearington the animated reconstruction that had been prepared based on evidence that has been developed since he completed his report – in that case, principally the findings of the defendants' own experts. Mr. Dearington's response to seeing the reconstruction was that if it was accurate, it would "give [him] pause for thought in terms of assessing the whole scenario, again." Dearington Depo at 31. Similarly, Mr. Dearington reported that the defendant was standing near or on the center line of Route 80 as the Camaro approached him (Dearington report at 13, 18), moved to his right after his first shot, and yet was right next to

the Camaro as it passed him. These facts are impossible if the Camaro was way over on the right side of the road (Breen's left side) as it passed him – which is where Dr. Lee placed it during his deposition.

This case therefore presents the same situation that Judge Winter addressed as a trial judge in *Cowan v. Prudential Ins. Co.*, 703 F. Supp. 177 (D. Conn., 1986), *affirmed,* 852 F.2d 688 (2d. Cir. 1988), where he found that an official report "would be of little probative value, a view confirmed by the critical importance of the testimony given at trial by [a key witness]." 703 F. Supp. at 189 n.9.

Finally, also as in *Paolitto*, the defendants will have "a full opportunity to present to the jury all the evidence" that Mr. Dearington had available to him.  *See also Information Sys. & Networks Corp. v. Twenty-First Sec. Corp.*, 172 F.3d 38, 38 (2d Cir., 1999) (per curiam) (report excluded when "plaintiffs had the opportunity to present at trial the evidence contained in the report."). Thus, the "sole purpose of admitting [the] report 'would be to suggest to the jury that it should reach the same conclusion' as" Mr. Dearington. *Paolitto,* 151 F.3d at 65*, quoting, Denny v. Hutchinson*, 649 F.2d at 822.  This "vouching" function is just the kind of misuse of Rule 803(8)(C) that trial judges can avoid by refusing to admit reports that add little of substance.  As the court noted in *Abramowitz v. Inta-Boro Acres Inc.*, 1999 U.S. Dist. LEXIS 20005, 21-22 (D.N.Y., 1999):

> The [administrative law Decisions offered under the Rule] contain factual conclusions that, if taken at face value, might reasonably be construed as foreclosing deliberation on whether the firing of plaintiff was pretextual. Because its finding on this issue will determine the jury's ultimate finding on liability under the ADEA, the Decisions would function, in effect, as a kind of vouching for plaintiff's evidence on pretextuality.

*See also, Pullman,* at 915 (government report has "an aura of special reliability and

trustworthiness [which may not be] commensurate with its actual reliability").

## II.   THE DEARINGTON REPORT SHOULD BE EXCLUDED BECAUSE IT STATES LEGAL CONCLUSIONS

In his deposition, Mr. Dearington testified that he was not an expert in any area of police practice or procedure other than the law applicable to police officers.

> Q.   .... Other than the area of the legal requirements for police officers, do you consider yourself an expert in any other area of police practice or procedure?
> A.   If the question deals with other than law that's applicable to police officers, the answer is there would be nothing beyond that.

Dearington Depo. at 13.  Mr. Dearington's admission is well-taken, given that he has never worked as a police officer, *id.* at 11, and has never trained police officers in anything other than what the law requires of them.  *Id.* at 13. Mr. Dearington's sole relevant area of expertise, "the law that's applicable to police officers," is an impermissible subject for expert testimony in an excessive force case.  A long line of Second Circuit precedent holds that expert testimony is impermissible when it goes to the applicable legal standard in the case. [5]

In a case that is right on point, the Second Circuit found in a police brutality case that it was error to admit expert testimony about whether the force used was lawful. *Hygh v. Jacobs*,

---

[5] The *Beech Aircraft* Court declined to decided whether the Rule 803(8)(C) hearsay exception extended to legal conclusions.  *See Beech Aircraft*, 488 U.S. at 170 n.13 ("We emphasize that the issue in this litigation is whether Rule 803(8)(C) recognizes any difference between statements of "fact" and "opinion."  There is no question here of any distinction between "fact" and "law."  We thus express no opinion on whether legal conclusions contained in an official report are admissible as "finding of fact" under Rule 803(8)(C).")  Though the Second Circuit has not addressed this precise point, its decisions discussed in the text make the result limiting the Rule to factual as opposed to legal opinions inevitable.  An extended discussion of these issues, explaining this conclusion, may be found in *Miranda-Ortiz v. Deming,* 1998 U.S. Dist. LEXIS 17147 at *2-*5. (S.D.N.Y. 1998).  *See also* 30B Michael H. Graham, Federal Practice &

961 F.2d 359 (2d Cir. 1992). The expert in that case was not a lawyer, but a professor of criminal justice, who, unlike Mr. Dearington, had legitimate expertise on police practices and procedures. Nevertheless, the court excluded the expert's testimony that force was "totally improper," *id.* at 364, on the grounds that the testimony "'merely [told] the jury what result to reach.'" *Id.* (quoting Fed. R. Evid. 704 Advisory Committee Notes). Furthermore, the court held, "[e]ven if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard--explicit or implicit--to the jury. Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." *Id.* (citations omitted).

