TAB 1

REPORT TO THE CHIEF STATE'S ATTORNEY
PURSUANT TO SECTION 51-277a
CONNECTICUT GENERAL STATUTES

FEB 8  II 40 AM '00

CHIEF STATE'S
ATTORNEY'S OFFICE

Shooting Death of VICTORIA COOPER
on July 13, 1999

Submitted by:

MICHAEL DEARINGTON
State's Attorney
Judicial District of New Haven

February 8, 2000

Copy to:

Honorable Frank B.  Connolly
Town Manager
Town of North Branford

Honorable JoAnne Wentworth
Mayor
Town of North Branford

Honorable Matthew L.  Canelli
Chief of Police
Town of North Branford



PLAINTIFF'S
EXHIBIT
1-20
5-18-05

# INDEX

Preface................................................................................................................1

Overview of Investigation..................................................................................2

Summary of Statements.....................................................................................3

Cause of Death...................................................................................................8

Evidence Collected at Scene and Forensic Findings..........................................9

Exterior Examination of Camero and Forensic Findings....................................11

Evidence Seized from Within Camero and Forensic Findings.............................12

Summary of Reconstruction...............................................................................13

Conclusion.........................................................................................................15

# APPENDIX

Criminal History of Steven Guerette....................................................................21

North Branford Police Department Policy............................................................22
     Concerning "Use of Force; Weapons"

Law Concerning Use of Deadly Physical Force by Officer....................................23

Recent Court Decisions Concerning Firing Shots at Motor Vehicle.......................25

Law Concerning Motor Vehicle Stops..................................................................26

Reconstruction Report........................................................................................27

Street Diagrams.............................................................................................38-40

# PREFACE

The following report concerning the tragic shooting death of Victoria Cooper, age 41, on July 13, 1999, at about 1:35 a.m., is prepared and submitted by Michael Dearington, State's Attorney, Judicial District of New Haven, pursuant to Section 51-277a, of the Connecticut General Statutes. The lethal shots were fired by on duty Officer Michael Breen of the North Branford Police Department, near the intersection of Route 80, known as Foxon Road, and County Road, North Branford, Connecticut. The report and conclusions are based upon the joint investigation conducted by the Connecticut State Police Central District Major Crime Squad, the State Police Forensic Science Crime Laboratory and the State Police Scientific Services Toxicology Unit, the State's Attorney's Office for the Judicial District of New Haven, as well as the Office of the State medical Examiner, and with the cooperation of the North Branford Police Department.

It must be said that the loss of human life particularly under these circumstances is a great tragedy.

Victoria Cooper's death has resulted in an immeasurable loss to her family, her children and her friends. It is undoubtedly made more unbearable by her age and the abruptness of her passing.

1

## OVERVIEW OF THE INVESTIGATION

The Connecticut State Police Central District Major Crime Squad at the request of the State's Attorney, New Haven Judicial District, was the lead investigative agency in the investigation. Members of such unit responded to the scene in the area of Route 80, known as Foxon Road, and County Road within approximately one hour of the incident. The scene had already been cordoned off and secured by the North Branford Police Department. Dr. Henry Lee, Commissioner of Public Safety and former Director of the State Police Forensic Laboratory, Dr. Wayne Carver, Chief Medical Examiner and the New Haven State's Attorney and members of his staff responded to the scene shortly after the shooting.

The scene that day was processed, photographed and diagrammed and evidence was collected by the Major Crime Squad with the assistance of members of the State Police Forensic Science Laboratory during a period of approximately 10 hours. Since that time, certain and elaborate reconstruction of specific aspects of the incident, including bullet trajectory patterns, has been conducted at State Police facilities. Also, on October 22, 1999, there was at the scene a recreation of the events immediately leading up to and including the shooting, by members of the various involved State Police Investigative and Scientific Units and the Office of the Chief Medical Examiner. Members of Victoria Cooper's family were invited to attend and did attend such per creation along with an attorney representing the family. Also, Officer Michael Breen and his attorney were present.

Since July 13, 1999, approximately nine members of the Central District Major Crime Squad have been assigned to various aspects of the investigation. The entire rural neighborhood has been canvassed by police in an effort to locate witnesses. Statements were taken from fourteen so-called civilian witnesses. A detailed written report dated July 27, 1999, was received from Officer Michael Breen. Also, on November 12, 1999, Officer Breen was interviewed at the scene in order to offer him opportunity to specifically identify where certain activity occurred.

A written statement was taken from Steven Guerette on July 13, 1999. On November 16, 1999, he accompanied members of the Major Crime Squad to the scene in order for him to identify where the vehicle was initially stopped and what he observed thereafter. Also, a letter was received on January 24, 2000, from the brother of Steven Guerette wherein, the brother provided information on behalf of Steven Guerette. Also, state police officers attended the autopsy and took photographs and received evidence. A detailed report was prepared by the Central Major Crime Squad by case officer, Detective Thomas Murray and others. On January 19, 2000 a comprehensive report was submitted by the State Police Forensic Science Laboratory.

The Citizens of the State of Connecticut are fortunate to have such highly dedicated and extraordinarily competent experts available to conduct such a thorough investigation.

