UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARGARET COWAN,<br>  as Administratrix of the<br>  Estate of Victoria Cooper,<br>      Plaintiff, | | |
| V. | : | CIVIL NO.: 3:00CV00052(RNC)<br>ALL CASES |
| MICHAEL BREEN,<br>      Defendant. | : | |
| MARGARET COWAN,<br>  as Administratrix of the<br>  Estate of Victoria Cooper,<br>      Plaintiff, | | |
| V. | : | CIVIL NO.: 301CV00229 (RNC) |
| TOWN OF NORTH BRANFORD<br>      Defendant. | : | JUNE 1, 2005 |

**MEMORANDUM RE: OPINIONS OF DR. HENRY LEE**

Dr. Henry Lee led a State Police team that attempted to reconstruct the circumstances of the shooting. The results of that effort were described in a reconstruction report co-authored by Dr. Lee. A copy of the report is attached to this Memorandum as Tab 1. Dr. Lee's findings have been the basis for the parties' own reconstruction efforts and are for the most part unassailable. In certain limited respects, however, the report and findings did not purport to meet the standards of Fed. R. Evid. 702 and are inadmissible under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

I.  **THE RECONSTRUCTION REPORT'S ESTIMATE CONCERNING THE MOST PROBABLE VERTICAL ANGLE OF THE FIRST BULLET SHOULD NOT BE ADMITTED**

The reconstruction report says that:

> The bullet defect in the front hood of the Camaro was located and marked, as shown in photograph #25.  The trajectory of this bullet that caused the defect was determined by positioning rods and by laser sighting, as shown in photograph #26.  The trajectory of the bullet was determined to be from front to back, right to left and downward.  The angle of impact at the hood was approximately ten (10) degrees, as shown in photograph #27.  Based on the trajectory of the bullet, and the angle of impact, the most likely location of the police officer at the time of the shooting was established.

Reconstruction Report at 6-7.

The reconstruction report did not purport to be based on any testing or investigation to determine whether there is a consistent relationship between the downward angle of the bullet penetration mark and the trajectory of the bullet. In fact, when experts for both plaintiff and defendants subsequently did such testing, it showed that there is no predictable relationship between the two angles (although, importantly for this case, there is direct relationship between the *horizontal* angle of the penetration mark and the bullet trajectory). Experts for both sides tested by firing bullets from known angles and comparing the angle of the shot with the angle of the bullet penetration mark. The testing, done independently for defendants and plaintiffs by opposing experts, reached the same result. Thus, defendants' expert Dr. Manning testified to his findings about the downward angle as follows:

> A.   … the police stuck a rod down there.  Miller [an engineer hired by plaintiff] stuck a rod down there, and they took a laser.  Well, it's pretty obvious after we put eight holes through there …   There isn't any way with that bullet tearing that up like that that you can--you can measure what that angle is in any kind of accuracy.
> …
> Q.   When did you stick a stick in there?
> A.   When we had the hood, I stuck a stick in there two or three times.  We've got-- we've got some quarter- inch dowel pins, and some three-eighths-inch dowel pins that we'd stick in there.
> Q.   And what were you able to determine using the dowel pins?

2

> A.   … I can put the dowel pin in there, though, and I can get-- I can get a pretty vari--wide variation in numbers when I put the dowel pin in there, because of the way that bullet, when it's spinning, tears that hole up.
> Q.   Do you get a wide variation in the [horizontal] angle to the center line from the way the bullet tears the metal up?
> A.   Oh, no. You don't get any variation in center line where you're shooting, because we're able to measure very carefully that line in front of it in the right side. But going down in, no.

Deposition of Charles Manning, March 7, 2002, at 110-12 (attached as Tab 2).

Plaintiff's expert, Kent Schwendy, got the same result.

> A.   ...I don't think that the way that they determined ten degrees was reliable by using the penetration mark on the hood. In the testing that I did, one of the things that I noticed was that even though I was using a controlled situation so that the vertical angle was always the same between the fire arm and the sheet metal that I was using as a target. Some of the bullets would penetrate down through the metal. Some would glance off and go up. Some would actually tear very long trails through the metal. The vertical angle that resulted from those penetrations then varied greatly, and I didn't see any form or pattern based on the original angle.

