**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARGARET COWAN, | : | |
| ADMINISTRATRIX OF THE ESTATE | : | |
| OF VICTORIA COOPER | : | NO.:  3:00 CV 0052 (RNC) |
| | : | |
| v. | : | |
| | : | |
| MICHAEL BREEN | : | |

| | | |
|---|---|---|
| MARGARET COWAN, | : | |
| ADMINISTRATRIX OF THE ESTATE | : | |
| OF VICTORIA COOPER | : | NO.:  3:01 CV 0229 (RNC) |
| | : | |
| v. | : | |
| | : | |
| NORTH BRANFORD | : | JUNE 1, 2005 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE RE
TESTIMONY OF KENT M. SCHWENDY, P.E.**</u>

**I.    <u>BACKGROUND.</u>**

This case involves the death of a citizen, Victoria Cooper, who was shot by

Officer Michael Breen as she drove a motor vehicle towards him on a darkened

roadway in North Branford, Connecticut following a stop of that vehicle and escape of

the driver, Steven Guerrette.  Despite having ample opportunity to change direction and

avoid a confrontation, Cooper drove toward Officer Breen, who, fearing that the deadly

force embodied in a moving motor vehicle would be used against him imminently, fired

two shots from his service weapon at the vehicle. The first shot deflected off of the hood

of the vehicle; the second shot struck Cooper and fatally wounded her.

It is the defendants' contention that Officer Breen reasonably believed that his life was in danger of the imminent deadly force embodied by the motor vehicle driven toward him by Victoria Cooper.  The defendants submit Officer Breen is protected by the doctrine of qualified immunity and self-defense. Concerning the plaintiff's claim that the Town of North Branford violated the decedent's rights as a result of its failure to train its officers about shooting at motor vehicles, the defendants submit that there is no factual basis for this claim.

The plaintiff is expected to introduce the testimony of Kent Schwendy, P.E. Mr. Schwendy is a professional engineer. Mr. Schwendy's relevant experience is attached as **Exhibit A**.  Mr. Schwendy's report is attached as **Exhibit B**.  Excerpts from Schwendy's deposition transcript are attached as **Exhibit C**.

In his report, Schwendy identifies two assignments from the plaintiff. The first assignment was to develop a testing procedure to determine whether the original trajectory of a bullet could be reasonably calculated based on measurements of the associated impact hole. The second assignment was to calculate the most probable relative positions and locations of the vehicle, officer and firearm involved in the subject shooting.

In the plaintiff's section of the Joint Trial Memorandum, the plaintiff states that

Schwendy will offer the following opinions:

> This expert witness is an engineer and an expert marksman. He will testify to the following: 1. The methods and results of his tests firing bullets into sheet metal to determine whether there is a relationship between the angle from which a bullet is fired into metal like the Camaro hood and the shape of the strike mark made by the bullet. These include a) there is such a relationship for the horizontal angle, but not for the vertical angle; and b) the horizontal angle at which the bullet hit the Camaro hood was calculated to be 18 degrees, with a standard deviation of 1.5 degrees, so that there is a 95% chance that the bullet hit the Camaro hood at an angle of 15.5 degrees or more. 2.  The positions of the car and officer on the road at given points during this event may be determined to a reasonable degree of engineering probability based on data from Dr. Lee, the defendants, and other sources as shown in his report.  These data show that Breen was well off to the side of the Camaro when he fired the first shot and moved toward the Camaro between the first and second shots. 3. It is unlikely that Breen was moving to his right, toward the center of the road, when he fired the second shot for an additional reason – the extraordinary difficulty of the shot from such a position while making such movements. 4. The computerized reconstruction accurately depicts reliable information available to him and is an accurate reconstruction of the event. 5.  The findings of Dr. Manning, defendants' expert engineer, closely agree with the witness's findings and provide an additional basis for believing that the opinions are accurate. 6. The results obtained by testing are consistent with the characteristics of the weapon Breen used.

