nUNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARGARET COWAN, ADMINISTRATRIX OF THE ESTATE OF VICTORIA COOPER | : : : : | NO.: 3:00 CV 0052 (RNC) |
| v. | : : | |
| MICHAEL BREEN | : | |

| | | |
|---|---|---|
| MARGARET COWAN, ADMINISTRATRIX OF THE ESTATE OF VICTORIA COOPER | : : : : | NO.: 3:01 CV 0229 (RNC) |
| v. | : : | |
| NORTH BRANFORD | : | JUNE 1, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE RE TESTIMONY OF BRUCE J. ROUNSAVILLE, M.D.**

**I.    BACKGROUND.**

This case involves the death of a citizen, Victoria Cooper, who was shot by Officer Michael Breen as she drove a motor vehicle towards him on a darkened roadway in North Branford, Connecticut following a stop of that vehicle and escape of the driver, Steven Guerrette. Despite having ample opportunity to change direction and avoid a confrontation, Cooper drove toward Officer Breen, who, fearing that the deadly force embodied in a moving motor vehicle would be used against him imminently, fired two shots from his service weapon at the vehicle. The first shot deflected off of the

hood of the vehicle; the second shot struck Cooper and fatally wounded her.

It is the defendants' contention that Officer Breen reasonably believed that his life was in danger of the imminent deadly force embodied by the motor vehicle driven toward him by Victoria Cooper. The defendants submit Officer Breen is protected by the doctrine of qualified immunity and self-defense. Concerning the plaintiff's claim that the Town of North Branford violated the decedent's rights as a result of its failure to train its officers about shooting at motor vehicles, the defendants submit that there is no factual basis for this claim.

The plaintiff is expected to introduce expert testimony from Dr. Bruce Rounsaville that the cocaine use of the plaintiff's decedent, Victoria Cooper, would be unlikely to have had an effect on her life expectancy. Further, Dr. Rounsaville is expected to testify that the most common course would be for her addiction to naturally taper off over time. *See* **Exhibit A,** Dr. Rounsaville's Report, p 4.

In the joint trial memorandum, the plaintiff discloses that Dr. Rounsaville's opinion

> is subject to motion in limine excluding all evidence of drug use from the case on grounds of irrelevance and prejudice. This witness will testify to the following, if necessary:  1. The lack of any supportable basis for predicting the impact of Vicki Cooper's drug use on her conduct on the night in question, future life, or longevity.

Dr. Rounsaville's opinion is rank speculation of the worst kind, based on reading a few anecdotal studies that are unquestionably relevant. Moreover, the underlying

2

studies themselves are wholly unreliable for the sort of opinion offered here.

Accordingly, Dr. Rounsaville's opinion and testimony must be precluded. Dr. Selig

points out the multitude of deficiencies in his opinion and conclusion. Dr. Rounsaville's

opinion is exactly the sort of junk science that the gatekeeping function of the District

Court is designed to keep out.

## II.    LAW AND ARGUMENT.

### A.    STANDARD OF REVIEW.

Fed.R.Evid. 702, which governs the admissibility of scientific or technical expert

testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is
> the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

Expert testimony must be helpful to the jury in comprehending and deciding

issues beyond the understanding of a layperson. *Id.*

In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

Supreme Court made clear that the district court has a "gatekeeping" function under

Rule 702, and is charged with "the task of ensuring that an expert's testimony both rests

on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. In fulfilling

3

this role, the district court must consider both the reliability and relevance of the proffered testimony. In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on "sufficient facts or data;" (2) that the testimony "is the product of reliable principles and methods;" and (3) that "the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In so doing, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1993).

Although Rule 702 sets forth specific criteria for the district court's consideration, these criteria are not exhaustive. The district court may consider a number of other factors in determining the reliability of the proffered testimony, including: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the technique's known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593-94.

Expert witnesses may not testify based on their personal view of the veracity of a

lay witness's testimony. *See United States v. Scop*, 846 F.2d 135, 142 (CA2 1988), *rev'd in part on other grounds*, 856 F.2d 5 (CA2 1988); *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1072 (CA3 1996). Similarly, "[Expert witness] statements embodying legal conclusions exceed[ ] the permissible scope of opinion testimony under the Federal Rules of Evidence". *United States v. Scop*, 846 F.2d at 139; *see also, United States v. Bilzerian*, 926 F.2d 1285, 1294 (CA2 1991), *citing Expert Legal Testimony*, 97 HARV.L.REV. 797 (1984).

