1

1

2                IN THE UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF CONNECTICUT

4

5        ---------------------------x

6     MARGARET COWAN, AS              :
      ADMINISTRATRIX OF THE           :
7     ESTATE OF VICTORIA COOPER,      :

8                     Plaintiff,      :

9        -versus-                     :     300 CV 0052 (DJS)

10    MICHAEL BREEN,                  :

11                    Defendant.      :

12       ---------------------------x

13

14

15

16         Videotaped deposition of MICHAEL BREEN, taken

17    pursuant to the Federal Rules of Civil Procedure, at

18    the law offices of Rosen & Dolan, 400 Orange Street,

19    New Haven Connecticut, before Brenda K. Granfield, a

20    Registered Professional Reporter and a Notary Public

21    in and for the State of Connecticut, on Wednesday,

22    July 12, 2000 at 10:40 a.m.

23

24

25

2

```
 1        A P P E A R A N C E S :

 2

 3

 4        FOR THE PLAINTIFF:

 5        ROSEN & DOLAN
          400 Orange Street
 6        New Haven, Connecticut
          By:  DAVID ROSEN, Esq., of Counsel
 7

 8

 9

10

11        FOR THE DEFENDANT:

12        HOWD & LUDORF
          65 Weathersfield Avenue
13        Hartford, Connecticut  06114
          By:  THOMAS R. GERARDE, Esq., of Counsel
14        DAVID MONASTERSKY, Esq., of Counsel

15

16

17

18

19

20

21

22

23

24

25
```

120

1    best I can in relation to the road.  Okay?

2         A.   All right.

3         Q.   All right.  Now, if you take a look at

4    Plaintiff's Exhibit Number 4, do you see that there

5    is a number 16, a circle with a number 16 on it?

6         A.   Yes.

7         Q.   Okay.  And does the circle with the number

8    16 appear in the map to be in a place corresponding

9    to where there is a semicircle with the number 16 in

10   the photograph?

11              MR. GERARDE:  Objection to form.

12        A.   Appears to be.

13        Q.   Okay.  And looking at the photograph,

14   would it be fair to say that the location that you

15   identified for the State Police when you went out

16   there last November was in approximately the

17   location where this photograph shows a semicircle

18   with a number 17.

19        A.   Yes.

20        Q.   Okay.  All for the purpose of trying to be

21   clear that the spot you identified for the police in

22   this past November is your best estimates of where

23   you were standing when you fired the second shot was

24   in the approximate location of the semicircle that's

25   shown as 17 in Plaintiff's Exhibit 6; is that

121

1   correct?

2       A.   Approximate area.

3       Q.   Okay.  Now, that is in the -- somewhere in

4   the eastbound lane of travel on Route 80; is that

5   correct?

6       A.   Within the eastbound travel lane, that's

7   correct.

8       Q.   And does this photograph show that there's

9   a double yellow center line on Route 80 at that

10  location?

11      A.   Yes.

12      Q.   And is there also a single white line

13  indicating the divider between the travel lane and a

14  breakdown or shoulder?

15      A.   Yes.

16      Q.   And what would you call it, a breakdown

17  lane or shoulder?

18      A.   Shoulder.

19      Q.   Okay.  I would like to ask you now to turn

20  to this enlargement that we have here that's

21  Plaintiff's Exhibit 5 and tell me -- or before you

22  even ask -- before I even ask you to do anything

23  specific with relation to the photo -- at the time

24  you fired the second shot, where on the roadway was

25  the vehicle?

1      A.    It was coming at me.

2      Q.    Okay.  And was it in the eastbound lane?

3      A.    Yes.

4      Q.    Was any portion of the vehicle over on the

5  shoulder?

6      A.    I don't know.

7      Q.    You just don't know one way or the other?

8      A.    I don't know if it was on the shoulder or

9  not.

10      Q.    All right.  I'd like to ask you to go back

11  now a couple of steps, maybe even a few minutes, and

12  tell me, at some point you spotted this vehicle at

13  the Extra Mart; is that correct?

