

# State of Connecticut
## DIVISION OF CRIMINAL JUSTICE

OFFICE OF
### THE CHIEF STATE'S ATTORNEY

JOHN M. BAILEY
CHIEF STATE'S ATTORNEY

300 CORPORATE PLACE
ROCKY HILL, CONNECTICUT 06067
TELEPHONE (860) 258-5800

February 8, 2000

Matthew L. Canelli
Police Chief
North Branford Police Department
P.O. Box 287
North Branford, Connecticut   06471

Honorable JoAnne Wentworth
Mayor
North Branford Town Hall
1599 Foxon Road
North Branford, Connecticut   06471

Honorable Frank B. Connolly
Town Manager
North Branford Town Hall
1599 Foxon Road
North Branford, Connecticut   06471

Dear Chief Canelli, Mayor Wentworth and Mr. Connolly:

Pursuant to Connecticut General Statutes Section 51-277a(c), I hereby transmit the report of State's Attorney Michael Dearington into the use of deadly force by Officer Michael Breen of the North Branford Police Department on July 13, 1999.

Very truly yours,

JOHN M. BAILEY
CHIEF STATE'S ATTORNEY

Enclosure

c.    Michael Dearington, Esq.

DEFENDANT'S
EXHIBIT

CASE
NO.3:00 CV 0052 (RNC)

EXHIBIT
NO.      D-64

REPORT TO THE CHIEF STATE'S ATTORNEY
PURSUANT TO SECTION 51-277a
CONNECTICUT GENERAL STATUTES

FEB 8  11 40 AM '00

CHIEF STATE'S
ATTORNEY'S OFFICE

Shooting Death of VICTORIA COOPER
on July 13, 1999

Submitted by:

MICHAEL DEARINGTON
State's Attorney
Judicial District of New Haven

February 8, 2000

Copy to:

Honorable Frank B. Connolly
Town Manager
Town of North Branford

Honorable JoAnne Wentworth
Mayor
Town of North Branford

Honorable Matthew L. Canelli
Chief of Police
Town of North Branford

## INDEX

Preface...........................................................................................................1

Overview of Investigation..........................................................................2

Summary of Statements.............................................................................3

Cause of Death............................................................................................8

Evidence Collected at Scene and Forensic Findings................................9

Exterior Examination of Camero and Forensic Findings.......................11

Evidence Seized from Within Camero and Forensic Findings...............12

Summary of Reconstruction.....................................................................13

Conclusion.................................................................................................15

## APPENDIX

Criminal History of Steven Guerette..........................................................21

North Branford Police Department Policy..................................................22
        Concerning "Use of Force; Weapons"

Law Concerning Use of Deadly Physical Force by Officer........................23

Recent Court Decisions Concerning Firing Shots at Motor Vehicle.........25

Law Concerning Motor Vehicle Stops........................................................26

Reconstruction Report................................................................................27

Street Diagrams.....................................................................................38-40

## PREFACE

The following report concerning the tragic shooting death of Victoria Cooper, age 41, on July 13, 1999, at about 1:35 a.m., is prepared and submitted by Michael Dearington, State's Attorney, Judicial District of New Haven, pursuant to Section 51-277a, of the Connecticut General Statutes. The lethal shots were fired by on duty Officer Michael Breen of the North Branford Police Department, near the intersection of Route 80, known as Foxon Road, and County Road, North Branford, Connecticut. The report and conclusions are based upon the joint investigation conducted by the Connecticut State Police Central District Major Crime Squad, the State Police Forensic Science Crime Laboratory and the State Police Scientific Services Toxicology Unit, the State's Attorney's Office for the Judicial District of New Haven, as well as the Office of the State medical Examiner, and with the cooperation of the North Branford Police Department.

It must be said that the loss of human life particularly under these circumstances is a great tragedy.

Victoria Cooper's death has resulted in an immeasurable loss to her family, her children and her friends. It is undoubtedly made more unbearable by her age and the abruptness of her passing.

## OVERVIEW OF THE INVESTIGATION

The Connecticut State Police Central District Major Crime Squad at the request of the State's Attorney, New Haven Judicial District, was the lead investigative agency in the investigation. Members of such unit responded to the scene in the area of Route 80, known as Foxon Road, and County Road within approximately one hour of the incident. The scene had already been cordoned off and secured by the North Branford Police Department. Dr. Henry Lee, Commissioner of Public Safety and former Director of the State Police Forensic Laboratory, Dr. Wayne Carver, Chief Medical Examiner and the New Haven State's Attorney and members of his staff responded to the scene shortly after the shooting.

