## EVIDENCE COLLECTED AT SCENE AND FORENSIC FINDINGS

Members of the Central District Major Crime Squad seized the following evidence at the scene on Route 80.

1)   Seized from the rear deck lid of the red Camero, CT Registration 801KCA: One black leather wallet; two pocket knifes; one comb; one blue ziplock baggie containing a smaller plastic bag with residue (The residue was determined based upon toxological testing to be cocaine); and, one dollar bill and nine cents in change. It is concluded that all of such items, based upon the statements of Officer Breen and Steven Guerette, belonged to Steven Guerette. They were taken by Mr. Guerette or Officer Breen from Mr. Guerette's clothing as he and Officer Breen stood behind the red Camero on Route 80.

2)   One pair of Peerless handcuffs, serial number 928485 were recovered on the paved surface of Route 80 to the rear and close to where, based on scene reconstruction, the Camero was parked by Guerette after he stopped the vehicle. The handcuffs were assigned to Officer Breen. Based on statements it is concluded that they were dropped by Officer Breen after he unsuccessfully attempted to handcuff Steven Guerette just prior to Guerette fleeing from Officer Breen.

3)   One torn partial Connecticut Motor Vehicle Registration for a red Chevrolet Camero assigned Connecticut Registration 801KCA and one towing bill, dated 6/9/99 for a vehicle with Connecticut Registration 801KCA. Both items were seized from the surface of Route 80 adjacent to the eastbound shoulder of the road. Both documents were approximately 17 feet east of where the handcuffs were located. It is concluded that they were removed by Steven Guerette from his pocket and placed on the rear deck of the Camero as were the aforementioned items. The papers were displaced as the Camero was driven eastbound by Victoria Cooper.

4)   Officer Breen's service weapon was given by Officer Breen to North Branford Sergeant Manner at the scene and subsequently turned over to the Firearms Section of the State Police Forensic Laboratory. It is a .40 Caliber Glock semi-automatic pistol, model 22. Serial number RG 325. It contained a magazine holding twelve live Winchester, jacketed hollow point .40 Caliber Smith and Weston cartridges. The magazine has a maximum load capacity of 14 rounds.

5)   Two Winchester .40 caliber shell casings were located and seized from approximately the center of the eastbound lane of Route 80 about 195 feet east of where the handcuffs were located. There was a distance of about 5 feet and 9 inches between the casings.

The Firearms Section examined the two shell casings and the .40 caliber Glock, semi automatic pistol, carried by Officer Breen on July 13, 1999. Such were compared with casings ejected by such weapon during test fires. The firearms section concluded that the two casings found on Route 80 were fired from Officer Breen's Glock pistol. The Firearms section also reports that "glass like material was observed in the barrel of the handgun."

6) A trail of fragments of broken glass were observed on Route 80. Such trail started approximately less than 20 feet east of the two shell casings in the approximate center of the eastbound lane. It extended for about one hundred feet and its direction veered toward the center line and slightly over the center line of the roadway. Samples of the many fragments of glass were seized. It is concluded that such glass came from the driver's side front window of the Camero as a result of bring penetrated by a bullet fired by Officer Breen. The elongated glass fragment pattern was caused by the forward movement of the Camero. It is consistent with the line of the easterly travel of the Camero from the right lane, across the center line eventually stopping on the should of the westbound lane.

7) On July 13, 1999, in the early afternoon, a pedestrian in the area of the intersection of Route 80 and County Road observed in a grass triangle at such location what appeared to be a bullet. The observation was reported to the North Branford Police Department and the item was seized by a North Branford Police Officer. Such bullet was submitted to and examined by the Firearms Section. It was determined that it was a .40 caliber bullet similar to bullets carried by Officer Breen. However, due to the condition of the bullet it could not be positively concluded that the bullet was fired from Officer Breen's weapon. It is reasonable to conclude as found in the reconstruction report that such bullet was the first bullet fired by Officer Breen which struck the hood of the Camero and then deflected off the hood.

