United States District Court
District of Connecticut
FILED AT HARTFORD
6/20/05
Kevin F. [illegible], Clerk
By [signature]
Deputy Clerk

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

MARGARET COWAN,
ADMINISTRATRIX OF THE ESTATE
OF VICTORIA COOPER                 :

           :  NO.:  3:00 CV 0052 (RNC)

v.                                 :

           :

MICHAEL BREEN                      :


MARGARET COWAN,
ADMINISTRATRIX OF THE ESTATE
OF VICTORIA COOPER                 :

           :  NO.:  3:01 CV 0229 (RNC)

v.                                 :

           :

NORTH BRANFORD                     :  JUNE 20, 2005

### MEMORANDUM OF LAW IN OPPOSITION TO
### PLAINTIFF'S MOTION IN LIMINE RE: OPINIONS OF DR. HENRY LEE

**I.**  **BACKGROUND.**

   The plaintiff has moved to exclude certain opinions and testimony of world-renowned forensic scientist, Dr. Henry Lee and the defendants hereby object to plaintiff's motion for the following reasons:

   Plaintiff objects to Dr. Lee's opinion that the first bullet that hit the hood was probably fired from a certain vertical angle based upon subsequent testing.

   This objection is unsupported for the following reasons:

1.  Trajectory rod and laser trajectory analysis is a well-accepted method of

determining bullet trajectory.  Plaintiff does not dispute this.

2.      The testing done by Kent Schwendy and Dr. Manning is not a generally accepted method.

3.      The testing conducted by Mr. Schwendy and Dr. Manning was under conditions that were not sufficiently similar to the actual conditions to have any degree of reliability or accuracy.

4.      The testing conducted by Dr. Manning and Kent Schwendy did not have a known or potential rate of error.

5.      The test method used by Dr. Manning and Kent Schwendy did not have standards controlling the technique's operation.

Plaintiff objects to Dr. Lee's opinion that of the "most likely" location of the officer at the time he fired his shots.  Plaintiff seeks to exclude this opinion because it is allegedly based upon assumptions about the vertical angle and what happened to the bullet casings from the officer's shots.

This objection is unsupported for the following reasons:

1.      Experts may testify as to hypothetical questions that are based upon facts supported by evidence.

2.      Dr. Lee's conclusions were based upon "examination of the incident scene on

the night of the shooting, observation and evaluation of the pattern evidence at the scene, the examination of physical evidence, the documentation provided by the major crime squad, and subsequent experimentation and reconstruction at the scene." *See*, Reconstruction Report, pp. 7-8, attached hereto as **Exhibit H**.

3,      Dr. Lee's opinions were not based upon assumptions, but rather his measurement and analysis of the vertical angle that was determined based upon well accepted scientific methods.

Plaintiff objects to Dr. Lee's opinions as to what could and could not be determined from the evidence.  Plaintiff objects to these opinions because Dr. Lee did not have the benefit of the defendants' admissions or the results of the parties' additional testing at the time he rendered his opinions.

This objection is unsupported for the following reasons:

1.      Dr. Lee's analysis was based upon the physical evidence, not what the parties claimed to have happened.

2.      Defendant's admissions were estimates and approximations and, therefore, too unreliable to be included as evidence in a scientific test.  Furthermore, they are not part of the physical evidence.

3.      Dr. Lee considered the testing completed by experts as unreliable because the shooting incident was a dynamic situation that could not be duplicated.

## II.    LAW AND ARGUMENT.

### A.    STANDARD OF REVIEW.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. of Evid. Rule 702.

Expert testimony must be helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson. Id.

In Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court made clear that the district court has a "gatekeeping" function under Rule 702, and is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597.  In fulfilling this role, the district court must consider both the reliability and relevance of the proffered testimony. In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on "sufficient facts or data;" (2) that the testimony "is the product of reliable principles and methods;" and (3) that "the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702. In so doing, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience,

4

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1993).

Although Rule 702 sets forth specific criteria for the district court's consideration, these criteria are not exhaustive. The district court may consider a number of other factors in determining the reliability of the proffered testimony, including: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the technique's known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. See Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993).

Whether to admit expert testimony is a matter left to the discretion of the trial judge and is set aside only when the decision is "manifestly erroneous." United States v. Schwartz, 924 F.2d 410, 425 (2d Cir. 1991).

