TAB 1

```
 1                              DISTRICT COURT OF CONNECTICUT
 2                              LAW DIVISION - DISTRICT COURT
 3                              DOCKET NO. 3:00CV52(DJS)
 4   MARGARET COWAN,            *
     ADMINISTRATRIX OF THE
 5   ESTATE OF VICTORIA COOPER, *
 6            Plaintiffs,       *    CIVIL ACTION
 7       vs.                    *    Deposition of:
 8   MICHAEL BREEN,             *    JAMES J. FYFE
 9            Defendant.        *
10   - - - - - - - - - - - - - - - - -
11   MARGARET COWAN,            *    NO. 3:01CV229(DJS)
     ADMINISTRATRIX OF THE
12   ESTATE OF VICTORIA COOPER, *
13            Plaintiffs,       *
14       vs.                    *
15   NORTH BRANFORD,            *
16            Defendant.        *
17       T R A N S C R I P T of the stenographic notes
     of the proceedings in the above-entitled matter, as
18   taken by and before MANDY J. FEIN, a Shorthand Reporter
     and Notary Public of the State of New Jersey, held at 25
19   Parkside Drive, Princeton, New Jersey 08540, on Monday,
     October 29, 2001, commencing at approximately 10:40 in
20   the FORENOON, pursuant to notice.
21              CONTINENTAL REPORTING
22              500 UNION STREET, SUITE 926
23              SEATTLE, WASHINGTON 98101
24
25              1 - (800) - 308 - DEPS
```

22

2  A    I disarmed people. I was searching for a
3  couple of burglars and walked through a doorway
4  and suddenly felt very uneasy, stepped backwards
5  just in time for a crowbar to come down swinging a
6  couple of inches in front of my face. I engaged
7  in a struggle with the guy with the crowbar.
8         There was another time when I had
9  investigated a complaint in a restaurant. When we got
10 there I found out the complainant involved a guy with a
11 cowboy gun, 44 caliber, and he tried to pull it on me.
12 I managed to grab his arm and prevent that.
13        In 1971 a robbery suspect with whom I was
14 engaged in a wrestling match loaded and cocked a Wahtler
15 PPK and stuck it into my abdomen. That was taken away
16 from him by another sergeant. In 1971 or 1973 I believe
17 someone fired shots at me while I was in a patrol car in
18 Astoria, Queens in the projects.
19 Q    Does anything else come to mind?
20 A    I think that may be it.
21 Q    I am not familiar with a Wahtler PPK,
22 what is that?
23 A    At that time it was the sophisticated
24 semiautomatic weapon, 9 millimeter.
25 Q    Would it be fair to state that in

23

2  those situations that you described the man with
3  the crowbar, the other man with the 44 caliber
4  revolver, the Wahtler PPK and the person that shot
5  at you while you were in a moving vehicle that it
6  would have been justified for you to use deadly
7  force on those persons?
8  A    In none of those situations did I have the
9  opportunity. You really have to define
10 reasonable. If you are defining it as a defense
11 against a criminal prosecution I would have to say
12 yes. But in terms of the police standard of care
13 and federal rights litigation I am not so sure it
14 would have been right to use deadly force against
15 the guy with the PPK. I would have had to let him
16 go and he would have been freer to use it.
17        I couldn't use deadly force against the
18 people on the roof of the projects without endangering
19 others because I think the shots were coming from the
20 14th floor where it runs A to L. Without endangering
21 anybody else in the building would have been another
22 question. The guy in the restaurant was a situation
23 where use of deadly force was going to be a loser. He
24 already had his gun half way out so if I tried to do a
25 quick draw on him I would have lost.

24

2  Q    Do you believe it is a mistake to use
3  deadly force under any circumstance?
4  A    No.
5  Q    Would you agree that each situation
6  presents a different set of facts and has to be
7  analyzed on its own facts?
8  A    Sure.
9  Q    Do you think that the reasonableness
10 that officers get judged by when talking about
11 qualified immunity is a different reasonableness
12 that the prosecutors would utilize in bringing
13 charges against him?
14 A    I think the -- from the point of view of
15 the person bringing the charges it certainly does.
16 The prosecutor knows that when he brings a
17 criminal charge against a police officer for the
18 use of force he basically has to prove a negative
19 beyond a reasonable doubt and the standard of
20 care. In the courts as evidence I understand it
21 looks at more of the incident in which the
22 officers pulled the trigger. It looks at
23 questions as to how he got into that situation.
24 Q    What do you base that understanding
25 on, sir?

