UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARGARET COWAN,
  as Administratrix of the
  Estate of Victoria Cooper,
            Plaintiff,

V.                                        :        CIVIL NO.: 3:00CV00052(RNC)
                                                   ALL CASES
MICHAEL BREEN,                            :
            Defendant.


MARGARET COWAN,
  as Administratrix of the
  Estate of Victoria Cooper,
            Plaintiff,

V.                                        :        CIVIL NO.: 301CV00229 (RNC)

TOWN OF NORTH BRANFORD                    :        JUNE 20, 2005
            Defendant.

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION IN LIMINE RE: TESTIMONY OF KENT M. SCHWENDY, P.E.**

Because the Court will have an opportunity to hear from Mr. Schwendy, this

memorandum is intended as an introduction to the *Daubert* hearing.[1] Mr. Schwendy is an

engineer and an expert marksman who checked the findings of defendants' experts concerning

the angle of defendant Breen's first bullet. He used essentially the same testing methodology

---

[1] This defense motion can appropriately be considered in conjunction with two others: Defendants' Motion in Limine re Animation, No. 103, *see* no. 126 (memorandum in support) because Mr. Schwendy's testimony provides the foundation for the animation; and Defendants' Motion in Limine re Deposition testimony of Dr. Manning or Dr. Eberhardt, No. 99, *see* No. 100 (memorandum in support) because Mr. Schwendy's testing and opinions are closely related to those of the defense experts Dr. Manning and Dr. Eberhardt.

and, not surprisingly, obtained similar results.  He then found that his results were consistent with other established  facts about the shooting and could be combined with them to determine a great deal about the positions and movement of Breen and the Camaro.  This second part of his work was essentially a mathematical process that depended upon an engineer's ability to make mathematical analyses of real world data rather than expertise in accident reconstruction.

Because Mr. Schwendy is highly qualified to do the testing and analysis that he did, and his methodology was sound, defendants' objections are misdirected. This memorandum first reviews Mr. Schwendy's qualifications, then discusses what he did and why.

### I.    MR. SCHWENDY IS HIGHLY QUALIFIED

Mr. Schwendy is a professional engineer with approximately thirteen years experience. He has a B.S. from Rensselaer Polytechnic Institute and served in the Air Force as an engineer for five years. He is now a vice president at Fuss & O'Neill, a leading engineering firm based in Manchester. Defendants rightly do not question that Mr. Schwendy is a well qualified, highly skilled professional engineer. What they have missed, because they did not look for it, are Mr. Schwendy's extensive relevant training and experience. This experience is in several relevant areas; combined they make him extraordinarily well qualified for the assignment he undertook.

#### 1.  Experience with the properties of steel

Mr. Schwendy's trajectory testing involved analysis of a bullet penetration mark – a deformation, or failure – in the Camaro's stamped steel hood.  He is well qualified to understand and analyze this penetration mark because he has substantial experience and expertise in the characteristics and failure of steel, including stamped and rolled steel like the type used in the Camaro hood.

2

Mr. Schwendy's experience, after college study, comes first from his work as a structural engineer, working mostly with steel structures[2]. This experience has given him expertise concerning the properties of different types of steel, knowledge that he applied in designing, performing, and analyzing his testing.

Mr. Schwendy's deployment in the Air Force was as a lead structural engineer. In that position he worked in the design of steel structures, work that involved knowledge of the failure properties of steel, including both catastrophic and deflection failure. He often worked with stamped and rolled steel, and he is very familiar with the material characteristics of the varieties of this type of steel. As a structural engineer both in the military and afterward he was also required to specify components of building structures, including stamped and rolled steel components, also work that required expertise in the properties of steel, including particularly stamped steel. In the Air Force he also supervised personnel who actually fabricated steel components also in the field, including stamped steel components, as well as personally working with steel fabricating tools and equipment.

After leaving the Air Force, his assignments have included acting as special inspector for the fabrication of steel components for a large waste-water treatment plant. This work involved inspection of the manufacture of steel components to insure that they met detailed sets of specifications, including resistance to failure and deflection properties. As a civilian he was also the field representative, inspector and lead designer for the fabrication of a steel aviation fuel line at Westover Air Force Base, an assignment in which he was responsible for the procedures and

---

[2]Mr. Schwendy's most recent experience is as a civil engineer, but much of his background is in structural engineering.

testing of the fabrication and welding of steel piping. This assignment too required a high level of expertise in the properties of steel, including its failure properties.

