# TAB 1

Case 3:00-cv-00052-RNC   Document 142-2   Filed 06/20/2005   Page 1 of 16

PLAINTIFFS EXHIBIT

# TAB 2

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3    - - - - - - - - - - - - - - - - - -x

 4    MARGARET COWAN, as Administratrix    :

 5    Of the Estate of Victoria Cooper,    :

 6              Plaintiff,                 :  Civil Action No.

 7         vs.                             :    3:00CV00052

 8    MICHAEL BREEN,                       :       (DJS)

 9              Defendant.                 :

10    - - - - - - - - - - - - - - - - - -x

11    MARGARET COWAN, as Administratrix    :

12    Of the Estate of Victoria Cooper,    :

13              Plaintiff,                 :  Case No.

14         vs.                             :    3:01CV00229

15    TOWN OF NORTH BRANFORD,              :       (DJS)

16              Defendant.                 :

17    - - - - - - - - - - - - - - - - - -x

18              Deposition of HENRY LEE, taken

19    pursuant to the Federal Rules of Civil Procedure at

20    the Connecticut State Forensic Laboratory, 278

21    Colony Road, Meriden, Connecticut, before Elizabeth

22    A. Zawacki, LSR #00087, a Registered Merit Reporter

23    and Notary Public in and for the State of

24    Connecticut, on October 3, 2002, at 9:53 a.m.

25
```

Page 22

1  the pattern. That pattern is intact and then we can
2  look at visual comparison.
3      Q.  So is it the situation that you can have,
4  the gun powder can be too little or too fine to be
5  able to be seen, even under 25 power microscope, and
6  yet it will still leave a chemical residue?
7      A.  It's possible. That's a good question.
8  Many times the visual, the visual, we look at the
9  particle, basically umber if a very close contact.
10 Most umber and soot. From a distance, you see some
11 umber, partial burned particles.
12     A lot of a gun powder residue material is
13 a submicro size. You can't really see. That's why
14 we use a swab or SEM disk to lift at the scene.
15 Here what we did is instrumental test, very
16 sensitive equipment to do that analysis.
17     Q.  So your test was more sensitive than
18 looking at it under a 25 power microscope?
19     A.  Yes.
20     Q.  But with your test you think the maximum
21 distance would be 48 to 54 inches?
22     A.  I did not conduct this instrumental test
23 myself. One of the laboratory criminalists, which,
24 who is the one conduct the tests, maybe the one you
25 should ask him what's the more information on that.

Page 23

1      Q.  Let me ask in another area. You mentioned
2  looking at the enlargement before of the vehicle,
3  that you found bullet casings, or bullet casings
4  were found on the roadway. Are there concerns about
5  what information you can get from the location of
6  the bullet on the roadway, and what affects that?
7      A.  Yes. Excellent question. Casing,
8  different weapon -- weapons generally have two ---
9  handguns, have two types, one a revolver, one called
10 a semiautomatic. Revolver, when you fire a shot,
11 casing will stay in the cylinder. Semiautomatic,
12 the casing will eject. Other chamber, the second
13 bullet will be load into the chamber. This action,
14 ejecting, we can take advantage of this ejecting
15 pattern because different weapon will have different
16 ejection pattern.
17     This particular weapon we test fired. We
18 know it eject back rear. So what we did is test
19 that weapon, use the location of the casing, then
20 reconstruct what's the most likely position of the
21 police officer.
22     Of course, here we assume the resting
23 location of the casing is the original location of
24 the casing, the casing did not rebound, did not roll
25 on the road surfaces. So that location, what we

Page 24

1  determined, therefore we give an approximate area,
2  instead of saying single spot, to cover other
3  possibilities.
4      Q.  So the bullet casing on a roadway can roll
5  or bounce or be kicked by a person on the scene?
6      A.  Could be.
7      Q.  Those are all things that would affect the
8  location?
9      A.  Location, exact location of the finding.
10     MR. ROSEN: That's all I have at this
11 time, Doctor. I know Mr. Gerarde has questions.
12     MR. GERARDE: Thank you. Why don't
13 we go off the record for a minute, and I can set
14 some exhibits up.
15     THE VIDEOGRAPHER: Going off the
16 record at 10:29.
17     (Recess: 10:29 to 10:32 a.m.)
18     THE VIDEOGRAPHER: On the record at
19 10:32.
20 CROSS-EXAMINATION
21 BY MR. GERARDE:
22     Q.  Doctor, I'd like to direct your attention
23 to the enlargement of the road diagram prepared by
24 the major crime squad, and if you look at the bottom
25 of the diagram, you'll see there are red circles

Page 25

1  with 12, 13, 14 and 15, and would you indicate what
2  that reflects, sir?
3      A.  The yellow circle shows the location which
