UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARGARET COWAN,
  as Administratrix of the
  Estate of Victoria Cooper,
       Plaintiff,

V.                   :       CIVIL NO.: 3:00CV00052(RNC)

MICHAEL BREEN,        :
          Defendant.


MARGARET COWAN,
  as Administratrix of the
  Estate of Victoria Cooper,
       Plaintiff,

V.                   :       CIVIL NO.: 301CV00229(RNC)

TOWN OF NORTH BRANFORD    :     JUNE 20, 2005
        Defendant.


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE RE LIVE OR DEPOSITION TESTIMONY OF
<u>DR. MANNING AND DR. EBERHARDT</u>**

Relying exclusively on Fed. R. Evid. 403, defendants seek a judicial license to talk out of

both sides of their mouth without having to face any consequences. In a proceeding whose

purpose is to find the truth, they seek to hide the facts under circumstances quite different from

those in the cases they rely on. They seek restriction or outright exclusion of testimony from their

retained expert Charles Manning[1] after they 1) formally disclosed him as an expert witness

---

[1]Defendants' motion is also directed at Dr. Manning's employee, Dr. Alan Eberhardt, who did some of the testing and whom defendants also disclosed, produced for a deposition, and listed as a witness in the Joint Trial Memorandum.  The same reasons to deny the motion apply to Dr. Eberhardt as well as to Dr. Manning.  This memorandum focuses primarily on Dr. Manning but also briefly addresses Dr. Eberhardt specifically.

1

pursuant to Rule 26(b)(4); 2) made him available for a deposition; and 3) identified him as a trial witness in the Joint Trial Memorandum. Perhaps most indefensible, 4) this is a witness they have actually used in this case; they presented his affidavit to Judges Smith and Squatrito in support of their effort to have this case dismissed on summary judgment – and then, when they lost in the District Court, presented again to the Court of Appeals.

The testimony that they seek to suppress is relevant, reliable, useful and unprivileged. There is no applicable countervailing policy that comes close to overriding the jury's interest in having access to this important information that will help it determine the truth; on the contrary, suppressing the evidence would unfairly misrepresent the relevant facts and mislead the jury. Defendants' only arguments are that Dr. Manning's testimony would be cumulative because Dr. Manning corroborates plaintiff's expert Kent Schwendy, whose critical testimony defendants vehemently contest and have moved to preclude; and that it would be unduly prejudicial because the jury would be likely to believe facts that experts for both sides agreed were true. These truth-defeating arguments have no support in Rule 403 and should be rejected.[2]

## FACTS

### 1. Why the Issue Matters

Plaintiff's expert engineer Kent Schwendy has been able to go beyond Dr. Lee's findings based on four key facts. Dr. Manning corroborates each of these facts, but defendants are running

---

[2] Defendants' lead issue – their objection to use of the witnesses' deposition – may be disposed of in two sentences. Rule 32(a)(3(B) allows plaintiff to introduce the testimony of a witness who is, like North Carolinians Manning and Eberhardt, more than 100 miles from court. But if defendants produce them as they say they will, so that they are no longer more than 100 miles away, plaintiff will have them testify live.

away from all four. The four facts are:

1.    Breen was approximately 40 feet forward of the Camaro at the time he fired his first shot.

2.    The horizontal incoming angle of Breen's first bullet may be determined from the horizontal angle of the bullet penetration mark. Dr. Manning testified that it was 13 degrees.[3] Mr. Schwendy calculated to a 95 percent certainty that it was at least 15.5 degrees.[4]

3.    The downward, or vertical, incoming angle of Breen's first bullet is not reliably related to the downward angle of the bullet penetration mark.

4.    The time needed for Breen to squeeze the trigger to fire his first shot was a quarter second.

The first two of these facts establish geometrically the critical fact that when Breen fired his first shot he was not, despite his testimony, in front of the Camaro but was well off to the side. This is a huge fact: it means that he could have easily gotten out of the way, or even just stood there as the Camaro drove away. It also means that he was actually moving *toward* the Camaro in between shots, not away from it.[5]

---

[3]*See* pp. 5-7, *infra*.

[4] They all used the same methodology: they fired test shots from known angles into a test hood or similar sheet metal and observed the relationship between the angle of the bullet penetration mark and the angle of the shot.  The difference in results arose principally from the fact that Mr. Schwendy fired many more test shots and therefore obtained more reliable results.

