UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARGARET COWAN, ADMINISTRATRIX OF THE ESTATE OF VICTORIA COOPER | : : : : | NO.: 3:00 CV 0052 (RNC) |
| v. | : : | |
| MICHAEL BREEN | : | |

| | | |
|---|---|---|
| MARGARET COWAN, ADMINISTRATRIX OF THE ESTATE OF VICTORIA COOPER | : : : : | NO.: 3:01 CV 0229 (RNC) |
| v. | : : | |
| NORTH BRANFORD | : | JULY 5, 2005 |

**REPLY TO PLAINTIFF'S MEMORANDUM RE OPEN ISSUES DATED JUNE 30, 2005**

The defendants offer the following reply to the plaintiff's memorandum regarding open issues.

**Shirt.** The defendants maintain that any probative value of the bloody shirt worn by the decedent on the night in question is outweighed by prejudice and the health and safety concerns of the same. The defendants will agree that the plaintiff may show the shirt to the jury for identification but it will not become a full exhibit.

**Exemplar of Glock Handgun**. The defendants object to the introduction of a fully functioning handgun into evidence in this case. The defendants further object to any demonstrative use of a fully functioning handgun into evidence in this case. The most basic aspects of court house safety and security suggest this is improper.

Photos of the handgun are sufficient, including explaining the position of the handgun on the monopod as it relates to Mr. Schwendy's testing. The plaintiff curiously

withdrew exhibit 146 which shows that exact view of Mr. Schwendy, the handgun and the monopod at the time she filed the memorandum re open issues. The defendant will be marking this photograph as a defense exhibit. From the plaintiff's memo at page 2, the plaintiff suggests the use of a previously undisclosed area of testimony from Mr. Schwendy regarding the shell casing discharges. Mr. Schwendy has never been disclosed on this issue and such an implication that the handgun is needed to discuss this issue is improper. He was never disclosed on this issue, has no qualifications on the issue, did not consider the shell casings in formulating his opinions and should not be allowed to sneak this opinion in the back door with the use of an exemplar handgun.

Concerning the plaintiff's claims that the admission of handguns is "routine," the plaintiff's argument is inapplicable to the present case. While handguns may be admitted into evidence and admitted often, the reasons for admission are the important factors, not the regularity in which they are admitted. In criminal prosecutions, handguns are often admitted into evidence as the handgun often links a person to a crime when they deny participation. Thus, such evidence in a criminal prosecution tends to show the identity of the defendant, particularly when the defendant denies involvement in the crime. For example, a robbery occurs and a masked perpetrator uses a silver revolver. Later, the defendant is arrested in possession of the silver revolver. Such evidence would tend to show the defendant was involved and the admission of revolver and witness testimony about seeing the weapon at the scene of the alleged crime would tend to show the defendants involvement, particularly when he or she denies the same. *See United States v. Shea*, 159 F.3d 37, 39 (CA1 1998) (principal issue at trial as is the case in most bank robberies was identification of

defendant as one of the participants in the crime through possession of revolver used in crime). Similarly, the admission of a handgun would be relevant in a charge of firearm possession. Also, courts allow admission of evidence because it is "inextricably intertwined" with the underlying offense. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-15 (CA9 1995). All of these situations are viewed in the context of a defendant who denies participation in the alleged crime or has an innocent explanation for being in possession of the evidence.

**Departmental training about "double tapping."** The defendants maintain that this evidence is irrelevant and should be precluded. "As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. at 397. "The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx,* 93 F.3d 86, 92 (CA2 1996). *See also, Holeman v. City of New London*, 330 F.Supp.2d 99, 116 (D. Conn. 2004). "When a jury measures the objective reasonableness of an officer's action, it must stand in *his* shoes and judge the reasonableness of his actions based upon the information he possessed and the judgment he exercised in responding to that situation." *Sherrod v. Berry*, 856 F.2d 802, 804 -805 (CA7 1988). "We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act." *Rodriguez v. Farrell*, 280 F.3d 1341, 1353 (CA11 2002). The plaintiff's proffered evidence is against the Fourth Amendment standard embodied by *Graham v.*

*Connor, Salim v. Proulx* and related cases. A cautionary instruction is not enough. There is no place for this evidence in the first phase of trial and its only possible relevance could be in the case against the Town but the plaintiff would still need to lay the foundation, establish the relevance, etc. to any of her specific claims against the Town.

