**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARGARET COWAN, | : | |
| ADMINISTRATRIX OF THE ESTATE | : | |
| OF VICTORIA COOPER | : | NO.: 3:00 CV 0052 (RNC) |
| | : | |
| v. | : | |
| | : | |
| MICHAEL BREEN | : | |

| | | |
|---|---|---|
| MARGARET COWAN, | : | |
| ADMINISTRATRIX OF THE ESTATE | : | |
| OF VICTORIA COOPER | : | NO.: 3:01 CV 0229 (RNC) |
| | : | |
| v. | : | |
| | : | |
| NORTH BRANFORD | : | JULY 25, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR**
**JUDGMENT OF QUALIFIED IMMUNITY**

**I.    BACKGROUND.**

        In the present case, a jury trial was held on the issue of liability of Officer Michael

Breen for the plaintiff's claim that he utilized excessive force against the plaintiff's

decedent as she drove a motor vehicle towards him on a darkened roadway in North

Branford, Connecticut following a stop of that vehicle and escape of the driver, Steven

Guerrette. The parties presented evidence that concerning the location of Officer Breen

at the time of the shots, the opportunity of the plaintiff's decedent to change direction

and avoid a confrontation, and experts on the issue of prevailing police practices. The

court reserved the issue of qualified immunity for itself.

During trial, evidence was adduced that Officer Breen, while on routine patrol on Route 80 in North Branford, stopped a 1985 Camaro operated by Steven Guerette, with Victoria Cooper, the plaintiff's decedent, in the passenger seat.   Officer Breen stopped the Camaro after it drove erratically, crossing over the double yellow line three times. Following the stop, Officer Breen spoke to Cooper and Guerette and then asked Guerette to step to the rear of the Camaro for further investigation. Officer Breen observed that Guerette's eyes were watery and bloodshot, and Guerette was placed under arrest.

In the course of the arrest, a search of Guerette revealed a glassine bag with a white powdery residue, evidence that a reasonable police officer could infer formerly contained a quantity of illegal narcotics, such narcotics were recently consumed, and that other illegal narcotics, including paraphernalia were likely located nearby.  Before the handcuffing of Guerette was complete, he fled from Officer Breen in the direction ahead of the stopped Camaro, right alongside the passenger side of the vehicle where Cooper was seated.  Guerette was chased on foot by Officer Breen for approximately 2-3 minutes.  Officer Breen was unable to capture Steven Guerette, and decided to return to his police cruiser to contact police headquarters.  He also had intention of searching the stopped Camaro incident to the arrest of Guerette and to interview the female passenger.  When Officer Breen was in a position approximately 177 ft ahead of the stopped Camaro on Route 80 the Camaro began to drive toward him. His first reaction was to attempt to stop the Camaro by waving his hands and calling out, "Stop."

Despite Officer Breen's lawful commands, the Camaro continued toward Officer Breen and reached him in approximately 6 seconds.  After approximately 4 seconds and once he realized that the Carmaro was not going to yield to his lawful commands to stop, Officer Breen made a decision to fire his service weapon at the Camaro.  He began to pull the trigger after 4.75 seconds and the round discharged after 5.0 seconds had elapsed. Officer Breen was in front of and slightly to the right at the time the first round was fired. Officer Breen then made a decision to fire a second shot sometime during the next 0.75 seconds, and began to pull trigger at 5.75 seconds after the Camaro first started toward him.[1] The second shot entered the driver's window and fatally wounded Cooper.

At trial, an expert witness in police practices, Lt. Daniel Wicks from the Massachusetts State Police, testified on the reasonableness of Officer Breen's actions. Specifically, plaintiff's counsel asked Lt. Wicks to articulate what a reasonable officer would believe about the intent of the driver heading toward him and what the reasonable officer's perception would be of the threat posed by the approaching Camaro.

> BY ATTORNEY ROSEN:
>
> Q.  And tell me every fact -- perhaps that's what you were doing, but I want to be sure that you're focused and that I understand where you're focused.
>
> A.  He –
>
> Q.  Wait.  Let me finish.

---

[1]The exact length of the timeline from when the Camaro started forward until the second shot was fired by Officer Breen is not material.  The parties have stipulated that one second elapsed between the first and second shots; thus the decision to fire the second shot would have to have been made within 0.75 seconds from the time the first shot was fired.

Tell the jury every fact that would lead a reasonable police officer to believe that the driver of the Camaro was intent on doing him harm as opposed to leaving the scene without injuring anybody.

A.   As I read the case, the officer's perception was at the moment he deployed deadly force he had a drug-related case.  He knew the operator fled from him.  Two things occur when he fled from him.  One is it shows a level of resistance; and two, it fatigued the officer.  When the officer comes back on the scene –

Q.   What does is that have to do with the intent?

A.   These are all the factors he had to consider when he deployed deadly force.

Q.   You understand that the factor that we're focusing on right now is all the information that a reasonable officer would have that would lead him to think the driver was intent on doing him harm?

A.   These facts had to be considered when he made his deadly force decision.  That's why deadly force has to be considered on a case-by-case basis.  Each one is unique in and of itself.

Q.   And all the facts that would tend to show a reasonable officer that the driver was intent on doing him harm are what?  To the phone booth?