There are a host of other similar cases in the Second Circuit alone. In *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977), the Court fully explained the reasoning behind excluding expert testimony on applicable legal issues. In excluding the testimony of Friedman, a securities lawyer, the Court noted that the testimony

> did not concern practices in the securities business, on which Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue. ... [I]t would not have been possible to render this testimony admissible by qualifying Friedman as an "expert in contract law." It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.

*Id.* at 509-510. *See also, e.g., United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir., 1991) (expert testimony may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it . . . although an

---

Procedure (2000) § 7049 at 515 n.37 (legal conclusions inadmissible under Rule 803(8)(C)).

expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."); *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 709 (2d Cir. 1989) (excluding expert testimony that railroad was negligent); *United States v. Scop*, 846 F.2d 135, 139-40, *modified*, 856 F.2d 5 (2d Cir. 1988) (expert's repeated statements that defendants' conduct established a manipulative and fraudulent scheme within the meaning of the securities laws exceeded the permissible scope of opinion testimony); *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.)(1983) (excluding testimony as to meaning of advisory opinions when the testimony "would invade the province of the court to determine the applicable law and to instruct the jury as to that law"). All these cases reinforce the point that the only thing Mr. Dearington is specially qualified to address is not a proper subject of testimony.

### III.   THE DEARINGTON REPORT SHOULD BE EXCLUDED BECAUSE IT RELIES ON EVIDENCE SUBJECT TO EXCLUSION UNDER *DAUBERT*

The Dearington report relies heavily on the State Police reconstruction. As Mr. Dearington testified, he accepted all the conclusions of the reconstruction. Dearington Depo. at 20. This reliance is an additional reason the report should not be admitted, since some of the findings of the reconstruction report are subject to *Daubert* challenges. The issues are addressed in the separate memorandum on the Reconstruction Report. For purposes of this memorandum, the point is that nothing in Rule 803(8)(C) authorizes an interpretation of the Rule that would trump Rule 702, particularly since Rule 702 was amended as recently as 2000 to incorporate *Daubert* standards.  *See* Fed. R. Evid. 803 ("[t]he following [hearsay exceptions] are not excluded *by the hearsay rule*") (emphasis added).

### IV.   THE DEARINGTON REPORT SHOULD BE EXCLUDED BECAUSE IT IS FILLED WITH PREJUDICIAL AND INADMISSIBLE MATERIAL.

The Report returns over and over to Ms. Cooper's drug use and Mr. Guerette's shady conduct. *See, e.g.,* Report pp. 3,5,7-9, 12, 15, 18-19 and appendix 1.[6] As with expert opinions subject to *Daubert*, nothing in Rule 803(8)(C) creates an exception to ordinary standards of evidence such as, in this case, the limitations Rule 403 places on the admission of prejudicial evidence. *See Beech Aircraft*, 488 U.S. at 167-68 ("safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them.").

## V.    MR. DEARINGTON SHOULD NOT BE PERMITTED TO TESTIFY

According to their witness list, defendants propose to call Mr. Dearington as an expert witness to testify "concerning his analysis of the information provided to him by the State Police and Dr. Henry C. Lee, and his conclusion that the use of deadly force by Officer Breen was justified under the circumstances confronting Officer Breen." All the reasons discussed above as to why Mr. Dearington's report is inadmissible should also preclude his testimony.

This testimony would be improper for another reason as well: relying on the "deliberative process privilege" Mr. Dearington will not discuss the basis for his conclusions. Thus, at Mr. Dearington's deposition counsel, for the Division of Criminal Justice instructed Mr. Dearington not to answer dozens of questions – anything aimed at why he came to the conclusions that he did. This claim of privilege may be proper because Mr. Dearington did not volunteer to be an expert witness, but it is completely inconsistent with Rule 26(a)(2)(B)'s requirement that an

---

[6] This evidence is the subject of a separate Memorandum. *See* Memorandum in Support of Motion in Limine Re: Previous Incidents Involving Stephen Guerette; Guerette's Criminal Record; Vicki Cooper's Personal Body Markings; Other Irrelevant Conduct of Ms. Cooper; and Late Disclosed Exhibit.

expert disclose "the basis and reasons" for his opinions, not to mention the right of a party to cross-examine an expert concerning his opinions. *See Ling Nan Zheng v. Liberty Apparel Co.*, 2004 U.S. Dist. LEXIS 15026 (S.D.N.Y. 2004) at *5-*6 (Rule 26(a)(2)(B) trumps privilege, in that case the work product privilege). Permitting defendants to call Mr. Dearington would be unfair to plaintiff and create a completely unnecessary collateral issue concerning Mr. Dearington's privilege and what to do about the fact that plaintiff cannot cross examine him.

## CONCLUSION

The Dearington report should not be admitted and defendants should not be permitted to call Mr. Dearington as a witness.

THE PLAINTIFF

By__/s/_____
David N. Rosen
400 Orange Street
New Haven, Connecticut 06511
(203) 787-3513
CT00196
E-mail: drosen@davidrosenlaw.com

## CERTIFICATION

15

     I hereby certify that a copy of the foregoing Memorandum was sent first class mail, postage prepaid on June 1, 2005 to:

Thomas R. Gerarde, Esquire
Howd & Ludorf
65 Wethersfield Avenue
Hartford, Connecticut  06114


                                                _____/s/_____
                                                David N. Rosen