2

## SUMMARY OF STATEMENTS

Steven Guerette in his statement, to police dated July 13, 1999, states that on July 12, 1999, at about 4:30 p.m., he dropped off his girlfriend, Victoria Cooper, at the American Steak House, West Haven, where she was a waitress. He then drove to the home of his mother for dinner. Mr. Guerette stated that he returned to West Haven and picked up his girlfriend at her place of employment at around 9:30 p.m. that evening. He was driving a 1985 red Chevrolet Camero which was registered to his brother John Guerette. He states they drove to Asylum Street in New Haven where he purchased four dime bags of crack cocaine for the sum of $40.00. They proceeded to I-95 eastbound and at the time were smoking the crack cocaine. They exited at Exit 56 and made a left onto Leetes Island Road. After crossing over the Turnpike, they stopped at the Berkshire Gas Station to refuel the Camero. They then drove to Route 80 in North Branford for the purpose, according to Mr. Guerette, of going east on Route 80 to Madison, going north on Route 79 to Durham, and then traveling to his home in Wallingford. He states he stopped at the Xtra Mart Store on Route 80 in North Branford to purchase Monarch cigarettes for his mother. Guerette placed a call to his brother on the phone located in the parking lot at Xtra Mart Store, for the purpose of telling his brother that he would be late in returning the Camero to him. He states no one answered the phone and he and Ms. Cooper proceeded eastbound on Route 80.

Steven Guerette states that while traveling east on Route 80 he observed a police vehicle behind him and threw a piece of aluminum foil out the window which was fashioned into a crack cocaine pipe and which they had previously been using to smoke crack cocaine. A police vehicle activated its "emergency lights" and Guerette states that he pulled the Camero over onto the right shoulder. He states that he rolled down the passenger window as the officer approached the vehicle on foot.

Guerette, in response to the officer's inquiry indicated he did not have his driver's license but did have the vehicle registration. Guerette related in his statement that he did not carry his license since it had been suspended. He was asked out of and to the rear of the vehicle by the officer. Also, he states he was directed to empty the contents of his pockets onto the rear deck of the vehicle. Guerette placed his wallet, cigarettes, cigarette lighter, coins, two small pocket knives and a comb on the rear deck of the vehicle. He was then patted down by the officer. He states the officer, during such procedure, located in his pocket two zip lock baggies, one inside the other. The bags were empty but had previously contained cocaine. He stated that he then ran across Route 80. He prepared a crude sketch showing that he ran to a grassy island at the intersection of what is County Road and Route 80 and then recrossed Route 80 and ran east to what is Stroud Road. Guerette stated that he tripped and fell when he initially crossed Route 80. He stated as he ran up what is Stroud Road, he heard two shots which he believed had been fired at him. Guerette states that there was a hesitation between the shots. He states he continued to run and then hid in the woods until located later by police utilizing a canine.

North Branford Police Officer Michael Breen in his report, dated, July 27, 1999, indicates that on July 13, 1999, he was on patrol in a marked patrol vehicle. He was working the 11:00 p.m.

3

(July 12, 1999) to 7:00 a.m. shift (July 13, 1999). At about 1:11 a.m., he observed a red Chevrolet Camero parked next to an outside payphone located in the parking lot at the Xtra Mart Store gas station at the intersection of Route 80 and Ciro Road, North Branford. The driver's side of the car was next to the phone. The officer states that he observed two individuals sitting, respectively, in the front driver's and passenger's seats of the car. He called in the marker, Connecticut 801KCA, to the dispatcher for a motor vehicle check due to his concern that he did not recognize the particular vehicle and Xtra Mart Store at that time of night could be vulnerable to criminal activity. As Officer Breen turned onto Ciro Road, he observed the person in the driver's seat to be a white male with blonde hair wearing a baseball hat. The driver's window was down and the male was holding the phone receiver. According to Officer Breen, the male stared at him as he passed the area. Officer Breen was informed by the police dispatcher about that time that the vehicle was registered to John Guerette of Wallingford. Officer Breen turned around on Ciro Road and returned to the area of the Xtra Mart Store where he again observed the male holding the phone. Again, the male stared at Office Breen as he approached. As he passed by, the male looked back over his shoulder at the officer. The officer turned onto Route 80 going in an easterly direction. Officer Breen indicates that he was "curious that the occupants of this car were so concerned with my presence so I decided to monitor them further." He watched the vehicle in his rear view mirror. Officer Breen turned around near Maple Road and went in a westerly direction on Route 80 and for the third time passed the Xtra Mart Store. The Camero remained in the same location and the male stared at him as he approached. The Officer observed both occupants moving about in the front seats. Officer Breen reports he observed the passenger also looking at him. Officer Breen drove by and parked a short distance away in the parking lot of the Giant Power Equipment business located on Route 80. He turned the lights off such that he could further observe the vehicle. The dispatcher, in response to Officer Breen's requests for a license and criminal record check of John Guerette reported that John Guerette's license was under suspension and he had a prior criminal history. (A criminal record check indicates John Guerette, d.o.b. 12/18/69, S, brother of Steven Guerette, as of July 17, 1999, had been arrested on four separate occasions.)

Moments after parking, Officer Breen states he observed the Camero exit the Xtra Mart Store parking lot and proceed in an easterly direction on Route 80. The officer pulled onto Route 80 and followed the Camero. The Camero was traveling at a speed of 35 miles per hour in an area with a posted speed of forty five miles an hour. There was no other traffic. The officer states he observed the two occupants moving around in the vehicle and the Camero crossed over the center line into the oncoming lane on three occasions.