Deposition of Kent Schwendy, May 13, 2005, at 139 (attached as Tab 3).

The report's estimate was apparently based simply on the observation itself; there is no suggestion in the report that there is a scientific basis for inferring the angle of flight from the angle of the penetration mark. Without a scientific basis for the inference, the estimate based on the inference should not be admitted.

II.   **THE RECONSTRUCTION REPORT'S CONCLUSION CONCERNING THE MOST LIKELY LOCATION OF THE SHOOTER AT THE TIME HE FIRED THE FIRST BULLET SHOULD NOT BE ADMITTED.**

The relevance of the vertical angle is identified in the paragraph of the reconstruction report quoted above. If the downward angle is known, it can, as the paragraph says, give information about the likely location of the shooter. The reason this is true is that with a ten-degree downward angle, as a matter of geometry the shooter can only be so far away from the car and not have the height of the muzzle be unrealistically high. (For example, if the shooter is just fifteen feet in front of the penetration mark – eleven feet in front of the Camaro --  the

3

muzzle of the gun would have to be as high as the top of the officer's head.) However, since the estimate of the downward angle of the first bullet is not reliable, the estimate of the shooter's position at the time of the first shot is not reliable either and should not be admitted.

At one point the reconstruction report offered a different rationale for locating the shooter, but it is not clear what exactly it referred to. One of the conclusions of the report is:

> The exact position of the officer at the time of the shooting incident cannot be positively determined at this time. His general location was determined based on the location of the two spent cartridge cases, the location of the glass fragments, the trajectory patterns, and the ejection patterns of cartridges fired from the weapon.

Reconstruction Report at 9-10.

It is not clear if this paragraph refers to the first shot, the second shot, or both. In any case, for the reasons discussed above it does not support an admissible opinion about the location of the shooter at the time of the first shot. Additionally, Dr. Lee was very careful to emphasize that the probative value of the location of spent cartridge casings is very limited because cartridges can so easily move. As he explained at his deposition:

> Q. So the bullet casing on a roadway can roll or bounce or be kicked by a person on the scene?
> A. Could be.
> Q. Those are all things that would affect the location?
> A. Location, exact location of the finding.

Deposition of Henry Lee, October 3, 2002, at 24 (attached as Tab 4).

Without an estimate of how likely it would be for the bullet casing to be moved – and Dr. Lee did not suggest that he could make such an estimate – there is simply no basis for saying that a particular location or area is probably where the shooter was when he fired the first bullet.[1] (Notably, the situation is different for the second bullet because

---

[1] Dr. Lee appears to agree. The reconstruction report notes that all that was done was that "the shooter's *possible* location was estimated" Reconstruction Report at 5 (emphasis added)

the Camaro left a trail of broken glass after that bullet shattered the driver's window, and the beginning of that broken glass trail gives a reliable estimate of the location for the Camaro at the time of the second shot.)

### III. TESTIMONY THAT THE POSITION OF THE SHOOTER CANNOT BE DETERMINED SHOULD NOT BE ADMITTED

The reconstruction report concluded that the exact location of the shooter could "not be positively determined at this time." Reconstruction Report at 9. That statement may well have been accurate, but it is important that it not be converted into something more than it was.  As the words "at this time" show, the report simply reported on the extent of the available information at the time it was submitted and left the door open to further findings. And in fact the parties have subsequently obtained additional information through both testing – such as the test firings by defense and plaintiff's experts described above – and admissions under Rule 36.  It would be a misinterpretation and a misuse of the reconstruction report to offer either it or Dr. Lee's testimony to support a claim that it is *still* not possible to positively determine the position of the shooter.