Plaintiff's disclosure in Joint Trial Memorandum, *supra.*

The defendants submit that Mr. Schwendy's testimony must be precluded as set forth below. The defendants request that this Court conduct a preliminary hearing into Mr. Schwendy's qualifications as well as his opinions as contemplated by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## II.     <u>LAW AND ARGUMENT.</u>

**A.    STANDARD OF REVIEW.**

Fed.R.Evid. 702, which governs the admissibility of scientific or technical expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

Expert testimony must be helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson.  *Id.*

In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court made clear that the district court has a "gatekeeping" function under Rule 702, and is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. In fulfilling this role, the district court must consider both the reliability and relevance of the proffered testimony. In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on "sufficient facts or data;" (2) that the testimony "is the product of reliable principles and methods;" and (3) that "the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In so doing, the district court must "make certain that an

expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1993).

Although Rule 702 sets forth specific criteria for the district court's consideration, these criteria are not exhaustive. The district court may consider a number of other factors in determining the reliability of the proffered testimony, including: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the technique's known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593-94.

Expert witnesses may not testify based on their personal view of the veracity of a lay witness's testimony. *See United States v. Scop*, 846 F.2d 135, 142 (CA2 1988), *rev'd in part on other grounds*, 856 F.2d 5 (CA2 1988); *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1072 (CA3 1996). Similarly, "[Expert witness] statements embodying legal conclusions exceed[ ] the permissible scope of opinion testimony under the Federal Rules of Evidence". *United States v. Scop*, 846 F.2d at 139; *see also, United States v. Bilzerian*, 926 F.2d 1285, 1294 (CA2 1991), *citing Expert*

*Legal Testimony*, 97 HARV.L.REV. 797 (1984).

Whether to admit expert testimony is a matter left to the discretion of the trial judge and is set aside only when the decision is "manifestly erroneous." *United States v. Schwartz*, 924 F.2d 410, 425 (CA2 1991).

Whether the expert is "qualified" is initially a question for the Court. Fed.R.Evid. 104(a). There is no presumption that a witness is competent to give an opinion; it is incumbent upon a party offering an expert witness to establish that the witness possesses the necessary learning, knowledge, skill, or practical experience to enable him or her to give expert testimony. The Rule 104(a) inquiry requires the proponent of the expert to show by a preponderance of the evidence that the expert's opinion is admissible. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993), *citing Bourjaily v. United States*, 43 U.S. 171, 175-76 (1987).

**B.    MR. SCHWENDY'S TESTIMONY MUST BE PRECLUDED BECAUSE HE IS NOT QUALIFIED TO OFFER THE OPINIONS EXPRESSED IN HIS REPORT, IN HIS DEPOSITIONS TESTIMONY, AND IN THE DISCLOSURE IN THE JOINT TRIAL MEMORANDUM.**

The *Daubert* approach requires the district court to ensure that the "expert knows whereof he speaks." *Id.* at 590. In determining whether an expert does know "whereof he speaks" federal courts have generally looked at two things: (1) whether the proffered expert has minimal education or experience in a field that is relevant to the subject matter, and (2) whether the expert has sufficient expertise in the particular field in which

he is offering an opinion to enable him to give testimony that is capable of assisting the trier of fact. To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony. *See United States v. Diallo*, 40 F.3d 32, 34 (CA2 1994).

This Court must conduct an initial inquiry into the qualifications of a proffered expert before anything else. Fed.R.Evid. 104(a). There is no presumption that a witness is competent to give an opinion. Once qualified, the court must then examine the opinions themselves. The undisputed evidence demonstrates that Mr. Schwendy, while a bright, personable, professional engineer, is simply not qualified to offer the opinions contained in his report.

The following evidence is undisputed:

1.    Schwendy is a professional engineer;

2.    He has never performed a motor vehicle accident reconstruction or taught the same;

3.    He has never performed a crime scene reconstruction or taught the same;

4.    He has never conducted or taught terminal ballistic or bullet trajectory analysis;

5.    He has never attempted to reconstruct a bullet trajectory against a motor vehicle under these circumstances;

6.    Other than being proficient in target shooting, Schwendy has no specialize knowledge of firearms;

7.    He has no knowledge of the science of toolmarks;

8.    He is not regularly engaged in the forensic determination of events;

9.    He has never written any professional papers on forensic determination of events, bullet trajectory analysis, toolmark analysis or terminal ballistics;

10.    He does not posses education beyond a BS degree in civil engineering;

11.    He does not hold any professional certifications or memberships in any specialized field related to accident reconstruction, crime scene reconstruction, or in the field of firearms and toolmark examiners;

12.    He is not a criminologist; and

13.    He did not consult a single source of information from any of the above sources to obtain even an informal familiarity with any of the above subjects (**Exhibit B**, p. 1-2, documents and information

reviewed).