Whether to admit expert testimony is a matter left to the discretion of the trial judge and is set aside only when the decision is "manifestly erroneous." *United States v. Schwartz*, 924 F.2d 410, 425 (CA2 1991).

Whether the expert is "qualified" is initially a question for the Court. Fed.R.Evid. 104(a). There is no presumption that a witness is competent to give an opinion; it is incumbent upon a party offering an expert witness to establish that the witness possesses the necessary learning, knowledge, skill, or practical experience to enable him or her to give expert testimony. The Rule 104(a) inquiry requires the proponent of the expert to show by a preponderance of the evidence that the expert's opinion is admissible. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993), *citing Bourjaily v. United States*, 43 U.S. 171, 175-76 (1987).

**B.    DR. ROUNSAVILLE'S TESTIMONY MUST BE PRECLUDED BECAUSE HIS OPINION UNRELIABLE, IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS, AND IS RANK SPECULATION.**

Rule 702 requires that expert testimony be: (1) "based upon sufficient facts or data"; (2) "the product of reliable principles and methods"; and (3) "applied ... reliably to the facts of the case." Fed.R.Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 & n. 7, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(holding that pursuant to the trial judge's "gatekeeping responsibility," she "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

In this case, Dr. Rounsaville has taken a few journal articles and a selective reading of the facts to ascertain Cooper had episodic cocaine use and that her cocaine use would merely taper off over time. It is undisputed that Dr. Rounsaville never met Cooper, never treated her, and has no first hand knowledge of the depth of her cocaine use, abuse or addiction. Moreover, it is undisputed that Dr. Rounsaville has never studied the effects and course of late-onset cocaine use in females nor attempted to determine whether the most likely trajectory is a natural tapering off. In his report, Rounsaville admits that the very subject that he professes an opinion upon is "largely unstudied and statistics documenting the impact on life expectancy are not available." Despite this striking admission, Rounsaville opines that the scant literature out there allows him to draw conclusions about Cooper's potential life. *See* **Exhibit A**, Rounsaville's Report.

6

As discussed by Dr. Selig, the studies relied upon by Rousaville are riddled with deficiencies that make them unreliable and offer only anecdotal information about cocaine use, abuse and addiction. The study from the *American Journal of Public Health* addresses only the natural history of drug use from adolescence to the mid-thirties in a general population sample. *See* **Exhibit B**, Selig's Report. Cooper is past that range; this article is irrelevant. Moreover, consider the population sample – how do you get a sufficient scientific sample from users of illegal drugs? Do they come forward and acknowledge their use? It is illegal and they would suffer adverse consequences. Common sense dictates that the data simply **cannot** be gathered on cocaine users in the same manner on persons who smoke cigarettes. Cigarettes are perfectly legal and there is not the same social or legal stigma on their use. The AJPH study acknowledges that the data is scanty.  Dr. Selig observes that the other articles relied upon by Dr. Rounsaville are inadequate because of small sample size, inadequate long-term outcome research or reliability of amount and frequency of use. *See* **Exhibit B**, Selig's Report. "Whether a sample is too small to yield meaningful results is a determination made by the district court on a case-by-case basis." *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277,  1289 n. 20 (CA5 1994). The Fifth Circuit has cautioned against the use of statistics involving small sample sizes. "The reason for [the] hesitance is obvious: 'the smaller the sample size, the greater the likelihood that the underrepresentation reflects chance rather than discriminatory practices.' " *Stendebach*

*v. CPC Int'l, Inc.*, 691 F.2d 735, 738 (5th Cir.1982) (*citing Williams v. Tallahassee*

*Motors, Inc.*, 607 F.2d 689, 693 (5th Cir.1979)). "Both the determination of reliability

itself and the factors taken into account are left to the discretion of the district court

consistent with its gatekeeping function under Fed.R.E. 702." *Munoz v. Orr*, 200 F.3d

291, 301 (CA5 2000), *cert. denied*, 531 U.S. 812, 121 S.Ct. 45, 148 L.Ed.2d 15 (2000)

(upholding district court's exclusion of plaintiff's statistical expert in disparate impact

case). This court should do the same.