14      A.    Yes.

15      Q.    Okay.  And you noted in some detail what

16  the driver and the passenger were doing when you

17  first saw it; is that correct?

18      A.    Yes.

19      Q.    Okay.  And on July 27th when you made this

20  report, did you actually remember all the details

21  that you put in the report?

22      A.    Yes.

23      Q.    Had you made any notes to yourself of any

24  information before July 27th?

25      A.    I might have.

123

1      Q.   Up until the time you filed your report,

2  July 27th, had you ever heard the radio dispatches

3  relating to this incident?

4      A.   No.

5      Q.   Have you up until this day?

6      A.   Yes.

7      Q.   When did you hear them?

8      A.   Several months ago.

9      Q.   Can you tell me what the last dispatch

10  before the shooting said, what did you say in it and

11  what was said back to you?

12      A.   I can't tell you.  I don't know.

13      Q.   Can you tell me what the first dispatch

14  after the shooting said?

15      A.   Exactly, no.

16      Q.   Can you tell me anything about what was

17  said in that first dispatch that you made after the

18  shooting?

19      A.   I believe it's on my report.

20      Q.   What do you recall of what you said on

21  that first dispatch?

22      A.   Can I refer to the report?

23      Q.   All right.  Before you do, Officer, let me

24  ask you if you can recall anything of what you said

25  in that first dispatch without looking at your

124

1  report.

2      A.  Well, I believe I asked for additional

3  assistance, and I might possibly have asked for

4  medical attention to be sent to the scene.  Without

5  looking at my report, I can't give an accurate

6  description of what I said, though.

7      Q.  Okay.  Now, at some point you pulled this

8  vehicle over; is that correct?

9      A.  Yes.

10     Q.  And you asked the driver to get out at

11 some point, correct?

12     A.  At some point, yes.

13     Q.  You never asked the passenger to get out

14 of the vehicle, correct?

15     A.  No, sir.

16     Q.  You never told her that her freedom of

17 movement was restrained, correct?

18         MR. GERARDE:  Objection to the form.

19     A.  I never told her that exact -- those exact

20 words, no.

21     Q.  You never -- did you ever tell her

22 anything?

23     A.  I had a brief conversation with her, but I

24 have to refer to my report to accurately describe

25 it, the conversation.

125

1   Q.  Okay.  Why don't I ask you to do that.

2  What conversation did you have with the female

3  passenger?

4   A.  Okay.  Okay.  In my report I indicate I

5  requested -- if I'll read from the report, if that's

6  okay.

7   Q.  Tell me what page that's on.

8   A.  It's on page 5 of 10.

9   Q.  Okay.

10  A.  It indicates, "I requested from the female

11  passenger if she was carrying her driver's license,

12  and she stated, 'No, I don't have any ID.'"

13  Q.  Other than that exchange did you have any

14  conversation with the female passenger at any time?

15  A.  No.

16  Q.  When you were -- when you asked the driver

17  to get out of the vehicle, did you take him around

18  to the back of the vehicle?

19  A.  I requested that he meet me at the back of

20  the vehicle, and he walked back.

21  Q.  And you had conversation with him, did you

22  not?

23  A.  Yes.

24  Q.  Okay.  Now, what was the female passenger

25  doing while you had conversation with the driver?

126

1    A.    She was still seated in the passenger or

2  right front passenger seat.

3    Q.    Okay.  Do you know what she was doing up

4  there?

5    A.    She was sitting there, and as I spoke to

6  Mr. Guerette, they were both looking at each other

7  quite nervously.

8    Q.    Did you put that in your report?

9    A.    Yes.

10    Q.    Now, after you took Mr. Guerette out of

11  the or asked Mr. Guerette to get out of the vehicle

12  and meet you around back, what was the passenger

13  doing?  Did she remain in the passenger seat?

14    A.    Yes.

15    Q.    Do you know what she was doing in the

16  passenger seat while you were behind the car with

17  Mr. Guerette?

18    A.    No.  My attention was focused on him and

19  his actions at that point.