The scene that day was processed, photographed and diagrammed and evidence was collected by the Major Crime Squad with the assistance of members of the State Police Forensic Science Laboratory during a period of approximately 10 hours. Since that time, certain and elaborate reconstruction of specific aspects of the incident, including bullet trajectory patterns, has been conducted at State Police facilities. Also, on October 22, 1999, there was at the scene a recreation of the events immediately leading up to and including the shooting, by members of the various involved State Police Investigative and Scientific Units and the Office of the Chief Medical Examiner. Members of Victoria Cooper's family were invited to attend and did attend such per creation along with an attorney representing the family. Also, Officer Michael Breen and his attorney were present.

Since July 13, 1999, approximately nine members of the Central District Major Crime Squad have been assigned to various aspects of the investigation. The entire rural neighborhood has been canvassed by police in an effort to locate witnesses. Statements were taken from fourteen so-called civilian witnesses. A detailed written report dated July 27, 1999, was received from Officer Michael Breen. Also, on November 12, 1999, Officer Breen was interviewed at the scene in order to offer him opportunity to specifically identify where certain activity occurred.

A written statement was taken from Steven Guerette on July 13, 1999. On November 16, 1999, he accompanied members of the Major Crime Squad to the scene in order for him to identify where the vehicle was initially stopped and what he observed thereafter. Also, a letter was received on January 24, 2000, from the brother of Steven Guerette wherein, the brother provided information on behalf of Steven Guerette. Also, state police officers attended the autopsy and took photographs and received evidence. A detailed report was prepared by the Central Major Crime Squad by case officer, Detective Thomas Murray and others. On January 19, 2000 a comprehensive report was submitted by the State Police Forensic Science Laboratory.

The Citizens of the State of Connecticut are fortunate to have such highly dedicated and extraordinarily competent experts available to conduct such a thorough investigation.

## SUMMARY OF STATEMENTS

Steven Guerette in his statement, to police dated July 13, 1999, states that on July 12, 1999, at about 4:30 p.m., he dropped off his girlfriend, Victoria Cooper, at the American Steak House, West Haven, where she was a waitress. He then drove to the home of his mother for dinner. Mr. Guerette stated that he returned to West Haven and picked up his girlfriend at her place of employment at around 9:30 p.m. that evening. He was driving a 1985 red Chevrolet Camero which was registered to his brother John Guerette. He states they drove to Asylum Street in New Haven where he purchased four dime bags of crack cocaine for the sum of $40.00. They proceeded to I-95 eastbound and at the time were smoking the crack cocaine. They exited at Exit 56 and made a left onto Leetes Island Road. After crossing over the Turnpike, they stopped at the Berkshire Gas Station to refuel the Camero. They then drove to Route 80 in North Branford for the purpose, according to Mr. Guerette, of going east on Route 80 to Madison, going north on Route 79 to Durham, and then traveling to his home in Wallingford. He states he stopped at the Xtra Mart Store on Route 80 in North Branford to purchase Monarch cigarettes for his mother. Guerette placed a call to his brother on the phone located in the parking lot at Xtra Mart Store, for the purpose of telling his brother that he would be late in returning the Camero to him. He states no one answered the phone and he and Ms. Cooper proceeded eastbound on Route 80.

Steven Guerette states that while traveling east on Route 80 he observed a police vehicle behind him and threw a piece of aluminum foil out the window which was fashioned into a crack cocaine pipe and which they had previously been using to smoke crack cocaine. A police vehicle activated its "emergency lights" and Guerette states that he pulled the Camero over onto the right shoulder. He states that he rolled down the passenger window as the officer approached the vehicle on foot.