## EXTERIOR EXAMINATION OF
## 1985 Camero CONNECTICUT REGISTRATION 801KCA

On July 13, 1999, the red Camero, Connecticut Registration 801KCA was seized by the Connecticut State Police. Police upon the initial examination at the scene observed what was concluded to be a projectile strike on the driver's side of the hood. The indentation was located 21 ½ inches from the windshield and 30 inches from the front edge of the hood. It was located 6 inches from the driver's side edge of the hood. It is reasonable to conclude as found in the reconstruction report that based upon the totality of the circumstances that the projectile strike was caused when the first bullet fired by Officer Breen struck the hood and deflected off the hood.

A .40 caliber bullet was located at the intersection of Route 80 and County Road. Although it was due to its condition insufficient to scientifically conclude it was fired from Officer Breen's weapon, it is reasonable to conclude as found in the reconstruction that based upon the totality of the evidence that it was the bullet which struck the hood of the Camero.

Also, it was observed during an initial examination of the vehicle, that the driver's side window was shattered. It is reasonable to conclude that such was caused by Officer Breen firing his second shot through the window. Such bullet passed through the deceased and came to rest on the front passenger floor in front of the seat. (See section on Cause of Death).

## EVIDENCE SEIZED FROM INSIDE THE 1985 Camero, CONNECTICUT REGISTRATION 801KCA AND FORENSIC FINDINGS

1. One bullet projectile was seized from the passenger side front floor. The bullet was similar to bullets in Officer Breen's weapon. However, due to the condition of the bullet it could not be positively concluded such was fired from Officer Breen's weapon. It is reasonable to conclude that it is a portion of the bullet fired by Officer Breen which struck and exited from the body of Victoria Cooper.

2. One copper jacket fragment was seized from the top of the passenger side front seat sitting portion. It was determined to be a prong from a jacketed bullet which weighed .6 grains. Due to its size and condition further identification could not be made. It should be noted that a hollow point bullet jacket was taken from the exit wound located on the decedent Victoria Cooper.

3. A gunshot residue test was conducted on the drier's side door and window area. It was submitted to the Forensic Laboratory. It was forensically determined such contained lead antimony and barium. (Substances ejected from a weapon upon the firing of a bullet).

4. Two glass bottle smoking pipes were seized from under the passenger side front seat. The State Police toxicology laboratory concluded that there was cocaine residue on both pipes.

5. A clear plastic bag containing nine plastic ziplock baggies each containing a white powder residue was seized from under the front passenger side floor carpeting near the firewall. The Laboratory concluded that the ziplock baggies each contained free base cocaine. Such is commonly called crack or rock cocaine.

6. The Chief Medical Examiner, Dr. Wayne Carver, during an initial examination of Victoria Cooper at the scene located nine small ziplock baggies contained in a larger bag in the decedent's left sock. The Laboratory concluded that each baggie contained cocaine.

## SUMMARY OF RECONSTRUCTION

The State of Connecticut, State Police Forensic Science Laboratory as a result of an exhaustive effort by highly distinguished and dedicated experts to reconstruct and reenact the tragic events occurring on July 13, 1999, issued a report as to its findings (See Appendix for a copy of such report).

It made findings as to the initial stopping by Officer Breen of the Camero operated by Steven Guerette and occupied by Victoria Cooper; the location of such stopping and the subsequent foot chase of Guerette by Officer Breen; and Officer Breen being confronted by the Camero traveling eastbound on Route 80 as he returned to the area of Route 80. Such conclusions are in part based upon the location of evidence, such as the handcuffs found on Route 80 and the pattern of fragments of glass from the driver's side window found in the road.

Moreover the report concluded, based upon the glass pattern and location of two cartridge casings fired from Officer Breen's weapon that the vehicle traveled a distance of about 177 feet eastbound from the original point of being stopped to the location where Officer Breen fired two shots at the vehicle while standing near the center of the road.

The report indicates:

The exact position of the officer at the time of the shooting incident cannot be positively determined at this time. His general location was determined based on the location of the two spent cartridge cases, the location of the glass fragments, the trajectory patterns, and the ejection patterns of cartridges fired from the weapon. p. 9-10.

Also:

The first was fired at the Camero when the officer was in front of and slightly to the right of the vehicle. This bullet impacted the hood of the vehicle and ricocheted. p.10.

The bullet trajectory was at a downward angle of approximately 10 degrees.