### B.    DR. LEE IS CLEARLY QUALIFIED TO OFFER ALL HIS OPINIONS IN THIS CASE.

The Daubert approach requires the district court to ensure that the "expert knows whereof he speaks." Id. at 590. In determining whether an expert does know "whereof he speaks" federal courts have generally looked at two things: (1) whether the proffered

expert has minimal education or experience in a field that is relevant to the subject matter, and (2) whether the expert has sufficient expertise in the particular field in which he is offering an opinion to enable him to give testimony that is capable of assisting the trier of fact. To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony. See United States v. Diallo, 40 F.3d 32, 34 (2d Cir. 1994).

Dr. Henry Lee has experience, education and training that ten forensic scientists would collectively be proud to obtain. "Dr. Lee has worked with law enforcement agencies helping to solve more than 6,000 cases." See Dr. Lee Biography, attached hereto as **Exhibit A**. He holds a B.S. in Forensic Science from John Jay College of Criminal Justice, a M.S. in Science and a Ph.D. in Biochemistry from New York University. See Henry Lee Curriculum Vitae, attached hereto as **Exhibit B**. Dr. Lee has received specialized training from the F.B.I., A.T.F., postgraduate schools, medical schools and professional organizations. **Exhibit B.** He holds five honorary Doctorate Degrees from universities in recognition of his contributions to law and science. **Exhibits A and B**.

Dr. Lee started his career in the Taipei Police department in 1960. After completing his university education, he served as Chief Criminalist for the State of Connecticut Police Forensic Science Laboratory from 1980 to 2000. **Exhibit B.** He

6

served as State of Connecticut Department of Public Safety Commissioner from 1998 to 2000 and has been Chief Emeritus of the Department of Public Safety since 2000. Id. He is the editor of seven Academic Journals and author/co-author of over thirty books and three hundred articles involving forensic science. Id. He has taught forensic science related courses at over a dozen universities and has conducted hundreds of seminars on forensic science around the world. Id.

Dr. Lee has been "qualified as an expert witness or an expert involved in forensic science, forensic serology, bloodspatter analysis, crime scene investigation, crime scene profiling, crime scene reconstruction, fingerprints, imprints and general physical evidence in the various county superior, supreme and federal courts of California, Connecticut, Delaware, Florida, Illinois, Louisiana, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Virginia, Washington, DC, West Virginia, and various foreign countries." **Exhibit B.**

Dr. Lee has been "recognized as an expert by involvement in and/or performance of forensic laboratory examination, traffic accident investigation, airplane accident investigation, fire and arson investigation, home and industrial security, homicide, rape, and robbery investigation in thousands of other criminal or civil cases submitted by representatives of the people and defendants, or by representatives of plaintiffs, and privately represented parties from forty different states and foreign

countries." Id.

Based upon the foregoing, there can be no doubt that Dr. Lee is qualified to test, determine and present all of his opinions and findings in this case.

### C.    DR. LEE'S DETERMINATION OF THE VERTICAL ANGLE IS BASED UPON RELIABLE PRINCIPLES AND METHODS.

All the methods used during Dr. Lee's reconstruction are well accepted in the forensic science community.  The rod and dowel and laser techniques have been tested and subjected to peer review and publication.  Plaintiff's objection is that the methodology used by Dr. Lee is not reliable because subsequent testing could not duplicate the vertical angle of the bullet mark.  However, Dr. Lee determined the approximate vertical angle by locating and marking the bullet defect in the front hood of the Camaro.  See Reconstruction Report, p. 6, attached hereto as **Exhibit H**.  The trajectory of the bullet was then determined by positioning rods and by laser sighting. Id. The defendants will demonstrate through expert testimony that this method is tested, reliable and well accepted in the forensic science community.  For example, the Federal Bureau of Investigation regularly conducts this type of trajectory analysis.  See Information from FBI website depicting the placement of trajectory rods to determine bullet trajectory, attached hereto as **Exhibit C**.  In addition, the United States Department of Justice publishes a Crime Scene Investigation Guide for law enforcement.  Attached hereto as **Exhibit D**.  That guide, on page thirty-four, lists equipment that a crime scene investigator should have at a crime scene.  Included in

this list are both trajectory rods and a laser trajectory kit. **Exhibit D**, p. 34. As such, it is clear that this method of determining bullet trajectory is not only well-accepted, but is recommended. Therefore, Dr. Lee's opinion as to the vertical trajectory of the bullet must be admitted.