25

2  A    That is my understanding. As I understand
3  it the standard of care in the civil courts is to
4  generally accept the custom and practice of the
5  police.
6  Q    I am kind of jumping ahead but I want
7  to stay with that last comment. I am I am not
8  sure how deep you get into constitutional law --
9  A    Not at all because you would slap me if I
10 said that this was an unconstitutional shooting.
11 You would object and say I have no authority to do
12 so since I am not a lawyer.
13 Q    Focussing on what you teach you don't
14 teach constitutional law?
15 A    Last semester I taught an undergraduate
16 criminal procedure course that involved questions
17 to constitution as it applies to the criminal law.
18 Q    Did you talk about the fourth
19 amendment?
20 A    Yes.
21 Q    Did you talk about the various types
22 of seizures?
23 A    Yes.
24 Q    Did you talk about qualified immunity

26

2  A    No.
3  Q    Do you know what that is?
4  A    Yes.
5  Q    What is your understanding of it?
6  A    It generally means in a police case that a
7  police officer is immune from liability from a
8  good faith reliance of his understanding of the
9  law.
10  Q    I just want to circle back to the
11  original question in this series. Do you think
12  that the reasonableness that officers get judged
13  by when talking about qualified immunity is a
14  different reasonableness that the prosecutors
15  would utilize in bringing charges against them?
16  A    I think there are other questions that the
17  prosecutor has to think about. First of all
18  whether he will risk his relationship with the
19  police department. He has to determine whether he
20  can prove beyond a reasonable doubt that at the
21  instant the officer used force he didn't fear for
22  his safety. What you usually find typically is
23  that prosecutors are very reluctant to bring those
24  cases in a civil case. It is a little different.
25  It deals with matters of how the officer got into

27

2  the circumstances and whether he adhered to the
3  prevailing police degree of standard.
4       I did testify in a case called Zuchel
5  verses City and County of Denver. I think it was about
6  a 1993 decision from the US Circuit Court of Appeals
7  that covers Denver. They ruled in that case that there
8  was a difference between the criminal law standard for
9  the use of force and the police industry standard.
10  Q    Do you attempt to stay current on the
11  latest decisions from the US Supreme Court in your
12  field from the fourth amendment?
13  A    I do but I am not nearly as current as an
14  attorney would be. I am going by whether the
15  police used custom and practice not by the fourth
16  amendment.
17  Q    Tell me again what the study was that
18  you conducted where you came upon a number of
19  incidents when police officers shot at moving
20  vehicles in New York City?
21  A    It covered the period of 1971 through
22  1975. It was my Doctoral Dissertation. From
23  January 1971 to August 18, 1972 the police
24  department basically had no restrictions on
25  firearm discharges at motor vehicles. Then in

28

2  August of 1972 it instituted a policy that said in
3  part police officers will not use deadly force at
4  or from a moving vehicle unless the occupants of
5  the moving vehicle are using force against the
6  officer by means other than the vehicle.
7  Q    That is New York's policy?
8  A    Yes.
9  Q    I am just curious I saw that you gave
10  me a number of model policies along with your CV
11  and I didn't see that provision in any of them.
12  In other words, that they can't use deadly force
13  on a moving vehicle unless force is being used on
14  them other than the moving vehicle.
15  A    I didn't give you New York?
16  Q    You gave me Houston, Dallas, San
17  Diego --
18  A    That is the New York policy. I gave you
19  one from the International Association of Police
20  Officers and Chiefs. It says, "police officers
21  shall not fire their weapons at or from a moving
22  vehicle." Here is the San Diego policy. It says,
23  "firing at or from moving vehicles is prohibited
24  except when immediately protecting persons from
25  death or injury. And when on foot to stop a

29

2  moving vehicle the officer should exercise caution
3  and position themselves in such a location that
4  any evasive movement of the vehicle shall not put
5  them in jeopardy."
6  Q    Do you find fault with that policy,
7  sir?
8  A    No. I don't find fault with that policy.
9  I prefer the ISEP model policy that they will not
10  shoot at cars at all and of course the presumption
11  can be rebutted.
12  Q    When you say that do you mean that
13  since all circumstances are different you believe
14  the general rule is that you should never fire at
15  a moving vehicle but there may be circumstances
16  that arise under which you believe it would be
17  justified in doing so?
18  A    Yes. But they are very limited. When I
19  did my dissertation the policy in New York was as
20  I stated most of the time. I came across a couple
21  of situations that I can think of.
22       One as I recall was officers that pursued
23  suspects in a snow storm. Officers pursued, at a low
24  speed because of the snow, a vehicle that was wanted in
25  a bank robbery that had just been committed. The