### 2. Experience with shooting, bullets, and handguns

Mr. Schwendy is expert in the use of firearms, including handguns. He is an expert marksman who is intimately familiar with the properties of firearms, including weapons like the one defendant Breen used to shoot Victoria Cooper.

In the military, he used this expertise as an airbase ground defense instructor, a position in which he instructed military personnel concerning the tactics for defense of an airbase (particularly one on foreign soil) from terrorists or other hostile forces. This work involved expertise not only in the use and characteristics of firearms but also in related issues such as when steel structures or motor vehicles should be used as protection from hostile fire – a subject requiring knowledge of when and how projectiles penetrate the sheet metal bodies of steel objects, including motor vehicles.

In the military he also worked with snipers, another job that required expertise in how and when bullets penetrate metal. He had additional experience involving projectile penetration of the metal of  motor vehicles in his work with ordinance disposal teams (bomb squads) disabling explosives in motor vehicles: disabling a car bomb involves shooting projectiles into the vehicle through the steel body, in order to detonate or disable the explosives inside.

### 3. Experience in statistical analysis

Mr. Schwendy's work has involved extensive statistical analysis. In a variety of assignments, he has had to assemble data and do mathematical and statistical analyses of data similar to the analysis he performed in this case. This type of analysis is part of the stock and

trade of engineers.

### 4. Experience reconstructing accidents

Though he does not call himself an "accident reconstructionist," a term of vague and shifting meaning, Mr. Schwendy has done  reconstructions of accidents.  At Fuss & O'Neill he participated in accident reconstructions, doing both data analysis and field work.  While serving in the Air Force, at Tinker Air Force Base, Dover Air Force Base, and in Saudi Arabia he investigated vehicle collisions in order to reconstruct what had occurred. This included instances where a collision had actually resulted in damage to steel structures and he had to use his expertise in steel structures and the properties of steel to insure the integrity of the structure. His investigation and reconstruction of an auto accident in Saudi Arabia was a particularly sensitive assignment because it involved an American in one vehicle and a Saudi civilian in the other. Mr. Schwendy's work involved not only reconstructing what had happened but working with a bi-national team to use his findings to improve the safety of the road where the collision had occurred.

In sum, Mr. Schwendy is well qualified by virtue of his credentials and experience to perform testing involving firearms and stamped steel in connection with the reconstruction of this shooting and to do mathematical analyses of the implications of his testing and other data. As the Court will see at the hearing, the quality of the work that he did reflects his high abilities and considerable experience. We now summarize that work, looking first at the trajectory testing, then at his mathematical analysis.

### II.  THE DETERMINATION OF THE BULLET ANGLE WAS RELIABLE

Two photographs of the mark that Breen's first bullet made in the hood of the Camaro are

5

attached at tab 1. A glance at the photo shows that the mark is at an angle, suggesting that it was fired not from in front of the Camaro but from somewhat off to the side. Defendants retained a large and well-credentialed firm that describes itself expert in accident reconstruction.  It is even called, Accident Reconstruction Analysis, Inc.  They asked their experts to determine the location of the shooter and the Camaro when the shots were fired, as well as the Camaro's speed. The firm, led by its senior member, Dr. Charles Manning, developed and deployed a protocol to determine the angle of the first bullet and reported the results of their testing. They found that the first bullet struck the Camaro at an angle of 13 degrees from the center line.[3]. Plaintiff then retained Mr. Schwendy to check those results, and Mr. Schwendy did so, following a very similar methodology.

Defendants' criticism of Mr. Schwendy's testing thus has a surreal quality about it because defendants are criticizing Mr. Schwendy for using essentially the same methodology that their own experts developed and used.  Any differences between what Mr. Schwendy did and what the defense experts did were solely in the service of additional reliability (not, for example, to save money or to skew the results, neither of which happened.) At the hearing, Mr. Schwendy will explain the reasons for each variation from defendants' protocol, but the basic point is that the parties agree on the fundamentals of how to determine the angle of the first bullet.