4  police officer at the scene recovered some physical
5  evidence. Item 12 depicts the location of a pair of
6  handcuff. Item 13 depicts a beer can. Item 14
7  depicts the presence of some paperwork, registration
8  of a Camaro. 15 is a tow bill of the vehicle.
9      Q.  All right. And was it the conclusion of
10 you and your team that this location where we see
11 12, 13, 14 and 15 is the most probable location of
12 where the Camaro was stopped by the police officer
13 originally?
14     A.  Yes.
15     Q.  And as we travel along the road, we see
16 items 16 and 17, and those represent the location of
17 the spent shell casings?
18     A.  That's correct.
19     Q.  All right. And we'll get a little closer
20 to that in a minute, but I want to ask you about
21 your speed calculations and time calculations.
22     What you did when you went back to
23 reconstruct was you put the Camaro at the most
24 probable starting point and timed how long it took
25 to reach the most probable location of the second

Page 30

1  on the back of the trunk, can you tell me what the
2  purpose of that test was?
3     A.  The test of the trunk, when the officers
4  searched, the individual took some material out of
5  the pocket, some paper, a wallet, a cigarette
6  lighter, a dollar bill, a couple coins. At the time
7  of the incident, the vehicle, the Camaro located
8  here. When I got to the scene I see those materials
9  still on the back of the top of the trunk, so which
10 indicative, those material here on the surface, if
11 you drive at excessive speed, those material in
12 theory should fall off. So the day of our
13 reconstruction, we used similar material put on the
14 back of the trunk to do the test.
15    Q.  All right; and what was the parameters of
16 the test? In other words, what did you actually do
17 and at what speeds?
18    A.  From ten, 30, up to 45, the material still
19 remained intact.
20    Q.  So what you're saying is you started at
21 the original location where the Camaro was stopped,
22 and you put the same or similar items on the back of
23 the Camaro trunk?
24    A.  Trunk, top of the trunk.
25    Q.  On the top of the trunk, right where they

Page 31

1  were located when you arrived at the scene
2  originally?
3     A.  Yes.
4     Q.  And you then accelerated the Camaro four
5  different times, once to ten miles an hour, the
6  second time to 20, the third time to 30, and the
7  fourth time to 45, to see if these items would blow
8  off as the Camaro traveled along the road?
9     A.  Yes.
10    Q.  And what you found is that in none of the
11 tests did the items blow off as it traveled along
12 the road?
13    A.  That's correct.
14    Q.  So what we can conclude from that is that
15 simply because there's items on the back of the
16 trunk when the vehicle came to rest doesn't mean it
17 was traveling at any specific speed; is that fair?
18    A.  Not fair. This has to be up to 45.
19    Q.  Well, it was traveling at 45 or less; is
20 that fair?
21    A.  That's fair. We don't know, maybe over 45
22 or not, but that we cannot achieve because only 174
23 feet. You take a little time to pick up the speed.
24 That not the condition of the car. We tested at 45
25 feet -- 45 miles per hour, we stopped.

Page 32

1     Q.  Thank you. Now, 16 and 17 represent the
2  location of the shell casings; is that right?
3     A.  That's correct.
4     Q.  And what you told us on direct examination
5  is that you test fired the Glock semiautomatic
6  handgun to get an idea of the ejection pattern, and
7  I'm reading in your report that you concluded that
8  or you observed there was a three to five foot to
9  the right and to the rear pattern of ejection?
10    A.  Yes, standard testing condition. That's a
11 standard testing condition. That night we did not
12 fire the shot on the roadside, so we used basically
13 a similar type of surface, test fired.
14    Q.  And what I would like to ask you about,
15 when you say three to five feet to the right and to
16 the rear, that would be oriented to the barrel of
17 the gun; is that right?
18    A.  The shooter. If I fired a shot, holding
19 my gun, will eject to my right, to my rear, about
20 three to five feet from the gun, from the gun
21 (indicating).
22    Q.  Could you make the gun again. I want to
23 ask you another question. What if the gun was aimed
24 this way? See how I have your hand (indicating)?
25    A.  Yes. I said standard testing condition,

Page 33

1  if you read my report. You don't know the officer
2  holding one hand or both hands. That's why the
3  detective, they interview him that night, how he's
4  holding his gun, which I don't know.
5     Q.  So in the scenario where you have a gun
6  aimed at an angle, you would expect the ejection to
7  go three to five feet to the right of the direction
8  the gun is aimed, not necessarily the direction the