[5]This is true because Breen was close to the Camaro when he fired the second shot despite the fact that, as Dr. Lee has testified, the Camaro was way over on the right side of the road at the time and Breen fired the first shot from the centerline.

The third and fourth facts substantiate the first two. Fact 3 is important because if Dr. Lee's estimate of the vertical angle of the first shot as 10 degrees were correct, a shooter could not have been forty feet away unless he were standing on a stepladder. Fact 4 is important because of defendant's response to plaintiff's request for admission. Defendants have admitted that Breen "was approximately 50 feet away from the Camaro when he began to pull the trigger on his gun that resulted in the firing of the first shot." Stuck with this admission (it's the one they tried unsuccessfully to amend), defendants seek to get around it by claiming that it took Breen a long time to pull the trigger, long enough for the Camaro to get very close to him.

Dr. Manning supports all four of these facts, and defendants now seek to deny all four. The way they propose to cover up this conflict is to suppress or restrict Dr. Manning's testimony.

Dr. Manning supports Fact 1: he testified at his deposition that to a reasonable degree of scientific certainty Breen was 43 to 45 feet forward of the Camaro when he fired the first shot.[6]

Dr. Manning supports Fact 2: he testified at his deposition to a reasonable degree of scientific certainty that the first bullet struck the Camaro at an angle of 13 degrees.[7]

Dr. Manning supports Fact 3: he testified at his deposition that he had determined that the vertical angle of the penetration mark could not predict the vertical angle of the bullet trajectory.[8]

Dr. Manning supports Fact 4. He testified at his deposition and wrote in his report that the time it takes to pull the trigger of a Glock 22 is approximately one-quarter second.[9]

---

[6] Manning Deposition at 124-125.

[7] *See* pp. 5-7, *infra*.

[8] Manning Deposition at 111-112.

[9] *See* Tab 3.

4

Defendants now seek to deny Fact 1: They advertised in their proposed revision to their Rule 36 admission that Breen plans to testify that his distance from the Camaro at the time he fired his first shot was 20-25 feet.[10]  And they have vigorously contested Mr. Schwendy's testimony tending to prove Fact 1, even moving to exclude it on *Daubert* grounds.

Defendants now also seek to deny Fact 2. In the Joint Trial Memorandum, they said that Dr. Manning would furiously backpedal in his testimony:

> He will testify that *when pressed for a response* at deposition he opined that it was *reasonably probable* that the angle from which the first shot was fired was 13 degrees; however, *he does not consider himself certain* about this opinion, particularly in light of the fact that he never examined the subject Camaro. Dr. Manning agrees with Dr. Eberhardt's statement that *one would have to be cautious* about saying the angle of entry of the first shot has to be less than or greater than a given numerical angle.

Joint Trial Memorandum18-19 (emphasis added).

To see the extent to which defendants are, shall we say, not wholeheartedly committed to the search for truth, let's look at what Dr. Manning actually said at his deposition under oath.

Here are some excerpts:

> Q.     So what--what is your opinion as to the angle at which the first bullet struck the hood?
>
> A     Well, their angle's not correct, but they did--had it wrong.  The first--the bullet that struck the hood struck the hood at thirteen degrees.

Deposition of Charles Manning, March 7, 2002, at 18**.**

---

[10]See Defendants' Memorandum in Support Request for Leave to Amend Responses, April 14, 2005(Def. Request to Amend Mem.") at 3.  The number has been creeping down as trial approaches and the implications of the fact that the first bullet came in at an angle sink in. In his police report and deposition, Breen said he was approximately fifty feet from the Camaro when he fired. In the original requests, that was amended to 50 feet when he started to pull the trigger, and now it is down to 20-25 feet.

A       --what we know is that the true angle of that bullet is marked by the opposite side of the bullet, or the right side, because we fired eighteen bullets into a Camaro hood, and we knew we were standing right in front of the hood when we fired them. So we know the angle that it was coming from. So the right--the side over here, the right side of the--of the bullet is the correct angle. And you can see that's where I made a mark, the black mark up here. Now, here is a straight line which is parallel to the line they've got here down the dead center of the hood. And if you measure off of this line here, you'll find that the actual bullet was between--was thirteen degrees.

*Id.* at 21

A       When we took the--when we took a straight line-- sorry. If we took--when we took a straight line along the hood, we then went ahead and measured that angle from a straight line over to the right side of the bullet. And that was thirteen degrees.