**Departmental weapons training.** The defendants maintain that this evidence is irrelevant and should be precluded. The plaintiff's proffered evidence is against the Fourth Amendment standard embodied by *Graham v. Connor, Salim v. Proulx* and related cases. A cautionary instruction is not enough. There is no place for this evidence in the first phase of trial and its only possible relevance could be in the case against the Town but the plaintiff would still need to lay the foundation, establish the relevance, etc. to any of her specific claims against the Town.

**Mr. Dearington as a "fact witness."** Attorney Dearington is an important witness to show that the entire reconstruction of the subject shooting, particularly with the involvement of the Connecticut State Police and Dr. Henry Lee and his team did not occur because someone, like the plaintiff, Attorney Dearington or anyone else, believed that this shooting incident was suspicious or improper. Rather, it is relevant and important to show through Attorney Dearington that the involvement of the CSP and Dr. Lee occurs in every police shooting which results in a death, whether the parties, the police, the attorneys or anyone else believes or suspects otherwise. This is particularly relevant because Dr. Lee's reconstruction is addressed to State's Attorney Dearington. If Attorney Dearington not allowed to place this investigation in context, the jurors will be left to speculate or infer that the investigation took place only because of a suspicious of

criminal wrongdoing on the part of Officer Breen. Such speculation or inference is improper and prejudicial and Attorney Dearington's testimony will allow the defendants to place the events in context, giving the jury a fair and balanced view of the investigation.

**Testimony about State's Attorney Dearington's report.** The plaintiff apparently fears that Deputy Chief Doody will testify concerning Attorney Dearington's report. Despite the plaintiff's claims to the contrary, Deputy Chief Doody will not so testify so long as the plaintiff does not claim that the Town failed to conduct its own investigation or inquire about the same or make claims concerning the Town's failure to discipline Officer Breen or during the individual liability case against Officer Breen. Whether Breen was disciplined or not has no place in the first phase of this trial. . Deputy Chief Doody, having relied on the report, may testify about his conclusions after reviewing the same.

**Defendants' use of their own admission.** The defendants disagree with the plaintiff's position on this matter and have submitted a separate memorandum of law on this issue.

**Necessity of calling every neighbor.** Notwithstanding an explicit rule concerning hearsay, the plaintiff proposes to lower her burden and allow rank hearsay to ease her burden of attempting to prove that Officer Breen did not yell "stop, police." There is no exception in the Federal Rules of Evidence or anywhere else that allows the admission of hearsay evidence for the convenience of the offering party. If the plaintiff wants to prove a negative, the plaintiff may do so and should be required to do so based on our Rules of Evidence not watered down in the interests of convenience.

**So-called after acquired information about narcotics.** Plaintiff objects that the defendants intend to refer to the contraband seized from Steven Guerette as "crack" or "cocaine", claiming that such information was not available to Officer Breen. The defendants will not refer to the contraband as "crack" or use the modifier "crack", but argue that Officer Breen's training and experience as a police officer would allow him to assume that such white powder was contraband, was a narcotic and was either cocaine or heroin. The relevant case law and plaintiff's own police practices expert allows such an inference based on Officer Breen's training and experience. The test to determine if the plain view of the white substance provided sufficient probable cause is whether the criminal nature of the seized object was immediately apparent in light of the officer's particular experience. *Texas v. Brown*, 460 U.S. 730, 742-43 (1983); *United States v. Szymkowiak*, 727 F.2d 95, 97 (CA6 1984).   Officer Breen had such experience.  It was immediately apparent to him that defendant possessed a narcotic substance, likely cocaine. An officer can justifiably rely upon his training and experience in asserting whether criminal activity is occurring. *Texas v. Brown*, 460 U.S. at 742-43.   Like all police officers, Officer Breen had experience in observing cocaine and knew how it was packaged. Dr. Fyfe, in his trial deposition, testified that Officer Breen could have concluded that the white powder was mostly likely cocaine or heroin. *See* Trial Dep. Fyfe, pp. 58-9. Therefore, it is appropriate to refer to this material as narcotics, cocaine, and/or heroin. Plaintiff's objection is without merit.  Since the substance actually tested positive for cocaine, defendants will agree to leave any reference to heroin out of evidence and will refer to the substance as suspected narcotics that later tested positive for cocaine.

        RESPECTFULLY SUBMITTED,

        THE DEFENDANTS,
        MICHAEL BREEN and TOWN OF
        NORTH BRANFORD

        _____
        Thomas R. Gerarde, ct5640
        John J. Radshaw, III, ct19882
        Jeffery E. Potter, ct26356
        HOWD & LUDORF
        65 Wethersfield Avenue
        Hartford, CT  06114
        (860) 249-1361
        (860) 249-7665 (fax)

## **CERTIFICATION**

    This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 5th day of July 2005.