A.   I'll start again. Nighttime stop, realized drugs are going on, the driver flees.  He pursues him.  Again, the fact that he fled would lead a high level threshold of threat to the officer.  The fact that the officer's physically fatigued will limit the officer's options.

Q.   I'm sorry to interrupt you, sir, but --

THE COURT:  Let's just skip over that one for now.  Would you go on to the next one on the list, please.

 A.   Once that officer steps onto Foxon Road, the vehicle starts moving, the officer had to consider the options available to him.  He needs to stop this vehicle.  As the vehicle continues towards him, it accelerates.  A reasonable person -- I'm switching from an officer to a person -- would realize they're behind a police car with its lights on, they just saw the driver run away, they're not free to leave.  This person made the decision to drive towards him.  That person behind the wheel had the option of getting out and fleeing on foot, reversing the direction, taking County Road, or stopping when the officer told him or her to stop.  The person didn't do any of those, he continued eastbound on Route 80.

BY MR. ROSEN:

Q.   Have you told the jury all the facts that would tend to lead a reasonable police officer to believe that the driver was intent on doing him harm?

A.   I'd have to reenumerate them, but there's several. There's a multitude of factors that Officer Breen should have considered as this vehicle is coming down the road towards him.

Q.   Have you -- can you think of any other factors that would lead a reasonable officer to believe that that the driver was intent on doing him harm at the time he decided to fire his first shot?

A.   Again, for clarification purposes, I'm not concerned about the driver of the Camaro's thought process.  What I'm concerned about is the officer's threat of perception. I would add in the slick roadway and the officer's fatigue.

Vol. VI., pp. 984-7.

4

Thereafter, the Court questioned Lt. Wicks on issues germane to its decision on the qualified immunity issue. This examination took place outside the presence of the jury. The colloquy was as follows:

QUESTIONS BY THE COURT:

Lieutenant, in the event the jury were to return a verdict in favor of the plaintiff against the officer, the officer could appeal to me for a ruling in his favor on the issue of qualified immunity. Are you familiar with that body of law?

THE WITNESS: Somewhat.

THE COURT: That's the reason why I'm interested in understanding this as fully as possible. It's not like the usual case where the jury decides and that's it.

You have helpfully listed a series of factors that in your opinion would justify an objectively reasonable belief on the part of Officer Breen that the person driving that car toward him was intent on using it as a weapon to assault him.

What I'd like to do is find out why these facts matter, okay? And I think I have a complete list and I'd like to take you through it and ask you to explain your reasoning.

THE WITNESS: Certainly.

THE COURT: Number one, a nighttime stop.

 What's the significance of that?

THE WITNESS: Poor visibility; the fact that the majority of the traffic is not -- it's not as heavy during the evening as during the daytime. The lighter traffic, reduced visibility.

THE COURT: The next one, drugs involved. And you mentioned that -- don't worry about it, it's going to be repaired tomorrow. It's been broken for a while. Drugs involved, meaning, among other things, the possibility that the person is not going to act rationally. You mentioned that?

THE WITNESS: That and there's other components to it. There's generally statutory penalties for trafficking and distribution of drugs. And at that point Officer Breen doesn't know how many -- how much – what quantity of drugs were in the car.

So we have one argument, reduced rationality of the people, but also the possibility of violence because of extensive jail time. We know that a lot of times there's a lot of hours associated with drug dealers and drug trafficking.

THE COURT: You mentioned the flight of the operator Guerette. What is the significance of that with regard to the reasonableness of the perception that the person now pulling away is going to use that car as a weapon?

THE WITNESS: It raises the threat perception in my opinion. And again, it's multi-faceted. The fact that this person felt that he needed to flee makes me -- and I mentioned early in my testimony the possibility of a body in the trunk, remote as it may be, it's relatively unusual for someone to flee from his own car. A stolen car, relatively common. But the plate was run. It didn't come back stolen. So why is this person fleeing? It leads to the possibility of larger crimes occurring. But also you have to factor in the physical incapacitation of Officer Breen.

5

In a foot pursuit, you can't confuse that with a jog. It's an all out, 100 percent lung-burning sprint in a foot pursuit. We saw that by the fact that Mr. Guerette actually fell down at one point.

This guy is it going to run as fast as he possibly can, as recklessly as he can, and for Officer Breen to be competitive, he's going to do the same thing. So he's physically exhausted after this foot pursuit -- not even this foot pursuit, this pursuit on foot. And now his testimony was that he's jogging back to his cruiser.

So I'm going under the assumption that he's physically spent at this point, which speaks to his mobility as the car bears down.

THE COURT: You mentioned that the operator of this car who was now pulling away did not run like her companion and is not doing a U-turn or taking this alternative route. And the significance of those things?

THE WITNESS: You also have to consider the fact that she knew she was supposed to stay stationary in that car.

THE COURT: Right.

THE WITNESS: So in effect, that is a level of resistance. And the most common resistance we encounter is someone fleeing from us. She had ample opportunity. She could have gone out and walked to the Xtramart. There's been testimony that she was on the phone. She could have called for assistance, but she didn't do that. She could have taken those other avenues. Or she could have simply stopped when Officer Breen said stop. She didn't do that. That's clear resistance here. And the fact that she said, well, maybe I just want to try to drive around him, he doesn't have that luxury. His life is in jeopardy. He's exhausted and on a wet road. And now because he took the time to stop this vehicle, it's in reasonably close proximity to him. He can't make the assumption there's no malice intent on her part. He has to look at his threat perception. When he looks at the totality of the circumstances, there's a clear and present danger there.