Officer Breen states that based on his observation at the Xtra Mart Store, the possibility that the operator had a suspended license and might have a criminal record, the movement of the occupants in the car, and the travel of the vehicle into the oncoming lane, he activated his strobe lights. The Camero pulled over onto the right shoulder of Route 80 and stopped west of the intersection of Route 80 and County Road. Officer Breen, at about 1:32 a.m., notified this dispatcher of his location and action and then exited his vehicle. Officer Breen reports he approached the front passenger window and knocked several times on the window in order to obtain the attention of the occupants. The passenger who was observed to be a female, opened her window. Officer Breen

4

asked the male operator for his license and registration. The male stated he was not carrying his license and the car was registered to his brother. The officer asked the passenger for her license and she indicated she was not carrying any identification.

Officer Breen states that after ascertaining that the operator did not have a license and the passenger did not present any identification, he asked the operator out of and to the rear of the vehicle. Officer Breen stated that when he unsuccessfully asked for the operator's license and passenger's identification, he observed that both appeared nervous, their arms and legs were shaking and they looked at each other as if unsure of how to respond. Officer Breen states he believed both individuals, based upon the circumstances and his training, were possibly under the influence of alcohol or drugs. Officer Breen states he met the operator at the rear of the Camero. In response to inquiry the operator stated his name was Steven Guerette and the vehicle belonged to his brother John Guerette. Also, his license was in his truck and he did not have a wallet. Officer Breen states he observed a wallet in Guerette's back pocket. The officer removed the wallet and found no identification. He observed Guerette's body and hands shaking, his eyes were watery, droopy and bloodshot. Guerette looked nervously back at the passenger. Officer Breen patted him down for weapons and found none. At some point he asked him to empty his pockets on the rear of the vehicle. Guerette removed several items but did not take anything from his front pockets. When asked if there were other items, he answered in the negative. Officer Breen states he reached into his front pockets and removed two plastic bags containing white powder which he believed to be narcotics. (Such bags, based on later tests, were determined to contain cocaine residue.) Officer Breen asked Guerette what it was and was told "it's just paraphernalia." Officer Breen took out his cuffs and told Guerette he was under arrest. Guerette said "wait, wait, wait" and pulled his arm away and ran easterly on Route 80. Guerette then cut over to County Road. Officer Breen attempted to call the dispatcher on his portable radio but was unsuccessful due to an apparently uncharged battery. Officer Breen states that he was about 10 feet behind Guerette when the latter slipped and fell on the pavement on County Road which was wet due to recent rain. Guerette then got up and ran back toward Route 80. He ran east on Route 80. Officer Breen states he had been yelling for Guerette to stop and the latter disregarded his orders. Due to his inability to make radio contact with his department and call for back up he stopped the chase and ran in a westerly direction toward his cruiser. He wanted to return to his vehicle to make contact with his department. Officer Breen states in his police report as follows:

> I began to run as fast as I could west on Foxon Road back to the area of the car stop. As I got close to this area I was surprised to see that the Camero which I had stopped began moving eastbound on Foxon Road directly at me with its headlights on. I could hear the vehicles engine accelerating. I would estimate that the Camero was approximately 250 feet from me. I was physically tired and nearly out of breath from the foot pursuit and began to yell as loud as I could for the car to stop. I yelled at least twice "stop police, stop police". As I yelled, I began waving my arms over my head hoping the operator would see me and stop. I saw that the car did not stop but was instead bearing down on me. I was not running at this point and felt exhausted. I knew that I was not going to be able to get out of the cars path and that I was going

to be struck and seriously injured or killed if I did not act to defend myself. With the car aiming directly at me and its headlights shining on me I felt the operator was attempting to strike me with the car. I drew my .40 caliber Glock service pistol from my holster with my right hand and yelled once more "stop police". I fired once at the left front windshield of the car when it was approximately 50 feet from me and traveling at approximately 25 to 30 miles per hours. I fired a second shot approximately one second later as I quickly moved to my right to avoid being struck by the car as it was still coming directly at me. I heard the sound of breaking glass. The vehicle which was still continuing eastbound on Foxon Road passed me on the roadway with the left side of the cars body close to my own body. I would estimate that the car was within three feet of me. I watched as the car drifted into the westbound lane of Foxon Road and subsequently mounted the end of a metal guard rail system with its front end, and come to a rest. I did not observe any further movement from the car or the operator. I got to my car and radioed our dispatcher that I needed additional personnel, medical assistance, and that shots had been fired. I drove up to the rear of the Camero and got out of my car and cautiously approached it. I could hear the person within making a wheezing type sound. I then saw the persons head recline against the back of the drivers seat. The person was motionless in the drivers seat of the car. I observed that she was the same female passenger who was within the car when I had stopped it minutes before. I reached inside the car and shut off the cars ignition and checked the females neck for a pulse. I found none. I again returned my car and again radioed into our dispatch that I need assistance and medical assistance to the scene for the female operator. I also radioed in a complete description of the male subject who was still on foot in the area. Moments later I saw a Town of Guilford police car arrive. A short time later units from North Branford police arrived.

Officer Breen stated he remained at the scene and eventually observed the individual who had fled from him escorted by police from a wooded area near the intersection of Route 80 and Stroud Road.