### IV. EXCLUSION OF THESE OPINIONS IS REQUIRED BY LAW

#### A. Under Rule 702, Trial Judges Must Scrutinize The Reliability Of Proffered Expert Testimony.

The legal principles supporting these proposed exclusions are well known.  In *Daubert*, the Supreme Court held that Federal Rules of Evidence assign to trial judges the "gatekeeping" role "of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Court clarified that *Daubert* applies to all expert

5

testimony, not just scientific expert testimony, and explained that the objective of *Daubert* is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Federal Rule of Evidence 702, as amended in 2000, "incorporates the Supreme Court's guidelines for reliability of expert testimony set forth in *Daubert*." *United States v. Dukagjini*, 326 F.3d 45, 51 n.2 (2nd Cir. 2002). The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

*Daubert* further elaborates on the criteria trial judges should consider in evaluating expert testimony. "The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation'; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 266 (2nd Cir. 2002) (*quoting Daubert*, 509 U.S. at 593-94).

**B.     To Be Admissible Under Rule 702, Expert Analysis Must Be Reliable At Every Step.**

As the Second Circuit has emphasized, Rule 702 requires that each component of an expert's analysis must individually meet the *Daubert* standards of reliability. "To warrant admissibility . . . it is critical that an expert's analysis be reliable at *every step*." *Amorgianos*, 303 F.3d at 267 (emphasis added). "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* (quoting In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994)).

Based on the requirement that every step of expert analysis satisfy *Daubert*, the Second Circuit and other circuits have excluded flawed expert opinions even when certain elements of the underlying analysis were reliable. *See, e.g., Zaremba v. GMC,* 360 F.3d 355, 359 (2nd Cir. 2004) (upholding the exclusion of expert testimony as to design defect when there was a reliable basis for the opinion that an alternative design "would, in some respects, have better performance than the [car] involved in the accident," but no basis for the ultimate determination that the alternative design "would have resulted in greater safety in the rollover accident at issue"); *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1245 (11th Cir. 2005) (overturning the admission of expert testimony that a drug was dangerous when there was a reliable basis for the belief that a similar drug was dangerous but no basis for drawing the analogy between that drug and the drug involved in the case); *In re TMI Litig.,* 193 F.3d 613, 694-95 (3rd Cir. 1999) (upholding the exclusion of expert testimony that trees near Three Mile Island had been exposed to radiation when reliable dendrometric analysis of growth rings had not been supplemented by tests to exclude other possible causes of variation in tree growth); *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir. 1999) (upholding exclusion of expert testimony when there was reliable evidence that benzene was harmful but no reliable basis for drawing analogy between benzene

and chemical involved in case); *see also In re Rezulin Prods. Liab. Litig.,* 2005 U.S. Dist. LEXIS 3790 at *70 (S.D.N.Y. March 14, 2005) (excluding expert testimony as to harmful effects of drug despite scientific evidence linking the drug to certain harms, when attributing the specific harms involved in the case to the drug would require "extrapolation from the existing literature that never has been tested, peer-reviewed, published, or widely accepted").

These cases confirm the importance of the rule stated in *Amorgianos*: To warrant admissibility it is critical that an expert's analysis be reliable at *every step.* Most of the State Police reconstruction readily passes this test. But the three opinions identified above do not – as Dr. Lee might well be the first to affirm. Accordingly, they should not be admitted into evidence.

## **CONCLUSION**

The three opinions identified above – concerning the downward angle of the first bullet, the likely location of the shooter at the time of the first shot, and the inability to draw conclusions about the location of the shooter beyond those reached by the reconstruction report – should not be admitted. Alternatively, in the event that the defendants make a sufficient proffer, plaintiff requests that the Court hold an evidentiary hearing to determine the admissibility of the three opinions.

THE PLAINTIFF

By  /s/
    David N. Rosen
    400 Orange Street
    New Haven, Connecticut 06511
    (203) 787-3513
    CT00196
    E-mail: drosen@davidrosenlaw.com

## CERTIFICATION

I hereby certify that a copy of the foregoing Memorandum was sent first class mail, postage prepaid on June 1, 2005 to:

Thomas R. Gerarde, Esquire
Howd & Ludorf
65 Wethersfield Avenue
Hartford, Connecticut  06114


                                                /s/
                                     David N. Rosen