*See* **Exhibit A.**

All of these facts could be evaluated and explored by a *Daubert* hearing before the Court. On this basis, Schwendy is not qualified to develop the tests he performed. His principal experience is in project management.  Particularly, Schwendy was project manager and lead designer for the UCONN Football Stadium at Rentschler Field. There is no mention in the "Relevant Experience" section of his resume on any issue related to the opinions expressed in his report.  Additionally, Schwendy does not possess any of the credentials, much less all of them, possessed by Dr. Henry C. Lee or any member of his professional staff. *See* **Exhibit B**.

In *Wilson v. Woods*, 163 F.3d 935 (CA5 1999), the Court of Appeals for the Fifth Circuit affirmed the district court's decision to preclude a fire reconstruction expert from testifying as to an accident reconstruction in a case which arose from an automobile and truck collision. The district court found that the expert in question, Mr. Rosenhan, while well-qualified to reconstruct fires, was not qualified to reconstruct accidents. In reaching this determination, the district court ascertained that Rosenhan, (1) while having taught at the college level, never was a professor, (2) never taught accident reconstruction, (3) possessed no degree or certification in accident reconstruction, (4) had not completed the requirements for certification by the Association of Accident Reconstructionists, and (5) had be previously held unqualified to testify about accident

reconstruction. *Wilson*, 163 F.3d at 937. The district court also determined that

Rosenhan (1) had never conducted any studies or experiments in the field of accident

reconstruction, (2) did not take any measurements or collect any data from the scene,

(3) did not inspect the mechanical parts in this case, (4) based his calculations on

publically accessible data, and (5) was unable to show how his training or experience as

a mechanical engineer gave him expertise in the field of accident reconstruction that

was distinguishable from training received by other mechanical engineers. *Id.* In ruling

from the bench on this issue, the district court observed:

> Here, we don't have simple physics questions.  If we did, according to Mr.
> Rosenhan's testimony, then anyone who has any background in physics
> and mathematics, which any engineering graduate of any university in the
> country would have, would be capable of looking at whatever tables the
> government publishes and thereby become an expert. I don't think that's
> what an expert is supposed to be or is supposed to do in order to qualify
> as an expert.

*Wilson*, 163 F.3d at 938.

The Court of Appeals agreed, concluding that Rosenhan's "expertise" in accident

reconstruction was no greater than that of any other individual with a general scientific

background. The Court of Appeals observed that Rosenhan had never taught accident

reconstruction courses, never experimented or conducted studies in the field, and never

published anything on the subject. The Court of Appeals affirmed the preclusion of

Rosenhan as he had done little to acquire or practice the requisite expertise in the field.

Based on the reasoning in *Wilson*, this Court should preclude any testimony from

Mr. Schwendy as he is unqualified to act as an expert. This Court must exercise its gate-keeping function and preclude Mr. Schwendy.  Mr. Schwendy has merely taken his general scientific background and applied it to the facts of this case.  That does not make him an expert witness.  Schwendy has never performed any of the tasks, tests or procedures upon which he bases his opinion before getting the assignment from the plaintiff. He has, in effect, made this entire process up as he went along.  While it may be based on his "general scientific background" associated with earning his degree in civil engineering, Schwendy lacks any professional experience in the forensic determination of events, crime scene reconstruction, accident reconstruction, terminal ballistic analysis, toolmark analysis or any other field causally related to the determination of events. Simply put, Schwendy does not possess the knowledge, skill, experience, training, or education that would make him an expert.  Even if his intentions are good, he has no prior experience on which to base his opinions. *See, e.g., United States v. Hirschberg*, 988 F.2d 1509, 1514 (CA7 1993) ("Expert opinion is gained from a 'special skill, knowledge, or experience,' and is a reasoned decision drawn from the witness' expertise." (*quoting United States v. Benson*, 941 F.2d 598, 604 (7th Cir.1991))); *United States v. Kladouris*, 964 F.2d 658, 670 (7th Cir.1992) (affirming district court's ruling that a proffered witness's lack of training in chemistry prevented him from testifying as an expert on the significance of the presence of chemicals at the scene of the fire). Schwendy, not only lacking formal training, education or employment,

also lacks any experience that could qualify him as an expert.