Also, Dr. Rounsaville does not reliably apply his suspect methods to the facts of

the case. The contradictory data, unreliable data and inadequate data prevent him from

his key opinion – that Cooper was suffering from Cocaine Abuse rather than Cocaine

Dependence.  Dr. Selig's report amply sums up Rounsaville's deficiencies. *See* **Exhibit**

**B.**

III.    **CONCLUSION.**

For the reasons set forth above, the defendants, MICHAEL BREEN and TOWN

OF NORTH BRANFORD, pray that their motion in limine is granted.

THE DEFENDANTS,
MICHAEL BREEN and TOWN OF
NORTH BRANFORD

_____
Thomas R. Gerarde, ct5640
John J. Radshaw, III, ct19882
Jeffery E. Potter, ct26356
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 1st day of June 2005.

David N. Rosen, Esquire
400 Orange Street
New Haven, CT  06511

_____
Thomas R. Gerarde
John J. Radshaw, III
Jeffery E. Potter

# YALE UNIVERSITY
## School of Medicine

Department of Psychiatry
VA CT Healthcare System
950 Campbell Avenue (151D)
West Haven, Connecticut 06516
Phone: (203) 932-5711, Ext. 7401
Fax: (203) 937-3869 or 937-3486
Email: bruce.rounsaville@yale.edu



Bruce J. Rounsaville, M.D.
Director, VA VISN1 MIRECC
Professor of Psychiatry

February 12, 2002

Attorney David N. Rosen
Rosen & Dolan, P.C.
400 Orange Street
New Haven, CT 06511

Dear Attorney Rosen:

I am writing to provide information about the potential impact of cocaine use on the life expectancy of Victoria Cooper who was killed by a gunshot wound on July 13, 1999, at the age of 41. I have reviewed the following materials: a) the autopsy and toxicology report, b) the police evidence report, 9/7/99, and c) depositions of Steven Guerette, Robert Cowan, Mark Cowan, Joann Cowan, Toni Carlino, Maureen Small, Bonnie Dekoyer, Bob Dekoyer, Mark Cooper, Patty Cwalina, Laurie Luce, Marjorie Demet, Patricia Twiss, Sherri Fitzgerald, Pam Bartolotta and Tina Monck.

At the time of her death, Ms. Cooper and her boyfriend Steven Guerette, were found in possession of cocaine and the autopsy report noted that cocaine was found in Ms. Cooper's blood at the level of 0.72 mg/L. In his deposition, Mr. Guerette reported having been involved with Ms. Cooper for 2 years and using cocaine with her around once per week during a 2 month period when the couple lived together in Wallingford. He stated that Ms. Cooper used cocaine occasionally when he met her. Testimony from a Patty Cwalina, a friend of Ms. Coopers, indicated Ms. Cwalina's suspicion that Ms. Cooper was using drugs in 1997 under the influence of a former boyfriend, "Andy" with whom Ms. Cooper was living at the time. No testimony provides evidence for cocaine use earlier than that time. Regarding consequences of cocaine use, I understand that Ms. Cooper lost her job from Amtrak in 1998 after an initial positive urine test for cocaine followed by a second attempted urine test at which Ms. Cooper could not produce a sample. In the material I reviewed, the earliest indicator of illicit substance abuse was a mention by Attorney Gerarde, in a question to Pam Bartolotta, of a report by Patty Twist that Ms. Twist and Ms. Cooper used marijuana before the summer of 9th grade. None of the testimony or records indicated that Ms. Cooper had a record of legal problems related to drug or alcohol use, that Ms. Cooper had ever sought treatment for drug or alcohol abuse problems or that Ms. Cooper had been a regular user of illicit drugs or cocaine prior to 1997. Testimony suggests that she was regularly employed during the 1990's, participated in recreational activities including team softball and showed no obvious

evidence of physical or mental impairment until the final year of her life, when she was described as losing weight by a number of informants.