20    Q.    Do you know whether she heard your

21  conversation?

22    A.    I don't know.

23    Q.    Do you know whether she saw what you were

24  doing or Mr. Guerette was doing?

25    A.    Like I said, she was making eye contact

127

1    with him on several occasions.

2        Q.    Was this when you were behind the vehicle

3    with Mr. Guerette?

4        A.    Yes, sir.

5        Q.    And is that in your report?

6        A.    Yes.

7        Q.    Can you tell me where in your report?

8        A.    Okay.  Okay.  It indicates on page 6.  "I

9    also noticed that on several occasions he nervously

10   looked back toward the passenger in the car."

11       Q.    Okay.  And the passenger in the car is the

12   woman you shot, correct?

13       A.    Yes.

14       Q.    And her shooting was the reason that this

15   had become more than just a routine event, correct?

16       A.    You need to clarify that question for me.

17   I don't understand.

18       Q.    You did not mention in your report

19   anything about whether the passenger was looking at

20   Mr. Guerette when he was in the back of the car with

21   you, correct?

22       A.    No.

23       Q.    Until this minute, have you ever told

24   anybody that the passenger was looking back at Mr.

25   Guerette when he was with you behind the car?

128

1    A.    I don't believe so.  I might have.

2    Q.    Who do you think you might have told?

3    A.    I don't know.  I might have mentioned it

4    to someone.

5    Q.    And you never at any time said to the

6    driver -- said to the passenger, "I want you to wait

7    in your vehicle for me," or words to that effect,

8    correct?

9    A.    I never said that to her, no.

10    Q.    You never said anything to her that would

11    reasonably believe her to think she wasn't free to

12    go, correct?

13            MR. GERARDE:  Objection to form.

14    A.    Can you clarify that question for me,

15    please?

16    Q.    You didn't tell her she wasn't free to go,

17    free to leave the scene, correct?

18    A.    No, I never told her that, sir.

19    Q.    Okay.  And you never told her anything to

20    that effect, correct?

21    A.    No.  My conversation with her was very

22    limited, and the conversation I testified to earlier

23    was the only conversation I had with her.

24    Q.    Okay.  Is it your claim or belief that she

25    was not lawfully free to leave the scene if she so

129

1   chose?

2       A.    Is it my belief?

3       Q.    Yeah.

4       A.    No.

5       Q.    You agree that she was free to leave the

6   scene if she so chose.

7       A.    No.


8       Q.    You don't believe that.

9       A.    I don't believe that, no.

10      Q.    Okay.  What's your basis for -- question

11  withdrawn.

12            You believe that she was not free to leave

13  the scene.

14      A.    That's correct.

15      Q.    Okay.  She was not -- she was legally

16  required to remain at the scene, in your opinion.

17      A.    Yes.

18      Q.    Okay.  And what is the basis for your

19  opinion?

20      A.    Well, I believe a reasonable person would

21  believe that the vehicle was stopped and they were

22  not free to go based on the fact that my cruiser was

23  parked behind them with the lights flashing.  And I

24  think I need some clarification on at what point are

25  you talking about she did not feel she was free to

130

1  leave?

2      Q.   After you left the area in pursuit of Mr.

3  Guerette.

4      A.   Okay.  Again, my police car is behind her

5  with the lights flashing.  She sees me run past her

6  car door in pursuit of the operator of the car at

7  that time.  She knows I'm in a foot pursuit with

8  him.  I had found narcotics on him.

9      Q.   Now, did she know that?

10     A.   I don't know if she knew that.

11     Q.   Okay.  Go ahead.

12     A.   She knew we were in the area.  She knew I

13 was running down the road after him.  She -- I

14 believe a reasonable person would not believe they

15 were free to go at that point based on all the

16 circumstances.  She had -- she had an opportunity to

17 drive in several directions if she wanted to leave

18 the scene.

19     Q.   Okay.  Well, that's -- I mean, that's a

20 question that I wanted to clarify.