Guerette, in response to the officer's inquiry indicated he did not have his driver's license but did have the vehicle registration. Guerette related in his statement that he did not carry his license since it had been suspended. He was asked out of and to the rear of the vehicle by the officer. Also, he states he was directed to empty the contents of his pockets onto the rear deck of the vehicle. Guerette placed his wallet, cigarettes, cigarette lighter, coins, two small pocket knives and a comb on the rear deck of the vehicle. He was then patted down by the officer. He states the officer, during such procedure, located in his pocket two zip lock baggies, one inside the other. The bags were empty but had previously contained cocaine. He stated that he then ran across Route 80. He prepared a crude sketch showing that he ran to a grassy island at the intersection of what is County Road and Route 80 and then recrossed Route 80 and ran east to what is Stroud Road. Guerette stated that he tripped and fell when he initially crossed Route 80. He stated as he ran up what is Stroud Road, he heard two shots which he believed had been fired at him. Guerette states that there was a hesitation between the shots. He states he continued to run and then hid in the woods until located later by police utilizing a canine.

North Branford Police Officer Michael Breen in his report, dated, July 27, 1999, indicates that on July 13, 1999, he was on patrol in a marked patrol vehicle. He was working the 11:00 p.m.

3

(July 12, 1999) to 7:00 a.m. shift (July 13, 1999). At about 1:11 a.m., he observed a red Chevrolet Camero parked next to an outside payphone located in the parking lot at the Xtra Mart Store gas station at the intersection of Route 80 and Ciro Road, North Branford. The driver's side of the car was next to the phone. The officer states that he observed two individuals sitting, respectively, in the front driver's and passenger's seats of the car. He called in the marker, Connecticut 801KCA, to the dispatcher for a motor vehicle check due to his concern that he did not recognize the particular vehicle and Xtra Mart Store at that time of night could be vulnerable to criminal activity. As Officer Breen turned onto Ciro Road, he observed the person in the driver's seat to be a white male with blonde hair wearing a baseball hat. The driver's window was down and the male was holding the phone receiver. According to Officer Breen, the male stared at him as he passed the area. Officer Breen was informed by the police dispatcher about that time that the vehicle was registered to John Guerette of Wallingford. Officer Breen turned around on Ciro Road and returned to the area of the Xtra Mart Store where he again observed the male holding the phone. Again, the male stared at Office Breen as he approached. As he passed by, the male looked back over his shoulder at the officer. The officer turned onto Route 80 going in an easterly direction. Officer Breen indicates that he was "curious that the occupants of this car were so concerned with my presence so I decided to monitor them further." He watched the vehicle in his rear view mirror. Officer Breen turned around near Maple Road and went in a westerly direction on Route 80 and for the third time passed the Xtra Mart Store. The Camero remained in the same location and the male stared at him as he approached. The Officer observed both occupants moving about in the front seats. Officer Breen reports he observed the passenger also looking at him. Officer Breen drove by and parked a short distance away in the parking lot of the Giant Power Equipment business located on Route 80. He turned the lights off such that he could further observe the vehicle. The dispatcher, in response to Officer Breen's requests for a license and criminal record check of John Guerette reported that John Guerette's license was under suspension and he had a prior criminal history. (A criminal record check indicates John Guerette, d.o.b. 12/18/69, S, brother of Steven Guerette, as of July 17, 1999, had been arrested on four separate occasions.)

Moments after parking, Officer Breen states he observed the Camero exit the Xtra Mart Store parking lot and proceed in an easterly direction on Route 80. The officer pulled onto Route 80 and followed the Camero. The Camero was traveling at a speed of 35 miles per hour in an area with a posted speed of forty five miles an hour. There was no other traffic. The officer states he observed the two occupants moving around in the vehicle and the Camero crossed over the center line into the oncoming lane on three occasions.

Officer Breen states that based on his observation at the Xtra Mart Store, the possibility that the operator had a suspended license and might have a criminal record, the movement of the occupants in the car, and the travel of the vehicle into the oncoming lane, he activated his strobe lights. The Camero pulled over onto the right shoulder of Route 80 and stopped west of the intersection of Route 80 and County Road. Officer Breen, at about 1:32 a.m., notified this dispatcher of his location and action and then exited his vehicle. Officer Breen reports he approached the front passenger window and knocked several times on the window in order to obtain the attention of the occupants. The passenger who was observed to be a female, opened her window. Officer Breen

4

asked the male operator for his license and registration. The male stated he was not carrying his license and the car was registered to his brother. The officer asked the passenger for her license and she indicated she was not carrying any identification.