Also:

The officer fired a second shot as the Camero began to pass him. The bullet went through the driver's window and entered the decedent's left side. The bullet continued to travel through the decedent's body and exited through her right chest area. p.10.

"The trajectory was from left to right and downward at an angle of approximately 65 degrees." p.9

13

The presence of lead, antimony and barium (substances ejected from a weapon upon the firing of a bullet) taken found on the exterior of the driver's side door indicate that the officer was "relatively close to the vehicle at the time he discharged the second shot." p.10.

Moreover, "at the time of the shooting the vehicle and the officer were involved in a series of dynamic movements." p.10. That is both the vehicle and Officer Breen were in motion during this time.

Also:

> Although the exact speed of the Camero at the time of the shooting is unknown, it is clear that the vehicle was not moving at a speed under ten (10) miles per hour.

The report provides a speed/distance chart which shows at 10 miles per hour the vehicle traveled the distance from the initial point of stopping to the shooting location in 9.5 seconds, and at 20 miles per hour 6.5 seconds, thirty miles per hour, 6.0 seconds, and forty-five miles per hour at 5.3 seconds. p.6.

The report states:

> Although the speed of the Camero at the time of the shooting is unclear, it is clear from the experimental results that the vehicle was not stationary or traveling at a low speed. Based on the location of the spent cartridge casings and the impact points of the bullets on the Camero, the entire shooting incident took place within seconds. p. 10-11.

After the shots were fired, the vehicle traveled in a diagonal direction across Route 80 in a northeasterly direction hitting the guard rail on the westbound side of the road.

"Glass fragments were deposited diagonally across Route 80 for a distance of approximately 110 feet" between the point where the second shot was fired and along the path the car traveled before it came to rest.

After being hit by the shots, the vehicle traveled approximately 240 feet before coming to rest.

14



## CONCLUSION

Section 51-277a, of the Connecticut General Statutes, provides that "the Division of Criminal Justice shall cause an investigation to be made whenever a peace officer, in the performance of his duties, uses deadly physical force upon another person and such person dies as a result thereof..." Traditionally, the State's Attorney for the Judicial District where the death occurs, represents the Division of Criminal Justice in such capacity. The State's Attorney must not only make a finding as to the circumstances of the incident, but also must make "a determination of whether the use of such deadly physical force by the police officer was appropriate (reasonable) under Section 53a-22", Connecticut General Statutes, and a determination as to "any future action to be taken by the Division of Criminal Justice as a result of the incident."

Based upon a thorough and professional investigation it is reasonable to find the following facts.

On July 12, 1999, sometime around 9:30 p.m., Steven Guerette, while driving a red Camero registered to his brother John Guerette, picked up Victoria Cooper at her place of employment in West Haven. The two had been close acquaintances for some period of time. They both drove to New Haven where Guerette purchased crack cocaine. They then drove from New Haven to North Branford, arriving around between 1:00 a.m. and 1:30 a.m. on July 13, 1999.

Between the time they left New Haven and the time they arrived at the Xtra Mart Store in North Branford around or after 1:00 a.m., they both ingested cocaine. It is probably that such substance was crack cocaine also called rock cocaine. They stopped at the Xtra Mart Store and Steven Guerette used the telephone in the parking lot. Officer Breen who was on routine patrol in a marked police car initially observed Guerette using the telephone. Officer Breen continued to observe the vehicle and the occupants as he drove by the location on three occasions. Also, the occupants watched the officer. Officer Breen, who was in communications with his department was advised that the Camero was registered to John Guerette, that John Guerette's license, and accordingly his right to operate a motor vehicle, was under suspension, and John Guerette had a prior criminal history. Steven Guerette, after a period of time, drove out of the Xtra Mart Store parking lot and took a right turn traveling eastbound on Route 80 which is also known as Foxon Road.

The statements given by Officer Breen have been compared with the statements given by Mr. Guerette, other witnesses to various aspects of the overall incident, and all of the forensic evidence in order to not only reconstruct what occurred early that morning but also to assess the credibility of Officer Breen. Based upon this evaluation there is no indication that Officer Breen did not candidly and honestly relate what he perceived as occurring during the overall incident. The reconstruction is in no way inconsistent in any significant way with the Officer's statements.