Furthermore, the testing done by experts that the plaintiff attempts to use to exclude Dr. Lee's opinions is clearly unreliable. This testing was conducted under conditions that were not the same as those that existed during the incident, with no procedures for ensuring accuracy and reliability. For example, these experts claim that they could not accurately measure the vertical angle because the marks left by the bullets could not be duplicated. Therefore, the experts opine, the vertical angle could not be consistently measured from their test results.

The failure to duplicate the vertical angle was a result of the method used in shooting the gun. The experts fired the test shots while holding the gun in hand instead if placing it in a secured gun rest. <u>See</u> photograph of Kent Schwendy, attached hereto as **Exhibit E**. The recoil from the gun, variance in grip, and shooter fatigue would all have a tendency to change the vertical angle of each shot ever so slightly so that the results could not be duplicated because of variances in the test conditions. <u>See also</u> Fuss & O'Neill Reconstruction Report Schwendy test results for horizontal angle demonstrating a variance in the angle of shots fired from the same angle, attached hereto as **Exhibit F,** Appendix A-3. These variances, rather than any unreliability in Dr.

Lee's method, are why the experts could not duplicate the vertical mark left by the bullet.

Without using a gun rest to establish controlled testing conditions, these experts had no way of knowing whether the gun was actually fired at the same vertical angle. See photographs of gun rest, attached hereto as **Exhibit G**. There was no way for Kent Schwendy or Dr. Manning to know to know whether the firing angle was influenced by human error. The plaintiff concludes that the opinions of an expert with absolutely no experience, education or background in ballistics or crime scene reconstruction (see Defendants Motion in Limine re: Kent Schwendy) that resulted from obviously flawed testing methods, should be used to exclude the opinions of the most capable forensic scientist in the world. This result would destroy the holding of Daubert and intent of Federal Rules of Evidence 702.

In contrast, Dr. Lee conducted a meticulous analysis of all the available physical evidence using well accepted and reliable forensic science methods. Dr. Lee returned to the location of the shooting incident at approximately midnight on October 21, 1999. Based upon the documentation and measurements taken by the Central District Major Crime Squad on July 13, 1999, areas of the pavement were marked with white spray to designate the original location of items of physical evidence, including the bullet casings and broken glass. Experiments were conducted under laboratory conditions to determine the ejection pattern of the cartridge cases from the Glock semi-automatic

10

weapon that was submitted as evidence. A range of locations was established based
upon ejection patterns that varied depending on whether the shooter held the gun with
one hand or two hands.

The Camaro was placed in its approximate original stopped location on the night
of the incident. A series of tests was conducted to determine the approximate time it
took the Camaro to travel from its original stopped location to the most likely location
where the officer fired the shots. In addition, items similar to those found on the trunk
of the Camaro the night of the incident were placed on the trunk to see if they would fall
off. Dr. Lee next located and marked the bullet defect. The trajectory of the bullet was
determined by positioning rods and by laser sighting. Then, based upon the trajectory
of the bullet (including both the horizontal and vertical trajectory) and the angle of
impact, Dr. Lee established the most likely location of Officer Breen at the time of the
shooting. Prior to the reconstruction, glass fragments collected from the road were
reassembled at the laboratory. A bullet entrance hole was then located in this glass. A
photographic transparency was made of the reconstructed glass window. This
transparency was then placed in the window of the Camaro and the bullet trajectory
was determined.

Dr. Lee then based his opinions, including his opinions about Officer Breen's
location, the vertical angle and what could and could not be determined from the
evidence upon "the examination of the incident scene on the night of the shooting,

observation and evaluation of the pattern evidence at the scene, the examination of

physical evidence, the documentation provided by the major crime squad, and

subsequent experimentation and reconstruction at the scene." Reconstruction Report,

**Exhibit H**.

In addition, various methods of determining bullet trajectory by placing an object

into the mark, including trajectory rod and laser analysis, have been generally accepted

and recognized as reliable forensic science by the courts for decades.