54

2  I have a problem with that. If you assume that he
3  did a double tap and the laws of speed and motion
4  were suspended I would still have a problem with
5  it. I think this is one of those shootings where
6  an officer is advised to get out of the way rather
7  than to fire at the car. The best evidence was he
8  was not in fact hit by the car he was in fact able
9  to get away.
10    Q    What is your understanding as to how
11  it was that Officer Breen was able to get out of
12  the way, in other words, by doing what?
13  A    I think he says he moved 5 feet.
14    Q    Do you have any recollection as to
15  what kind of movement was made whether it was a
16  sudden movement?
17  A    I believe it was a sudden movement. That
18  is one of the reasons that police officers are
19  instructed to try and get out of the way of cars
20  because they can make sudden movements and which
21  the operator of a car cannot respond.
22    Q    Say that again.
23  A    A person on foot who is facing a car that
24  is coming at them with reasonably close distance
25  and low speeds can make sudden moves. A vehicle

55

2  cannot respond in a timely way.
3    Q    Why is that?
4  A    Because the human body is much more
5  removable than a 4,000 pound car that is already
6  in motion.
7    Q    A 4,000 pound car with power steering
8  can make a quick left or right turn; can't it?
9  A    I don't think any car can make a turn even
10  with the slowest speed they may move 35 or 40 feet
11  and I can certainly turn more quickly than 35 or
12  40 feet.
13    Q    There was a mention in the City of
14  San Diego Police Department motor vehicle
15  regulation that we read earlier that cautioned
16  officers on foot trying to stop vehicles. That
17  vehicles can take quick action that they need to
18  be worried about getting hit.
19  A    Sure. That is why the officers are
20  advised not to put themselves in that situation in
21  the first place. The experience of the police is
22  that officers are hit by people intentionally
23  very, very rarely. That is something that happens
24  maybe three or four times a year throughout the
25  United States.

56

2    Q    You have given deposition testimony
3  this year in Brocco verses Fairfax County?
4  A    Yes.
5    Q    You were a defense expert?
6  A    Right.
7    Q    What was that case about?
8  A    Mr. Brocco claimed that he was arrested
9  falsely by the police. It was dismissed on a
10  motion for summary judgment or a motion for the
11  dismissal.
12    Q    In other words, summary judgment was
13  granted after you were deposed?
14  A    Yes.
15    Q    Was it your opinion in that case that
16  there was probable cause to arrest Brocco?
17  A    Yes.
18    Q    In Chow verses Atlantic City you gave
19  testimony in Camden US District Court in 1997 for
20  the defendant?
21  A    That is correct.
22    Q    Do you remember what that case was
23  about?
24  A    That was a case that involved the arrest
25  of a woman who was causing disorder on a charter

57

2  bus that was traveling from Atlantic City back to
3  New York. It was one of those day gambling buses.
4  An Atlantic City police officer arrested her after
5  she was extremely disorderly. And she sued
6  arguing that she was arrested falsely. And that
7  case was also dismissed after trial.
8    Q    Did Chow make a claim that the police
9  used excessive force in connection with the
10  arrest?
11  A    Probably. She was fighting with another
12  woman over a seat in the bus. And I think she had
13  lost a lot of money at Atlantic City. And the bus
14  driver tried to calm her down. And he called a
15  police officer because he couldn't go any where.
16  So, the police took her off the bus and arrested
17  her. I am sure she alleged that she felt that she
18  was the subject of excessive force.
19    Q    Do you remember whether or not you
20  testified that the police did not use excessive
21  force?
22  A    I testified that I thought the police
23  officer acted reasonably. He had a public
24  conveyance with people saying that this woman was
25  raising hell because she couldn't sit in the seat