This agreement simplifies the Court's gatekeeping task. Mr. Schwendy is fully prepared to explain and justify the protocol that he and defendants' experts followed. But in view of the fact that there is so much agreement, the main questions are whether Mr. Schwendy's execution

---

[3]*See* Deposition of Charles Manning, March 7, 2002 at 18, 19, 21, 41-43, 64-65, 99-100, 117, 124, 126.

of the protocol was done properly and whether his departures from it were reasonable. He did

and they were, as his testimony will show. At this point it may be useful to walk through the

methodology that Mr. Schwendy and the defense experts followed, in order to see that it was

systematic and reliable.

A.    **Mr. Schwendy and the Defense Experts Used the Same Systematic Approach
      and Reached Similar Results.**

Both Mr. Schwendy and the defense experts went through the same multi-step process. It

consisted of the following steps:

**Step one: Choose a weapon and ammunition.** In order to determine the angle from

which the first bullet was fired, the defense experts fired a series of bullets from a Glock 22

semiautomatic pistol, the same make and model weapon as that used by defendant Breen. They

also used the same make and model of Smith and Wesson cartridges as Breen had used. Mr.

Schwendy did exactly the same thing.

**Step two: Choose a target metal.** The defense experts fired the bullets into a Camaro

hood from the same year as the Camaro that Breen shot. Mr. Schwendy did this too (see step 4).

But first after considerable investigation, he used a slightly different approach. He carefully

examined the actual Camaro hood and determined that it was made of two pieces of stamped

steel welded together in various spots and was not completely uniform in shape or thickness. He

examined the particular spot where the bullet hit and obtained sheet metal that closely matched

the characteristics of the hood at that spot.

**Step three: Fire a series of rounds into the metal at known angles.** The defense

experts fired a series of rounds into the Camaro hood from a fixed point 25 feet in front of the

center of the hood.  They sprayed their shots across the hood, resulting in a series of penetration

marks at different angles. Mr. Schwendy chose not to do that, because of the variations across the

hood,  but he did something very similar. He fired a series of shots from known angles, but used

several different pieces of metal instead of just one hood, allowing him to fire many shots.

Additionally,  instead of standing still and spraying his shots, he moved himself around an arc 25

feet in front of the metal.

**Step four: Compare the angle of the bullet marks with the known angle of the shot.**

The  defense experts made a series of measurements of the angle between the right side of

the bullet mark and the centerline of the hood. They found that there was a consistent relationship

between the two angles. Mr. Schwendy did exactly the same thing. His  results were slightly

different from theirs – a difference the jury could conclude was due to Mr. Schwendy's greater

care and accuracy in performing the tests.[4]  The lead defense expert, Dr. Manning, testified that

the angle of the right side of the bullet mark was the same as the angle of the shot.[5]  Mr.

Schwendy, with almost ten times as many shots to measure and a more careful measurement of

the angle of the shot, determined that the angle of the shot was approximately five degrees

greater than the angle of the bullet mark. (As he will explain  based on his knowledge of

_____

[4]Mr. Schwendy did his work more carefully than the defense experts. The defense experts
took two shots from 50 feet and the rest from 25 but did not make any correction for that
difference. Mr. Schwendy fired all his shots from 25 feet.  The defense experts also did not
correct for the fact that the bullet marks on the hood were not exactly 25 feet from the shooter,
who was 25 feet from the front of the hood which; this also made their measurements less
accurate. Mr. Schwendy carefully calculated the precise angle from his weapon to the bullet mark
Finally, the defense experts used only six bullet marks; Mr. Schwendy made more than fifty,
allowing him to reach more statistically reliable findings.

[5]The bullet mark bowed out on the left side due to the spinning of the bullet but was
much straighter on the right side. *See* p. 14, *infra,* Tab 4.

firearms, this consistent difference makes sense because the bullet's spin makes it "kick" slightly and in a consistent way when it hits the metal.)

At this point Mr. Schwendy took an additional step. He fired from a known angle into a Camaro hood just like the actual hood. Using his skill as a marksman, he hit the exact spot on the test hood where Breen's bullet had hit the actual hood. He measured the bullet angle and determined that it matched the predicted angle to within half a degree, confirming that his test methodology was reliable.