9  shooter is facing; am I right about that?
10    A.  That's correct. Most people, the police
11 academy teach you to fire the gun, you don't fire
12 the gun like this. Right (indicating).
13    Q.  What I'd like to do is talk to you about
14 your conclusion that says this was a dynamic
15 situation.
16    A.  Yes.
17    Q.  And that the car and the officer were
18 moving at the same time of the shots.
19    A.  Yes, because we look at the vehicle, it's
20 moving. We don't know the exact speed, I don't
21 know, but definite moving about ten miles or above
22 here. Now officer is moving in that direction. The
23 shot is fired, and both at the time, the vehicle
24 continued moving after the shot. In other words,
25 it's not the standard testing laboratory condition.

Page 34

When we do the or conduct our testing everything is freezing, freeze, and we use the laboratory best condition to do the test, which not necessarily identical as that night.
So a dynamic situation which involve a lot of factors. Many times you cannot reproduce. Also, the dynamic condition, which means when the car is moving, the bullet firing, because two objects both moving, so the impact angle may be not the original aimed angle.
Q. Say that again.
A. Let's say I aim at my hand. I fire this direction (indicating).
Q. Yes.
A. If the vehicle move, now the impact point going to be in the window now, driver window. The initial, maybe I'm not aiming at the driver window.
Q. And that's because the car is moving?
A. Maybe the officer jumped.
Q. All right.
A. So a lot of issues here which unknown factor we did not determine.
Q. That was what I wanted to zero in on. If I ask you to assume that the officer was in an evasive movement to get out of the vehicle's path

Page 35

and was still trying to train and aim his weapon, and I want you to assume this, that he had his gun aimed at a location that was not directly in front of the way his body was facing, you would expect the shell to eject three to five feet to the right from the direction of the gun, not necessarily the direction of the officer?
A. No, no. That's correct.
Q. And does the same hold true when you calculate the angle of entry of the bullet? When you calculated the angle of entry that the bullet entered the side window, what you are calculating is the direction that the gun was facing?
A. The barrel. Not even the gun. The barrel.
Q. So the angle of the barrel of the gun, which is not necessarily the angle of the officer's body?
A. No.
Q. And I'm just going to pick up this other exhibit. This, for the record, is Exhibit 4 for your deposition. We have this visual of a state police major crime squad person with a camera. Is that a laser?
A. It's a laser pointer.

Page 36

Q. A laser pointer.
A. Laser apparatus.
Q. I'm sorry. This is what you utilized in order to help you determine?
A. Well, you have a bullet hole. So the laser light which is indicative of trajectory have to through this bullet hole. That line tells you the barrel to the target.
Q. So we have this man standing behind the laser pointer. This is not indicative --
A. No.
Q. -- or in any way a finding of where the police officer was?
A. No. It means the gun, the barrel is here.
Q. And it doesn't necessarily mean the barrel is where the tripod is because the officer could be anywhere within this range that you have drawn?
A. Yes.
Q. Is that right?
A. Yes.
Q. So what we are looking at when we look at this photograph is just the general orientation of the angle of the weapon, the barrel of the weapon to the window glass?
A. That's correct.

Page 37

Q. And when you reported that that angle -- well, let me ask you something about the recreation of this side window, and we have, actually have the window here, but I just want to ask you in general, what you do is you pick up all the pieces of glass and you try and build the jigsaw puzzle?
A. Yes.
Q. And what you were able to do in this case was to identify where the gunshot passed through the window?
A. The bullet impacted, the impact site, yes.
Q. And would it be fair to state that the more you are able to define the specific bullet hole, the better chance you have to calculate the angle of entry?
A. We -- not really necessarily. We recover almost 90 percent of the glass around the bullet hole. That give us a pretty good parameter indication of the general direction of the trajectory.
Q. All right. What I want to do is ask you about the paramters. You said it's a pretty good general direction. Are you saying that you can say with substantial certainty that it's 65 degrees versus 55 or 45 degrees on the angle?

Page 38

1    A.   Our calculation is 65 degrees. So maybe
2 plus minus a couple of degree, around that area.
3 That's the general direction.
4    Q.   And when we were talking off the record
5 before we began I thought you said something to me
6 about, well, it could be 55, it could be 45?
7    A.   Because that's a dynamic situation. The