*Id.* at 40-41

A.      The ones that did penetrate, if we followed the right side, we had the correct angle. If you tried to take the left side, where the bullet was spinning and tearing out, it was absolutely misleading.

Q.      And did you, on the photograph--one of the photographs that you said is your No. 29, did you measure the angle on the photograph of the right side of the tear?

A       Yes, I did.

Q       And what did you come up with?

A       I measured the--on the right side, I measured thirteen degrees.

Q       Okay. You think that's the angle at which the bullet actually hit the hood?

A       Thirteen degrees, yes.

Q       All right. And is it your opinion to a reasonable degree of scientific certainty that the first bullet struck the hood at an angle from the center line of thirteen degrees?

A       Yes.

*Id.* at 65

Q.      Doctor, could you calculate how far off to the side of the vehicle the officer was at the time he fired the first shot if you knew the angle with the center line of thirteen degrees and the distance from the front of the car of forty-three feet?

A       Yes.

Q       Have you done that?

6

A       No.  No.
Q       How would--how would you do that?  Is that a--just
        simple geometry?
A       Just a geometry problem.
Q.      You could find out how far off to the side he was, is that right?
A.      Yes.
Q.      And you could determine that with a reasonable degree of scientific certainty?
A.      Yes.
Q.      And do we have the numbers right?  The thirteen degrees with the center line is
        the angle that, to a reasonable degree of scientific certainty, you believe the bullet
        was fired from?
A.      Yes

*Id.* at 123

And defendants not only say that Dr. Manning will change his testimony, they vigorously

challenge Mr. Schwendy's calculations tending to prove Fact 2, even moving to exclude them on

*Daubert* grounds.

Defendants now also seek to deny Fact 3. They apparently intend to rely on Dr. Lee's

conclusion about where Breen was standing when he fired the first shot, even though that

conclusion is based on the assumption that the vertical angle of the first shot *can* be estimated

based on the vertical angle of the penetration mark. And defendants challenge Mr. Schwendy's

testimony tending to prove Fact 3, even moving to exclude it on *Daubert* grounds.

Defendants also now seek to deny Fact 4. They said in support of their effort to change

their admission that maybe it took Breen three-quarters of a second to pull the trigger, which

would move him much closer to the Camaro than Dr. Manning says he was.  *See* Def. Request to

Amend Memo. at 3.

In short, defendants' expert has given testimony supporting four critical facts that for

tactical reasons defendants have now chosen to dispute. So they want to throw his testimony

7

down the memory hole. Or, in the alternative, they want the jury to think that Dr. Manning is not affiliated with the defense and, presumably, that his forthcoming retraction of his sworn testimony is a disinterested clarification that has nothing to do with who is paying him.

To see how important a member of the defense team Dr. Manning has been, consider the chronology of his three and a half year participation in this case.

**2. Drs. Manning and Eberhardt's long connection with this case as defense experts**

As long ago as 2001 defendant asked the Court to rely on its expert Dr. Manning, and it has continued to do so right up until the present even as it seeks to prevent plaintiff from using their testimony.

| | |
|---|---|
| November 2001 | Defendants move for summary judgment. In connection with that motion, they submit to the Court an affidavit from Charles Manning, Ph.D of Accident Reconstruction Analysis in Raleigh, North Carolina. (See November 28, 2001 affidavit at tab 1.) |
| December 2001 | Defendants formally disclose Dr. Manning and his colleague, Alan Eberhardt, Ph.D, as experts. Dr. Manning "will testify regarding the location of Officer Breen at the time two shots were fired in the direction of Victoria Cooper" as well as to the speed of the Camaro. (See expert disclosure attached at tab 2.) |
| January 2002 | Dr. Manning submits a report, which defendants disclose to plaintiffs pursuant to Rule 26(a)(2). (See expert report attached at tab 3.) |

March 2002          Plaintiff takes Dr. Manning's deposition. Dr. Manning testifies that he and

                    Dr. Eberhardt did testing and calculations from which they determined the

                    speed of the Camaro; the horizontal angle of the first bullet, and the

                    distance in front of the car defendant Breen was at the time he fired the

                    first bullet, all to a "reasonable degree of scientific certainty." See

                    Deposition of Charles Manning, March 7, 2002 (attached at tab 4).

April 2003          Appealing this Court's denial of their motion for summary judgment,

                    defendants submit Dr. Manning's affidavit to the Court of Appeals in

                    support of their effort to have the case dismissed. They again rely on Dr.