David N. Rosen, Esquire
400 Orange Street
New Haven, CT  06511

        _____
        Thomas R. Gerarde
        John J. Radshaw, III
        Jeffery E. Potter

                                        2

1           (It is hereby stipulated and agreed
2    by and between counsel that signing, sealing,
3    certification and filing are waived.)
4           JAMES J. FYFE, Ph.D., after having
5    been first duly sworn, was examined and testified
6    as follows:
7    ^EXAMINATION
8    BY MR. COHEN:
9       Q.   Would you tell the jury your name?
10      A.   It's James J. Fyfe, F-y-f-e.
11      Q.   And what is your job?
12      A.   I'm deputy commissioner of training
13   of the New York City Police Department.
14      Q.   What are your responsibilities in
15   the New York City Police Department as deputy
16   commissioner of training?
17      A.   I'm responsible for all the
18   training.  We train 37,000 uniformed officers and
19   14,000 civilian employees.  We have a recruit
20   school in-service training, training for new
21   sergeants, new lieutenants, new captains, an
22   executive development program, a fire arms range,
23   a tactical village.  You name it.  We do a lot of
24   training on counter terrorism.
25      Q.   Can you tell the jury something

# Trial Depo. Dr. Fyfe

58

```
 1          Q.   Now, the arrest and the search of
 2   Steven Guerette who was the driver was justified
 3   in your opinion, wasn't it?
 4          A.   He had no identification, so it was
 5   reasonable, sure.
 6          Q.   And you understand that when Mr.
 7   Guerette was searched incident to arrest one of
 8   the things that was uncovered was an empty
 9   glassine bag with white powder residue; is that
10   right?
11          A.   That's correct.
12          Q.   And reasonably trained police
13   officers know that a small glassine bag with white
14   powder residue usually means narcotics such as
15   cocaine?
16          A.   Sure.
17          Q.   And is it reasonable for an officer
18   to believe that if a person is in possession of an
19   empty glassine bag with white powder residue
20   suggestive of cocaine that the fact that it's
21   empty means that the operator has consumed what
22   was in there previously?
23          A.   It may, sure, that's a reasonable
24   assumption.
25          Q.   All right.  In connection with --
```

59

```
 1            A.    We don't know -- I mean, heroin also
 2     comes in a white powder form in a glassine
 3     envelope.
 4            Q.    I understand.  In connection with
 5     the arrest of Steven Guerette, Officer Breen would
 6     have a right to search the Camaro operated by
 7     Guerette based on the search incident to arrest
 8     laws; is that right?
 9            A.    That's correct.
10            Q.    He would be looking for evidence of
11     the crime arrested for which may include drugs?
12            A.    Right, depending on the laws in
13     Connecticut may be different, but I know that's a
14     Supreme Court ruling.
15            Q.    And when you have a vehicle that's
16     been pulled over by a police cruiser and the
17     cruiser lights are on behind the stopped vehicle,
18     that vehicle was not free to leave until the
19     officer completes his duties and allows the driver
20     to leave; is that right?
21            A.    Generally that's the case, sure.
22            Q.    So in this case Victoria Cooper was
23     not authorized to drive away in the Camaro at any
24     point, was she?
25            A.    Well, I don't think she had been
```

60

```
 1     told anything, but I would assume that she knew
 2     she wasn't supposed to drive away, sure.
 3          Q.   It's common knowledge amongst
 4     drivers that when the cruiser lights are on behind
 5     you, you're not allowed to leave until the officer
 6     says have a nice day?
 7          A.   Right, that's one of the reasons why
 8     in high-risk vehicle stops the officers are
 9     instructed to make sure the ignition keys are out
10     of the car.
11          Q.   Now, does the fact that this is not
12     just a situation where an officer saw a Camaro
13     veer over the center line, but he saw the
14     suspicious conduct that preceded him getting
15     behind the Camaro in the first place, he found a
16     driver in possession of empty glassine bags one of
17     which had residue, and the fact that the driver
18     fled, doesn't that create a heightened suspicion
19     about there being evidence in the vehicle?
20          A.   Sure.
21          Q.   And so certainly when Officer Breen
22     gives up his foot chase of Guerette and returns to
23     the cruiser that's got its lights on behind the
24     Camaro, he would certainly have reason to want to
25     search that car, wouldn't he?
```