THE COURT: And in addition, I think you mentioned the car was accelerating.

THE WITNESS: That's the testimony that I've read. When he stepped on to Foxon Road, the car had been stationary. At least that's my understanding. Once he stepped on Foxon Road, he was illuminated by those headlights. He heard the car accelerating. And from the testimony I'm reading and what I heard from Dr. Lee, it accelerated rather rapidly, zero to 25 or 30 miles an hour.

THE COURT: So if you take all those factors into account, you believe it would be objectively reasonable for the officer in that situation to assume that whoever this is is going to be using this vehicle as a weapon to hit him. He's got to make that assumption. A reasonable, experienced officer, given those factors, would draw that inference?

THE WITNESS: With one caveat; that if he could reasonably have gotten out of the way, he should have. That's clear.

But because of this fact pattern, that wasn't a viable option.

THE COURT: So if you're in a situation like this and you've tried to stop the car without success, the car is now two seconds away from you and in a position to swerve into you, you are entitled to use deadly force because in that circumstance, given this constellation of factors, it would be objectively reasonable to fear that the car would swerve into you?

THE WITNESS: With this certain set of circumstances, yes.

6

THE COURT:  And even if the jury were to find that Officer Breen violated Victoria Cooper's rights, it would be your position that a reasonable officer in his position could believe that the use of deadly force was lawful.

THE WITNESS:  I believe that with these specific facts -- if we change one component, I may have a different answer -- but with these components, that was the only reasonable option.

THE COURT:  All right.  And just one last question, I think.  You told Attorney Rosen -- I should say you testified in response to a question by Attorney Rosen that if the officer in this situation sees the headlights of the oncoming car turning away from him, in this instance turning from his right to his left, from the operator's left to her right, that fact alone could make it a no-shoot situation? With every other fact present other than that?

THE COURT:  You've got the totality of the facts that you have covered with me except now, as the car is approaching, you see the headlights turning to some degree away from you.

THE WITNESS:  I would say it would depend on the degree, but if it's a significant degree the vehicle appears to be turning away from you, then it is clearly a no-shoot situation.

Vol. IV, pp. 1000-6.

Following trial on Fourth Amendment issue, the jury answered two questions as follows:

1.      At the moment Officer Breen irrevocably decided to fire the second shot, did he have an objectively reasonable belief that he was in immediate danger of serious injury or death because the driver of the car was trying to hit him?

YES___X___            NO_____

2.      At the moment Officer Breen irrevocably decided to pull the trigger to fire the second shot, did he have an objectively reasonable belief that he could not safely get out of the way.

YES_____            NO___X___

Doc. #181

Based on the above responses the court entered a plaintiff's verdict on the

Fourth Amendment claim against officer Breen.  This conclusion is inconsistent with the

Second Circuit's position on this issue. The Second Circuit observed that Officer Breen

"would be entitled to qualified immunity if he reasonably believed at the moment he fired

at Cooper that she posed a significant threat of death or serious physical harm to him or

others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, *764 (CA2

(Conn.),2003). That is exactly what the jury decided.

The defendant, Officer Michael Breen, now moves for a determination that he is entitled to qualified immunity, insofar as based on the governing law, no constitutional violation occurred and at the time of the incident, the law that formed the basis for the finding of Fourth Amendment liability against him was not clearly established at the time of his use of force; and, even if such law was clearly established, it was objectively reasonable for Officer Breen to believe that his conduct and decisions met constitutional standards existing at the time of his use of force.

## II.    LAW AND ARGUMENT.

### A.    OFFICER BREEN IS PROTECTED FROM ANY LIABILITY BY THE DOCTRINE OF QUALIFIFED IMMUNITY AND JUDGMENT MUST BE ENTERED IN HIS FAVOR.

#### 1.    *Doctrine of Qualified Immunity.*

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McEvoy v. Spencer*, 124 F.3d 92, 97 (CA2 1997), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is more than just a defense; the doctrine of qualified immunity is an immunity from suit. *Locurto v. Safir*, 264 F.3d 154, 163 (CA2 2001). A right is "clearly established" when "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [T]he unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). *See, e.g. Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly break the law"); *Mitchell v. Forsyth*, 472 U.S. 511,

528 (1985) (officials are immune unless "the law clearly proscribed the actions they took").

In determining whether a particular right was clearly established at the time defendants acted, this Circuit has considered three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant or official would have understood that his or her acts were unlawful. *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991). *See Francis v. Coughlin*, 891 F.2d 43, 46 (CA2 1989), citing *Anderson*, 483 U.S. at 640.

In 2001, the Supreme Court has re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. *Saucier v. Katz*, 533 U.S. 194 (2001). For example, there is no doubt that the case of *Graham v. Connor*, 490 U.S. 386 (1989), clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, the Supreme Court has concluded that observation of that general principle is simply not enough when undertaking a qualified immunity analysis. In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court reiterated the need for a careful examination of the particular constitutional right alleged to have been violated when considering the defense of qualified immunity. Not only should the right itself be identified with a higher degree of specificity, the precise contours of the application of that more specific right to the facts

at hand must be made by the district court reviewing a defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). The *Saucier v. Katz* Court reiterated the admonition from *Anderson v. Creighton* that:

> [t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Saucier v. Katz*, 533 U.S. at 202.