North Branford police Sergeant Christopher Manner monitored Officer Breen's communication about shots being fired. Sergeant Manner was the first responding officer to the scene. He reports that Officer Breen's first comments to him were that he fired at the vehicle which was going to run over him. He checked Victoria Cooper who was in the red Camero and found no vital signs. Officer Breen also stated that he stopped a vehicle and was attempting to handcuff the driver. The driver "struggled free" and ran down County Road. Officer Breen told Sergeant Manner that he pursued the person but was unable to capture him so he started to return to his police vehicle. Officer Breen stated that the Camero was driven toward him and he waived his arms and yelled for the vehicle to stop. The vehicle continued toward him and he, believing that he would be run over, discharged his weapon. Sergeant Manner received Officer Breen's service weapon, secured the scene and informed the dispatcher to notify the Chief, Deputy Chief and State Police. Several East Haven and Guilford Officers responded to the scene. East Haven Police Officer Henry Butler

6

arrived with his canine named Alec. Alec tracked the suspect into a wood area near the intersection of Stroud Road and Route 80. Steven Guerette was taken from the woods and subsequently arrested by Ronald Onofrio for Operating under Suspension, Interfering with a Police Officer, Illegal Possession of Cocaine and Possession of Drug Paraphernalia. The Central District Major Crime Squad and members of the New Haven State's Attorney's Office arrived at the scene shortly after the incident was reported. Responding medical personnel determined that Victoria Cooper was deceased. Dr. Wayne Carver, the Chief Medical Examiner later responded to the scene.

A canvass of neighborhood residents resulted in the collection of the information pertaining to various observations made during the sequence of events.

Adjacent neighbors collectively observed the flashing of the police strobe lights; heard someone yelling stop; heard two shots; saw the cruiser parked on Route 80; saw an officer in front of his cruiser; saw the cruiser being driven to a location behind a red car after the shots and the officer exit the cruiser, check the red car; heard an officer say to a second officer "she tried to run me over"; saw an individual being escorted from the woods. No one interviewed as part of the canvass saw the entire sequence of the events or saw the red car being driven toward the officer or saw Officer Breen fire the shots.

7

## VICTORIA COOPER, D.O.B. 3/16/58
## CAUSE OF DEATH AND RELATED FINDINGS

On July 13, 1999, in the morning, Dr. Wayne Carver, the Chief Medical Examiner, responded to the scene on Route 80. Certain observation as to the deceased were made by the Chief Medical Examiner at such time prior to the removal of the body of Victoria Cooper from the Camero. The deceased was removed, under the supervision of Dr. Carver, from the vehicle and taken to the Office of the Chief Medical Examiner. Prior to the removal of the body, personal items and clothing were removed from the body including small plastic bags containing a white substance which were located in the left sock. An autopsy was performed commencing at 1:13 p.m. A gunshot entry wound was located on the left side. Its location is described as "just medial to the left posterior axillary line centered at a point 19" from the top of the head and centered 5 ½" to the left of the posterior midline. This level is 14" above the ischial tuberosity." That is, if sitting the wound is 14" above the sitting surface.

In lay terms the bullet entered the extreme left side of the back near where the side meets the back surface. Vertically it is located approximately in the mid back. No soot was found in the area of the wound. Small pieces of glass, assumably from the driver's side window through which the bullet passed, were found around the wound. Such glass apparently penetrated through the shirt.

The track of the bullet traveled from left to right and slightly from back to front and slightly downwards. The path enters the left chest cavity through the 9th intercostal space grazing the 9th rib. It passed through the lower portion of the left lung and the aorta causing significant damage to both organs. It then passed through the lower portion of the right lung, the diaphragm, the liver, re-entered the diaphragm and exited the chest. In summary the track passed through both lungs, aorta and liver.

The exit wound is located at a point 21" from the top of the head and 6" to the right of the anterior midline.

In lay terms the wound would be located on an imaginary line dawn from the right armpit to the center right thigh. It is located approximately equidistant from the armpit and top of the right hip.

A copper colored bullet jacket (partial bullet) was located and retrieved from below the skin at the point of exit.

The cause of death was determined to be a gunshot wound of the chest.

A toxicological analysis of the decedent's blood detected the presence of cocaine, acetaminophen, an aspirin substitute, caffeine and theobromine, common components of tea and other foods. The quantitative measure of cocaine showed .72 milligrams per liter.

8

## EVIDENCE COLLECTED AT SCENE AND FORENSIC FINDINGS

Members of the Central District Major Crime Squad seized the following evidence at the scene on Route 80.

1)    Seized from the rear deck lid of the red Camero, CT Registration 801KCA: One black leather wallet; two pocket knifes; one comb; one blue ziplock baggie containing a smaller plastic bag with residue (The residue was determined based upon toxological testing to be cocaine); and, one dollar bill and nine cents in change. It is concluded that all of such items, based upon the statements of Officer Breen and Steven Guerette, belonged to Steven Guerette. They were taken by Mr. Guerette or Officer Breen from Mr. Guerette's clothing as he and Officer Breen stood behind the red Camero on Route 80.