The bar for expert testimony is high and Mr. Schwendy cannot reach it.  In *Gates v. City of Memphis*, 210 F.3d 371, 2000 WL 377343 (CA6 2000), the Court of Appeals for the Sixth Circuit affirmed the trial court's decision to preclude an claimed expert who was offered to provide a trajectory analysis. That expert, Rocky S. Stone, appeared to have the requisite qualifications. The court observed that Stone was a police officer for 19 years, the last 12 of which he was assigned to the criminalistic section, or crime lab, where he was assigned to the latent fingerprint and firearm tool mark units. The court also observed Stone also participated in the reconstruction of shooting incidents. His education includes graduation from the police academy in 1973, some course work toward an unfinished degree in police science, and a number of courses and training seminars on crime scene investigation. *See Gates*, 210 F.3d 371, 2000 WL 377343, *3. The court rejected the claim that Stone had sufficient knowledge, skill, experience, training, and education as a crime scene investigator and reconstructionist to testify about the probability of the threat based on trajectory analysis. *Id.*

Schwendy's opinions are essentially the same. He is providing a trajectory analysis of the bullet that killed Cooper and the relative positions of the subject vehicle and Officer Breen. It is undisputed that Schwendy has never been a police officer, never been employed in a crime law, never reconstructed shooting incident, has never taken course work or seminars on crime scene investigation. Schwendy is not even as

qualified as the precluded expert in *Gates*, who appeared to be qualified on the surface. Courts have observed that crime scene reconstruction and testimony concerning bullet trajectory have been recognized as areas of expertise.  *Rowe v. State*, 276 Ga. 800, 806-7, 582 S.E.2d 119, 126-7 (2003); *Brannan v. State*, 275 Ga. 70, 74(c), 561 S.E.2d 414 (2002); *Speed v. State*, 270 Ga. 688, 692(17), 512 S.E.2d 896 (1999). Schwendy has no expertise in this regard. For example, Schwendy's opinions are entirely based upon measurement of the angle of the bullet strike mark. Mr. Schwendy has no training, experience or knowledge to qualify him to even know how to place the protector to measure this angle. *Rowe v. State*, 276 Ga. 800, 806-7, 582 S.E.2d 119, 126-7 (2003) (experience as law enforcement officer for nearly 10 years, certification as ID technician, training in crime scene reconstruction and bullet trajectory; attendance at advanced reconstruction workshop; and instructor at the police academy in crime scene processing qualified police officer to testify as expert in crime scene reconstruction and bullet trajectory").

Accordingly, this Court must preclude Mr. Schwendy from testifying. In addition, the defendants move to exclude Schwendy's report and photographs and the animation produced in connection and as a result of his testing and analysis, as all of these are derived from the opinions of Mr. Schwendy.  He is unqualified to offer any opinions in this case. His opinion is little more than the application of general scientific principles to the assignment given to him by plaintiff's counsel. This Court must exercise its gate-

keeping function and preclude his testimony. To allow Mr. Schwendy to testify would be an abuse of discretion and reversible error in this case.

**C.    SCHWENDY'S OPINIONS MUST BE PRECLUDED BECAUSE HIS OPINIONS ARE UNRELIABLE AND ARE NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS.**

If the Court concludes that Mr. Schwendy is qualified, a position the defendants expressly reject, the Court must evaluate his opinions to fully discharge its gatekeeping duty under Fed.R.Evid. 702 and *Daubert*.  The Supreme Court in *Daubert* established a two-step approach the district court must take when faced with a proffer of scientific testimony under Rule 702: (1) whether the expert's testimony is reliable; and (2) whether the testimony assists the trier of fact. *Id.* at 588-593.  Rule 702 requires that expert testimony be: (1) "based upon sufficient facts or data"; (2) "the product of reliable principles and methods"; and (3) "applied ... reliably to the facts of the case." Fed.R.Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 & n. 7, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(holding that pursuant to the trial judge's "gatekeeping responsibility," she "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

The Court must preclude Schwendy's opinion of any extrapolation of bullet strike to ascertain position of Officer Breen at the time of the shooting. If precluded, Mr. Schwendy cannot offer any other opinions as his opinion stands or falls on the methodology of the bullet strike extrapolation. If his opinion on the bullet strike is

precluded, the animation is precluded as well as it can only be demonstrative of Mr.
Schwendy's conclusions and nothing else.