The above evidence and testimony suggest a picture of regular cocaine use for a 2-3 year period, possibly initiated during the relationship with "Andy", beginning when Ms. Cooper was in her late 30's and continuing despite adverse consequences of losing a job at Amtrak. This pattern suggests a diagnosis of Cocaine Abuse (DSM IV # 305.60) and no evidence is provided to suggest that Ms. Cooper would meet criteria for the more severe diagnosis of Cocaine Dependence. Regarding the report of Ms. Cooper's use of marijuana before 9th grade, this single report is not amplified by any evidence to suggest that Ms. Cooper became a regular user or experienced difficulties with marijuana. At the time of Ms. Cooper's reported teenage use, experimenting with marijuana was extremely common. In 1980, 60% of a national sample of U.S. high school seniors reported using marijuana at least once.

The long term course and consequences of cocaine use and abuse have been largely unstudied and statistics documenting the impact on life expectancy are not available, the way that such evidence is available regarding cigarette use or high blood pressure. However, several lines of evidence would suggest that Ms. Cooper's cocaine use is unlikely to have reduced her life expectancy and no evidence suggests that her level of use would decrease her life expectancy. An initial factor is Ms. Cooper's relatively late age of onset of cocaine use. Numerous studies indicate that initiation of illicit substance use most typically occurs in the teens and early 20's and that an early age of onset is one of the best predictors of chronic course. Second, longitudinal studies of individuals meeting criteria for substance "abuse" indicate relative stability of this level of use and not a progression to more severe use. The only available long term follow up study indicates that only around 10% of a sample of regular cocaine users were continuing to experience consequences of regular cocaine use 11 years after cocaine initiation. Third, several factors suggest that Ms. Cooper's degree of involvement with cocaine was not severe. She had never experienced legal consequences related to drugs and she had never sought treatment. Generally, around 20% of current cocaine abusers are in treatment and these generally constitute the more severe users. Fourth, the autopsy report detected no evidence of ongoing health problems and, while she was described by her friends as thin, her weight of 103 pounds with a height of 62 inches was within normal limits.

Thus, in my professional opinion, Ms. Cooper's cocaine use at the time of her death is unlikely to have had an effect on her life expectancy. Regarding the most likely trajectory of her cocaine use, the most common course for non-treatment seeking regular cocaine

users is one of episodic use followed by "natural recovery" with use tapering off. Only a minority of cocaine users (ranging from 10-20%) develop cocaine dependence and most individuals who meet criteria for substance "abuse" do not progress toward the more severe diagnosis of "dependence". Hence, it is most likely that Ms. Cooper's trajectory would follow that of a typical user in which use tapers off over time.

Sincerely,

Bruce J. Rounsaville, M.D.
Professor of Psychiatry

References

Murphy, SB, Reinarman, C, Waldorf, D.(1989) An 11-year follow-up of a network of cocaine users. British Journal of Addictions, 84(4): 427-436.

Chen, K, Kandel, DB. (1995) The natural history of drug use from adolescence to the mid-thirties in a general population sample. American Journal of Public Health 85(1): 41-47.

Winick, C (1992) Epidemiology, in JL Lowinsohn, P Ruiz, RB Miliman, JG Langrod (eds). Substance Abuse: A Comprehensive Textbook Baltimore: Williams and Wilkins, pp. 10-16.

Regier, DANarrow, WE, Rae, DS, Manderscheid, RW, Locke, BZ, Goodwin, FK: The defacto U.S. mental health and addictive disorders service system: Epidemiological Catchment Area prospective one-year prevalance rates of disorders and services. Arch Gen Psychiatry 50:85, 1993.

Anthony, JC, Arria, AM, Johnson, EO. (1995) Epidemiological and Public Health Issues for Tobacco, Alcohol and Other Drugs. In JM Oldham and MB Riba (eds) Review of Psychiatry (volume 14), Washington D.C.: American Psychiatric Press, pp. 15-50.