21     A.   Uh-huh.

22     Q.   Because one of the things she could have

23 done, I guess you're indicating, was make a U-turn

24 and drive back toward the direction they came from.

25     A.   She had a lot of options.

Sanders, Gale & Russell
203-624-4157

131

1     Q.   Now, was she -- is it your belief or claim

2 that she was not legally free to make a U-turn and

3 drive back to the Extra Mart?

4     A.   Yes.

5     Q.   You believe she was not free to do that.

6     A.   That's correct.

7     Q.   Okay.   And the reason that she was not

8 free to make a U-turn and drive back to the Extra

9 Mart is --

10    A.   I had made a stop on a vehicle, and I

11 believed that there was criminal activity based on

12 what I found on Mr. Guerette within the vehicle.  I

13 believe she was a part of it.  And as a police

14 officer, no, I did not believe she was free to go at

15 that point.  I believe she was involved in some type

16 of criminal activity at that point.

17    Q.   But you had not attempted to restrain her

18 or communicate your belief to her, correct?

19              MR. GERARDE:  Objection to form.

20    A.   No.  The only thing that I spoke to her

21 about was what I testified earlier.

22    Q.   All right.  You pursued Mr. Guerette on

23 foot, correct?

24    A.   Yes.

25    Q.   All right.  Now, in your report, you gave

132

1   a description of the route that you traveled when

2   you were pursuing him.

3        A.   Yes, I did.

4        Q.   Now, let me show you an aerial photo that

5   the State Police made of the scene and ask you if

6   you can recognize it as being a photo of that

7   portion of Route 80 that are where some of these

8   events took place.

9        A.   Yes.

10            MR. ROSEN:   Okay.   I'd like to mark

11  it as Plaintiff's 7.

12            (Plaintiff's exhibit marked for

13            identification No. 7:   Copy of aerial

14            photograph.)

15  BY MR. ROSEN:

16        Q.   Now, can you using Plaintiff's 7 tell me

17  the route that you traveled in pursuit of Mr.

18  Guerette?

19        A.   What would you like me to do?   Verbally

20  tell you?   Point it out to you?

21        Q.   I guess my first question is the

22  photograph only shows so much of the road, right?

23        A.   Yes.

24        Q.   Does it show the entire area where you

25  were during the time that you were pursuing Mr.

Sanders, Gale & Russell
203-624-4157

133

1   Guerette?

2       A.   With the exception of Stroud Road there

3   would be a little more of Stroud Road should be

4   shown on the photo.

5       Q.   Okay.  Stroud Road goes off to the left of

6   the photo?

7       A.   It goes to the right, in this direction.

8       Q.   Okay, but it's -- you're indicating the

9   left-hand side of the photograph, as you look at it.

10      A.   Yes.

11           MR. GERARDE:  Can we describe that a

12   little better?  As he looks at it?  In other words,

13   he's looking at it not from the point of the sticker.

14   BY MR. ROSEN:

15      Q.   You're looking at it so that if you were

16   holding it in front of you, the number 4 would be

17   facing the right way for you to read it, correct?

18      A.   Yes.

19           MR. GERARDE:  Thank you.

20      Q.   All right.  What I'd like you to do is

21   mark with your pen, if you would, the path that you

22   took, and indicate for me if there is a spot where

23   you went off the edge of the photo where that would

24   be.

25           MR. GERARDE:  Once again, before you

Sanders, Gale & Russell
203-624-4157

134

1    do this, I'm going to ask for a foundation question

2    that you have the ability to use this exhibit and to

3    trace the path that you took.

4              THE WITNESS:  Okay.

5              MR. GERARDE:  And if you do, then I

6    don't have an objection.  But if you're unclear or

7    you don't have a perspective on what that shows,

8    then I would ask you to voice that.

9    BY MR. ROSEN:

10        Q.   So are you able to do that?

11        A.   Yes.

12        Q.   Okay.  Then in that case, I'd like you to

13    do it, starting off, if you'd indicate initially

14    with an X where the approximate location where the

15    Camaro was when you stopped Mr. Guerette and Vicki

16    Cooper.

17        A.   I don't want to mark exactly where that

18    was.  I don't know exactly where it was in that

19    photo.