Officer Breen states that after ascertaining that the operator did not have a license and the passenger did not present any identification, he asked the operator out of and to the rear of the vehicle. Officer Breen stated that when he unsuccessfully asked for the operator's license and passenger's identification, he observed that both appeared nervous, their arms and legs were shaking and they looked at each other as if unsure of how to respond. Officer Breen states he believed both individuals, based upon the circumstances and his training, were possibly under the influence of alcohol or drugs. Officer Breen states he met the operator at the rear of the Camero. In response to inquiry the operator stated his name was Steven Guerette and the vehicle belonged to his brother John Guerette. Also, his license was in his truck and he did not have a wallet. Officer Breen states he observed a wallet in Guerette's back pocket. The officer removed the wallet and found no identification. He observed Guerette's body and hands shaking, his eyes were watery, droopy and bloodshot. Guerette looked nervously back at the passenger. Officer Breen patted him down for weapons and found none. At some point he asked him to empty his pockets on the rear of the vehicle. Guerette removed several items but did not take anything from his front pockets. When asked if there were other items, he answered in the negative. Officer Breen states he reached into his front pockets and removed two plastic bags containing white powder which he believed to be narcotics. (Such bags, based on later tests, were determined to contain cocaine residue.) Officer Breen asked Guerette what it was and was told "it's just paraphernalia." Officer Breen took out his cuffs and told Guerette he was under arrest. Guerette said "wait, wait, wait" and pulled his arm away and ran easterly on Route 80. Guerette then cut over to County Road. Officer Breen attempted to call the dispatcher on his portable radio but was unsuccessful due to an apparently uncharged battery. Officer Breen states that he was about 10 feet behind Guerette when the latter slipped and fell on the pavement on County Road which was wet due to recent rain. Guerette then got up and ran back toward Route 80. He ran east on Route 80. Officer Breen states he had been yelling for Guerette to stop and the latter disregarded his orders. Due to his inability to make radio contact with his department and call for back up he stopped the chase and ran in a westerly direction toward his cruiser. He wanted to return to his vehicle to make contact with his department. Officer Breen states in his police report as follows:

> I began to run as fast as I could west on Foxon Road back to the area of the car stop. As I got close to this area I was surprised to see that the Camero which I had stopped began moving eastbound on Foxon Road directly at me with its headlights on. I could hear the vehicles engine accelerating. I would estimate that the Camero was approximately 250 feet from me. I was physically tired and nearly out of breath from the foot pursuit and began to yell as loud as I could for the car to stop. I yelled at least twice "stop police, stop police". As I yelled, I began waving my arms over my head hoping the operator would see me and stop. I saw that the car did not stop but was instead bearing down on me. I was not running at this point and felt exhausted. I knew that I was not going to be able to get out of the cars path and that I was going

5

to be struck and seriously injured or killed if I did not act to defend myself. With the car aiming directly at me and its headlights shining on me I felt the operator was attempting to strike me with the car. I drew my .40 caliber Glock service pistol from my holster with my right hand and yelled once more "stop police". I fired once at the left front windshield of the car when it was approximately 50 feet from me and traveling at approximately 25 to 30 miles per hours. I fired a second shot approximately one second later as I quickly moved to my right to avoid being struck by the car as it was still coming directly at me. I heard the sound of breaking glass. The vehicle which was still continuing eastbound on Foxon Road passed me on the roadway with the left side of the cars body close to my own body. I would estimate that the car was within three feet of me. I watched as the car drifted into the westbound lane of Foxon Road and subsequently mounted the end of a metal guard rail system with its front end, and come to a rest. I did not observe any further movement from the car or the operator. I got to my car and radioed our dispatcher that I needed additional personnel, medical assistance, and that shots had been fired. I drove up to the rear of the Camero and got out of my car and cautiously approached it. I could hear the person within making a wheezing type sound. I then saw the persons head recline against the back of the drivers seat. The person was motionless in the drivers seat of the car. I observed that she was the same female passenger who was within the car when I had stopped it minutes before. I reached inside the car and shut off the cars ignition and checked the females neck for a pulse. I found none. I again returned my car and again radioed into our dispatch that I need assistance and medical assistance to the scene for the female operator. I also radioed in a complete description of the male subject who was still on foot in the area. Moments later I saw a Town of Guilford police car arrive. A short time later units from North Branford police arrived.

Officer Breen stated he remained at the scene and eventually observed the individual who had fled from him escorted by police from a wooded area near the intersection of Route 80 and Stroud Road.