Officer Breen observed the vehicle cross over the center line and return to its proper lane on several occasions. The vehicle was pulled over nine tenths of a mile from the Xtra Mart Store.

15

However speed is only one factor in evaluating what Officer Breen reasonably perceived. The Camero traveled about 177 feet from the starting point until the shots were fired. Such distance would take about 9.5 seconds at ten miles per hour, 6.5 seconds at 20 miles per hour and 6.0 seconds at thirty miles per hour.

Based upon Officer Breen's estimation of speed, it is reasonable to conclude that the time period would be closer to 6 than 9.5 seconds.

Part of the period during which Officer Breen observed the vehicle in motion was consumed by the officer's efforts to stop the Camero. Accordingly, several seconds were consumed leaving only several seconds remaining before the vehicle reached his location.

Officer Breen indicated the vehicle was 50 feet from him when he fired the first shot. The reconstruction and re-enactment is consistent with a shorter distance.

When the first shot was fired it has been determined Office Breen was in front and slightly to the right of the vehicle. When the second shot was fired within seconds, the car was actually at his location as "it began to pass him." Based on this and the gunshot residue on the exterior of the passenger door, it is concluded the officer was "relatively close to the vehicle." Officer Breen stated that after firing the first shot he "fired a second shot approximately one second later as I quickly moved to the right to avoid being struck by the car as it was still coming directly at me." This account is consistent with the reconstruction report and is indicative of the car nearly being at the officer's location as he stepped to the side and fired. Moreover, the officer's account is consistent with the reconstruction report as to both the vehicle and Officer Breen being in motion at this time as well as in close proximity to each other.

Section 53a-22, provides, in part that:

> A peace officer . . . is justified in using deadly physical force upon another person . . . only when he reasonably believes such is necessary to: (1) defend himself or a third person from the use or imminent use of deadly physical force.

However, in determining whether Officer Breen was justified in using such force, the test is not whether he personally believed he was in jeopardy of "deadly physical force." Rather, the question is, whether he "reasonably believes" he was at such risk. That is, what a reasonably well-trained officer would have believed.

It is significant that courts have held that "(I)t is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon. *State v. Aceves-Rosales*.

The forensic science reconstruction is helpful in approximating, among other things, what occurred as to the movement of the vehicle, the movement of Officer Breen in relation to that

17

vehicle, and where Officer Breen was with respect to the vehicle when the shots were fired.

Such information understandably does not directly address the ultimate question of what a reasonable police officer would perceive at the time of the incident.

The facts indicate Officer Breen returned to the roadway of Route 80 and it was at that time he observed the Camero proceed in an easterly direction toward him. It would be significant to a reasonably well trained officer, in assessing whether the vehicle posed a threat of harm, that the vehicle did not move down the road in the officer's direction until the officer appeared on Route 80. The timing of such movement is consistent with one perceiving a threat of personal risk.

Moreover, the fact that the operator did not respond to both yelling and waiving of hands also is supportive of the officer's belief that the operator was intending to inflict harm and/or flight.

Also, Officer Breen believed that the operator was possibly under the influence of drugs or alcohol. Officer Breen was in the center of the road and the vehicle was seconds away in travel time when the shots were fired.

In assessing the reasonableness of Officer Breen's stated belief that he was at risk of deadly physical force, it is necessary to consider whether Officer Breen could have reasonably and safely removed himself from such risk without resorting to the use of deadly physical force.

The reasonableness of an officer's decision to use deadly force is not to be determined based upon a dispassionate and analytical critique at some remote time and place within a safe sanctuary.

Rather:

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments - in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation.
> **Graham v. Connor**

Also, the legal standard to apply is whether a reasonable officer at the time would have acted as did Officer Breen, "rather than with 20/20 vision of hindsight." **Graham v. Connor**

Officer Breen was standing in the middle of the road and at that point the vehicle was seconds away from him and there was little time to evade the vehicle. Moreover, as stated by Officer Breen and supported by the evidence the officer was fatigued from the pursuit and assumably his ability to move quickly was diminished.