> Various trial courts have readily admitted crime scene reconstruction
> evidence that included the insertion of dowels, rods, or strings through
> bullet holes to demonstrate a bullet's path. See, *Vasquez v. Hernandez,*
> No. 91 C 4088, 1994 WL 201092 (N.D.Ill. May 18, 1994) (memorandum
> opinion) (laser trajectory system used to determine where bullets
> originated); *Sizemore v. State,* 251 Ga. 867, 310 S.E.2d 227 (1984)
> (officer testified he positioned string through bullet holes to demonstrate
> bullet's path); *Pruitt v. State,* 232 Ala. 421, 168 So. 149 (1936) (no error in
> allowing witness to testify he placed a pencil in bullet hole to see direction
> it entered); *State v. Dunn,* 824 S.W.2d 533 (Mo.App.1992) (defendant's
> lawyer testified he checked state's theory of bullet trajectory by attaching
> string between bullet holes); *Quinlivan v. State,* 627 So.2d 1082
> (Ala.Crim.App.1992) (investigator testified he ran string through bullet
> holes demonstrating bullet's path); *People v. Ross,* 201 Cal.App.3d 1232,
> 247 Cal.Rptr. 827 (1988) (police officer permitted to testify he used laser
> to reconstruct path of bullets to determine gunman's location); *Smith v.
> State,* 466 So.2d 1026 (Ala.Crim.App.1985) (officer testified he attached
> string between bullet hole and bullet ricochet mark); *Ivey v. State,* 369
> So.2d 1276 (Ala.Crim.App.1979) (permitted use of life-size mannequin
> with steel rod positioned to demonstrate bullet's path through entrance
> and exit wound was not abuse of discretion); *Cherry v. State,* 488 S.W.2d
> 744 (Tex.Crim.App.1972), *cert. denied* 411 U.S. 909, 93 S.Ct. 1538, 36
> L.Ed.2d 199 (1973) (officer testified he and another officer inserted
> pencils through bullet holes to determine angle, then attached strings to

pencils between bullet holes to demonstrate trajectories of bullets).

Nebraska is no exception. In *State v. Thompson,* 244 Neb. 375, 507 N.W.2d 253 (1993), the trial court admitted evidence concerning the reconstruction by police of the paths taken by bullets, which included the placing of rods through bullet holes to determine the angle from which the bullets were fired.

The firearms examiner testified that the use of lasers to reconstruct bullet trajectories is accepted among firearms examiners. The record demonstrates that the fact a laser beam travels in a straight line is common knowledge. Therefore, aiming a laser beam through bullet holes to reconstruct a bullet's path is no less reliable than inserting a dowel into a bullet hole to demonstrate its path. In short, laser trajectory analysis is not the type of novel scientific evidence that lacks judicial sanction because of questionable reliability or validity such as is the case with polygraphs, horizontal nystagmus tests, hypnosis to refresh a witness' recollection, or certain aspects of deoxyribonucleic acid profiling. See, *State v. Houser,* 241 Neb. 525, 490 N.W.2d 168 (1992); *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d 551 (1986); *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981), *cert. denied* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *Boeche v. State,* 151 Neb. 368, 37 N.W.2d 593 (1949).

State v. Dean, 246 Neb. 869, 883-884 (1994).

As such, Dr. Lee's opinion as to the vertical angle of the bullet must be admitted.

## D.    DR. LEE'S DETERMINATION OF THE MOST LIKELY LOCATION OF THE OFFICER IS BASED UPON RELIABLE PRINCIPLES AND METHODS.

Plaintiff concludes that since the vertical angle allegedly cannot be accurately

measured, Dr. Lee's opinion as to the most likely location of the officer must be

excluded.  In this regard, defendants fully adopt and incorporate their argument as to

Dr. Lee's opinion about the vertical angel in Section C, <u>infra</u>.

Dr. Lee's reconstruction was based upon well accepted forensic science methods and Dr. Lee applied these methods reliably to the evidence in this case. Dr. Lee made it quite clear that the that his conclusions were based upon "examination of the incident scene on the night of the shooting, observation and evaluation of the pattern evidence at the scene, the examination of physical evidence, the documentation provided by the major crime squad, and subsequent experimentation and reconstruction at the scene." Reconstruction Report, **Exhibit H**, p. 7-8. Thus, the vertical angle of the bullet as determined by the laser trajectory analysis was only one of many factors considered by Dr. Lee in forming his conclusions.