**Page 86**

2  justification for stopping the car and that a
3  normally alert police officer would do that but
4  this is clearly a circumstance in which he thinks
5  he is dealing with suspicious people rather than
6  traffic violaters and the protocol is to get help
7  to the scene before you actually stop the car.
8      Q    I am looking at this document that we
9  have marked as Exhibit 3. This is identified as
10  your notes as you read through some of the
11  materials on September 3 and the first thing you
12  have is the stop is probably okay. Do you still
13  believe that, sir?
14  A    I think the stop was okay in the sense
15  that there were grounds for making the stop. The
16  police can stop the car because they reasonably
17  suspect its operators of some wrongdoing or
18  because it has committed a traffic violation.
19      Q    The search of Guerette for all intent
20  purposes that was okay because he was under
21  arrest?
22  A    I think he had no license. Nobody had a
23  license. They had no I.D. so basically he was
24  under arrest and I had no problem with him
25  searching them.

**Page 87**

2      Q    I believe that there was evidence of
3  driving under the influence; do you disagree with
4  that?
5  A    No, no, that's correct. He says he
6  believes that.
7      Q    Once you are under arrest you are
8  entitled to search incidental to the lawful
9  arrest; is that right?
10  A    That's true.
11      Q    That would also permit Breen to
12  search the vehicle; would it not?
13  A    Yes. That's right.
14      Q    What you are saying is because of the
15  way you see the circumstances that Breen should
16  have treated this as a felony or a high-risk motor
17  vehicle stop?
18  A    He had no justification for stopping the
19  car if it was not for his suspicions. He did not
20  articulate any traffic violations. He says the
21  guy was parked staring at me in the middle of the
22  night in a place that it is the only place that is
23  open. It doesn't say I saw them go through a red
24  light and I pulled them over.
25      Q    He does have information from the

**Page 88**

2  dispatcher that the owner's license was suspended
3  so he was operating the vehicle without a license?
4  A    Yes. And he had a history.
5      Q    Didn't he say he saw the vehicle
6  cross the center line?
7  A    Right.
8      Q    That would be grounds for a traffic
9  violation; right?
10  A    You can interpret that any way that you
11  want. It seems to me that he was making a case in
12  his report that he stopped this car because he
13  suspected these occupants were involved in
14  criminal activity. And in following the car it
15  crossed the white line. But I don't see that is
16  why he stopped the car.
17      Q    Is it your testimony that what
18  Officer Breen should have done is by using his
19  loudspeaker order them to turn the car off and
20  throw the keys on the ground?
21  A    He should have had another car there. He
22  is stopping the car because he suspects they are
23  in criminal activity. So, he should not have
24  attempted the situation alone. He should have had
25  another car there. That's correct, if you go

**Page 89**

2  through the ISAP policy or training the point is
3  to select the spot to stop the car and direct the
4  people in the car to put their hands out, to throw
5  the keys of the car out on the ground and to get
6  the people out one at a time when standing in a
7  position of cover.
8      Q    What if that is how the police
9  proceeded in this case and the operator did not
10  have a suspended license and there were no drugs
11  in the car and the people were permitted to drive
12  away, don't you think then there would be a
13  complaint to the police that you pulled me over,
14  had me throw keys on the ground and came out with
15  guns drawn?
16  A    I didn't say to draw guns. The Supreme
17  Court says I have to judge an officers actions
18  based on the information reasonably available to
19  me. It seems to me that the information -- I
20  would have stopped them if I was on patrol in a
21  quite place and I saw these two people in a car
22  next to the only business open that is a target
23  for crime, and I learned that the driver had a
24  suspended license and a criminal history. I would
25  have pulled them over.

94

2  first car times the speeding vehicle and the
3  second car gets the transmission and stops it
4  appropriately.
5     Q    There are situations, however, and I
6  think I have seen them recently whereby the first
7  car determines that a given driver is speeding and
8  then within about a half a mile down the road the
9  state police officer is pointing at cars going by
10 saying you pull over?
11    A    I would say that is illadvised. If you
12 look at how officers get killed in the United
13 States you would see that about half of them get
14 killed in accidents and that accounts for a good
15 number of accidents.
16    Q    Let me tell you about something that
17 happens in the town that I live in. There are
18 emission sticker sweeps that the police officers
19 are sometimes out in the road. You don't know
20 where they are going to be. And they will be
21 there telling you to pull over. And they will
22 tell you if your emissions sticker is valid and up
23 to date. Have you ever heard of that?
24    A    I have seen sweeps like it. They pull you
25 over here.