**Step five: Measure the angle of the original bullet mark.**  Dr. Manning measured the original bullet mark and found that it was at a 13 degree angle to the center line of the car. Mr. Schwendy also measured the original bullet mark and, as would be expected, got the exact same measurement of 13 degrees. This agreement is significant because it confirms both that Mr. Schwendy knew what he was doing when he measured the angles of the bullet marks and that the bullet marks may be reliably measured.

**Step six: Calculate the angle of Breen's first shot.** Dr. Manning testified that Breen's first shot came in at a thirteen degree angle, the same angle as the bullet mark. Because Mr. Schwendy found that there was actually a five-degree difference between the bullet mark angle and the angle of the shot, he made a more accurate estimate of 18 degrees.

**Step seven (Schwendy only): Calculate the variation in possible angles.**  Mr. Schwendy went beyond Dr. Manning by calculating the mean and standard deviation of his measurements in order to determine the probability that the true measurement fell within a given range. Using this powerful and widely-accepted statistical technique, he calculated that the standard deviation of his measurements was 1.5 degrees, which, he calculated, meant statistically

that there is a 95% probability that the true angle of the first bullet is at least 15.5 degrees.

**Step eight: Examine the vertical angle to see whether it is related to the bullet angle.**

Dr. Manning also examined the vertical angle of the shots into the test hood and determined that there was no relationship between the vertical angle of the bullet mark and the vertical angle of the shot. He said the bullet mark angles varied widely, so that the vertical angle of the bullet mark was not useful in calculating the vertical angle of the shot.[6] Mr. Schwendy did the same thing and came to the same conclusion.

There is nothing inappropriate or unscientific in any of this. On the contrary, it is a model of systematic testing.

**B.      Defendants' Criticisms of Mr. Schwendy's Methods Are Wide of the Mark**

Defendants' Memorandum raises several objections to Mr. Schwendy's methodology.

---

[6]A.      … the police stuck a rod down there.  Miller [an engineer hired by plaintiff] stuck a rod down there, and they took a laser.  Well, it's pretty obvious after we put eight holes through there …  There isn't any way with that bullet tearing that up like that that you can--you can measure what that angle is in any kind of accuracy.

…

Q.      When did you stick a stick in there?

A.      When we had the hood, I stuck a stick in there two or three times.  We've got-- we've got some quarter- inch dowel pins, and some three-eighths-inch dowel pins that we'd stick in there.

Q.      And what were you able to determine using the dowel pins?

A.      … I can put the dowel pin in there, though, and I can get-- I can get a pretty vari-- wide variation in numbers when I put the dowel pin in there, because of the way that bullet, when it's spinning, tears that hole up.

Q.      Do you get a wide variation in the [horizontal] angle to the center line from the way the bullet tears the metal up?

A.      Oh, no.  You don't get any variation in center line where you're shooting, because we're able to measure very carefully that line in front of it in the right side.  But going down in, no.

Manning Deposition 110-12, attached at Tab 4.

None has the slightest merit. One of the defense experts – Dr. Manning's employee, Dr. Alan

Eberhardt –  has now also produced a report criticizing Mr. Schwendy's procedure, and those

criticisms are also unpersuasive. In any case they are criticisms of the details of Mr. Schwendy's

procedures that go to the weight of his testimony, not its admissibility. We will first address the

criticisms in defendants' memorandum.

### 1.  How the Pistol Was Held

Defendants say that Mr. Schwendy should have held the pistol in a vice or a pistol rest to

be sure his angle was accurate.  That would have been a good idea if Mr. Schwendy were firing

from three feet away, as in the article defendants refer to. But he was firing from 25 feet**,** so that a

couple of inches variation in the location of his weapon would have only an imperceptible effect

on the angle of his shot. Defendants' suggestion that "the angle identified by Schwendy is based

on his ability to hold a handgun at that angle" Def. Mem. at 16, *see id.* at 17,  betrays a profound

misunderstanding of how a bullet travels from a gun. Mr. Schwendy did not determine the

trajectory of his shot by measuring the angle of his weapon at the time he fired: he *knew* the angle

of his shot by carefully measuring the angle between the bullet's trajectory and his reference line.