8 car is moving, the officer is moving. Everything is
9 moving. So slightly -- we assume the vehicle is
10 this location. If the vehicle slightly, a little
11 bit angled, can be 45, can be a 65. That's why we
12 say general direction.
13   Q.   All right. So what you do is you have
14 placed the vehicle in a spot on the roadway that
15 you --
16   A.   More likely.
17   Q.   So you can't be certain that's where it
18 was?
19   A.   Nobody. I wasn't there.
20   Q.   So we can't be certain about the angle
21 because if the car was off a little bit --
22   A.   We are pretty certain the angle is not
23 going to be 90-degree. We definitely certain it's
24 not going to be zero degree, cannot be 180 degree.
25 It's around 65 degree.

Page 39

1    Q.   Okay. Now I just want to make sure I
2 understand what you said before, though. Because
3 you have placed the car in a location that you
4 believe would be the best place to place it, but
5 you're not certain that's where it was, you can't
6 rule out that this was a 45 degree angle because of
7 the dynamic movement of the car and the officer; is
8 that fair?
9    A.   It's fair, it's fair; but most likely 65
10 degrees.
11   Q.   And when we talk about what the most
12 likely angle is, once again we are talking about the
13 angle of the barrel of the weapon, and it doesn't
14 say anything about the position of the officer?
15   A.   No, no.
16   Q.   So theoretically if we were to assume that
17 this laser pointer was the barrel of the weapon, the
18 officer could be to the --
19   A.   Any location, to the right, to the left,
20 to the back. That's why we have the orange line.
21 He can be any location.
22   Q.   Including within a few inches of the
23 vehicle?
24   A.   It could be. The gun, it has to be
25 holding certain angles.

Page 40

1    Q.   Now, the 65 degree conclusion that you are
2 arriving at is a conclusion about an angle of entry
3 of the gunshot which is the second gunshot and --
4    A.   Entered the window, windshield.
5    Q.   Where it entered the window. So what this
6 reflects as far as this location of the vehicle is
7 the position of the vehicle when the window broke;
8 is that fair?
9    A.   Yes. We found some broken pieces and the
10 casing. So because the window broke, we found
11 pieces of broken glass. If -- this vehicle has to
12 be to the right of those broken windows. You see,
13 otherwise, the piece of glass is underneath the car.
14 It doesn't work. If you put the car way over there,
15 the glass should be next to the window, not going to
16 be in the roadway. So that's the most likely
17 position.
18   Q.   All right. What I'm driving at with this
19 question, is that if the officer's decision to fire
20 his weapon was made and then there was, say, a half
21 or quarter of a second before the weapon actually
22 fired, the car would have moved forward during that
23 half or quarter of a second, right?
24   A.   Yes.
25   Q.   So this doesn't reflect, where we are

Page 41

1 looking at this laser pointer, this does not reflect
2 the location of the officer when he made the
3 decision to fire the weapon?
4    A.   I cannot give you what is in his mind. We
5 only can look at the physical evidence. Also, I
6 don't want you to walk away with the impression this
7 is exactly what did happen. This is a dynamic
8 situation. This thing is moving, it's not standing
9 here. If this car is freeze frame, stay here, two
10 shots should be in the front because it's not
11 moving. This is moving. Officer is moving. So
12 nobody knows, nobody can tell you exactly the
13 location. We only can tell you that's an impact,
14 this is an impact. What the officer's decision at
15 that time, what went through his mind, I'm not in a
16 position to testify (indicating).
17   Q.   All right. Now, I'd like to show you the
18 reconstructed glass window.
19        MR. GERARDE: Could we go off the
20 record for just a minute, please.
21        THE VIDEOGRAPHER: Certainly. Off
22 the record at 10:53.
23        (Discussion off the record.)
24        (Lee Deposition Exhibit 5 marked for
25 identification.)

Page 46

1  degrees, would you say that that's possible because
2  you can't really rule it out?
3    A.  It's possible. It doesn't really matter.
4    Q.  Why doesn't it matter to you?
5    A.  It does not matter because either you
6  fired the first quadrant or the second quadrant. If
7  in the first quadrant, it doesn't matter 30 degree,
8  ten degrees, 20 degree, 60 degree because it's
9  moving. Everything is moving. Nobody knows
10 exactly.
11   Q.  And would it be fair to state that your
12 purpose in examining this was to find out if we were
13 in the first quadrant or the second quadrant?
14   A.  Not only that. That's the best when the
15 bullet impact that glass, more likely 65 degree.
16 That's what our determination is. But when the gun