                    Manning in their papers. (See Defendants' Brief in the Court of Appeals,

                    attached at tab 5.)

December 2003       Plaintiffs disclose to defendants their intention to rely on Dr. Manning's

                    results and produce an animation that incorporates them.

March 2005          Defendants for the first time suggest that they may not call Drs. Manning

                    and Eberhardt and will object if plaintiff uses their information.

June 1, 2005        Defendants list Drs. Manning and Eberhardt as trial expert witnesses in the

                    Joint Trial Memorandum while at the same time moving in limine to

                    prevent plaintiff from using Dr. Manning's report or deposition testimony.

June 1, 2005        Defendants move in limine to exclude plaintiff's exhibits 49, 50, 51, and

                    52 based on Dr. Manning's deposition testimony.

June 14, 2005       Defendants disclose a supplementary expert report from Dr. Eberhardt

                    criticizing Mr. Schwendy's methodology and findings.

This supplementary report makes Dr. Manning's testimony even more crucial. One of Dr. Eberhardt's principal criticisms of Mr. Schwendy's methodology is that he did what Dr. Eberhardt's boss Dr. Manning did. Moreover, Mr. Eberhardt's methodological criticisms make it even more significant that Mr. Schwendy and Dr. Manning reached almost the same results.

Dr. Eberhardt's new report is attached at tab 6. One of his principal criticisms of Mr. Schwendy is that Mr. Schwendy measured the angle of the bullet hole by using its right edge. According to Dr. Eberhardt,

> THE CLAIM THAT THE RIGHT EDGE OF THE BULLET HOLE IS A RELATIVELY STRAIGHT LINE AND EASILY MEASURED, IS FALSE, AND SCHWENDY'S HYPOTHESIS IS THUS FLAWED IN ITS BASIC ASSUMPTIONS.

*Id.* (Capitalization in original). What Dr. Eberhardt does not say, however, is that while he criticizes Mr. Schwendy, Dr. Manning has rebutted the criticism. Dr. Manning *also* used the right edge of the bullet hole and also found that it could be reliably measured. He said so at his deposition not once but *twelve times*. He testified that it was "absolutely" reliable to look at the right side of the bullet hole, Manning Deposition at 32. The twelve separate deposition excerpts are attached at tab 7.

Likewise, Dr. Eberhardt says that Mr. Schwendy has "no statistical basis for comparison" and "no mechanical basis for comparison" because his methodology is flawed. But he does not reckon with the fact that Dr. Manning's – and his own – findings are very similar to Mr. Schwendy's. This close correlation is particularly important corroboration when the defense expert team that reached those closely correlated results is the very same group that is leveling criticisms at Mr. Schwendy.

10

## ARGUMENT

Against this backdrop of 1) defendants' long history, continuing right up until today, of presenting Dr. Manning to the Court and to plaintiff as an expert witness, and 2) defendants' current effort to deny the accuracy of Dr. Manning's critically important findings, defendants' invocation of Rule 403 smacks of a desire to avoid not undue prejudice but disclosure of important and relevant information. Moreover, while the cases are mixed on the question whether a party should always or ordinarily be permitted to call an adversary's expert, there is no support for defendants' position that a party may actually *use* an expert as defendants have done (and continue to do) and still keep their adversary from doing so.

Defendants rely principally on two cases from the Southern District, *Agron v. Trustees of Columbia Univ.,* 176 F.R.D. 445 (S.D.N.Y. 1997) and *Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458 (S.D.N.Y. 1995). Neither, frankly, is persuasive, and there are more sensible cases on the other side of the question of whether use of an adversary's disclosed expert should generally even raise a concern about prejudice. But the issue before the Court much simpler, for two reasons.

First, the issue here is unlike *Agron* or *Rubel:* it is whether limitation of use of testimony from an expert originally retained by the adversary should be allowed when the adversary seeking suppression has already submitted the witness's affidavit to the court (and the court of appeals) in the very same case; has listed the witness in the Joint Trial Memorandum; and has not withdrawn the witness even now, two weeks before trial. There appears to be no case that has limited use of an expert after the expert already been used by the party who hired him or her. In *Rubel,* the defendant never used the expert and gave the plaintiff six months' notice that it was not going to do so. In *Agron*, the expert was never even deposed, and the plaintiff, who had retained the

expert, withdrew him before the final trial preparation order. *See also, e.g., Commerce & Indus. Ins. Co. v. Grinnell Corp.*, 1999 U.S. Dist. LEXIS 14627, 10-11 (D. La. 1999) (critical point is when witness lists have been exchanged).