Since the decision in *Saucier v. Katz*, the Supreme Court decided *Hope v. Pelzer*, 536 U.S. 730 (2002), providing additional guidance to litigants and courts examining the issues within and part of the defense of qualified immunity. In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court denied qualified immunity to three correctional officers who had handcuffed a prisoner to a "hitching post" as punishment for non-compliance with various orders and rules. The Supreme Court's decision reversed the Court of Appeals for the Eleventh Circuit, which had affirmed the district court's grant of summary judgment based on qualified immunity to the three correction officers in question.

The Supreme Court in *Hope* rejected the Eleventh Circuit's rule that the test for the existence of a clearly established right that would allow a public official to understand the potential wrongfulness of his conduct should be evaluated in light of federal law that was "pre-existing, obvious and mandatory." *See Hope*, 536 U.S. at 734. While the Eleventh Circuit had agreed that the conduct itself was violative of the Eighth Amendment, the panel held the corrections officers were not on notice that such conduct was unlawful. The Eleventh Circuit held that prior cases should be "materially

similar." Finding none, the Eleventh Circuit affirmed the district court's decision granting qualified immunity to the corrections officers.

In reversing the Court of Appeals for the Eleventh Circuit, the Supreme Court rejected the gloss placed on the *Saucier v. Katz* analysis for qualified immunity by that Circuit that there must be reported cases that are "materially similar" before a violation is found. In so holding, the Supreme Court adopted the "fair warning" standard found in *United States v. Lanier*, 520 U.S. 259 (1997) as an additional methodology to evaluate the second prong of the qualified immunity analysis.

In *Lanier*, the Supreme Court began its analysis with the understanding that in the situation of qualified immunity, "it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court reasoned that officers sued in a civil action for damages under 42 U.S.C. § 1983 should have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. In reviewing Section 242, the Court observed that it makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. The *Lanier* Court held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under Section 1983.

In *Lanier*, the Eleventh Circuit had assumed (and held) that a criminal defendant should be held to a "substantially" higher standard of notice for the purposes of Section 242. In *Lanier*, the Supreme Court rejected this approach, and reasoned:

> This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

*Hope*, 536 U.S. at 739-40 (internal citations omitted).

In sum, the Supreme Court in *Hope* rejected the "materially similar" gloss placed on a qualified immunity analysis as well as the notion that the absence of a reported case on point equates to a holding that qualified immunity applied in a given situation. In so holding, the Supreme Court emphasized the need for the detailed, searching and thorough analysis each and every time the defense based on the doctrine of qualified immunity is raised. The decision in *Hope v. Pelzer* is, in one sense, a continuation of the Supreme Court's admonition that the most important part of any qualified immunity decision is the examination of the constitutional right at issue and "the precise contours of the application of that more specific right to the facts at hand must be made." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In rejecting the "materially similar" standard espoused by the Eleventh Circuit, the Court has done nothing more than demand a high standard – not in pleading or proof – but in the continued, searching, and thorough,

step-by-step examination of the defense of qualified immunity in the manner long-established by clear and unequivocal precedent.

In *Hope*, the Court held that the corrections officers were on notice that their conduct was clearly unlawful. Not long after the decision in Hope, the Second Circuit stated:

> Our analysis of a qualified immunity claim consists of a three step inquiry. First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendants], he or she must demonstrate that defendants' actions were not objectively reasonable. This three step inquiry should typically be done in sequential order.

*Harhay v. Town of Ellington, et al.*, 323 F.3d 206, 211 (CA2 2003) (internal citations omitted)

This statement of the law succinctly captures just the sort of step-by-step, orderly methodology mandated by twenty years of Supreme Court precedent. Furthermore, this Court recognized that the failure to establish any one step of the analysis grants qualified immunity to the defendant in question. *Harhay v. Town of Ellington, et al.*, 323 F.3d 206, 211-2 (CA2 2003).

Therefore, before applying the qualified immunity standard, the Court must ask whether there was a constitutional violation in the first instance. *See Stuto v. Fleishman*, 164 F.3d 820, 825 (CA2 1999). Whether a violation existed must be viewed in the context of the amendment in question that governs the conduct at issue in the case.

2. **Based On The Fourth Amendment, Law Enforcement Officer's Permitted Use Of Force Under *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989), and Decisions Addressing the Use of Deadly Force at Operators of Motor Vehicles, No Constitutional Violation Occurred.**

The initial inquiry of whether a constitutional violation occurred, an officer's decision to use deadly force is objectively reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others," *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

The Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989) refined this analysis and added guidelines to help reviewing courts understand the use of force in a general perspective. The Court in *Graham* provided us with many of the useful principles by which all uses of force are measured: For example, "[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. "[T]he "reasonableness" inquiry in an excessive force case is an objective one:  the question is whether the

14

officers' actions are "objectively reasonable" in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation.  *Graham*, 490

U.S. at 397.