2)    One pair of Peerless handcuffs, serial number 928485 were recovered on the paved surface of Route 80 to the rear and close to where, based on scene reconstruction, the Camero was parked by Guerette after he stopped the vehicle. The handcuffs were assigned to Officer Breen. Based on statements it is concluded that they were dropped by Officer Breen after he unsuccessfully attempted to handcuff Steven Guerette just prior to Guerette fleeing from Officer Breen.

3)    One torn partial Connecticut Motor Vehicle Registration for a red Chevrolet Camero assigned Connecticut Registration 801KCA and one towing bill, dated 6/9/99 for a vehicle with Connecticut Registration 801KCA. Both items were seized from the surface of Route 80 adjacent to the eastbound shoulder of the road. Both documents were approximately 17 feet east of where the handcuffs were located. It is concluded that they were removed by Steven Guerette from his pocket and placed on the rear deck of the Camero as were the aforementioned items. The papers were displaced as the Camero was driven eastbound by Victoria Cooper.

4)    Officer Breen's service weapon was given by Officer Breen to North Branford Sergeant Manner at the scene and subsequently turned over to the Firearms Section of the State Police Forensic Laboratory. It is a .40 Caliber Glock semi-automatic pistol, model 22. Serial number RG 325. It contained a magazine holding twelve live Winchester, jacketed hollow point .40 Caliber Smith and Weston cartridges. The magazine has a maximum load capacity of 14 rounds.

5)    Two Winchester .40 caliber shell casings were located and seized from approximately the center of the eastbound lane of Route 80 about 195 feet east of where the handcuffs were located. There was a distance of about 5 feet and 9 inches between the casings.

The Firearms Section examined the two shell casings and the .40 caliber Glock, semi automatic pistol, carried by Officer Breen on July 13, 1999. Such were compared with casings ejected by such weapon during test fires. The firearms section concluded that the two casings found on Route 80 were fired from Officer Breen's Glock pistol. The Firearms section also reports that "glass like material was observed in the barrel of the handgun."

9

6)      A trail of fragments of broken glass were observed on Route 80. Such trail started approximately less than 20 feet east of the two shell casings in the approximate center of the eastbound lane. It extended for about one hundred feet and its direction veered toward the center line and slightly over the center line of the roadway. Samples of such many fragments of glass were seized. It is concluded that such glass came from the driver's side front window of the Camero as a result of bring penetrated by a bullet fired by Officer Breen. The elongated glass fragment pattern was caused by the forward movement of the Camero. It is consistent with the line of the easterly travel of the Camero from the right lane, across the center line eventually stopping on the should of the westbound lane.

7)      On July 13, 1999, in the early afternoon, a pedestrian in the area of the intersection of Route 80 and County Road observed in a grass triangle at such location what appeared to be a bullet. The observation was reported to the North Branford Police Department and the item was seized by a North Branford Police Officer. Such bullet was submitted to and examined by the Firearms Section. It was determined that it was a .40 caliber bullet similar to bullets carried by Officer Breen. However, due to the condition of the bullet it could not be positively concluded that the bullet was fired from Officer Breen's weapon. It is reasonable to conclude as found in the reconstruction report that such bullet was the first bullet fired by Officer Breen which struck the hood of the Camero and then deflected off the hood.

## EXTERIOR EXAMINATION OF
## 1985 Camero CONNECTICUT REGISTRATION 801KCA

On July 13, 1999, the red Camero, Connecticut Registration 801KCA was seized by the Connecticut State Police. Police upon the initial examination at the scene observed what was concluded to be a projectile strike on the driver's side of the hood. The indentation was located 21 ½ inches from the windshield and 30 inches from the front edge of the hood. It was located 6 inches from the driver's side edge of the hood. It is reasonable to conclude as found in the reconstruction report that based upon the totality of the circumstances that the projectile strike was caused when the first bullet fired by Officer Breen struck the hood and deflected off the hood.

A .40 caliber bullet was located at the intersection of Route 80 and County Road. Although it was due to its condition insufficient to scientifically conclude it was fired from Officer Breen's weapon, it is reasonable to conclude as found in the reconstruction that based upon the totality of the evidence that it was the bullet which struck the hood of the Camero.

Also, it was observed during an initial examination of the vehicle, that the driver's side window was shattered. It is reasonable to conclude that such was caused by Officer Breen firing his second shot through the window. Such bullet passed through the deceased and came to rest on the front passenger floor in front of the seat. (See section on Cause of Death).

11

## EVIDENCE SEIZED FROM INSIDE THE 1985 Camero,
## CONNECTICUT REGISTRATION 801KCA AND FORENSIC FINDINGS

1.  One bullet projectile was seized from the passenger side front floor. The bullet was similar to bullets in Officer Breen's weapon. However, due to the condition of the bullet it could not be positively concluded such was fired from Officer Breen's weapon. It is reasonable to conclude that it is a portion of the bullet fired by Officer Breen which struck and exited from the body of Victoria Cooper.

2.  One copper jacket fragment was seized from the top of the passenger side front seat sitting portion. It was determined to be a prong from a jacketed bullet which weighed .6 grains. Due to its size and condition further identification could not be made. It should be noted that a hollow point bullet jacket was taken from the exit wound located on the decedent Victoria Cooper.

3.  A gunshot residue test was conducted on the drier's side door and window area. It was submitted to the Forensic Laboratory. It was forensically determined such contained lead antimony and barium. (Substances ejected from a weapon upon the firing of a bullet).