The bulk of the inputs into Schwendy's iterative process are numerical averages
of ranges that were found in the case materials.  Rather than examine the data ranges
themselves, Schwendy selected averages.  Such selective identification of averages
does not make his opinion more probable than not. For example, Schwendy opines that
muzzle of the handgun held by Officer Breen was 2.58 feet from subject vehicle when
the second shot was fire.  **Exhibit C**, Schwendy Depo., p 150. This conclusion is based
on Dr. Lee's testimony that gun shot residue shows that Officer Breen was between 12"
and 50" from the subject vehicle.  Ignoring the wide range, one to four feet, Schwendy
arbitrarily selected the average. "An analysis is only as good as the data upon which it
rest [s]" and " 'it is important to verify the accuracy of the data collection.' " *Rowe
Entertainment, Inc. v. William Morris Agency, Inc., 2003 WL 22124991 *4
(S.D.N.Y.Sep't.15, 2003),* (quoting Federal Judicial Center, Reference Manual on
Statistics 90 (2d ed.2000)). Data relied upon by an expert as the basis for an opinion
that is neither verified as to its accuracy and completeness or, if from a recognized
source, is "speculative in nature and therefore inherently insufficient," should be
excluded. *Rowe Entertainment, Inc., supra*, at *9 (*quoting Boucher v. U.S. Suzuki Motor
Corp.*, 73 F.3d 18, 21 (2d Cir.1996)).

Turning to the bullet trajectory analysis, Schwendy's methodology undercuts the

reliability of his data.  Although Schwendy stated that he fired shots at the test metal

from a variety of angles to take in preliminary data, and then more at 12 degrees, the

shots were fired with the handgun in Schwendy's hand, supported by a piece of wood.

Clearly, the angle identified by Schwendy is based on his ability to hold the handgun at

that angle.  Understanding the violent nature of a handgun discharge, the scientific

practice would have been to place the gun in a pistol rest or vice, properly weighted so

that the discharge of the gun does not affect the aim and eliminate operator influence.

Schwendy did not do this, although such a practice is standard for the calibration of gun

sights and other accuracy tests. Indeed, a test conducted by Mickey L. French, Jr.,

published in the *AFTE Journal*, Vol. 29, No. 1 (Winter 1997) titled "Impact Angle

Determination Through Plastic Windows", Mr. French specifically utilized a gun rest to

make sure the angle was fixed when he fired at various angles against a fixed target.

*See* **Exhibit D**.[1] at p. 74.

Similarly, Schwendy, while attempting to ascertain the bullet trajectory, failed to

take into consideration the road structure as it affect bullet path angles.  Particularly

relevant to this issue would have been D.H. Garrisson, Jr.'s article on this subject

published in the *AFTE Journal*, Vol 30, No. 3 (Winter 1998) titled "Road Structure as it

Affects Bullet Path Angles in Vehicle Shootings". Mr. Garrision, an employee of the

_____

[1]The AFTE Journal is a peer-reviewed journal published by the Association of Firearms and
Toolmark Examiners. AFTE was founded in 1969 in recognition of the need for the interchange of
information, methods, development of standards, and the furtherance of research. *See*

Grand Rapids, MI Forensic Services Unit, aptly describes concerns to the determination of the vertical impact angle in vehicle shooting. *See* **Exhibit D.**

The most striking example of the defects in Schwendy's science is his assumption that the car is moving in a straight line parallel to the curb of the road. **Exhibit C**, Schwendy Depo., p. 68. Nothing could be further from the actual conditions. The road is plainly curved. **Exhibit F**, photographs of scene depicting curvature of the road.

The test concocted by Schwendy to ascertain the bullet trajectory angle is not the product of reliable principles or methods. The test is the product of Schwendy's imagination, and is not informed by generally accepted principles in the field of terminal ballistics or forensic science. As discussed above, the handgun used by Schwendy was merely held by him on a stick. Any claim that he fired it at a specific angle is subject to his inability to hold the same perfectly straight at the planned angle. This is impossible and he does not account for a margin of error in this regard.