Expert Witness Testimony 1997-2002  Bruce Rounsaville

1997  William T. Clipston, Sr vs. James F. Grimes  Consultation to Law Offices of
      Gerald H Cooper, Bridgeport, CT

1998  Bowman vs. Hill, et al. Consultation to Spencer & Moriarty, Lexington, KY

1999  Rowland vs. Charter Hospital of Santa Seresa, Inc. and Edgar W. Hein, M.D.
      Consultation to Grost, Poulos & Menendez, El Paso, TX

2001 Claude Dougharty vs. The Norwalk Medical Group, P.C. and Joel A. Papowitz,
M.D. Consultation to Williams, Cooney & Sheehy, LLP, Trumbull, CT

Certified by the American
Board of Psychiatry and Neurology

# KENNETH M. SELIG, M.D., J.D.
## Adult and Forensic Psychiatry
### 257 New London Turnpike
### Glastonbury, CT 06033

Member of the Connecticut
Bar Association

Telephone: (860) 659-8998
Fax: (860) 659-4723

August 9, 2002

Attorney John J. Radshaw, III
Howd and Ludorf, Attorneys at Law
65 Wethersfield Ave.
Hartford, CT 06114-1190

     Re:    Cowan v. Breen, et al
            Your File No.: 45-02414

Dear Attorney Radshaw:

At your request, I conducted a record review regarding the above captioned case in which Victoria Cooper was allegedly fatally shot by Police Officer Michael Breen on July 13, 1999 at the age of 41.

The plaintiff retained a psychiatrist, Bruce Rounsaville, M.D., who rendered an opinion in a letter to the plaintiff's attorney, David Rosen, Esq., on February 12, 2002 which indicated that in his professional opinion "Ms. Cooper's cocaine use at the time of her death is unlikely to have had an effect on her life expectancy." You requested that I comment on this opinion and, specifically, as to whether it is scientifically supportable or essentially mere speculation.

I reviewed all of the records listed in and accompanying your letter of April 23, 2002. I also reviewed the deposition transcript of Dr. Rounsaville, which was taken on May 9, 2002, and the exhibits accompanying that deposition. I also had a telephone conversation on July 11, 2002 with Sherwood Lewis, Ph.D., the Director of Toxicology in the office of the Chief Medical Examiner.

Dr. Rounsaville assumes the following facts in arriving at his opinion. He assumes that Ms. Cooper was using cocaine once a week at the most for two to three years. She had lost her job at Amtrak because she tested positive for cocaine and continued to use cocaine despite losing her job. He testified that the fact that she continued to use drugs despite having lost the job because of drug use was the positive factor in his diagnosis that she was a mere abuser of cocaine and not dependent on cocaine, and he apparently made that diagnosis within reasonable medical probability, although he acknowledged that he could not rule out a diagnosis of dependence and that it was possible that she could have been dependent, but that there was insufficient evidence in the record to

reach such a diagnosis.  Furthermore, he indicated that the autopsy finding of .72 mg/L was consistent with a "moderate" amount of cocaine having been ingested in the 24 hours before death.  He testified that whether she was snorting cocaine or smoking crack or using it intravenously does not affect the diagnosis, but the amount that she was using might affect the diagnosis.  He did acknowledge that people do under-report their use of drugs.  He also assumed that if the various people who have given depositions, including friends and relatives "knew so little about her cocaine use, then it must not have been, or, you know, must not have been, but probably wasn't that pervasive."  Mr. Guerrette is the only individual who commented on the frequency that Ms. Cooper was using cocaine and he said once a week and Dr. Rounsaville took this as a fact, though he acknowledged it was possible that Mr. Guerrette under-reported this.  However, he felt that Mr. Guerrette's testimony was reliable because Mr. Guerrette had no reason to be inaccurate or distort the truth.  He further indicated that the amount found in her blood at autopsy could have come from as little as one-half a bag of cocaine.  He acknowledged that it is unusual for an individual to begin using crack in their late thirties.  He also indicated that because people report the amount and frequency of their use inaccurately, it is very difficult to do proper scientific studies on the outcome or the natural course of cocaine abuse or dependence.  Furthermore, cocaine use is relatively infrequent in the general population and also there is a huge time-gap between use and death.