20        Q.   Can you mark sort of approximately,

21    understanding that you don't know exactly where it

22    was?  Was it somewhere over on the right-hand side

23    of the photograph as you look at it?

24        A.   Yes.

25        Q.   Was it as far over as the number 4, or not

135

1   quite so far?

2        A.    I don't want to indicate with an X because

3   I'm not exactly sure of that location.

4        Q.    Okay.  Well, why don't you just start

5   making -- why don't you not indicate with an X if

6   you don't want to, and start drawing from some point

7   in the general area where the vehicle was, and we'll

8   just follow that line along the path that you took.

9        A.    Okay.

10            MR. GERARDE:  Do you want to use a

11   thicker black pen?

12            MR. ROSEN:  Thick black pen is just

13   exactly right.  Thank you very much.

14            THE WITNESS:  Okay.

15        A.    Again, I'm not putting the location of the

16   vehicle.  I'm just indicating the path of travel

17   that I followed Mr. Guerette on foot.  It was down

18   Route 80 eastbound, and we crossed over a grassy

19   island here onto County Road.  We looped back over

20   the grassy island back onto Route 80, Foxon Road,

21   and I chased him eastbound on Route 80 to a point

22   roughly about here on Stroud Road.

23        Q.    About here being pretty near the border of

24   the photograph.

25        A.    Yes.

136

1                    MR. GERARDE:  That would be the left

2      border as you look at number 4.

3                    THE WITNESS:  That's correct.

4      BY MR. ROSEN:

5           Q.   And what happened when you got to that

6      point?

7           A.   When I got to that point, it was obvious

8      to me that I wasn't going to catch up with Mr.

9      Guerette.  And there were other circumstances

10     involved that, you know, led me to believe that I

11     should stop this foot pursuit.

12          Q.   Okay.  I'd like to be sure that we know

13     how to read the photograph.  I asked you to make a

14     little arrow marks in the direction of travel.

15          A.   Okay.  I'll indicate along the way.

16          Q.   Thank you.

17          A.   Uh-huh.

18          Q.   I'm going to ask you about those

19     circumstances in a moment, but before I do, I just

20     want to trace your route.  As a result of your

21     decision to not to pursue Mr. Guerette further, did

22     you then return westbound on Route 80?

23          A.   Yes, I did.

24          Q.   On foot.

25          A.   Yes.

137

1      Q.   And you returned directly without making

2   any turns or changing your route to the place where

3   the shooting took place, correct?

4              MR. GERARDE:  Objection to form.

5      A.   Could you clarify that question for me,

6   please?  I'm not sure what you mean.

7      Q.   When you came back after abandoning your

8   foot pursuit of Mr. Guerette, is it fair to say that

9   you came back along Route 80 to the location where

10  the shooting took place?

11     A.   Yes.

12     Q.   You didn't go anywhere else in between?

13     A.   No.

14     Q.   You were heading back to your car?

15     A.   Yes, sir.

16     Q.   All right.  Now, you made mention of

17  circumstances that made you decide to stop the foot

18  pursuit.  What were those circumstances?

19     A.   Well, the circumstances were that I had

20  lost radio communication with headquarters.  I

21  wasn't able to tell them what was going on at that

22  point.  I had no backup on scene with me at that

23  point from the time of the car stop up until -- up

24  until I aborted the foot pursuit.  And I knew there

25  was another person in the vehicle at that time.

138

1     Q.   Now, you did not call for backup when you

2  were still in your vehicle after initially pulling

3  over Vicki Cooper and Mr. Guerette?

4     A.   No.

5     Q.   Why did you not call for backup at that

6  point?

7     A.   I just indicated to headquarters that I

8  was making a traffic stop and the vehicle was

9  occupied twice.  And I don't normally as a matter of

10  routine call for backup.

11     Q.   At the point that you asked Mr. Guerette

12  to get out of the car and go to the rear of the

13  vehicle, you still did not call for backup, correct?