North Branford police Sergeant Christopher Manner monitored Officer Breen's communication about shots being fired. Sergeant Manner was the first responding officer to the scene. He reports that Officer Breen's first comments to him were that he fired at the vehicle which was going to run over him. He checked Victoria Cooper who was in the red Camero and found no vital signs. Officer Breen also stated that he stopped a vehicle and was attempting to handcuff the driver. The driver "struggled free" and ran down County Road. Officer Breen told Sergeant Manner that he pursued the person but was unable to capture him so he started to return to his police vehicle. Officer Breen stated that the Camero was driven toward him and he waived his arms and yelled for the vehicle to stop. The vehicle continued toward him and he, believing that he would be run over, discharged his weapon. Sergeant Manner received Officer Breen's service weapon, secured the scene and informed the dispatcher to notify the Chief, Deputy Chief and State Police. Several East Haven and Guilford Officers responded to the scene. East Haven Police Officer Henry Butler

6

arrived with his canine named Alec. Alec tracked the suspect into a wood area near the intersection of Stroud Road and Route 80. Steven Guerette was taken from the woods and subsequently arrested by Ronald Onofrio for Operating under Suspension, Interfering with a Police Officer, Illegal Possession of Cocaine and Possession of Drug Paraphernalia. The Central District Major Crime Squad and members of the New Haven State's Attorney's Office arrived at the scene shortly after the incident was reported. Responding medical personnel determined that Victoria Cooper was deceased. Dr. Wayne Carver, the Chief Medical Examiner later responded to the scene.

A canvass of neighborhood residents resulted in the collection of the information pertaining to various observations made during the sequence of events.

Adjacent neighbors collectively observed the flashing of the police strobe lights; heard someone yelling stop; heard two shots; saw the cruiser parked on Route 80; saw an officer in front of his cruiser; saw the cruiser being driven to a location behind a red car after the shots and the officer exit the cruiser, check the red car; heard an officer say to a second officer "she tried to run me over"; saw an individual being escorted from the woods. No one interviewed as part of the canvass saw the entire sequence of the events or saw the red car being driven toward the officer or saw Officer Breen fire the shots.

## VICTORIA COOPER, D.O.B. 3/16/58
## CAUSE OF DEATH AND RELATED FINDINGS

On July 13, 1999, in the morning, Dr. Wayne Carver, the Chief Medical Examiner, responded to the scene on Route 80.  Certain observation as to the deceased were made by the Chief Medical Examiner at such time prior to the removal of the body of Victoria Cooper from the Camero.  The deceased was removed, under the supervision of Dr. Carver, from the vehicle and taken to the Office of the Chief Medical Examiner.  Prior to the removal of the body, personal items and clothing were removed from the body including small plastic bags containing a white substance which were located in the left  sock.  An autopsy was performed commencing at 1:13 p.m.  A gunshot entry wound was located on the left side.  Its location is described as "just medial to the left posterior axillary line centered at a point 19" from the top of the head and centered 5 ½" to the left of the posterior midline.  This level is 14" above the ischial tuberosity."  That is, if sitting the wound is 14" above the sitting surface.

In lay terms the bullet entered the extreme left side of the back near where the side meets the back surface.  Vertically it is located approximately in the mid back.  No soot was found in the area of the wound.  Small pieces of glass, assumably from the driver's side window through which the bullet passed, were found around the wound.  Such glass apparently penetrated through the shirt.

The track of the bullet traveled from left to right and slightly from back to front and slightly downwards.  The path enters the left chest cavity through the 9th intercostal space grazing the 9th rib.  It passed through the lower portion of the left lung and the aorta causing significant damage to both organs.  It then passed through the  lower portion of the right lung, the diaphragm, the liver, re-entered the diaphragm and exited the chest.  In summary the track passed through both lungs, aorta and liver.

The exit wound is located at a point 21" from the top of the head and 6" to the right of the anterior midline.

In lay terms the wound would be located on an imaginary line dawn from the right armpit to the center right thigh.  It is located approximately equidistant from the armpit and top of the right hip.

A copper colored bullet jacket (partial bullet) was located and retrieved from below the skin at the point of exit.

The cause of death was determined to be a gunshot wound of the chest.

A toxicological analysis of the decedent's blood detected the presence of cocaine, acetaminophen, an  aspirin substitute, caffeine and theobromine, common components of tea and other foods.  The quantitative measure of cocaine showed .72 milligrams per liter.

8