It cannot be determined at this time whether he could have safely extricated himself from the situation without firing his weapon. It is possible that another officer may have acted differently

18

and safely withdrawn from the predicament without resorting to the use of fatal force. Also, it is unclear whether Officer Breen's actions effectively diminished the threat to him. An officer's actions may be found reasonable even where "officers of reasonable competence could disagree" on the proper response to the situation. ***Malley v. Briggs***[1]

Also, even where an officer creates a situation in which the use of force becomes necessary the court has held that the officer's actions leading up to a shooting situation are irrelevant.

Rather:

> The reasonableness of the inquiry depends only upon the officer's knowledge of circumstances immediately at the moment he made the split second decision to employ deadly force. ***Maria Salim v. Administrix v. Proulx***

Also, the intent of Victoria Cooper is not critical in assessing the reasonableness of Officer Breen's conduct. As previously discussed the issue is what Officer Breen reasonably perceived based upon the information available to him. It is, based upon Steven Guerette's history (see Appendix) possible that Ms. Cooper was attempting to flee rather than cause harm to Officer Breen. Guerette has been arrested at least nine times. Many of such incidents involved drug related charges. It is of particular significance that on one occasion Guerette, after being stopped in a car by a police officer, drove off causing minor injury to the officer's arm. Upon being later arrested, Guerette stated that he fled to prevent the seizure of drugs in the car. On another occasion the vehicle in which he was a passenger was stopped. He exited the vehicle at the request of the officer and then yelled for the female operator to drive away. The driver did this in a reckless manner putting the officer at risk. The driver later told the officer that there were drugs in the car and Guerette had on more than one occasion told her to flee if stopped by police to prevent the seizure of drugs in the vehicle. In 1999 Guerette fled from police at speeds of 112 miles per hour.

It may be that Ms. Cooper may have been driving off pursuant to Guerette's established modus operandi to prevent the seizure of 18 packets of cocaine and drug paraphernalia located in the car. If such was Ms. Cooper's intent then Guerette may have been responsible for setting the events in motion that tragically resulted in the death of Ms. Cooper.

---

[1] The North Branford Police Department personnel file concerning Officer Michael Breen was reviewed as part of this investigation.

It contained no evidence that Officer Breen, during his almost 15 years as a police officer was disposed to assaultive or inappropriately aggressive conduct in the performance of his duties.

Also, on July 13, 1999, Officer Breen was duly certified by the police officer's Standards and Training Council as to all mandatory training.

It is also possible that Ms. Cooper intended to harm Officer Breen. It cannot be concluded how, if at all, the presence of a significant amount of cocaine in her system effected her behavior and thought processes. Such drug can cause, increased activity, increased vigilance to the environment, excitability and paranoia.

Also, it is unknown how clearly Ms. Cooper saw the road ahead of her as she drove down Route 80 since she suffered from impaired vision, that section of the road was not well lighted and the road surface was wet due to recent rain.

However, irrespective of these considerations the conduct of Officer Breen must be judged based upon what he reasonably perceived and whether his response to such perceptions was reasonable.

Officer Breen through, no fault of his own, was confronted with a motor vehicle weighing over three thousand pounds bearing down on him and the operator did not heed his efforts to stop or slow down. Officer Breen fired two shots when the vehicle was within several seconds of arriving at his location.

Based upon a reconstruction of the event, it is not clear as to whether Officer Breen could have removed himself from the perilous situation without firing his weapon, or indeed whether the firing of such weapon, in fact, diminished the threat to him, or whether another officer would have responded differently to the circumstances. The law permits great latitude to police officers in making "split second judgments" in potentially deadly situations, which in hindsight, upon laborious deliberation, may have not been the optimal response. Moreover a reasonable response is not limited to one form of conduct. What is clear is that Officer Breen's conduct was reasonable based upon the totality of the circumstances.

It is concluded that Officer Breen, based upon the applicable law, was justified in using deadly physical force in the shooting death of Victoria Cooper and that he reasonably believed, as permitted by Section 53a-22 of the Connecticut General Statutes, such was necessary to defend himself from the use of deadly physical force

Accordingly, no further action is to be taken by the Division of Criminal Justice.

*Michael Dearington*
Michael Dearington
State's Attorney
Judicial District of New Haven