Dr. Lee did not simply assume the bullet casings fell next to the officer. He conducted testing and, as a result of that testing, took into account results that indicated a range of locations of the officer based upon the location of the bullet casings, as well as the angle, trajectory (including horizontal) and other evidence. Dr. Lee not only took into account the vertical angle and shell cases, but also determined the overall trajectory with the use of well-accepted trajectory rod and laser analysis. This trajectory rod and laser analysis included a determination of the horizontal angle and vertical angle at the same time. Dr. Lee did not actually measure the horizontal angle because he was more concerned with the placement of the officer in the road by use of the laser trajectory tool when he conducted the reconstruction.

As such, Dr. Lee's opinion as to the location of the officer at the time of the

14

shooting was based upon all available evidence, resulted from well-accepted forensic science methods, and must be admitted.

### E. DR. LEE'S OPINIONS REGARDING WHAT COULD AND COULD NOT BE DETERMINED FROM THE EVIDENCE ARE BASED UPON RELIABLE PRINCIPLES AND METHODS.

Plaintiff objects to Dr. Lee's opinions as to what can and cannot be determined by the evidence.  Plaintiff argues that Dr. Lee did not have the benefit of defendants' admissions or the additional testing conducted by the experts.  The possibility of conducting additional testing to make further conclusions is a subject for cross-examination and not one for admissibility.

Dr. Lee succinctly stated, "I said we don't talk to the witness. We just look at the physical evidence." Dr. Lee deposition transcripts, p.45, attached hereto as **Exhibit I**. The witness statements of what happened during an incident are not within the realm of what forensic scientists consider as evidence.  And, even if they were, defendants' admissions in no way can be held as conclusive of the facts the plaintiff purports them to determine.

In plaintiff's requests for admissions, plaintiff asked, and defendant responded, as follows:

24.    Breen was approximately 50 feet away from the Camaro when he fired his first shot.

**RESPONSE**:        The defendants admit that Officer Breen was approximately 50 feet away from the Camaro when he began to pull the trigger on his gun that resulted in the firing of the first shot.

51.    Breen has estimated the interval between the two shots as approximately one second.

**RESPONSE**:        Admitted.

52.    The most probable time interval between the two shots is one second.

**RESPONSE**:        Admitted.

See Defendants' Responses to Plaintiff's Requests for Admissions, attached hereto as **Exhibit J**.

Without a doubt, no one was at the shooting scene with a ruler to measure the distance from Officer Breen to the car at the time of the first shot. Without a doubt, no one was standing at the shooting scene with a stopwatch timing the time between shots. Yet, plaintiff's expert, Kent Schwendy, takes the "approximately" fifty feet and turns it into exactly fifty feet. Approximate means approximate. He does the same with Breen's "estimated" one second. The plaintiff attempts to take an "estimate" and an "approximation" and turn them into physical scientific evidence that Dr. Lee should have considered. This is something that forensic scientists do not and should not do. This is, in fact, why the methodology the plaintiff's expert used is so flawed. The plaintiff's expert takes the "estimate" and "approximation" and tries to make his test results fit around them, rather than conducting the testing and analysis to see what the results reveal. When a scientist makes the test fit the desired results, or visa-versa, the entire process become unreliable.

For example, Mr. Schwendy was so fixated on making the results fit the test that he determined that he needed to make an "adjustment" to the measured horizontal angle to make it match the so-called actual angle. See **Exhibit F**, p.3; Appendix A-3. Yet, before making this "adjustment," he failed to consider three possibilities that were equally likely to explain the variance in the measured angle from the alleged actual angle.

These are as follows:

1.    The horizontal angle cannot be reliably measured because it makes inconsistent marks;

2.    Schwendy was incorrectly measuring the mark left by the bullet,

3.    The "actual" angle at which he was intending to fire was different than the measured angle because he didn't have the gun in a proper gun rest for testing and the gun simply moved ever so slightly every time he fired or aimed.