95

2     Q    In other words, there are scenarios
3  whereby police officers do find themselves in the
4  road in need of again the attention of a driver in
5  advising the driver to pull over?
6     A    Right.
7     Q    It happens in police work?
8     A    Yes.
9     Q    We had a seat belt sweep in my town
10 the other day.
11    A    Your cops have nothing to do.
12    Q    I think you are right. I have
13 reviewed the policies that you have provided as
14 samples and I think they seem to be consistent
15 almost across the country that an officer is
16 justified in using deadly physical force when he
17 reasonably believes that it is necessary to
18 protect himself or a third party from the use of
19 deadly force?
20    A    Right. That is what the Supreme Court
21 approved in Tennessee verses Garner.
22    Q    Reasonable force does not equate to
23 minimum force; do you agree with that?
24    A    The standard that the police use is the
25 minimum reasonable necessary to accomplish a

96

2  mission. That is what they talk about.
3     Q    I think I have seen in one of these
4  training keys that minimum force is too confusing
5  to grasp so they stick to what is reasonable under
6  the circumstances?
7  A     Right. So, they should not be using any
8  more force than is reasonably necessary.
9     Q    So, that would have to be a based on
10 the circumstances that existed at the time that
11 the force was used?
12 A     Yes. And by applying the prevailing
13 police standards to those circumstances.
14    Q    We were talking about the stop of the
15 car operated by Guerette and I think you indicated
16 that you don't have any problem with the decision
17 by Officer Breen to stop the Guerette vehicle; is
18 that right?
19 A     No.
20    Q    You don't have any problem with the
21 decision of Officer Breen to have Mr. Guerette get
22 out of the car?
23 A     Right. I have a problem with the way he
24 went about it. If he wanted the car to be stopped
25 and if he ordered him out of the car he should

97

2  have had assistance at the scene before he did
3  that. The assistance is there to prevent just
4  what Mr. Guerette did. If you have one cop to the
5  left and one to the right it is hard for an
6  individual to run away.
7     Q    You don't have any problem with the
8  search of Mr. Guerette because he was essentially
9  under arrest?
10 A     Right.
11    Q    Once Guerette fled you don't have any
12 problem with Breen's authority to chase him
13 because he had reason to believe this is a person
14 who is under arrest who is fleeing?
15 A     Sure. I don't have any problem with that
16 at all but what you can see is by failing to call
17 for help Officer Breen has created a set of
18 circumstances where he has no choices. Guerette
19 is really calling the shots, to use a bad pun
20 here. I am going to do this so you have to do
21 that.
22        If you have a second officer on the scene
23 he would not have been able to run. If you stopped the
24 car appropriately the keys would have been on the
25 ground. If you had a second officer the second officer

98

2  could have stayed with Ms. Cooper if Guerette was able
3  to run.
4      Q    Let's get to the point where the
5  chase has become futile of Guerette. Breen can't
6  catch Guerette. He decides to make his way back
7  to the cruiser. Even at that point when he has
8  lost Guerette he still had the right to search the
9  Guerette vehicle incident to the arrest; didn't
10 he?
11 A    Sure.
12     Q    He certainly had a reason to go back
13 to the Guerette Camaro and wanted to stay there so
14 he can look inside and see if there is any
15 evidence related to the arrest?
16 A    Right.
17     Q    I believe the standard that we have
18 developed through this deposition that you believe
19 to be the correct one is if in fact Officer Breen
20 reasonably believed that the Camaro represented
21 imminent use of deadly force on him then he would
22 be justified in drawing his weapon at the Camaro?
23 A    He would be justified that a prosecutor
24 would not try to prosecute him. I am sure the
25 statutes in Connecticut covers that but I am

99

2  testifying about what the police standards say.
3      Q    I know that you think Officer Breen
4  should have done a lot of things differently but I
5  want to get you on police standards and away from
6  criminal prosecution.
7           Once Breen finds himself in the roadway
8  with the car moving at him if the circumstances were
9  such that he reasonably believed that the car
10 represented imminent deadly force on him even under the
11 police standards he would be justified in discharging
12 his weapon if he reasonably believed that?
13 A    I don't think that is what I said. If you
14 read the ISAP standard it says you will not fire
15 at a moving vehicle. If you read the New York or
16 Boston standard, which I did not provide, it says
17 you will not use deadly force unless the occupants
18 of a vehicle are shooting at you.
19          The other standards that I did provide tell
20 the officer that he shouldn't voluntarily put himself in
21 a position in front of the car. And it is my opinion
22 that Breen did that. He may have been surprised when
23 the car came at him but he stood in the middle of the
24 road instead of getting away.
25     Q    Let's vary the facts a little bit.