Where the bullet went, that's where the gun was pointed.

### 2.  The Significance of the Road Structure.

Defendants say that Mr. Schwendy did not take the slope of the road into account in

making his calculations. *Id.* 16-17. But as defendants acknowledge, *id.,* this data is significant in

measuring the *vertical* angle (because the road can go uphill or downhill). On the other hand,  it

has nothing to do with what Mr. Schwendy and the defense experts measured: the horizontal

angle between the shooter and the car.

11

### 3. The Choice of a Target.

Defendants criticize Mr. Schwendy's choice of sheet metal as a target. Mr. Schwendy can explain the reasons for his choice in detail at a hearing.  In brief, he determined through careful examination that the sheet metal he chose closely approximated the Camaro hood in the location of the shot – more closely than other parts of the Camaro hood did. He then he tested his results by firing a test shot into a Camaro hood at exactly the same spot Breen's bullet hit.

Mr. Schwendy can also answer the defendants' criticism that he used a stationary target – as, of course defendants' own experts did. Mr. Schwendy will explain at the *Daubert* hearing that using his engineering knowledge he can establish that the movement of the car during the time the bullet was in contact with it was too tiny to affect any of his results.

### 4.  The Angle of the Target.

Defendants criticize Mr. Schwendy for tilting the sheet metal slightly. He will explain at the hearing that this did nothing to affect the reliability or validity of his measurements and was, moreover, consistent with conditions at the scene.

### 5. Dr. Lee's Views.

Defendants invoke Dr. Lee's testimony about difficulties in determining exactly what happened. Def. Mem. 18 (citing deposition of Henry Lee at 31-34, 36, 41, 48, 54-55, 58-59).  But they misstate Dr. Lee's testimony, putting into his mouth the opinion that "the trajectory angle cannot be reproduced with a test as envisioned by Schwendy." Def. Mem. 18.  In fact, Dr. Lee never said any such thing. He neither attempted to do the testing that the defense experts and Mr.

Schwendy performed nor said that such testing would be unreliable.[7] Dr. Lee offers the

defendants no comfort. The defense experts, who did address the same issues as Mr. Schwendy,

used a very similar methodology and reached very similar results.

### C. The Criticisms from Defense Experts.

Dr. Manning's employee, Dr. Alan Eberhardt, has now submitted a report with criticisms

of Mr. Schwendy's methodology.  A copy of the report is attached as Tab 3.  Dr. Eberhardt

makes three criticisms, none of them warranted and none of them relevant to admissibility.

He criticizes the choice of a target metal. As noted above, Mr. Schwendy will explain his

choice at the hearing, and the steps he went through to determine that it was the most reasonable

choice. In a nutshell, the hood's curvature, the variation in its thickness at different points, and

the variation in the steel's behavior based on how close the bullet mark was to a weld point on

the hood, all made the steel sheets that Mr. Schwendy used more likely than other parts of the

Camaro hood to behave like the particular spot in the Camaro hood where Breen's bullet struck.

A related criticism is that Mr. Schwendy only fired one bullet that penetrated into a

Camaro hood. He will explain the reason he did this: the spot he fired at, which is the precise

spot where Breen's bullet struck, is the spot where a bullet will do the same thing as the bullet

Breen fired.  The fact that Mr. Schwendy found a stable relationship between the trajectory angle

---

[7]Thus, in the excerpts defendants cite he was talking about a variety of issues, none of them the one at hand. *See* Lee Deposition attached as Tab 2 at 31-34 (discussing cartridge ejection patterns and the fact that the car's movement may make the bullet strike a different part of the car than the one the shooter was pointing at when he pulled the trigger); 36 (the location of the person pointing a laser into a bullet hole did not necessarily represent the exact position of the shooter); 48 (discussing difficulty of estimating vehicle speed from spread of window glass); 54-55 (discussing difficulties with estimating the downward angle); 58-59 (noting that the scene was a "dynamic scene," meaning, the officer and the Camaro were both in motion).

and the angle of the right side of the penetration mark using sheet metal that closely resembled the hood, and that the bullet when shot into the hood then behaved precisely as his prior testing predicted, is powerful evidence that the prior testing, with sheet metal, can predict what happens when the bullet was fired into the hood.