17 fired maybe 30 degrees because car is moving. How
18 many times I have to explain? The car was moving.
19   Q.  I hope that's the last time. I think I
20 got it. So what you're saying is that simply
21 because the bullet entered the side window of the
22 Camaro at what you believe was most likely 60 --
23   A.  It doesn't matter. When he fired maybe
24 it's 30, 20.
25   Q.  So it doesn't mean that the officer was at

Page 47

1  a 65 degree angle?
2    A.  No.
3    Q.  He could have been at a 20 degree angle?
4    A.  Could be 20 degree.
5    Q.  Okay, thank you. Let me take this out of
6  your way for a minute.
7        THE VIDEOGRAPHER:  Going off the
8  record at 11:00 o'clock.
9        (Discussion off the record.)
10       THE VIDEOGRAPHER:  We are on the
11 record at 11:03.
12 BY MR. GERARDE:
13   Q.  Dr. Lee, was it within the scope of your
14 reconstruction assignment to determine the position
15 of the driver within the vehicle at the time the
16 shots were fired?
17   A.  No. Our reconstruction basically
18 determined what did happen, how did it happen, where
19 did it happen, what the sequence of events. We are
20 not determining the exact position of the driver
21 because that's another dynamic situation. Her body
22 can move and turn. You know, we know she is behind
23 the steering wheel.
24   Q.  All right. And we spoke about this
25 concept of the glass scattering down the road being

Page 48

1  indicative of some speed on the vehicle. Would it
2  be fair to state that you could investigate the
3  speed of the vehicle by attempting to recreate a
4  glass scatter? In other words, could you take some
5  broken Camaro window glass and drop it on a road at
6  a known speed and then make observations?
7    A.  No.
8    Q.  Why not?
9    A.  Well, they are involving five different
10 factors. First of all, we cannot reproduce the
11 weather conditions because that night apparently
12 it's drizzling, wet. Some of the glass may adhere
13 on the vehicle. Meanwhile, the glass come out.
14       Second, we don't know exactly the speed.
15 We tried to estimate the best speed, possible speed,
16 between 10 miles per hour to 45, reaching. Third,
17 we can't find another Camaro because if you used
18 another Camaro, that's going to be a different
19 Camaro. The force, that glass already broken. Even
20 if you have new glass put in there, can be a
21 different glass. The fifth one, who want to drive,
22 you want to fire a shot? I can't find a volunteer.
23   Q.  Well, in my hypothetical, I was thinking
24 that you would have the glass already broken and
25 pour it out.

Page 49

1    A.  It won't do that because the glass,
2  because the tension going to be stay intact, not
3  same as you pulling the glass out. When you first
4  shot, it will become diced. That's heat treated
5  glass. Once upon the impact, it become little
6  diced, but still holding together. If at that time
7  the Camaro stop, stationary, the glass will not
8  fall.
9    Q.  Yes.
10   A.  Once start shaking, the glass fall.
11   Q.  So the normal vibrations associated with a
12 car that's moving would be enough of a shake to
13 cause the glass to fall?
14   A.  Cause the glass, and the speed and the
15 direction, because the car did not travel a direct
16 line. It get to the side now. So I cannot
17 reproduce the condition.
18   Q.  I need to show you the diagram again, sir.
19   A.  Sure.
20   Q.  If you would stand up, please.
21   A.  I can see.
22   Q.  All right. Thank you.
23       The fact that we see glass fragments for
24 the first time at the 20 foot line, that does not
25 necessarily mean that this is where the car was

Page 54

1  Q. And this location here is where you say it
2  struck the hood?
3  A. Right.
4  Q. Now, tell me about the margin of error in
5  that calculation. There was a downward angle
6  calculated, as well as an angle on the plane of the
7  road?
8  A. Okay. The gun angle is pretty accurate
9  because you have an indentation. The other angle,
10 because this hood is not flat, so you are not flat,
11 if the hood like had, so very difficult to determine
12 the actual angle, but definite the shooter has to
13 be, the gun has to be that direction. The vehicle
14 has to be this direction here (indicating).
15 Q. And would it be fair to state that your
16 purpose in investigating this case was to see was
17 the police officer in front of the vehicle at the
18 time he fired at it?
19 A. Yes.
20 Q. And what your conclusion was in your
21 report was that he was in front of the vehicle at
22 the time of the first shot, and slightly to the
23 right of the vehicle, the officer's right?
24 A. Yes.
25 Q. Now, we have this vehicle going across the

Page 55

1  street and striking a guardrail where it came to
2  rest; is that right?
3  A. That's after, post shooting.
4  Q. Post shooting. And there was crush damage
5  on the vehicle, did you notice, when it hit the