Second, unlike the witness in *Rubel,* Dr. Manning is a critical witness, and unlike the witness in *Agron,* he is closely affiliated with the defense; the jury will not be able to assess his testimony without knowing that fact – particularly because he is apparently going to change his testimony to fit the defense theory and because defendants' chief witness in opposition to his findings is his colleague Dr. Eberhardt.

## I.    DISCLOSED EXPERTS SHOULD BE AVAILABLE TO BOTH SIDES

The state courts in both Connecticut and New York have recognized that use of an adversary's disclosed expert advances the truth-seeking process and should be allowed. *See, Lane v. Stewart,* 46 Conn. App. 172  (1997)[11]; *Gilly v. New York,* 508 N.E.2d 901 (1987). *Lane* put it quite simply and correctly: "To allow the defendant to prevent this witness from testifying may have deprived the trier of fact of material and relevant information that would have assisted it in reaching a decision in the case." *Lane* at 177.

The sensible, truth-oriented rule that a disclosed expert may be called by either side has been adopted in the more recent decisions, including one just a month ago, *see, Vandenbraak v. Alfieri*, 2005 U.S. Dist. LEXIS 9882, 17-19 (D. Del. 2005);  *Kreppel v. Guttman Breast Diagnostic Inst., Inc.,* 1999 U.S. Dist. LEXIS 19602 (S.D.N.Y. 1999*)*(expert report admissible as

---

[11]*Lane* relied on *Barksdale v. Harris*, 30 Conn. App. 754, *cert. denied*, 225 Conn. 927 (1993).

a party admission where expert was retained, gave a report, and was deposed); *Miller v. Marymount Med. Ctr.*, 125 S.W.3d 274, 281-84 (Ky. 2004).

At least in Connecticut, this rule has been applied routinely and without controversy, and the trial process has benefitted from it. The alternative is the deposition-as-audition approach, where a party, particularly one with deep pockets, trots out a litter of experts and then picks the best one to present to the jury, secure in the knowledge that the jury will never hear all those inconvenient opinions that the party's other experts expressed under oath.

## II.    DR. MANNING'S TESTIMONY IS CRITICAL, NOT CUMULATIVE

Dr. Manning's testimony is not cumulative. It is very useful to the jury because it fills significant gaps that defendants have pointed to in plaintiffs' presentation and corroborates critical and disputed facts. Some of the key points are:

Defendants say that Mr. Schwendy's testimony should be discounted, even excluded, because he lacks the experience Drs. Manning and Eberhardt have in accident reconstruction. Their criticism makes it highly significant that professional accident reconstructionists have followed almost the same methodology and reached almost the same results.

Dr. Manning's testimony is also vital because of Dr. Eberhardt's criticisms of Mr. Schwendy's methods.   The fact that testing was done by Drs. Manning and Eberhardt that was – according to Eberhardt at least – superior in design and execution to Mr. Schwendy's testing is an important fact. It becomes a critical fact when coupled with the similarity of results between the two tests. Suppose the jury accepts Dr. Eberhardt's criticism that Mr. Schwendy did not use the right kind of metal in his test – that the sheet metal he used may not have the same material characteristics as the Camaro hood. Then without Dr. Manning's testimony they will have no

basis to infer *anything* about the angle from which Breen shot his first bullet. With Dr. Manning's testimony, they will have a basis to assess the significance of the difference in the type of metal because they will have two sets of results that are a cross-check on each other. That was the whole purpose of having Mr. Schwendy do his testing in the first place, long before defendants – and, apparently, Dr. Manning – changed their mind about Dr. Manning's testimony.

Similarly, Dr. Manning's testimony is essential to help the jury evaluate Dr. Eberhardt's criticism that the right edge of the bullet hole cannot be measured reliably.  How is the jury to choose between him and Mr. Schwendy, who says the opposite? Surely it will be very helpful for them to hear that Dr. Manning has firmly defended the approach of measuring the right edge of the bullet mark based on his own testing.

And in particular, how should the jury assess Dr. Eberhardt's criticism that "Furthermore, the subject Camaro hood bullet hole has a right edge that appears to curve over a range of no less than 11 degrees along its length?" *See* tab 6. Surely it will be helpful for the jury to know that Dr. Manning, completely independent of Mr. Schwendy, measured the Camaro's right edge and obtained exactly the same result – the angle is 13 degrees – as Mr. Schwendy.