Following the decisions in *Tennessee v. Garner* and *Graham v. Connor*, the

Court of Appeals for the Sixth Circuit decided *Smith v. Freland*, 954 F.2d 343 (CA6

1992).  The *Smith* decision highlights and emphasizes many of the guiding principles at

issue here.  In *Smith*, the court concluded that no constitutional violation occurred when

Officer Schulz, faced with a driver backing towards him after being chased into a cul-de-

sac, fired one shot into the side window of the car, killing the driver.  954 F.2d at 344-5.

The *Smith* court found the motor vehicle represented an imminent danger of death or

serious bodily injury to Officer Schultz and other nearby officers and that reasonable

officers could perceive a motor vehicle as a deadly weapon.  *Id.* at 346-7.  In an

encounter that lasted approximately 67 seconds, the *Smith* court concluded that no

constitutional violation occurred notwithstanding the officer's alleged violation of

department policy concerning using deadly force against motor vehicles.  *Id.*, 344, 346,

348-9.  Furthermore, the *Smith* court rejected the notion that the use of force was

"unnecessary" and that other less intrusive means could have accomplished the

apprehension of the driver given the alleged existence of a roadblock nearby.  *Id.*  There

was no analysis whether Officer Schultz was in danger; such was assumed.

In *Pace v. Capobianco*, 283 F.3d 1275 (CA11 2002), the Court of Appeals for the

Eleventh Circuit concluded that officers who utilized deadly force against a driver who

they blocked in a cul-de-sac after a chase were entitled to qualified immunity.  The

incident occurred in 1998. While the motor vehicle in question was blocked on three sides by police vehicles, one officer moved toward and in front of the pinned vehicle to extricate the driver. Almost simultaneously, the driver moved the vehicle toward that officer who fired at least seven (7) times, according to witnesses, at least twice before the vehicle actually moved which narrowly missed striking the officer. The entire incident in the cul-de-sac happened "in a matter of seconds." 283 F.3d at 1278. Beginning their analysis with *Tennessee* and *Graham*, the Eleventh Circuit concluded that the deciding question was, given the circumstances, would the driver have appeared to reasonable police officers to have been gravely dangerous. This was exactly the standard based on *Tennessee v. Garner* and *Graham v. Connor*. The court answered the question in the affirmative. *Id.* at 1281.  The court concluded that the officer's use of force was not unlawful and no previous cases gave the officers fair warning that their conduct might be unlawful. *Id.* Furthermore, the court concluded that in 1998, this situation posed in this case, when examined in light of the general legal principles in *Tennessee* and *Graham,* was not obviously unlawful, thus did not serve as fair warning to inform the future conduct of public officials. *Id.* at 1283.

    In late 2004, the United States Supreme Court decided *Brosseau v. Haugen*, ___ U.S. ___, 125 S.Ct. 596 (2004) and held that an officer could shoot the driver of a motor vehicle in the back to protect herself and other officers who may be in the undesignated and unspecified vicinity from the dangerousness posed by the fleeing suspect. This incident occurred in early 1998.  In *Brosseau*, the Supreme Court observed that only a handful of cases appeared relevant to inform the "fair warning" standard.  However,

each case reviewed post-dated the conduct in question. Indeed, the Supreme Court cited the Second Circuit's decision in the present case as evidence of the unsettled nature of the law. *See Brosseau*, ___ U.S. ___, 125 S.Ct. at 600, n. 4. The Court held that the state of law was such that Officer Brosseau's conduct was violated the Fourth Amendment. 125 S.Ct. at 600. Moreover, *Brosseau* reaffirmed that the test for the officer's conduct in a situation where deadly force is employed against the driver of a motor vehicle is nothing more than the general legal principles discussed in *Tennessee* and *Graham* and no reported cases gave fair warning to the contrary. *Id*.

Several other decisions are instructive on the use of deadly force against operators of motor vehicles, particularly as they were decided after the Supreme Court's decision in *Brosseau v. Haugen*. While not identified by the district court by caption during the charge conference on July 13, 2005, (Vol. VI. pp. 1021-4), the decision of the Court of Appeals for the Fourth Circuit in *Waterman v. Batton*, 393 F.3d 471 (CA4 2005) is illuminating. This case concerned a November 2000 shooting incident where officers fired at a driver, who, after leading officers on a chase, approached the toll plaza at the Baltimore Harbor Tunnel. Shots were fired at the driver by the officers when the vehicle was in front of them and more shots were fired after the vehicle passed them. Despite some dispute about each officer's exact location in front of the vehicle as it drove toward them and the extent of the possible danger posed to those officers, the Fourth Circuit entered judgment in favor of the defendant officers on the question of whether the initial shots violated the driver's Constitutional rights. The Fourth Circuit found no constitutional violation.  Recognizing that no one could tell which shots actually killed the

driver, the Court of Appeals held the that officers were protected by the doctrine of qualified immunity concerning the shots fired after the vehicle passed them completely. The Fourth Circuit concluded that the law was not clearly established with respect to the shots that were fired after the alleged danger passed.