4.  Two glass bottle smoking pipes were seized from under the passenger side front seat. The State Police toxicology laboratory concluded that there was cocaine residue on both pipes.

5.  A clear plastic bag containing nine plastic ziplock baggies each containing a white powder residue was seized from under the front passenger side floor carpeting near the firewall. The Laboratory concluded that the ziplock baggies each contained free base cocaine. Such is commonly called crack or rock cocaine.

6.  The Chief Medical Examiner, Dr. Wayne Carver, during an initial examination of Victoria Cooper at the scene located nine small ziplock baggies contained in a larger bag in the decedent's left sock. The Laboratory concluded that each baggie contained cocaine.

## SUMMARY OF RECONSTRUCTION

The State of Connecticut, State Police Forensic Science Laboratory as a result of an exhaustive effort by highly distinguished and dedicated experts to reconstruct and reenact the tragic events occurring on July 13, 1999, issued a report as to its findings (See Appendix for a copy of such report).

It made findings as to the initial stopping by Officer Breen of the Camero operated by Steven Guerette and occupied by Victoria Cooper; the location of such stopping and the subsequent foot chase of Guerette by Officer Breen; and Officer Breen being confronted by the Camero traveling eastbound on Route 80 as he returned to the area of Route 80. Such conclusions are in part based upon the location of evidence, such as the handcuffs found on Route 80 and the pattern of fragments of glass from the driver's side window found in the road.

Moreover the report concluded, based upon the glass pattern and location of two cartridge casings fired from Officer Breen's weapon that the vehicle traveled a distance of about 177 feet eastbound from the original point of being stopped to the location where Officer Breen fired two shots at the vehicle while standing near the center of the road.

The report indicates:

The exact position of the officer at the time of the shooting incident cannot be positively determined at this time. His general location was determined based on the location of the two spent cartridge cases, the location of the glass fragments, the trajectory patterns, and the ejection patterns of cartridges fired from the weapon. p. 9-10.

Also:

The first was fired at the Camero when the officer was in front of and slightly to the right of the vehicle. This bullet impacted the hood of the vehicle and ricocheted. p.10.

The bullet trajectory was at a downward angle of approximately 10 degrees.

Also:

The officer fired a second shot as the Camero began to pass him. The bullet went through the driver's window and entered the decedent's left side. The bullet continued to travel through the decedent's body and exited through her right chest area. p.10.

"The trajectory was from left to right and downward at an angle of approximately 65 degrees." p.9

13

The presence of lead, antimony and barium (substances ejected from a weapon upon the firing of a bullet) taken found on the exterior of the driver's side door indicate that the officer was "relatively close to the vehicle at the time he discharged the second shot." p.10.

Moreover, "at the time of the shooting the vehicle and the officer were involved in a series of dynamic movements." p.10. That is both the vehicle and Officer Breen were in motion during this time.

Also:

Although the exact speed of the Camero at the time of the shooting is unknown, it is clear that the vehicle was not moving at a speed under ten (10) miles per hour.

The report provides a speed/distance chart which shows at 10 miles per hour the vehicle traveled the distance from the initial point of stopping to the shooting location in 9.5 seconds, and at 20 miles per hour 6.5 seconds, thirty miles per hour, 6.0 seconds, and forty-five miles per hour at 5.3 seconds. p.6.

The report states:

Although the speed of the Camero at the time of the shooting is unclear, it is clear from the experimental results that the vehicle was not stationary or traveling at a low speed. Based on the location of the spent cartridge casings and the impact points of the bullets on the Camero, the entire shooting incident took place within seconds. p. 10-11.

After the shots were fired, the vehicle traveled in a diagonal direction across Route 80 in a northeasterly direction hitting the guard rail on the westbound side of the road.

"Glass fragments were deposited diagonally across Route 80 for a distance of approximately 110 feet" between the point where the second shot was fired and along the path the car traveled before it came to rest.

After being hit by the shots, the vehicle traveled approximately 240 feet before coming to rest.

14

## CONCLUSION

Section 51-277a, of the Connecticut General Statutes, provides that "the Division of Criminal Justice shall cause an investigation to be made whenever a peace officer, in the performance of his duties, uses deadly physical force upon another person and such person dies as a result thereof . . ." Traditionally, the State's Attorney for the Judicial District where the death occurs, represents the Division of Criminal Justice in such capacity. The State's Attorney must not only make a finding as to the circumstances of the incident, but also must make "a determination of whether the use of such deadly physical force by the police officer was appropriate (reasonable) under Section 53a-22", Connecticut General Statutes, and a determination as to "any future action to be taken by the Division of Criminal Justice as a result of the incident."

Based upon a thorough and professional investigation it is reasonable to find the following facts.

On July 12, 1999, sometime around 9:30 p.m., Steven Guerette, while driving a red Camero registered to his brother John Guerette, picked up Victoria Cooper at her place of employment in West Haven. The two had been close acquaintances for some period of time. They both drove to New Haven where Guerette purchased crack cocaine. They then drove from New Haven to North Branford, arriving around between 1:00 a.m. and 1:30 a.m. on July 13, 1999.