Also, the target utilized by Schwendy bears no resemblance to the actual impact location on the hood of the subject vehicle. The subject vehicle was in motion towards the bullet as the bullet moved toward it. Schwendy's test does not account for this factor and does not even attempt to explain how this may impact the results of his test. Furthermore, the test target was merely a flat piece of sheet metal. The target did not

http://www.afte.org.

have the curves characteristic of the subject vehicle's hood. Moreover, Schwendy, when unable to reproduce bullet penetration in the target, arbitrarily turned the target to a downward angle different from the dimensions of the subject vehicle's hood. These factors alone compel rejection of Schwendy's methodology.  The test conditions must be substantially similar to the actual events in order to come up with reliable results.

Additionally, Schwendy's testing methodology is not a recognized test in the field of forensic science. His methodology is not approved by the forensic experts. Particularly, the world-renown expert in this field, Dr. Henry C. Lee, says that the trajectory angle cannot be reproduced with a test as envisioned by Schwendy. *See* Exhibit E, Depo. Lee, pp. 31-4, 36, 41, 48, 54-5, 58-9.

Because Schwendy never reconstructed crime scene or ever attempted such a bullet trajectory analysis, he has never had his methodology peer-reviewed or scrutinized by the relevant scientific community. This is especially so because he has never written a paper, article or note on this issue, much less had it published. Schwendy never consulted any person who has done this type of trajectory analysis or terminal ballistics before imagining the test he presents to the court as "expert testimony."

Schwendy also ignores the glass fragment evidence as well as the location of the spent bullet casings. He rejects the bullet casing evidence as irrelevant and did not study the phenomenon.  Not surprisingly, Schwendy's rejection of this evidence is ill-

informed.  In an article titled "Reconstructing Drive-by Shootings from Ejected Cartridge Case Location", authored by D.H. Garrisson, Jr. published in the *AFTE Journal*, Vol. 25, No. 1 (January 1993) (**Exhibit D**) considers spent bullet casing locations as an element in reconstructing a shooting scene.  Not having any experience in that science, or in bullet trajectory or terminal ballistics, Schwendy predictably ignores these issues or completely discounts them as unreliable because they conflict with his test results.

However, Rule 702 requires that an expert's opinion be "based upon sufficient ... data." Fed.R.Evid. 702. Where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence under Daubert. *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991 *9 (S.D.N.Y.Sep't.15, 2003) (excluding expert's testimony where expert "took no steps to clarify the accuracy of the data plaintiffs provided to him"); *Freeport-McMoran Resource Partners Ltd. Partnership v. B-B Paint Corp.*, 56 F.Supp.2d 823, 833 (E.D.Mich.1999) (unverified facts underlying challenged expert opinion required exclusion of expert testimony). When experts check the reliability of their studies to ascertain confidence in the results, they seek peer review of their data, methodologies and results.  Experts also look to other experts who have studied similar phenomenon and they compare their results.  They do not make assumptions in comparison studies.  In order for the comparison to be valid, the comparing expert must undertake a similar inquiry into the

data and methodologies of the comparison study.  Reaching the same results is

meaningless unless the comparison data and methodologies are themselves reliable.

The results in the comparison study could have been nothing more than computational

errors or the product of unreliable methodologies.  Therefore, Schwendy's confidence in

his opinions based on the findings of Dr. Manning, defendants' expert engineer, must be

precluded insofar as Schwendy expresses no opinion on the reliability of Manning's data

or methodology.

**III.    CONCLUSION.**

For the reasons set forth above, the defendants, MICHAEL BREEN and TOWN

OF NORTH BRANFORD, pray that their motion in limine is granted.

THE DEFENDANTS,
MICHAEL BREEN and TOWN OF
NORTH BRANFORD

/s/John J. Radshaw, III
Thomas R. Gerarde, ct5640
John J. Radshaw, III, ct19882
Jeffery E. Potter, ct26356
HOWD & LUDORF, LLC
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)

**CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges
prepaid, via U.S. Mail to the following counsel of record this 1st day of June 2005.

David N. Rosen, Esquire
400 Orange Street
New Haven, CT  06511

/s/John J. Radshaw, III
Thomas R. Gerarde
John J. Radshaw, III
Jeffery E. Potter