Dr. Rounsaville testified that in 10% to 20% of non-treatment-seeking cocaine users, use does not taper off, but it does in the rest.  Therefore, he concluded that drug use is something that can have terrible consequences and ruin people's lives, but it's only the minority for which this is the case.  He also acknowledged that "There are plenty of highly severe users that haven't sought treatment."  He testified that Ms. Cooper's weight loss was not a relevant factor to him in making his diagnosis.  He also acknowledged that the long-term course and consequences of cocaine use and abuse have been largely unstudied and that statistics documenting the impact on life expectancy are not available.  He also indicates that she had no ongoing health problems.  He also indicates that it was most likely that her use of cocaine would taper off without affecting her life span.

The literature which Dr. Rounsaville relies for his opinion does not address the issue at hand.  One article from the American Journal of Public Health in January 1995 addresses only the natural history of drug use from adolescence to the mid-thirties in a general population sample.  Ms. Cooper was in her mid- to late thirties when she began using cocaine and, therefore, this article cannot be relied upon to make predictions about her future use of cocaine had she lived or its effect on

her life span.  However, the article does note that it is unusual for people to begin using illicit drugs after the age of 29.  It also acknowledges that published research on the natural history of drug use in the general population is scanty.  Similarly, the other articles relied upon by Dr. Rounsaville are inadequate either because of small sample populations, inadequate long-term outcome research, or reliability of amount and frequency of use.  One article that he relied on from the Archives of General Psychiatry in February 1993 does indicate that fewer people with addictive disorders seek treatment than those with other mental illnesses.  This article indicated that fewer than 25% of people with addictive disorders sought treatment.  Therefore, Ms. Cooper's lack of seeking treatment is not informative as to the frequency or duration of her use.

There is substantial evidence to indicate that Ms. Cooper's use of cocaine was far greater in both quantity and frequency than Dr. Rounsaville concludes.  In a telephone call with Dr. Lewis, he indicated that Ms. Cooper's blood level of .72 mg/L is one of the highest levels he has ever seen.  He has been working with the office of the Chief Medical Examiner as the Director of Toxicology for many years.  In fact, this level is so high, that he speculates that she may have swallowed some cocaine in order to avoid its being detected on her person.  He was, however, unable to correlate the level of cocaine with the amount of use or her mental state as he indicated that it does depend on the route of administration, the time of intake, and, of course, the amount.  However, Dr. Lewis clearly contradicts Dr. Rounsaville's conclusion that .72 mg/L is merely a "moderate" blood level.  I defer to Dr. Lewis given that he is a toxicologist and specialist in this area.

Mr. Guerrette's entire history and deposition is of highly questionable reliability.  It is inconsistent with the statement he gave to the police.  He has a history of numerous arrests and is highly antisocial.  He had, in fact, been arrested just a week prior to this for speeding and driving without a license.  He and Ms. Cooper had been seeing each other for approximately two years.  In addition to her having tattoos, it is significant to me that her boyfriend was a known drug abuser who regularly flaunted the law in that he drove without a license on a regular basis, referred to police officers as "assholes" in his deposition, engaged police in a high speed pursuit, and suggests that the police constructed his statement to them without reading it back to him and then had him sign it.  He does indicate that Ms. Cooper smoked crack with him on the night that this happened while she was still working and then went back to work after smoking a bag with him in his car.

Police reports indicate that on March 10, 1997, Ms. Cooper was given a summons by police for criminal trespassing, but appeared to be attempting to obtain crack from a dealer in New Haven, but was interrupted by the police first. On December 23, 1998, she reported her car missing which she had "loaned" to a "friend."  She had waited 22 hours before calling the police and did not know the name or address of this "friend."  She also could not fully explain how she knew him.  (It is not uncommon for individuals seeking drugs to obtain drugs by loaning their car to dealers.)

In the high speed pursuit on July 6, 1999, Mr. Guerrette was clocked at 88 miles an hour and turned off his headlights and eventually struck a rock wall and then fled on foot just as he did on the night of this incident.  Contrary to what he said in his deposition, he told the police that night that he fled because he was speeding and knew his license was suspended.  He also wrestled with the police prior to being arrested once he was captured and he had to be handcuffed.  He has at least five previous criminal convictions.