14     A.   That's correct.

15     Q.   And why did you not call for backup at

16  that point?

17     A.   Because I didn't feel the situation

18  warranted it at that point.

19     Q.   At that point, you suspected Mr. Guerette

20  of at least possibly being in possession of

21  contraband; is that correct?

22     A.   No, I believed him at one point when he

23  was to the rear of the vehicle that his license

24  might be under suspension, and he was probably under

25  the influence of alcohol or drugs.

139

1      Q.    You did not believe he was in possession

2   of contraband until sometime during the course of

3   your conversation with him?

4      A.    After I made a determination to arrest

5   him, he was searched and the contraband was found.

6   Contraband being cocaine.

7      Q.    And when you searched him after placing

8   him under arrest -- question withdrawn.

9            What did you place him under arrest for?

10     A.    He was being placed under arrest for DWI

11  and operating a vehicle under suspension.   I

12  suspected he didn't have identification on him.   I

13  asked him if he had a wallet.   He said he didn't

14  have a wallet.   And we found a wallet -- I found a

15  wallet on him.   His actions were erratic.

16     Q.    And did you follow appropriate procedure

17  for arresting him for DWI?

18     A.    Yes.

19     Q.    Okay.   Did you do a field test?

20     A.    No.   I determined I was going to do the

21  field test back at the police department and

22  identify him properly.

23     Q.    Okay.   Did you advise him of his rights?

24     A.    I didn't advise him of his rights, no.

25     Q.    Okay.

140

1      A.   I didn't get an opportunity to.  He ran

2  away.

3      Q.   After you placed him under arrest, you

4  asked him to empty his pockets, correct?

5      A.   No.

6      Q.   When did you place him under arrest?

7      A.   I attempted to place him under arrest when

8  I found the cocaine.  I made a determination he was

9  going to be placed under arrest for operating under

10  the influence already.

11      Q.   You decided you were going to arrest him

12  for operating under the influence?

13      A.   Yes.

14      Q.   And you told him that you'd have to take

15  him down to the police station, correct?

16      A.   I was going to take him for a field test

17  at the station and to properly identify himself

18  because he had no ID.  I suspected he was under

19  suspension.

20      Q.   At that point, you had decided to place

21  him under arrest for operating under suspension and

22  driving under the influence, correct?

23      A.   Yes, I believed he was under the influence

24  of alcohol or drugs.

25      Q.   And you made that decision before you

141

1    asked him to empty his pockets, correct?

2    A.   Yes, sir.

3    Q.   Okay.  But even though you decided to

4    arrest him for operating under the influence and

5    operating under suspension, you did not advise him

6    of his rights before you told him to empty his

7    pockets, correct?

8    A.   That's correct.

9    Q.   And in fact and when you asked him to

10    empty his pockets, you asked him if he had any other

11    items in his pockets without having advised him of

12    his rights, correct?

13    A.   Yes.

14    Q.   And you reached into his pocket and found

15    the cocaine, and you still hadn't advice him of his

16    rights, correct?

17    A.   Well, I asked him if he had anything in

18    his pockets, and to empty his pockets.  He

19    purposefully avoided one pocket, which I noticed,

20    and that's the pocket that I found the cocaine in.

21    Q.   Okay.  And then even though he was

22    under -- you decided to arrest him and you had found

23    the substance in his pockets, you still didn't

24    advise him of his rights.  Instead you asked him

25    what was inside the bags, correct?

142

1       A.    Right.  I didn't advise him of his rights.

2       Q.    Okay.  You had time to search his pockets,

3   and you had time to ask him -- question withdrawn.

4             You had time to ask him what was inside

5   the bags that you had taken outs of his front pants

6   pocket, correct?

7       A.    Yes.

8       Q.    And when you asked him what was in his

9   pockets, you believed that what was in his pockets

10  was narcotics, correct?

11      A.    Well, he indicated to me it's just

12  paraphernalia.

13      Q.    But even before you asked him, you thought

14  it was narcotics because that's what it looked like?