In fact, Mr. Schwendy does not have the qualifications to know how to perform the measurement of a bullet mark or conduct a reliable firearms test, let alone to know how to extrapolate the measurement of such a mark into a method of making an adjustment to the measured angle and then determine the position of the officer in relation to the vehicle. Mr. Schwendy has no knowledge whatsoever from any training, education or

experience to know how to measure the angle left by a bullet mark.  Mr. Schwendy did not consult a single professional publication to determine how to measure the angle left by a bullet mark or how to conduct a ballistics test.  <u>See</u> Defendants' Motion in Limine re: Kent Scwendy.  Even the most basic research would have revealed that a gun rest should have been used in the ballistics test.  As such, Mr. Schwendy's test results and adjustment are the exact type of junk science that must be kept from the jury, and, without a doubt, certainly cannot be used to exclude the opinions obtained from the well-accepted scientific methods used by Dr. Lee.

Plaintiff states that "without an estimate of how likely it would be for the bullet casing to be moved-and Dr. Lee did not suggest that he could make such an estimate-there is simply no basis for saying that a particular location or area is probably where the shooter was when he fired the first bullet. " This reasoning is erroneous.  If Dr. Lee were to take into account an assumption or estimate about the casing moving from its original location, he would be taking into account an assumption that is based upon **absolutely no corresponding physical evidence whatsoever.**  The physical evidence demonstrates where the casing fell.  In fact, Dr. Lee's reconstruction of the location of the officer took into account varying patterns of the bullet casing based upon testing of ejection patterns that he conducted, despite plaintiff's assertion to the contrary that Dr. Lee does not know whether his assumptions are correct.  This testing, combined with Dr. Lee's extensive qualifications, serve as the bases of Dr. Lee's

opinions. The possible movement of the bullet casings is simply a hypothesis that has no support from any physical evidence.

In fact, plaintiff's expert's opinions, which plaintiff attempts to use to exclude Dr. Lee's opinions, are based upon many false assumptions and averages.    See Motion in Limine re Kent Schwendy, supra.  Plaintiff's expert opinions are based upon underlying factual data that is absolutely erroneous.  Id.  For instance, the tests of both Dr. Manning and Kent Schwendy were conducted with the shooter and target (sheet metal or car hood) stationary.  The physical facts demonstrate, and both parties agree, that both the vehicle and the officer were moving.  Both Schwendy's and Manning's opinions, which plaintiff seeks to use to exclude those of Dr. Lee, are therefore unreliable.  In fact, neither Manning nor Schwendy take into consideration what influence the movement of the vehicle or Officer Breen may have had on the angle of impact.  The very plain truth is that Kent Schwendy's opinions about the location of the officer and the horizontal angle of the bullet are based upon assumptions that the neither the car nor the officer were moving, which are false.  Where as, Dr. Lee acknowledges that the exact location of Officer Breen could not be determined because of these factors.

Dr. Lee testified as follows at his deposition:

**Q.    What I'd like to do is talk to you about your conclusion that says this was a dynamic situation.**

**A.    Yes.**

**Q. And that the car and the officer were moving at the same time of the shots.**

**A. Yes, because we look at the vehicle, it's moving. We don't know the exact speed, I don't know, but definite moving about ten miles or above here. Now officer is moving in that direction. The shot is fired, and both at the time, the vehicle continued moving after the shot. In other words, it's not the standard testing laboratory condition. When we do the or conduct our testing everything is freezing, freeze, and we use the laboratory best condition to do the test, which not necessarily identical as that night.**

**So a dynamic situation which involves a lot of factors. Many times you cannot reproduce. Also, the dynamic condition, which means when the car is moving, the bullet firing, because two objects both moving, so the impact angle may not be the original aimed angle.**

**Exhibit I**, pp. 33-34.

In essence, Dr. Lee explained nearly entirely while both plaintiff's and defendants' experts test results were unreliable as a method of extrapolating the position of the officer Breen from the angle of the bullet mark, as determined by test firing at an unmoving object from a stationary gun.

## III.    CONCLUSION.

For the reasons set forth above, the defendants, MICHAEL BREEN and TOWN

OF NORTH BRANFORD, pray that their objection to plaintiff's motion in limine is

sustained.

THE DEFENDANTS,
MICHAEL BREEN and TOWN OF
NORTH BRANFORD

Thomas R. Gerarde, ct5640
John J. Radshaw, III, ct19882
Jeffery E. Potter, ct26356
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges
prepaid, via U.S. Mail to the following counsel of record this 20th day of June, 20045.

David N. Rosen, Esquire
Rosen & Dolan, PC
400 Orange Street
New Haven, CT  06511

Thomas R. Gerarde
John J. Radshaw, III
Jeffery E. Potter