100

2  Let's say we knew for certain that Victoria Cooper
3  was behind the wheel and had all intentions of
4  trying to help her boyfriend out by running the
5  police officer over and killing him. Is it your
6  testimony that Breen would not be justified in
7  shooting at the vehicle under those circumstances?
8  A    I think he's got an obligation to try and
9  get out of the way. And the police experience
10 shows that you can do that successfully. In fact,
11 this case shows you can do it successfully. I
12 think that is the obligation and part of that is
13 because there is no way to know. Did she leave a
14 cassette recorder saying I am a suicide Camaro
15 driver I am going to run this guy over?
16     Q    Is it your belief that the standard
17 of care requires that you never under any
18 circumstances shoot a moving vehicle unless the
19 vehicle represents deadly physical force being
20 imparted on you in a means other than the vehicle
21 itself?
22 A    No. I think I testified earlier about a
23 couple of cases that the presumption was
24 overwritten but I don't think that this is one.
25 There is no way -- there are many more people who

101

2  try to run away from the police rather than try to
3  run them over.
4           There is no way that he had any indication
5  that she was trying to run him over. She was trying to
6  get away. He is in the direction where she was coming.
7  What the police have learned is that is not a situation
8  in which responsible police administrators regard deadly
9  force as reasonable. What you are doing is basically
10 shooting someone because they want to get away.
11     Q    I just want to make sure what the
12 standard is that you are applying. What you are
13 saying is that although you presume that it would
14 not be reasonable to shoot at a motor vehicle if
15 you are a police officer that there are
16 circumstances where it could be reasonable?
17 A    Right. Even if your life was not in
18 imminent danger -- one of the articles I wrote is
19 called a Better Test of Reasonableness of Police
20 Actions. And the test here is what the officer
21 did consistent with his or her responsibility to
22 protect life. It is not consistent with your
23 responsibility to protect life to stand in the
24 road and think of nothing else but to shoot the
25 car.

114

2  access to information that the police department
3  does. What does the police department do if the
4  cop says the Miranda Warnings. If he says please
5  tell me what happened and the person says no I
6  reserve to tell you. So, does that mean that the
7  police department says okay. No.
8      The police department has to conduct its
9  own administrative proceeding not using the standard of
10 care but his own policies, his police custom and
11 practice that justifies the deadly force.
12 Q   Did you notice whether or not there
13 was any approval or local justification for the
14 shooting that was found by North Branford? Did
15 you determine in looking at any of these papers
16 whether or not anyone from North Branford passed
17 judgment on the propriety of Officer Breen's
18 shooting?
19 A   I think they concluded that the DA found
20 nothing wrong so we found nothing wrong. But my
21 recollection of the policy is that it imposed an
22 obligation to conduct an investigation and they
23 didn't do it.
24 Q   Is there any criticism that you have
25 of the training received by Officer Breen?

115

2  A   Yeah. All of the officers whose
3  depositions I read -- Officer Breen testified that
4  he had not received any training on when to shoot
5  or refrain from shooting a vehicle with occupants.
6  Sergeant Manor who is the trainer for North
7  Branford recalls no such training and Kanelli got
8  no training.
9      In addition Breen says he was trained to
10 shoot double taps. I don't know of any police
11 department that trains to shoot double taps. And
12 Officer Manor says, "I don't know about double taps but
13 the police department found this shooting appropriate
14 even though according to Breen he fired shots in a way
15 that is not approved by his police department."
16 Q   Let me jump to the two shots without
17 referring to them as double taps. Would it be
18 fair to state that Officer Breen would have to
19 have an independent justification for each of his
20 shots in order to justify in the shooting that
21 occurred in this case?
22 A   Yes. He would have to have a
23 justification.
24 Q   It is not if shot one is justified
25 shot two are justified?