Finally, Dr. Eberhardt opines that the right side of the bullet marks cannot be reliably measured. This criticism too is surreal. As Dr. Manning testified, forcefully and repeatedly, the right side of the bullet mark is exactly what should be used and yields reliable results. His testimony on this subject is reproduced at Tab 4. See Manning Deposition at 18, 21, 27, 32, 39, 40-44, 53, 57, 59, 63-65.

### III. THE USE OF THE TEST RESULTS WAS SCIENTIFICALLY VALID

Dr. Manning testified that from knowing the distance Breen was in front of the Camaro and the angle of the first bullet, he could calculate how far Breen was off to the side of the car.[8] That is what Mr. Schwendy did. Mr. Schwendy took a series of facts determined by others to be accurate and found that they were not only consistent with each other and with his test results but that they could be correlated with each other to provide considerable information about the shooting. His results are illustrated in the animation that he will testify about at trial. He used a series of inputs, each of which is unimpeachable, and from them was able to determine mathematically the speed of the Camaro, the relative location of the Camaro and Breen at the time of the shots, and the location of the Camaro – and, therefore, Breen – on the roadway. The important point is that any reconstruction that he did beyond the testing described above was done through the use of calculations of the sort that engineers are well qualified to make, and that

---

[8]Manning Deposition at 123-124.

require engineering expertise but not "accident reconstruction" expertise to perform.

Thus, Mr. Schwendy used the following inputs:

| Value | Units | Description | Basis |
|---|---|---|---|
| 9.42 | feet | Distance from the front of the vehicle to the impact point of the second shot. | Measurement of the Camaro based on Dr. Lee's reconstruction of the window |
| 65 | degrees | Angle between barrel of weapon and vehicle during second shot. | Dr. Lee's deposition (page 38). |
| 2.58 | feet | Distance from the muzzle to the vehicle for the second shot. | Dr. Lee's deposition (page 2). Average of 1' to 50". |
| 1 | second | Time period between first and second shots. | Defendant's Rule 36 admission |
| 44.3 | fps | Velocity of vehicle between first and second shots. | Mathematically determined by all the other inputs |
| 3.75 | feet | Distance in x-direction from the front of the vehicle to the impact point of the first shot. | Measurement of the Camaro hood. |
| 1010 | fps | Muzzle velocity of the bullet. | Published data. |
| 15.5 | degrees | Angle between barrel of weapon and vehicle during first shot. | Mr. Schwendy's own testing and calculations. |
| 0.25 | second | Time period between beginning to pull the trigger to fire first shot and time of first shot. | Defendants' Rule 36 admission and opinion of Defendants' expert Dr. Manning. |
| 1.00 | feet | Distance in y-direction from the side of the car to the impact point of the first shot. | Measurement of the Camaro hood |
| 2.00 | feet | Distance between muzzle and chest of officer when holding weapon in two hands and positioned ready to fire. | Mr. Schwendy's measurement of a 5'-8" person holding a Glock 22. |

Defendants have no basis for criticizing any of these inputs. The best they can manage is to carp at Mr. Schwendy's choice of the middle of Dr. Lee's range for the distance between the muzzle and the car at the time of the second shot. *See* Def. Mem. 15. Because Mr. Schwendy's number, 2.58 feet (see chart above) is in the middle of the range, it is at most about 18 inches

15

from Dr. Lee's extreme values. As Mr. Schwendy can explain at the hearing, changing the value to either extreme, or to anything in between, would have at most a trivial effect on any of the other values.

Defendants also make an indistinct criticism to the effect that Mr. Schwendy "assumed that the car is moving in a straight line parallel to the curb of the road." Def. Mem. 17. If they mean that Ms. Cooper was driving down the road rather than across the road, it is true that Mr. Schwendy made that assumption, but she certainly was doing what he assumed, or otherwise she would not have gotten from her starting point to where Breen shot her. If the criticism is that Mr. Schwendy improperly assumed that the Camaro was in a particular position at the time of the second shot, it is true that he did make such an assumption, but he based that assumption on Dr. Lee's testimony that the Camaro was in fact in that position. Perhaps defendants can clarify this criticism at the hearing.