6  guardrail?
7  A. Yes. That's nothing to do. That's post
8  shooting. Nothing to do with our reconstruction.
9  Our reconstruction is from here to here and the
10 glass. After that, the post shooting, nothing to
11 do. Nobody knows what the vehicle, lost the
12 control, and I did not consider those factors. I
13 noticed the damage, and I just stay away from that
14 because post shooting really doesn't count anymore.
15 Once the shot fired, it doesn't really count
16 (indicating).
17 Q. And what counts to you is you were
18 investigating whether or not this was -- well, you
19 were assisting the state's attorney in investigating
20 whether or not this was a proper shooting by a
21 police officer?
22 A. That's the state attorney to determine
23 proper shooting or not. My determination basically
24 based on scientific evidence, where is the location
25 of the police officer, and how that shooting

Page 56

1  incident more likely was the location the shot was
2  fired. As far as the damage of the vehicle, because
3  after the shot you don't know the decedent's foot
4  still on the gas pedal or not. Not going to change
5  tremendously.
6  Q. Would you turn to your opinions, please,
7  and I'd like to ask you a few questions.
8  A. Sure.
9  Q. Page 8, paragraph 3:
10    "Based on the physical evidence left at
11 the scene it appears that the police officer was at
12 one point in time on Route 80 near the center of the
13 road and heading west."
14    What point in time are you referring to?
15 A. The shooting.
16 Q. And you aren't attempting to be or to say
17 anything different than what you have told us in
18 terms of drawing those --
19 A. Sure. The casing near the center.
20 Q. So what you're talking about is the
21 location of 16 and 17 --
22 A. Yes.
23 Q. -- in a scene in the photograph exhibit
24 where those hash marks are?
25 A. Right.

Page 57

1  Q. On the next page, in paragraph 8, you say,
2  "The exact position of the officer at the time of
3  the shooting cannot be positively determined at this
4  time."
5    Would it be fair to state that you can't
6  even now determine the exact position of the
7  officer?
8  A. Yes, I cannot.
9  Q. All right. The next page, number 11:
10   "Tests for the presence of gunshot residue
11 in some of the samples taken from the door of the
12 Camaro indicated the present of lead and antimoney.
13 One sample yielded the presence of barium."
14   Does the presence of one of those items
15 tell you anything different than the presence of the
16 others?
17 A. No. All three. Supposed to find three.
18 Q. If you found just one of those three,
19 would that tell you that the shooter was further
20 away?
21 A. You find lead, not necessarily from a
22 gunshot residue.
23 Q. I'm sorry. I spoke over you.
24 A. Lead, antimony and barium, three chemical
25 elements. If you just find lead, not necessarily

Page 58

1  that it's a gunshot residue. We did a chemical and
2  instrumental test. If you have a lead gasoline, you
3  are going to find lead all over the place.
4      Q.   So the preesnce of the barium and the
5  antimony tells you it's gunshot residue?
6      A.   It's consistent with a gunshot residue.
7      Q.   And you say that, based on these results,
8  the officer was relatively close to the vehicle at
9  the time he discharged the second shot, and you've
10 told us what you meant by that.
11     A.   Yes.
12     Q.   Now, paragraph 12 says, "The results of
13 the reconstruction indicate that at the time of the
14 shooting incident the vehicle and the officer were
15 involved in a series of dynamic movements. These
16 examinations indicate at the time of the shooting
17 the vehicle was in motion, the officer also was in
18 motion," and that's your opinion, sir?
19     A.   Yes.
20     Q.   And you hold that to a reasonable degree
21 of scientific probability?
22     A.   Yes.
23     Q.   Do you hold all the opinions you've given
24 us today to a reasonable degree of scientific
25 probability?

Page 59

1      A.   Yes.
2      Q.   13 really states the same thing, but you
3  say, "Based on the shooting scene patterns, the
4  location of the physical evidence, and the
5  distribution pattern of glass fragments, it is
6  indicated that the scene is consistent with an
7  active and dynamic scene," and I just want to be
8  clear. By active and dynamic you mean the car is
9  moving, the officer is moving, and it's happening
10 quickly?
11     A.   That's right.
12     Q.   Is that right?
13     A.   That's right.
14     Q.   That's your opinion to a reasonable degree
15 of scientific probability?
16     A.   Yes.
17     Q.   I think this is your last opinion. It
18 kind of states the same thing again.
19          "Although the speed of the Camaro at the
20 time of the shooting is unclear, it is clear from
21 the experimental results that the vehicle was not
22 stationary or traveling at a low speed. Based on