The same point applies to each of the four facts that Dr. Manning corroborates and that defendants now seek to deny. Dr. Manning's corroboration of Mr. Schwendy's calculation of the distance Breen was from the Camaro is critically important now that Breen has given notice that he is going to change his testimony from an estimate of 50 feet to an estimate of 20-25 feet. His corroboration of the angle of the first bullet is critically important now that Dr. Eberhardt is going to say that the angle has not been and/or cannot be reliably measured. His corroboration of the unreliability of the measurement of the downward angle is critically important in light of Dr.

14

Lee's use of the penetration mark to estimate the vertical angle. Here again two witnesses coming at the same problem from somewhat different directions have reached the same conclusion. This is an important fact for the jury to learn. And Dr. Manning's corroboration of the quarter-second trigger-pull time is important now that defendants have given notice that Breen will claim that he took a very long time to squeeze the trigger.

And Dr. Manning is of course particularly important because plaintiff has no witness at the scene to rebut Breen's story. Forensic evidence is all the evidence that plaintiff has. She is entitled to show the jury that this evidence has been corroborated by two separate sources.

## III.    IDENTIFYING DR. MANNING IS NOT UNDULY PREJUDICIAL

The suggestion that plaintiff's use of Dr. Manning's testimony would be unduly prejudicial to defendants is fundamentally flawed: there is no reason not to be able to identify witnesses affiliated with the other side; it happens every day with fact witnesses, and the truth-seeking process benefits from it. *Vandenbraak* disposed of the notion adopted by Judge Lowe in *Agron* that it would make sense to hide the witness's affiliation from the jury:

> [Defendants'] assertion is that it would be "inherently prejudicial to the defense" for the jury to know who had hired the doctor. The defendants' assertion, however, is no more than that. They do not explain how, under the balancing required by Federal Rule of Evidence 403, the identification of [the expert] as a defense expert would be so unfairly prejudicial or confusing as to substantially outweigh the probative value of that information. I conclude that the balancing does not favor exclusion of evidence of that fact. On the contrary, a fact finder must judge the weight and credibility of expert testimony, which naturally should include an understanding of the influences brought to bear on the expert.

*Vandenbraak* at 17-19 (reference and citations omitted). *See also Fenlon v. Thayer*, 506 A.2d 319, 323 (N.H. 1986); *Board of Educ. of S. Sanpete Sch. Dist. v. Barton*, 617 P.2d 347, 350 (Ut. 1980).

Keeping from the jury Dr. Manning's affiliation with the defense would be unfair and impractical. It would be unfair because Mr. Schwendy is obviously affiliated with the plaintiff, a point defendants will emphasize and the jury will properly take into account. It would be misleading to pretend that Dr. Manning is neutral. The situation is therefore quite different from *Agron*, where Judge Lowe thought that the jury would just see all the witnesses as treating physicians rather than hired experts.

Concealment of Dr. Manning's affiliation with the defense would be particularly misleading and impractical because Dr. Manning is a partisan. Defendants report that he will change his testimony to be more favorable to their position. It would be impractical and unfair to keep the jury in the dark about his possible reasons for doing so. Moreover, he and his firm are *still* consulting for the defense: Dr. Eberhardt's report is hot off the press. Defendants do not explain how they can call Dr. Eberhardt without disclosing that he and Dr. Manning are in the same firm, or why it would be fair to do so.

The fact that Dr. Manning is affiliated with the defense is relevant and will be particularly relevant when Dr. Manning hedges and retreats from his previous opinions, as defendants have declared that he will do. Disclosure of his ongoing affiliation with the defense is not unduly prejudicial – it will be helpful to the jury and fair to both sides.

## CONCLUSION

The motion should be denied.

16

THE PLAINTIFF

By /s/ David N. Rosen
David N. Rosen
400 Orange Street
New Haven, Connecticut 06511
(203) 787-3513
CT00196
E-mail: drosen@davidrosenlaw.com

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing Memorandum was sent first class mail, postage prepaid on June 20, 2005 to:

Thomas R. Gerarde, Esquire
Howd & Ludorf
65 Wethersfield Avenue
Hartford, Connecticut  06114

 /s/ David N. Rosen
David N. Rosen