In *Randall v Fairbanks*, 32 F.Supp.2d 1028 (D.Alaska 2005), the district court, relying on *Brosseau v. Haugen*, concluded that no constitutional violation occurred when an officer used deadly force against the driver of a motor vehicle when the officer was in the street attempting to stop that vehicle which was not accelerating towards him, but merely driving towards him at a "slow walking pace." The driver of the vehicle had lead officers on a prolonged chase before this time and the vehicle touched the officer's shins but he was able to leap out of the way, firing at the same time. The *Randall* court concluded that *Brosseau* governed, acknowledging that motor vehicles can inflict deadly force and can constitute the type of deadly force that justifies an officer's use of deadly force in return. Furthermore, the *Randall* court observed that police officers have no duty to retreat. The *Randall* court further found that that relevant police department polices do not establish the contours of clearly established law.

Additionally, in *Robinson v. Arrugueta*, ___ F.3d ___, 2005 WL 1567306 (CA11 2005), the Court of Appeals for the Eleventh Circuit affirmed summary judgment on the issue of qualified immunity following a police shooting of a driver. In *Robinson*, the officer was was standing in a narrow space between two vehicles, the police cruiser and the decedent's vehicle. The driver, Walters, disobeyed the officer's orders to put his hands up and the vehicle suddenly moved forward. The court found that Officer

Arrugueta had to make a split-second decision of whether he could escape before he got crushed. The court found that, At the most, Officer Arrugueta had only 2.72 seconds to react to what he perceived as a threat of serious physical harm from Walters.

The unanimous panel of the Eleventh Circuit observed that the court should take into account that "[r]econsideration [after the uncertainty and the excitement of the moment have passed] will nearly always reveal that something different could have been done if ... the future [was known] before it occurred." Particularly, the Eleventh Circuit observed that, "even if in hindsight the facts show that Officer Arrugueta perhaps could have escaped unharmed, we conclude that a reasonable officer could have perceived that Walters was using the [vehicle] as a deadly weapon."[2] Relying on the Supreme Court's decision in *Brosseau v. Haugen*, ___ U.S. ___, 125 S.Ct. 596 (2004), the Eleventh Circuit concluded that that Officer Arrugueta is entitled to qualified immunity under the first step of the Saucier analysis – no constitutional violation occurred.

Despite observing their inquiry ended at the first step of the analysis, the *Robinson* court went on to evaluate the second step of the qualified immunity analysis under *Saucier.* The *Robinson* court concluded that under the second step of the qualified immunity analysis, the law was not clearly established, and thus, Officer Arrugueta was entitled to qualified immunity under this step as well. The Court

___
[2]Notably, this is nearly the same conclusion of the Second Circuit in the present case. Officer Breen "would be entitled to qualified immunity if he reasonably believed at the moment he fired at Cooper that she posed a significant threat of death or serious physical harm to him or others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, *764 (CA2 (Conn.),2003).

concluded that, at the time of the shooting, no clearly defined preexisting law would have given fair warning to Officer Arrugueta that his use of force under this specific factual situation was unlawful. This is the same conclusion reached in *Brosseau* and other cases cited here.

It is beyond question that the Fourth Amendment does not mandate that a police officer who uses deadly force choose what in hindsight was the wisest or the best or the least intrusive alternative available. Officers making split second decisions must only act within a range of objective reasonableness. The reasonableness standard in the Fourth Amendment does not require that officers use alternative less intrusive means, nor does the officer have to explore or attempt all feasible alternatives to avoid the situation in which deadly force was used. The Fourth Amendment does not ask whether the course of action chosen was the most prudent or the wisest one, but only whether the decision to use deadly force was objectively reasonable.[3]

---

[3] *Medina v. Cram*, 252 F.3d 1124, 1133 (CA10 2001) ("[T]he reasonableness standard does not require that officers use alternative less intrusive means."); *Deering v. Reich*, 183 F.3d 645, 652-53 (CA7 1999) (it was not improper for the trial court to instruct the jury that the deputies did not need to use "all feasible alternatives" to avoid the situation in which deadly force was used); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (CA4 1998) ("Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently – and potentially still is – armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable."); *Tauke v. Stine*, 120 F.3d 1363, 1366 (CA8 1997) (court would not ask "whether the course of action chosen was the most prudent or the wisest one," but only "whether the decision to use deadly force was objectively reasonable, and we hold that it was as a matter of law."); *Schulz v. Long*, 44 F.3d 643, 648 (CA8 1995) ("[T]he Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment."); *Roy v. Inhabitants of Lewiston*, 42 F.3d 691,696 (CA1 1994) (although "[t]he police may have done the wrong thing . . . they were not 'plainly incompetent' nor were their actions 'clearly proscribed'"); *Scott v. Henrich*, 39 F. 3d 912, 915-16 (CA9 1994) ("[A]s the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them."); *Plakas v. Drinsky*, 19 F.3d 1143, 1148-49 (CA7 1994) ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in

From that body of law, it would be anomalous to conclude that it was clearly established that Officer Breen's conduct should not be measured by any other standard than that established by *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989). Officer Breen's conduct was lawful and did not violate the Fourth Amendment of the Constitution if at the moment Officer Breen irrevocably decided to fire the second shot, he had an objectively reasonable belief that he was in immediate danger of serious injury or death. Nothing more was required. He need not retreat. This is not a question that some other lesser alternative might have been better in hindsight. Based on existing law, Officer Breen did not violate Cooper's Fourth Amendment rights when he fired the second shot that killed her. Neither the Court nor the jury is required to determine whether the defendant had less intrusive alternatives available, for the defendants need only to have acted within that range of conduct identified as reasonable. *Busch ex rel. Estate of Busch v. City of New York* 224 F.R.D. 81, *94 (E.D.N.Y.,2004). Officer Breen is not required to use the least restrictive means or least intrusive force possible, as long as the force employed is reasonable. *Santana v. City of Hartford* 283 F.Supp.2d 720, *727 (D.Conn.,2003), *citing Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 696 (CA1 1994).