Between the time they left New Haven and the time they arrived at the Xtra Mart Store in North Branford around or after 1:00 a.m., they both ingested cocaine. It is probably that such substance was crack cocaine also called rock cocaine. They stopped at the Xtra Mart Store and Steven Guerette used the telephone in the parking lot. Officer Breen who was on routine patrol in a marked police car initially observed Guerette using the telephone. Officer Breen continued to observe the vehicle and the occupants as he drove by the location on three occasions. Also, the occupants watched the officer. Officer Breen, who was in communications with his department was advised that the Camero was registered to John Guerette, that John Guerette's license, and accordingly his right to operate a motor vehicle, was under suspension, and John Guerette had a prior criminal history. Steven Guerette, after a period of time, drove out of the Xtra Mart Store parking lot and took a right turn traveling eastbound on Route 80 which is also known as Foxon Road.

The statements given by Officer Breen have been compared with the statements given by Mr. Guerette, other witnesses to various aspects of the overall incident, and all of the forensic evidence in order to not only reconstruct what occurred early that morning but also to assess the credibility of Officer Breen. Based upon this evaluation there is no indication that Officer Breen did not candidly and honestly relate what he perceived as occurring during the overall incident. The reconstruction is in no way inconsistent in any significant way with the Officer's statements.

Officer Breen observed the vehicle cross over the center line and return to its proper lane on several occasions. The vehicle was pulled over nine tenths of a mile from the Xtra Mart Store.

15

Officer Breen, based upon the information available to him, was legally justified in pulling over the vehicle to ascertain whether the operator was licensed to operate a motor vehicle. Officer Breen was also legally justified in stopping the motor vehicle based upon the combination of his observations at the Xtra Mart Store with respect to what he considered to be suspicious behavior by both occupants of the vehicle, that is their continuously looking at him, their moving about in the vehicle both at the parking lot and while driving, and observing the vehicle cross over the center line on several occasions. Also, merely crossing the center line on several occasions would independent of other circumstances justify the stopping of the Camero.

Upon stopping the vehicle, Officer Breen was legally entitled to ask the operator, Mr. Guerette, to exit the vehicle. Moreover, based upon the totality of his observations up to that point as previously mentioned, and the perceived nervous type movements exhibited by both, and indications of being under the influence of alcohol or drugs, Officer Breen was justified in conducting a patdown of Guerette for the officer's protection.

It is unclear based upon the evidence whether Officer Breen exceeded the legal limits of a patdown. Such issue is however not pertinent to the ultimate question as to the justifiability of Officer Breen's later conduct.

Officer Breen, as a result of such procedure and admissions by Mr. Guerette, had probable cause to arrest Guerette for motor vehicle and narcotic related violations.

It is also determined that Mr. Guerette fled from Officer Breen and that the officer pursued him. The officer ultimately discontinued such pursuit after Guerette fled into a wooded area near the intersection of Stroud Road and Route 80. Officer Breen then returned to Route 80 and at such time heard the engine of the Camero accelerating. He observed the vehicle, now operated by Victoria Cooper, being driven in his direction down the road. Officer Breen eventually was standing on or near the center line of Route 80. The vehicle traveled a distance of about 177 feet from the original location to the location where Officer Breen fired two shots. It is reasonable to conclude that officer Breen, as he states, initially attempted to stop the vehicle by waiving his arms and yelling for it to stop. Common sense also suggests that he did not stand in the road passively waiting as the vehicle moved toward him. Officer Breen at some point drew his weapon and fired two shots at the oncoming vehicle. The first shot struck the hood and was deflected into a nearby grassy area. The second shot passed through the driver's side window striking Victoria Cooper on the left side of her upper body and exiting on the right side. Such shot caused her death. As the reconstruction report indicates, it is not possible to precisely pinpoint the speed of the vehicle or the location of Officer Breen with respect to the vehicle at the time the shots were fired. The reconstruction and re-enactment reasonably indicate Officer Breen was standing near the center of Route 80. The vehicle, according to the report, was "not moving at a speed under ten (10) miles per hour" and it "was not stationary or traveling at a low speed." Officer Breen estimated the speed of the vehicle to at around twenty-five to thirty miles an hour. The reconstruction report set a minimum speed of ten miles an hour without ruling out a higher rate of speed.

16

However speed is only one factor in evaluating what Officer Breen reasonably perceived. The Camero traveled about 177 feet from the starting point until the shots were fired. Such distance would take about 9.5 seconds at ten miles per hour, 6.5 seconds at 20 miles per hour and 6.0 seconds at thirty miles per hour.

Based upon Officer Breen's estimation of speed, it is reasonable to conclude that the time period would be closer to 6 than 9.5 seconds.

Part of the period during which Officer Breen observed the vehicle in motion was consumed by the officer's efforts to stop the Camero. Accordingly, several seconds were consumed leaving only several seconds remaining before the vehicle reached his location.

Officer Breen indicated the vehicle was 50 feet from him when he fired the first shot. The reconstruction and re-enactment is consistent with a shorter distance.

When the first shot was fired it has been determined Office Breen was in front and slightly to the right of the vehicle. When the second shot was fired within seconds, the car was actually at his location as "it began to pass him." Based on this and the gunshot residue on the exterior of the passenger door, it is concluded the officer was "relatively close to the vehicle." Officer Breen stated that after firing the first shot he "fired a second shot approximately one second later as I quickly moved to the right to avoid being struck by the car as it was still coming directly at me." This account is consistent with the reconstruction report and is indicative of the car nearly being at the officer's location as he stepped to the side and fired. Moreover, the officer's account is consistent with the reconstruction report as to both the vehicle and Officer Breen being in motion at this time as well as in close proximity to each other.