Although Ms. Cooper was ostensibly living with her sister, Toni Carloni, for the prior three to four months since losing her apartment, she had actually been staying there only about one day a week and had been spending a great deal of time with Mr. Guerrette.  Her sister was quite concerned about Ms. Cooper's loss of weight, being sickly looking, and having scabs on her face.  Ms. Carloni and her other sister, Joanne Cowan, had confronted Ms. Cooper about their suspicion that she was using drugs, but Ms. Cooper always avoided the subject.  Ms. Cooper's ophthalmology records indicate a history of high blood pressure and diabetes which Dr. Rounsaville does not mention.  It was also determined that the crack in Ms. Cooper's possession was of a very high quality, being 84% pure cocaine.  Patricia Fiske, who worked with Ms. Cooper, indicated that Ms. Cooper had told her and other waitresses that she could get crack for them and had told Ms. Fiske several times how "high" she was when she arrived at work.

All of this information indicates that she was using crack much more frequently than once a week and continued to use it even though it was having a significant adverse impact on her physical health and was using it during work.  (Although Dr. Rounsaville discounts Ms. Cooper's weight at death of 103 pounds because she was only 62" high and, therefore, not technically underweight, he ignores evidence that she had lost a significant amount of weight, which would be consistent with regular crack use.)  Additionally, she had lost her apartment, had stopped playing softball, was not eating well, and was spending a lot of time with Mr. Guerrette.  Prior to moving in with Ms. Carloni, Ms. Cooper was having

substantial money problems and was unable to pay her rent and so on and so she needed a place to live. (This would be consistent with her using substantial quantities of drugs, although, of course, not dispositive.) Mark Cowan, in his deposition, indicated that Ms. Cooper denied to him that she was using drugs. Again, denial is very common in a drug user. Toni Carloni was so concerned about Ms. Cooper's loss of weight and her not looking healthy that she looked like she was "wasting away to nothing." Ms. Cooper also was apparently filing for bankruptcy.

Bob Dekoyer, who was Ms. Cooper's softball coach and friend, testified that she told him that she lost the Amtrak job because she got hurt and missed too much time from work. This is, of course, another lie in an effort to hide her drug use.

Patty Cwalina, who has been friends with Ms. Cooper since they were teenagers, indicated that Ms. Cooper had another boyfriend, Andy, prior to Mr. Guerrette. Ms. Cwalina described Andy as a "total loser" who was unemployed and abusive and used cocaine. Ms. Cwalina said that Ms. Cooper "looked awful" during the time she was with Andy and that she constantly tried to get Ms. Cooper to break up with Andy, but Ms. Cooper did not have good self-esteem when it came to men.

In summary, any attempts to make a psychiatric diagnosis, within reasonable medical probability, based on this record can be nothing more than mere speculation because of contradictory data, unreliable data, and inadequate data. Furthermore, even if a diagnosis of either Cocaine Abuse or Cocaine Dependence could be made, it is not possible with our present scientific knowledge to render an opinion within reasonable medical probability as to what the future course of cocaine use would be and as to whether or not it would affect an individual's life span. Firstly, there are no studies and nothing in the literature that addresses this issue, never mind being dispositive of it, and, secondly, there are too many confounding factors. Ms. Cooper's beginning to use cocaine late in life, the fact that she continued to use cocaine despite numerous adverse consequences, including employment and physical health, the fact that she continued to use crack despite having high blood pressure (which would be likely substantially worsened by the use of crack), as well as diabetes (which constitutes an additional confounding factor), and that she was using crack in sufficient quantities to have lost her car, lost her apartment, lost her job, and to substantially impair her health indicates that her use was certainly not casual. Additionally, the extremely high blood level at the time of autopsy, the finding of nine bags of cocaine hidden in her sock, and her association with a highly

antisocial individual for the prior two years all indicates a life style that was extremely unstable, leading to a complete inability to predict what the future held for her. Of course, to put this whole issue in bold relief, the one conclusion that can be drawn from this case, within reasonable medical probability, is that had she not been using crack, it is very unlikely that she would have been involved with Mr. Guerrette and very unlikely that she would have been killed on July 13, 1999. It is likely that on this basis alone, her use of crack shortened her life.

I trust the foregoing is responsive to your inquiries.  If there are other issues which you would like me to address or issues addressed here which you would like me to elaborate, please do not hesitate to contact me.

Respectfully submitted,

Kenneth M. Selig, M.D., J.D.

KMS:jb