15      A.    Based on my training and experience, yes.

16      Q.    When you told him he was under arrest, he

17  pulled away from you and ran, started to run down

18  the street, down the road?

19      A.    He actually ran by the passenger side of

20  the car right by Vicki Cooper.

21      Q.    And you chased him?

22      A.    Yes.

23      Q.    And you tried to call on your radio?

24      A.    Yes.

25      Q.    Your radio's battery was dead?

143

1      A.    I believed so.

2      Q.    Now, are you responsible for being sure

3   that your equipment, including your radio, is in

4   good working order?

5      A.    Well, I don't believe there's any written

6   policy on it.

7      Q.    Do you believe that -- do you think it's

8   not your responsibility to be sure that your radio

9   is in good working order, including the battery is

10  adequately charged?

11     A.    Well, the problem with the particular

12  battery in the radio we have is you have to let it

13  charge down all the way.  It's a NiCad battery and

14  it has a memory in it.  Unfortunately, if you charge

15  it halfway through the cycle, it holds the memory,

16  and it's very hard to tell when it's fully charged.

17  I was out of the car at the beginning of my shift at

18  11:00 p.m. that evening for an extensive period of

19  time at a motor vehicle accident, and it's possible

20  the battery became discharged at that time.  I don't

21  know.  Also, that area is on the Guilford town line

22  with North Branford is known for having poor radio

23  reception, so I don't know if it was a combination

24  of both or one.  I don't know.

25     Q.    Your report said that you indicated that

144

1    the radio battery was weak, correct?

2        A.   Right.  That's what I believe, yeah.

3        Q.   I mean, that's as far as you're aware,

4    your radio battery was weak, correct?

5        A.   Right, for the reasons I indicated.  I'm

6    just throwing out another possible scenario that I'm

7    aware of.

8        Q.   You don't think that's what happened,

9    though; you think what happened was your radio

10   battery was weak.

11             MR. GERARDE:  Objection to form.  If

12   you understand, you can answer.

13       A.   Yes, I believe that was it, but I'm also

14   making a statement that it could possibly be

15   something else as well at this point.  In my report

16   I don't indicate that.

17       Q.   You never checked the radio afterward to

18   see whether or not it was weak?

19       A.   The radio was taken from me along with all

20   my equipment.

21       Q.   And, you know, I appreciate the

22   information you gave me about your different

23   possibilities, but the question I actually asked you

24   was whether it's your responsibility to be sure that

25   your battery is charged.

145

1      A.   We're given two batteries and a charger,

2  and, yeah it's my responsibility.

3      Q.   Had your radio ever gone dead before?

4      A.   Yes.

5      Q.   You were involved at a traffic stop at

6  11:00 o'clock?

7      A.   No, I was out of the car for a motor

8  vehicle accident.  I believe it came in right around

9  11 o'clock, right around the start of my shift that

10  evening, and I was out of the car for an extended

11  period of time there.  I don't know exactly how

12  long.

13      Q.   Were you on the radio for an extended

14  period of time?

15      A.   No, but the radio would be on if I was out

16  of the car.  I'd have the portable radio on.

17      Q.   When you chased Mr. Guerette, how far was

18  that foot pursuit?

19      A.   I don't know if I indicate in my report or

20  not.  If I could refer back to that, it might

21  indicate a distance.

22      Q.   Sure.

23      A.   No, it doesn't indicate a distance.

24      Q.   Well, how far did you chase Mr. Guerette?

25      A.   I can't say for any certainty.  I don't

199

1     Q.  Now, at any time while you fired the first

2  shot or the second shot, did you ever believe

3  yourself to be outside the zone of danger presented

4  by this oncoming vehicle?

5     A.  No.

6     Q.  Was it a critical fact in your decision to

7  shoot that you could not avoid the oncoming vehicle

8  with safety?