116

2  A   That is correct. And officers are
3  generally trained to shoot until resistance. In
4  this case you can't tell when resistance ceases
5  because a car doesn't stop. If you shoot at a
6  human resistance ceases when he falls down. The
7  car keeps going.
8  Q   Would it be fair to say that the
9  training Officer Manor and Officer Popolizio in
10 their depositions say that the use of deadly
11 physical force is justified under department
12 policy so long as the imminent threat of deadly
13 force persists?
14 A   Right. Except that there should be a
15 distance made between shootings of vehicles and
16 shootings in other circumstances. So, if you
17 confront a guy like Diallo you can shoot until
18 resistance ceases.
19 Q   Do you know of any police departments
20 that train on specifically shooting at motor
21 vehicles?
22 A   I wrote the training for New York in 1973.
23 I wrote it.
24 Q   You wrote the training policy?
25 A   I didn't write the training policy. The

117

2  police department in 1972 developed a policy on
3  deadly force that included the provisions on
4  shooting at cars. In 1973 I was the chairman of
5  the science department of the police academy and
6  it was my job to do training programs.
7  Q   That was my question, what did the
8  materials consist of? In other words, how do you
9  train on the motor vehicle aspect?
10 A   That officers have an obligation to
11 protect life and that included themselves. And
12 that there had been a lot of officers shooting at
13 cars in 1973 and officers were being instructed
14 not to do that. It is very difficult to hit the
15 target in a car. You are shooting at someone that
16 is moving and all you can see is his head and
17 shoulders. The likelihood of a miss is very
18 great. At that time police officers used round
19 nose bullets. They would bounce right off a car.
20     We conducted at the firearms range up on
21 cinder blocks windshields and they were positioned right
22 in front of the chair with an automatic gun. We would
23 try to fire shots through the windshield that would
24 simulate a cop firing. And unless you fired 8 or 10
25 degrees perpendicular the shot came back at you. If you

**122**

2  to live with their mistakes.
3      Q    Once again the decision to fire two
4  times at Victoria Cooper continued threat of
5  deadly force independently, in other words, you
6  don't get to shoot twice because you have an
7  initial proper judgment to shoot?
8      A    Right. Officers are generally trained to
9  keep shooting until the person falls down. I
10 don't understand where the business about firing
11 two shots at one time comes in.
12     Q    So we have some perspective on that
13 point the four officers in New York City who shot
14 41 times at Amadou Diallo had an independent
15 justification to continue shooting; is that right?
16     A    Right. And the four officers emptied
17 their guns in about four and a half seconds. And
18 the forensic evidence made it absolutely clear
19 that he did not fall until he was hit with that
20 one shot. And all the other wounds that he
21 sustained he sustained while he was standing
22 erect.
23     Q    The Diallo case there were four men
24 that each independently had to make the judgment
25 that the threat persisted?

**123**

2      A    Right.
3      Q    They had to make that judgment right
4  up until the very last time the trigger was pulled
5  by each of them?
6      A    Right. In fact, Carroll reloaded his gun.
7  It was during the course of him reloading his gun
8  that Mr. Diallo went down.
9      Q    Were any shots fired after the
10 reloading?
11     A    No. He fired 16 shots loaded the gun and
12 Diallo went down.
13     Q    The circumstances which were unique
14 to that case justified each of those four officers
15 making the justification that the threat persisted
16 and that deadly force was justified?
17     A    It is not a circumstance where you are
18 talking about a motor vehicle. Right. My opinion
19 was also by the only eyewitness who described the
20 situation three separate times but who reneged on
21 her testimony in the actual trial.
22          MR. GERARDE: Off the record.
23          (Whereupon, a discussion was held
24     off the record.)
25          MR. GERARDE: We have had some

**124**

2  discussions about the file contents and you
3  will be making a copy of your entire file
4  including the exhibits marked today,
5  Professor Fyfe, and forward it to my office.
6  That will be at my expense. It will provide
7  a copy of everything Attorney Rosen wants at
8  my expense. With that I have no further
9  questions.
10          MR. ROSEN: I have no questions at
11 this time. As we discussed off the record of
12 course I reserve my right to ask Mr. Fyfe to
13 prepare an affidavit in connection with any
14 motion for summary judgment that may cover
15 areas that if I didn't have an option to do
16 an affidavit I might feel I have grounds to
17 cover today.
18          MR. GERARDE: Understood.
19          (Whereupon, the deposition is
20 concluded at 2:30 p.m.)

**125**

CERTIFICATE

I, MANDY J. FEIN, a Shorthand Reporter and Notary Public of the State of New Jersey, certify that the foregoing is a true and accurate transcript of the stenographic notes of the deposition of said witness who was first duly sworn by me, on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by, an of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

_____
MANDY J. FEIN