Next, defendants say that Mr. "Schwendy also ignores the glass fragment evidence as well as the location of the spent bullet casings." Def. Mem. 19. This criticism misses the point of what Mr. Schwendy was doing.  The glass fragments are completely consistent with his findings: Dr. Lee relied on the glass fragments, and Mr. Schwendy relied on Dr. Lee. Likewise, defendants' experts relied on the glass fragments to estimate the Camaro's speed as 29 miles per hour. Mr. Schwendy calculated the speed, based on all the unimpeachable inputs, as 30 miles per hour. His close agreement with the defense experts' findings is solid corroboration of his results.

With regard to the bullet casings, Mr. Schwendy "ignored" them only in the sense that he did not let them trump the findings that he had reached through his own testing. This was perfectly proper, since Dr. Lee testified that a bullet casing is an unreliable piece of evidence

since it can be kicked, or roll, or be moved by vehicles at the scene, and so on. *See,* Lee

Deposition, Tab 2 at 23-24, 64-65.

And the source defendants cite does not help them at all.  The only bullet casing in

question is the one for the first shot. With regard to the second shot, everyone says that the

officer was in a location consistent with the location of the bullet casings; Mr. Schwendy has no

reason to doubt that conclusion and does not dispute it.  With regard to the first shot, the single

bullet casing cannot trump the other evidence. As the source defendants rely on puts it,

> No competent shooting reconstructionist would put all his eggs in one basket, nor
> should he estimate a vehicle position based on the location of a single fired case
> that has been subject to slope incline, roadway traffic, or any of the other
> aforementioned imponderables.

D.H. Garrison, Jr., *Reconstructing Drive-By Shootings From Ejected Cartridge Case Location,*

25 AFTE Journal No. 1, pp. 15-20, at 20 (included at tab D to Def. Mem.)

The fundamental point is this: if Mr. Schwendy's input variables are reliable, his output is

reliable. Defendants have no valid criticisms of any of his input variables or of the calculations

he made to derive his output from them.  They therefore have no basis to criticize his output.[9]

---

[9]Defendants' criticism of Mr. Schwendy's qualifications as an accident reconstructionist
fail for another reason as well. Mr. Schwendy's integration of information, and the resulting
animation, were very similar to what plaintiff's expert accident reconstructionist Michael Miller
previously did with the data supplied by defendants' experts. Mr. Miller specializes in accident
reconstruction. Like Mr. Schwendy, he took inputs from Dr. Lee and combined them with other
information – principally the expert results that defendants now seek to disavow – to make an
animation that showed the circumstances of the shooting.  Thus, as with the testing, Mr.
Schwendy followed in the footsteps of an accident reconstructionist to integrate the data
available about the shooting.

## IV. THE LAW SUPPORTS ADMISSION OF THE TESTIMONY

*Daubert* and Rule 702 are designed to assist jurors in finding the truth. Mr. Schwendy's careful and reliable work will assist that process, and the jury should be allowed to hear about it.

In the language of Rule 702,  Mr. Schwendy's scientific and technical knowledge "will assist the trier of fact to understand the evidence [and] to determine ... fact[s] in issue." The reconstruction analysis that Mr. Schwendy performed – the work underlying his animation – requires an expert ability to analyze quantitative data mathematically. Mr. Schwendy's testimony will help the jury understand the relationship between the different pieces of evidence. His testing will help the jury "determine a fact in issue" because where Breen was standing when he fired the first shot is a critical fact.  Without the scientific evidence, Breen's untrue version of the facts - that the car was heading right at him - will prevail by default, but with the scientific evidence the jury will be able to determine the facts.  *See* part V, infra.

Mr. Schwendy is qualified as an expert "by knowledge, skill, experience [and] education." *Id.* As discussed above, his unique portfolio of knowledge, skill, experience and education make him ideal for the assignment he undertook.