23 the location of the spent cartridge cases and the
24 impact points of the bullets on the Camaro, the
25 entire shooting incident took place within seconds."

Page 60

1           Do you hold that opinion to a reasonable
2  degree of scientific probability, sir?
3      A.   Yes.
4      Q.   And is that your signature on the last
5  page, next to that of Elaine Pagliaro?
6      A.   Yes.
7           MR. GERARDE: Thank you. I have no
8  other questions.
9           MR. ROSEN: Let's go off the record.
10          THE VIDEOGRAPHER: Off the record at
11 11:19.
12          (Pause in proceedings.)
13          THE VIDEOGRAPHER: We are on the
14 record at 11:19.
15 REDIRECT EXAMINATION
16 BY MR. ROSEN:
17     Q.   Dr. Lee, let me show you what we will mark
18 as Exhibit 6, which is pictures of the exterior of
19 the Camaro that were described in the state police
20 report as showing glass that was attached to the
21 outside of the Camaro at the scene.
22     A.   Yes.
23          (Lee Deposition Exhibit 6 marked for
24          identification.)
25 BY MR. ROSEN:

Page 61

1      Q.   Can glass that's attached to the Camaro,
2  would you expect that it would fall off the Camaro
3  during the course of the time that the Camaro was
4  going from the scene of the shooting across the
5  roadway?
6      A.   Yes.
7      Q.   The glass would not all fall at once. It
8  would fall over time?
9      A.   That's correct.
10     Q.   Some that was sticking to the outside of
11 the Camaro might stick for a while, and then after
12 that it would fall and be on the roadway?
13     A.   Yes, because the Camaro is wet, and some
14 of the glass particles going to adhere on the side
15 of the vehicle due to the gravity later may fall.
16     Q.   And in terms of the area shown in the
17 diagram of the broken glass, was that your own
18 personal observations, or is that the state police
19 officers made the observations?
20     A.   State police officer.
21     Q.   And the information that you went on was
22 basically the diagram that they gave you?
23     A.   Correct.
24     Q.   And based on that, you --
25     A.   Made a calculation, yes.

Page 62

1   Q.  In that case, you are depending on the
2   accuracy of the troopers on the scene --
3   A.  Absolutely.
4   Q.  -- to collect the glass and to identify
5   where the glass is on the diagram?
6   A.  Yes.
7   Q.  And with regard to the speed, you
8   indicated that a speed of up to 45 miles an hour --
9   I'd like to ask you about that. If the Camaro
10  started at the point where the handcuffs were --
11  A.  Yes.
12  Q.  -- and you had someone floor it and drive
13  it as fast as they could, did the top speed by the
14  time of the point of the shooting come out to be
15  about 45 miles an hour?
16  A.  Approximately.
17  Q.  And you indicated also in answer to some
18  questions about the path of the Camaro after the
19  shooting, you don't know, there's no way to know
20  whether the victim had her foot on the gas pedal
21  after she was shot?
22  A.  We don't know.
23  Q.  And is it also true that we don't know
24  where her hands were on the steering wheel, whether
25  she might have moved the wheel after she was shot?

Page 63

1   A.  That's correct.
2   Q.  And just to be sure that I'm understanding
3   the description of angles, we'll mark this as
4   Exhibit 7 in a moment, but could you take a look at
5   these photos, and the bottom photograph seems to
6   show a protractor, with the stick going into the
7   window glass. Is the 65 degree angle that you said
8   was the most probable angle of the bullet into the
9   glass the angle between the path of the bullet and
10  the plane of the glass?
11  A.  It appears to be.
12  Q.  As shown in the photograph?
13  A.  Yes.
14      (Lee Deposition Exhibit 7 marked for
15       identification.)
16  BY MR. ROSEN:
17  Q.  And could you turn to page 5, paragraph 3
18  of your report.
19  A.  Yes.
20  Q.  At the bottom you reported that the
21  pattern of ejected cartridges changed significantly
22  when they impacted the shooter, and that happened
23  apparently when the shooter used both hands to hold
24  the weapon?
25  A.  Yes. We try single handed and both hands.

Page 64

1   Single handed, the ejection pattern much clearer.
2   It's no interference. If both hands, depending on
3   how you're holding the weapon. Sometimes the casing
4   will eject to the shooter's clothes and then will
5   drop.
6   Q.  So the casing would drop right in front,
7   at the feet?
8   A.  At the shooter.
9   Q.  Right at his feet?
10  A.  Or around this area, instead of continue
11  and eject backwards (indicating).
12  Q.  If a shooter were holding a weapon with
13  both hands, is there any way to determine whether or
14  not the shooter, if he was in motion after the shot,
15  whether or not he kicked the cartridge?
16  A.  We cannot determine because we also don't