> 3.    **Plaintiffs' Claimed Constitutional Rights As Framed By The Court And Instructed To The Jury Are Not Clearly Established.**

---

search and seizure cases. The only test is whether what the police officers actually did was reasonable."); *Cole v. Bone*, 993 F.2d 1328, 1334 (CA8 1993); *Tom v. Voida*, 963 F.2d 952, 963 (CA7 1992); McRae v. Tena, 914 F. Supp. 363, 367 (D.Arizona 1996); *Estate of Saldana by Saldana v. Weitzel*, 912 F. Supp. 413, 416 (D.Wisc. 1996); *Yellowback v. City of Sioux Falls*, 600 N.W.2d 554, 560 (S.D. 1999).

Taking into consideration our Supreme Court's precedent in *Tennessee v. Garner*, 471 U.S. 1 (1985), *Graham v. Connor*, 490 U.S. 386 (1989), *Brosseau v.Haugen*, ___ U.S. ___, 125 S.Ct. 596 (2004) and the cases decided on the use of force against operators of motor vehicles--- and applying those lessons to the facts of the present case, it is clear that Officer Breen is entitled to qualified immunity.  The jury's affirmative answer to interrogatory no. 1 establishes that no constitutional violation occurred at the most; and at the least, the jury's affirmative answer to interrogatory no. 1 establishes that Officer Breen is entitled to qualified immunity. The Second Circuit agrees that Officer Breen "would be entitled to qualified immunity if he reasonably believed at the moment he fired at Cooper that she posed a significant threat of death or serious physical harm to him or others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, *764 (CA2 (Conn.),2003).

On this basis, Officer Breen is entitled to a finding by this Court that no constitutional violation occurred.

> **i.    *On July 13, 1999, It Was Not Clearly Established That A Reasonable Officer In Officer Breen's Position Was Required To Get Out Of The Way Of The Motor Vehicle Before Employing Deadly Force.***

Nothing in our decisional law gives fair warning that Officer Breen was required to get out of the way of the vehicle driven by Cooper before employing deadly force. In 1992 in *Smith v. Freland*, Officer Schultz was required to make the evaluation contemplated by *Tennessee v. Garner* and *Graham v. Connor* in 67 seconds.  In *Pace v. Capobianco,*  the officers made the deadly force calculation "in a matter of seconds."

22

In *Robinson v. Arrugueta*, Officer Arrugueta made the decision in merely 2.72 seconds. The undisputed testimony at trial established the time from observing the Camaro accelerate towards Officer Breen to the time of the second shot was about 6 seconds. The undisputed testimony was Officer Breen has 1 or 2 seconds to decide whether to employ deadly force in the form of his first shot, and only a fraction of one second to decide whether to fire the shot that struck Ms. Cooper.

The defendants acknowledge published cases with similar facts are not required to give public officials and police officers fair warning as to what the law requires or when the law is clearly established. The defendants acknowledge that general principles of law may give rise to the sort of fair warning identified by *Saucier*, *Lanier* and *Hope*. Based on the discussion above, no general principles exist from the cases decided which an officer could reach the conclusion that he had to get out of the way of the Camaro if he could within the fraction of a second allotted him. Indeed, many general principles exist that would lead to the conclusion that his actions did not violate the Constitution. Officer Breen had no duty to retreat.  As the court observed in *Waterman*, "the Constitution does not require officers to gamble with their lives."

There is not one case that holds an officer in Officer Breen's position had to get out of the way of the Camaro. *Graham v. Connor,* 490 U.S. 386 (1989); *Brosseau v. Haugen*, ___ U.S. ___, 125 S.Ct. 596 (2004); *Smith v. Freland*, 954 F.2d 343 (CA6 1992); *Pace v. Capobianco*, 283 F.3d 1275 (CA11 2002); *Waterman v. Batton*, 393 F.3d 471 (CA4 2005); *Randall v. Fairbanks*, 32 F.Supp.2d 1028 (D.Alaska 2005); *Robinson v. Arrugueta*, ___ F.3d ___, 2005 WL 1567306 (CA 11 2005).  Officer Breen need not

chose a less intrusive alternative, but must only act within that range of conduct
identified as reasonable. *Busch ex rel. Estate of Busch v. City of New York* 224 F.R.D.
81, *94 (E.D.N.Y.,2004). Officer Breen was not required to use the least restrictive
means or least intrusive force possible, as long as the force employed was reasonable.
*Santana v. City of Hartford* 283 F.Supp.2d 720, *727 (D.Conn.,2003), *citing Roy v.
Inhabitants of the City of Lewiston*, 42 F.3d 691, 696 (CA1 1994). Facing a motor
vehicle bearing down on him is recognized as deadly force. The cases discussed above
make this clear. *See supra*, note 3.