Section 53a-22, provides, in part that:

> A peace officer . . . is justified in using deadly physical force upon another person . . . only when he reasonably believes such is necessary to: (1) defend himself or a third person from the use or imminent use of deadly physical force.

However, in determining whether Officer Breen was justified in using such force, the test is not whether he personally believed he was in jeopardy of "deadly physical force." Rather, the question is, whether he "reasonably believes" he was at such risk. That is, what a reasonably well-trained officer would have believed.

It is significant that courts have held that "(I)t is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon. *State v. Aceves-Rosales*.

The forensic science reconstruction is helpful in approximating, among other things, what occurred as to the movement of the vehicle, the movement of Officer Breen in relation to that

17

vehicle, and where Officer Breen was with respect to the vehicle when the shots were fired.

Such information understandably does not directly address the ultimate question of what a reasonable police officer would perceive at the time of the incident.

The facts indicate Officer Breen returned to the roadway of Route 80 and it was at that time he observed the Camero proceed in an easterly direction toward him. It would be significant to a reasonably well trained officer, in assessing whether the vehicle posed a threat of harm, that the vehicle did not move down the road in the officer's direction until the officer appeared on Route 80. The timing of such movement is consistent with one perceiving a threat of personal risk.

Moreover, the fact that the operator did not respond to both yelling and waiving of hands also is supportive of the officer's belief that the operator was intending to inflict harm and/or flight.

Also, Officer Breen believed that the operator was possibly under the influence of drugs or alcohol. Officer Breen was in the center of the road and the vehicle was seconds away in travel time when the shots were fired.

In assessing the reasonableness of Officer Breen's stated belief that he was at risk of deadly physical force, it is necessary to consider whether Officer Breen could have reasonably and safely removed himself from such risk without resorting to the use of deadly physical force.

The reasonableness of an officer's decision to use deadly force is not to be determined based upon a dispassionate and analytical critique at some remote time and place within a safe sanctuary.

Rather:

> The calculus of reasonableness must embody allowance for the fact
> that police officers are often forced to make split second judgments -
> in circumstances that are tense, uncertain and rapidly evolving - about
> the amount of force that is necessary in a particular situation.
> *Graham v. Connor*

Also, the legal standard to apply is whether a reasonable officer at the time would have acted as did Officer Breen, "rather than with 20/20 vision of hindsight." *Graham v. Connor*

Officer Breen was standing in the middle of the road and at that point the vehicle was seconds away from him and there was little time to evade the vehicle. Moreover, as stated by Officer Breen and supported by the evidence the officer was fatigued from the pursuit and assumably his ability to move quickly was diminished.

It cannot be determined at this time whether he could have safely extricated himself from the situation without firing his weapon. It is possible that another officer may have acted differently

18

and safely withdrawn from the predicament without resorting to the use of fatal force.  Also, it is unclear whether Officer Breen's actions effectively diminished the threat to him.  An officer's actions may be found reasonable even where "officers of reasonable competence could disagree" on the proper response to the situation.  ***Malley v. Briggs[1]***

Also, even where an officer creates a situation in which the use of force becomes necessary the court has held that the officer's actions leading up to a shooting situation are irrelevant.

Rather:

> The reasonableness of the inquiry depends only upon the officer's knowledge of circumstances immediately at the moment he made the split second decision to employ deadly force.  ***Maria Salim v. Administrix v. Proulx***

Also, the intent of Victoria Cooper is not critical in assessing the reasonableness of Officer Breen's conduct.  As previously discussed the issue is what Officer Breen reasonably perceived based upon the information available to him.  It is, based upon Steven Guerette's history  (see Appendix) possible that Ms. Cooper was attempting to flee rather than cause harm to Officer Breen.  Guerette has been arrested at least nine times.  Many of such incidents involved drug related charges.  It is of particular significance that on one occasion Guerette, after being stopped in a car by a police officer, drove off causing minor injury to the officer's arm.  Upon being later arrested, Guerette stated that he fled to prevent the seizure of drugs in the car.  On another occasion the vehicle in which he was a passenger was stopped.  He exited the vehicle at the request of the officer and then yelled for the female operator to drive away.  The driver did this in a reckless manner putting the officer at risk.  The driver later told the officer that there were drugs in the car and Guerette had on more than one occasion told her to flee if stopped by police to prevent the seizure of drugs in the vehicle.  In 1999 Guerette fled from police at speeds of 112 miles per hour.

It may be that Ms. Cooper may have been driving off pursuant to Guerette's established modus operandi to prevent the seizure of 18 packets of cocaine and drug paraphernalia located in the car.  If such was Ms. Cooper's intent then Guerette may have been responsible for setting the events in motion that tragically resulted in the death of Ms. Cooper.

---

[1]The North Branford Police Department personnel file concerning Officer Michael Breen was reviewed as part of this investigation.

It contained no evidence that Officer Breen, during his almost 15 years as a police officer was disposed to assaultive or inappropriately aggressive conduct in the performance of his duties.

Also, on July 13, 1999, Officer Breen was duly certified by the police officer's Standards and Training Council as to all mandatory training.