9     A.  Could you repeat that, please?

10     Q.  Yes.  There was testimony on direct

11  examination about what was the critical factor or

12  what was one of the critical factors, and my

13  question to you is was it a critical factor in your

14  decision to shoot that, based on the circumstances

15  that presented to you, that you were not able to

16  avoid being struck by the vehicle by moving with

17  complete safety, and that was why you decided to

18  fire?

19     A.  That's correct.

20     Q.  Now, I would like to confirm some of the

21  circumstances that were known to you at the time of

22  the shooting and shortly before the shooting.  In

23  other words, the circumstances that existed as the

24  sequence led to the point where you made the

25  decision to shoot.

200

1        Now, you certainly knew that your cruiser

2   was stopped behind the Camaro on Foxon Road; is that

3   right, sir?

4        A.   Yes.

5        Q.   And your cruiser lights were flashing at

6   that time; is that right, sir?

7        A.   Yes.

8        Q.   And you knew once the vehicle began

9   traveling toward you after you had aborted your foot

10  chase that the passenger in the vehicle had moved

11  over to the driver's side and was operating the

12  vehicle; is that correct, sir?

13       A.   Yes.

14       Q.   And you certainly were aware that the

15  driver of this vehicle did not seek to avoid you by

16  taking a U-turn and traveling in the opposite

17  direction; is that correct?

18       A.   Yes.

19       Q.   And you were aware that the driver did not

20  seek to avoid you by taking a left at the fork onto

21  Old County Road; is that correct, sir?

22       A.   Yes.

23       Q.   I'm sorry.  That's County Road, not Old

24  County Road.

25       And you were aware that you were in front

201

1    of the vehicle as it approached you, and its

2    headlights were on you; is that correct, sir?

3        A.    That's correct.

4        Q.    And you were waving your arms while the

5    vehicle drove toward you, and you were in the

6    headlights; is that correct?

7        A.    Yes, sir.

8        Q.    And the roadway was wet as the vehicle

9    approached you; is that correct, sir?

10       A.    Yes.

11       Q.    And it was dark; is that correct?

12       A.    Yes.  Yes.

13       Q.    And you had just been at the end of a foot

14    chase of Steven Guerette as you described for us; is

15    that correct, sir?

16       A.    Yes.

17       Q.    And when you had Steven Guerette behind

18    the vehicle before he fled, you had probable cause

19    to arrest him, and in connection with the search you

20    discovered that he had contraband on his person; is

21    that correct?

22       A.    Yes.

23       Q.    And as that vehicle approached you, you

24    wanted to stop that vehicle in furtherance of your

25    police duties; is that correct, sir?

202

1      A.   Yes.

2               MR. GERARDE:   Thank you.   I have no

3    other questions.

4    REDIRECT EXAMINATION

5    BY MR. ROSEN:

6      Q.   I wanted you to explain one thing to me,

7    Officer.   At beginning of your lawyer's questions,

8    you pointed to some parts of the police report

9    having to do with my earlier questions about the

10   relationship between you and the vehicle at the time

11   you fired the second shot.   And he pointed to page

12   9.   Are you looking at page 9?

13     A.   Yes.

14     Q.   Okay.   And you first pointed to something

15   that was at the bottom of page 8 that went over to

16   page 9. Do you see that?

17     A.   Yes.

18     Q.   And that related to the time before you

19   fired the first shot; is that correct?

20     A.   Yes.

21     Q.   And he then called your attention to a

22   portion on page 9 where you said -- you said you

23   fired the second shot approximately one second later

24   "as I quickly moved to my right to avoid being

25   struck by the car as it was still coming directly at

203

1    me."

2         A.    Yes, sir.

3         Q.    That portion was called to your attention

4    by your attorney; is that right?

5         A.    Yes.

6         Q.    Okay.  Now, the part that I'd like you to

7    explain to me is at the time you fired the second

8    shot, was the car still coming directly at you?

9         A.    Yes.

10        Q.    Are you sure of that?

11        A.    Yes.

12              MR. ROSEN:  Thank you.

13              MR. GERARDE:  Thanks very much.

14              (Deposition concluded:  5:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Sanders, Gale & Russell
203-624-4157