Mr. Schwendy's proposed testimony satisfies the three criteria identified in Rule 702.  It is "based on sufficient facts or data" because he systematically collected the relevant data in his testing. It "is the product of reliable principles and methods" because the principles and methods he and the defense experts used are the fundamental scientific principles of observation, testing, measurement and analysis. And it is is a reliable application of the governing scientific principles and methods because each step of the testing procedure was carefully designed to achieve accurate, reliable results that addressed the precise question at issue: the angle of the first bullet.

The cases defendants have found do not help them. Their principal case, *Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999), appears to be about an engineer who was proposed to testify to calculations of speed based on tables showing how to derive speed from other information. Mr. Schwendy, by contrast, did not purport to apply principles of accident reconstruction with which he was unfamiliar: he applied engineering and scientific principles with which he is thoroughly familiar, based on his training and experience. The Sixth Circuit's unpublished decision in *Gates v. City of Memphis,* 210 F.3d 371; 2000 U.S. App. LEXIS 13065(6th Cir. 2000) is no more helpful. Like *Wilson,* it held that the trial court had not abused its discretion by excluding a marginal expert witness. In *Gates*, the witness was prepared to testify about bullet trajectories. The Sixth Circuit allowed the exclusion of his testimony because in addition to having no formal training in "trajectory analysis," the witness

> had no post-secondary education in physics, anatomy or physiology, and he had made no measurements, and had done no scientific testing on this particular shooting scene

*Id.* at *10. Suffice it to say, that is not this case.

Mr. Schwendy's work meets the core concern of Rule 702, *Daubert*, and *Kumho*: it is solidly based on scientific principles; it is carefully and thoroughly done; it is based on data, not the expert's *ipse dixit*; and it is grounded in data and methods that defendants themselves agree are accurate and valid.

## V.  IT WOULD BE WISER AND FAIRER TO ADMIT THE EVIDENCE

Admissibility of evidence under Rule 702 is committed to the Court's discretion. *United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir. 2000). Admission of Mr. Schwendy's scientific

evidence is particularly appropriate as a matter of discretion as well as a matter of science, for at least two reasons.

First, because the defense experts have conducted such a similar testing procedure and have reached such similar results, defendants are unusually well-equipped to assess and, where they deem it appropriate, to challenge Mr. Schwendy's methods and results. This case is thus the opposite of the sort of anything-goes free-for-all that *Daubert* sought to prevent: if there are any flaws in Mr. Schwendy's methods or results, the defense experts are extraordinarily well-positioned to expose them. As a result, the jury will not be rudderless; it will have the tools it needs to identify the strengths and weaknesses of Mr. Schwendy's testimony.

Second, the jury has a particularly challenging assignment because when defendant Breen killed Vicki Cooper, he became, except for neighbors with fragmentary observations, the only eyewitness. "Deadly force cases pose a unique evidentiary problem because the police officer defendants and their colleagues are often the only surviving eyewitnesses, while the person most likely to contradict their story is dead. *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995); *see also, Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). *All* plaintiff's evidence about what happened at the scene is forensic evidence; the only other evidence is Breen's carefully prepared,[10] self-serving account. Mr. Schwendy's evidence is, thus, indispensable. That doesn't make it admissible: it is admissible because it is "based upon sufficient facts or data, ... [it is] the product of reliable principles and methods, and ... the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. But to the extent that the Court's evidentiary determination is informed by consideration of the role of the evidence in the truth-

---

[10]Breen filed his police report detailing his version of events two weeks after the shooting.

seeking process under the circumstances of this case, it is significant that Mr. Schwendy's

testimony is essential if the jury is to have the tools to probe defendant Breen's account.

## **CONCLUSION**

Mr. Schwendy's tesimony is admissible. The motion in limine should be denied.


THE PLAINTIFF


By /s/ David N. Rosen
David N. Rosen
400 Orange Street
New Haven, Connecticut 06511
(203) 787-3513
CT00196
E-mail: drosen@davidrosenlaw.com


CERTIFICATION

I hereby certify that a copy of the foregoing Memorandum was sent first class mail,

postage prepaid on June 20, 2005 to:

Thomas R. Gerarde, Esquire
Howd & Ludorf
65 Wethersfield Avenue
Hartford, Connecticut  06114


/s/ David N. Rosen
David N. Rosen