17  know if shooter in a crouched position, or standing
18  upright, with both hands on the left, or both hand
19  on the right, or in the center, or up or down. Just
20  so many variables. So what we finally decide, just
21  use rough estimation, give a general, greater edge.
22  Q.  So the shooter, if the cartridge dropped
23  at the shooter's foot, the shooter could have kicked
24  the cartridge forward?
25  A.  It happened. Somebody afterwards maybe

Page 65

1   kick it.
2   Q.  Is it the case that the glass that you
3   used to reconstruct the actual bullet hole most
4   likely fell out of the car immediately?
5   A.  Some of those immediate area next to the
6   hole generally fall first.
7       MR. ROSEN: Those are all my
8   questions on redirect.
9       MR. GERARDE: Two very quick points,
10  Doctor.
11  RECROSS-EXAMINATION
12  BY MR. GERARDE:
13  Q.  I want to understand. 16 and 17 represent
14  the shell casings, but they do not in any way denote
15  shot one and shot two?
16  A.  No.
17  Q.  So you don't know which was --
18  A.  We don't know which is one and two.
19  Q.  So notwithstanding your testimony about
20  the glass on the side of the vehicle possibly
21  falling as the vehicle traveled, do you stand by
22  your opinion that's in paragraph 14 of your
23  reconstruction report, where you say, "It is clear
24  from the experimental results that the vehicle was
25  not stationary or traveling at a low speed"?

Page 66

1  A.  That's correct.
2  FURTHER REDIRECT EXAMINATION
3  BY MR. ROSEN:
4  Q.  And that's based on the length of the
5  spread of the glass over 110 feet?
6  A.  Yes. That's a lot of feet.
7      (Deposition concluded: 11:27 a.m.)

Page 67

1       J U R A T
2
3
4
5       _____
6       HENRY LEE
7
8
9       Subscribed and sworn to before me on
10 this _____ day of _____, 2002.
11
12
13
14      _____
15      Notary Public.
16
17
18 My Commission expires: _____

Page 68

        INDEX
WITNESS                                    PAGE
Henry Lee
    Direct Examination by Mr. Rosen         4
    Cross-Examination by Mr. Gerarde       24
    Redirect Examination by Mr. Rosen      60
    Recross Examination by Mr. Gerarde     65
    Further Redirect Examination
        By Mr. Rosen                       66


        EXHIBITS

LEE
EXHIBITS    DESCRIPTION                    PAGE
1           Reconstruction report.          4
2           Page from Dr. Lee's book.       4
3           Dr. Lee's CV.                   4
4           Aerial view.                   13
5           Reconstructed window.          41
6           Photographs.                   60
7           Photographs.                   63


Reporter's note: Exhibits retained by counsel.

TAB 3

CRITICISMS OF METHODS AND OPINIONS OF SCHWENDY

I.  Schwendy fires only two rounds at an exemplar Camaro hood, only one of which penetrates the hood. Schwendy sheet-steel firing results are not statistically correlated to the Schwendy Camaro hood firing results.

HAVING FIRED ONLY ONE PENETRATING HOOD SHOT, SCHWENDY HAS NO STATISTICAL BASIS OF COMPARISON FOR HIS TEST RESULTS ON FLAT SHEET-METAL PANELS.

II.  Flat sheet metal panels are not substantially similar to a Camaro hood with regard to impact and penetration, including obvious material and mechanical characteristics as follows:

Different steel alloy and composition
Different yield strength
Different strain hardening
Different ultimate strength
Different formed shape
Different stiffness
Different thickness
Different finish
Different support and weight

HAVING MADE NO DETERMINATION OF MATERIAL CHARACTERISTICS, SCHWENDY HAS NO MECHANICAL BASIS OF COMPARISON FOR HIS TEST RESULTS ON FLAT SHEET-METAL PANELS.

III.  The bullet-hole right edge is neither straight nor easily measured. In the one Camaro hood bullet hole that was produced by Schwendy, the right edge is far from a straight line, and in fact the line curves, its angle varying by 18 degrees along its length.

Furthermore, the subject Camaro hood bullet hole has a right edge that appears to curve over a range of no less than 11 degrees along its length.

However, Schwendy [p. 226 ln. 10-11, 13-15] claims a hypothesis that,
"I could relate the angle of the right edge of the defect."
"Seeing that was the only **relatively straight line** that I thought **I could measure easily**."

THE CLAIM THAT THE RIGHT EDGE OF THE BULLET HOLE IS A RELATIVELY STRAIGHT LINE AND EASILY MEASURED, IS FALSE, AND SCHWENDY'S HYPOTHESIS IS THUS FLAWED IN ITS BASIC ASSUMPTIONS.

Schwendy has made additional errors and assumptions that will produce significant errors in his measurement results, as follows:

- His vertical angle of inclination is unreliable and unknown.
- He adjusted his vertical angle of impact to achieve bullet penetration of the sheet metal.
- He did not record his test firing impact marks and measurements with any documentation or by photos.