Accordingly, Officer Breen is entitled to a finding that it was not clearly
established that he was required to get out of the way of a motor vehicle before
employing deadly force so long as the deadly force was employed under circumstances
where it was reasonable for a police officer in Breen's position to believe that he was in
immediate danger of serious injury or death because the driver of the car was trying to
hit him—which is the precise finding made by the jury in its answer to question 1.

> ii.    ***On July 13, 1999, It Was Not Clearly Established
> That A Reasonable Officer In Officer Breen's
> Position Needed Notice That The Driver Had Used
> Or Attempted To Use The Motor Vehicle As Deadly
> Force Before Employing Deadly Force Against
> The Driver.***

Because the plaintiff put at issue the intent of Cooper as the driver in this case
and repeatedly engaged in an exercise in mind-reading about Cooper's alleged lack of
aggressiveness and the court appeared concerned about the hypothetical elderly
Sunday driver operating a motor vehicle towards a police officer directing church traffic,

the defendant now address any concern that the law some how required Officer Breen to have some articulable notice of aggressiveness, other than the operation of the motor vehicle in his direction, as a prerequisite to utilizing deadly force against the driver. Indeed, established precedent of the Fourth Circuit demonstrates this notion is wrong and any such requirement is not clearly established now and was not clearly established in 1999.

Turning our attention back to *Waterman v. Batton*, this case puts to rest any notion that Officer Breen needed any more knowledge other than what he had about the intention of the driver of motor vehicle driven towards him. It was not clearly established that Officer Breen needed some notice that deadly force was about to be used. It is not a question that Fourth Circuit is informative on this issue; the Supreme Court's decision in *Brosseau v. Haugen* is controlling. Officer Breen's conduct is measured by the general principles in *Tennessee v. Garner* and *Graham v. Connor*; nothing more. Not only are there no materially similar cases at issue – the Supreme Court states that explicitly, there are no cases that would have provided fair warning in a general sense. This ends the inquiry and the absence of evidence of pre-shooting aggressive behavior is of no consequence.

**4.     Officer Breen's Actions Were Objectively Reasonable And He Should Be Protected By The Doctrine Of Qualified Immunity.**

If the court concludes that clearly established law required Officer Breen to get out of the way of the Camaro before using deadly force or that Officer Breen was required to have some knowledge that the driver intended to use the vehicle as a deadly weapon, the second step in the inquiry requires the district court to ascertain whether Officer Breen's actions were objectively reasonable in light of that law.

This second step proceeds as follows: were Officer Breen's actions objectively reasonable because a reasonable officer could have been reasonably mistaken about the requirements of the law given the situation facing him. *See Poe v. Leonard*, 282 F.3d 123, 132 (CA2 2002), *citing Saucier v. Katz*, 533 U.S. 194 (2001). "As the Supreme Court has explained, the 'concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular conduct....if the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to' immunity." *Id.* Only one conclusion is possible here – the uncertain state of the law on this issue demonstrates that a reasonable officer could be mistaken about the requirements of the law. The Supreme Court in *Brosseau* explicitly recognizes the uncertain state of the law.

   *i.*   ***Even If It Were Clearly Established As A Matter Of Law, As Of July 13, 1999, It Was Objectively Reasonable For Officer Breen To Believe The Law Did Not Require Him To Get Out Of The Way Before Employing Deadly Force***

As the court correctly instructed the jury, "the Constitution does not require police officers to gamble with their lives," Officer Breen was under no duty, constitutional or otherwise to get out of the way of the motor vehicle driven by Cooper. All that was required was that he reasonably perceive the vehicle as a threat of death or serious injury. To the extent that the court believes this to be an open question, the resolution must be in favor of Officer Breen. Indeed, the case law discussed herein demonstrates that the question was far from settled in 1998, 1999, and is not anywhere near settled today.

   *ii.*   ***Even If It Were Clearly Established As A Matter Of Law, As Of July 13, 1999, It Was Objectively Reasonable For Officer Breen To Believe The Law Did Not Require Him To Have Knowledge, Of Any Kind, That The Driver Had Used Or Attempted To Use The Motor Vehicle As Deadly Force Before Employing Deadly Force Against The Driver.***

The law as it existed in 1998, in 1999, and perhaps as late as 2005, does not require an officer to have some knowledge that the driver of the motor vehicle which presents a threat to her have acted in an aggressive manner prior to the use of deadly force. While many cases make these observations, *Waterman v. Batton* forecloses any such requirement. As discussed above, the law was not clearly established.  At the very least, the confusion in the law would allowed an officer such as Breen to be reasonably mistaken about the state of the law on this issue.

III.    **CONCLUSION.**

For the reasons set forth above, the defendants, MICHAEL BREEN and TOWN OF NORTH BRANFORD, pray that their motion for judgment as a matter of law is granted: that Officer Breen is granted qualified immunity and the case against the Town of North Branford is dismissed.

RESPECTFULLY SUBMITTED,

THE DEFENDANTS,
MICHAEL BREEN and TOWN OF
NORTH BRANFORD

By__/s/ Thomas R. Gerarde____
Thomas R. Gerarde, ct5640
John J. Radshaw, III, ct19882
Jeffery E. Potter, ct26356
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 25th day of July 2005.

David N. Rosen, Esquire
400 Orange Street
New Haven, CT  06511


_____/s/ Thomas R. Gerarde_____
Thomas R. Gerarde
John J. Radshaw, III
Jeffery E. Potter